UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BENJAMIN CASE, ELIZABETH CATLIN,
JENNIFER KLEIN, and MARK KUSHNEIR,

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

Plaintiffs,

**Index No.**

JUDGE TORRES

-v-

**ECF CASE**

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT ("NYPD") CHIEF OF
DEPARTMENT JOSEPH ESPOSITO, NYPD
DEPUTY CHIEF BRIAN MCCARTHY, NYPD
LIEUTENANT DAVID GROHT, NYPD
SERGEANT LAWRENCE PAPOLA, SHIELD NO.
03646, NYPD OFFFICER BENJAMIN ALMONTE,
SHIELD NO. 29182, NYPD OFFICER DANIEL
CONFORTI, SHIELD NO. 26403, NYPD OFFICER
FIRST NAME UNKNOWN ("FNU") DOWNES,
SHIELD NO. UNKNOWN, NYPD OFFICER
DMITRY TVERDOKHLEB, SHIELD NO. 27018,
and NYPD OFFICER MICHAEL MALDONADO,
SHIELD 23573,



Defendants.

---

Plaintiffs, by their counsel, GIDEON ORION OLIVER, as and for their Complaint

against Defendants, hereby allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action for compensatory damages, punitive damages and

attorney's fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. § 1988 for violations of their civil

rights, as secured by said statutes and the Constitution of the United States and the Constitution

and laws of the State of New York.

2.      On November 17, 2011, Plaintiffs participated in or were nearby peaceful

activities protected by the First Amendment to the United States Constitution associated with

Occupy Wall Street ("OWS") in the Wall Street area. Beginning at around 9:00AM, without

lawful authority or justification, and acting pursuant to unlawful policies, practices, and customs complained of elsewhere herein, Defendants unlawfully arrested Plaintiffs, detained Plaintiffs for an excessive period of time, maliciously abused process against, and otherwise injured Plaintiffs.

## JURISDICTION AND VENUE

3.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

4.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

5.      Venue is proper pursuant to 28 U.S.C. §1391(b) in that Plaintiffs' claims arose in the Southern District of New York.

## PARTIES

6.      Plaintiff BENJAMIN CASE is a Caucasian male, and at all times relevant to this action was a resident of the State of New Jersey.

7.      Plaintiff ELIZABETH CATLIN is a Caucasian female, and at all times relevant to this action was a resident of New York State.

8.      Plaintiff JENNIFER KLEIN is a Caucasian female, and at all times relevant to this action was a resident of the State of Connecticut.

9.      Plaintiff MARK KUSHNEIR is a Caucasian male, and at all times relevant to this action was a resident of New York State.

10.     Defendant THE CITY OF NEW YORK ("NYC" or "the City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York 10007.

11.     Defendant City is authorized by law to maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement, and Defendant NYC is ultimately responsible for the NYPD and assumes the risks incidental to the maintenance of it and its employees.

12.     At all times relevant herein, Defendant JOSEPH ESPOSITO was the NYPD Chief of Department, Defendant BRIAN MCCARTHY was a NYPD Deputy Chief,  Defendant DAVID GROHT was a NYPD Lieutenant,  and Defendant LAWRENCE PAPOLA was a NYPD Sergeant, and these Defendants were each and all supervisors, and defendants ESPOSITO, MCCARTHY, GROHT, and PAPOLA were high-level NYPD policymaking officials personally involved in depriving Plaintiffs of their rights and/or in developing and/or implementing the unconstitutional policies, practices, customs and/or conduct complained of herein.

13.     Defendants were personally involved in designing and/or implementing the policies and practices complained of herein, and were personally involved in or responsible for directing, supervising, and/or assisting in Plaintiffs' arrests and/or arrest processing and/or failed to intervene to prevent injuries to Plaintiffs.

14.     Defendants NYPD OFFFICER BENJAMIN ALMONTE, SHIELD NO. 29182, OFFICER DANIEL CONFORTI, SHIELD NO. 26403, NYPD OFFICER FIRST NAME UNKNOWN ("FNU") DOWNES, SHIELD NO. UNKNOWN, NYPD OFFICER DMITRY TVERDOKHLEB, SHIELD NO. 27018, and NYPD OFFICER MICHAEL MALDONADO, SHIELD 23573, were at all times herein officers, employees, and agents of the NYPD and who were personally involved in depriving Plaintiffs of their rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below. They are each being sued herein in their individual and official capacities.

15.     At all times hereinafter mentioned the Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

16.     Each and all of the acts of the Defendants alleged herein were done by said Defendants while acting within the scope of their employment by the Defendant City.

17.     Each and all of the acts of the Defendants alleged herein were done by said Defendants while acting in furtherance of their employment by the Defendant City.

18.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

19.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

20.     Each individual Defendant is sued in her or his individual and official capacities.

## STATEMENT OF FACTS

21.     In the period before the 2004 Republican National Convention in New York City beginning in early 2003, Defendant Joseph Esposito was among the high-level NYPD policymaking officials on the NYPD's Executive Committee who were personally involved in planning for aspects of the NYPD's response to the 2004 RNC.

22.     Defendant Esposito was specifically in planning the NYPD's responses to anticipated mass protests, mass arrests, and mass arrest processing.

23.     Defendant Esposito attended meetings at which planning for anticipated mass protests, mass arrests, and mass arrest processing were discussed, and/or sent representatives to such meetings, who reported back to him, including such meetings with then-NYPD Commissioner Raymond Kelly, and other high-level NYPD officials.

24.     The NYPD's final RNC mass arrest processing plans included an additional arrest processing procedure, not usually followed in other arrest situations, during which each "arresting officer" would meet with a supervisor from the NYPD's Legal Bureau.

25.     The NYPD's final mass arrest processing plans included an additional arrest processing procedure, not usually followed in other arrest situations, during which each "arresting officer" would meet with a supervisor from the NYPD's CJB.

26.     Defendant Esposito was personally involved in the NYPD's decisions to enact its RNC-related mass arrest processing plans.

27.     Defendant Esposito was personally involved in the NYPD's decision to enact a "no-summons" policy with respect to RNC-related arrestees.

28.     Between August 27, 2004 and September 2, 2004, there were over 1,800 RNC-related arrests.

29.     As a result of the City's and the NYPD's crowd and disorder control planning, the NYPD engaged in mass arrests during the 2004 RNC.

30.     As a result of the City's and the NYPD's crowd and disorder control planning, the NYPD failed to make individualized determinations of probable cause in connection with many RNC-related arrests.

31.     As a result of the City's and the NYPD's mass arrest and mass arrest processing plans with respect to RNC-related arrestees, force was used against many arrestees without any NYPD documentation.

32.     As a result of the City's and the NYPD's mass arrest and mass arrest processing plans with respect to RNC-related arrestees, RNC-related arrestees' arrest-to-arraignment time vastly exceeded twenty-four hours, and in many cases doubled non-RNC-related arrestees' arrest-to-arraignment times.

33.     As a result of the City's and the NYPD's mass arrest and mass arrest processing plans with respect to RNC-related arrestees, NYPD officers who had not in fact witnessed the conduct leading up to a person's arrest filled out NYPD paperwork and in a significant number of cases swore out criminal court complaints swearing that they had seen conduct they had not in fact seen.

34.     As a result of the NYPD's RNC-related conduct, the City of New York, and Defendant Esposito, were defendants in dozens of lawsuits challenging, among other things, the City's disorder control, mass arrest, use of force, and mass arrest processing polices, procedures, customs, and practices.

35.     After around a decade of discovery and litigation, during the course of which Defendant Esposito himself gave several days of deposition testimony, the bulk of the RNC cases settled.

36.     Beginning in around at least September of 2011, Defendant Esposito became aware of Occupy Wall Street.

37.     Beginning on September 17, 2011, Defendant Esposito was personally involved in planning for the NYPD's police responses to OWS.

6

38.     Upon information and belief, between September 17, 2011 and November 17, 2011, Defendant Esposito personally ordered and supervised the mass arrests of around 700 people on the Brooklyn Bridge on October 1, 2011.

39.     Upon information and belief, between September 17, 2011 and November 15, 2011, Defendant Esposito received regular information regarding OWS events and police responses to them.

40.     Upon information and belief, between September 17, 2011 and November 15, 2011, Defendant Esposito was personally involved in planning and supervising NYPD responses to anticipated OWS events, including, but not limited to, such events at which mass arrests were anticipated and occurred.

41.     Upon information and belief, between September 17, 2011 and November 15, 2011, Defendant Esposito and/or his subordinate NYPD officers or agents acting under his direction and supervision communicated with representatives of Brookfield Office Properties, Inc. regarding OWS and the occupation of Zuccotti Park, sharing information back-and-forth and planning to evict the occupation from Zuccotti Park.

42.     Upon information and belief, Defendant Esposito was personally involved in developing plans to evict the occupation from Zuccotti Park in November of 2011.

43.     Upon information and belief, Defendant Esposito supervised the mass eviction of Zuccotti Park on November 15, 2011.

44.     Upon information and belief, Defendant Esposito was aware of potential plans to engage in protests in the Wall Street area on the morning of November 17, 2011.

45.     Upon information and belief, Defendant Esposito was aware of potential plans to engage in protests in the vicinity of the Brooklyn Bridge area on the evening of November 17, 2011.

46.     Defendant Esposito and/or other unidentified NYPD officials under his command planned for policing, and potential mass arrests, in anticipation of protests planned for November 17, 2011.

47.     Defendant Esposito knew or should have known that the NYPD's plans for policing and mass arrest processing in connection with protests planned for November 17, 2011 would result in unlawful arrests, excessive use of force, excessive detentions, malicious abuse of process, and other unlawful conduct.

48.     On the morning of November 17, 2011, each Plaintiff was lawfully present in the vicinity of the New York Stock Exchange, participating in or observing First Amendment activities associated with OWS.

49.     On the morning of November 17, 2011, Defendant Esposito was the highest ranking NYPD officer in the vicinity of Plaintiffs' arrests.

50.     On the morning of November 17, 2011, Defendant Esposito was the NYPD Incident Commander in the vicinity of Plaintiffs' arrests and was actually responsible for making command and control decisions as well as all supervisory decisions with respect to all fellow officers on the scene.

51.     Upon information and belief, according to NYPD policy and procedure, as Incident Commander, Defendant Esposito had a responsibility to ensure that any arrest teams assigned to process arrests had definite knowledge of each arrest and that arresting officers could articulate all the factual elements of the offense for which each arrest was effected.

52.     On the morning of November 17, 2011, Defendant Esposito knew or should have known that the NYPD's crowd control plans with respect to the planned protest activities would result in unlawful mass arrests, uses of force, excessive detentions, and other injuries to Plaintiffs and others.

53.     Defendant Esposito and other unidentified NYPD supervisors maintained control of vehicular and pedestrian traffic in the Wall Street area throughout Plaintiffs' protest activities.

54.     Defendant Esposito and other unidentified NYPD supervisors allowed people perceived to be working on or associated with Wall Street to travel freely, while unreasonably restricting the movement of Plaintiffs and others similarly situated.

55.     Defendant Esposito and other unidentified NYPD supervisors knew or should have known that their crowd control tactics would result in purported dispersal orders that were impossible to comply with, and mass arrests without appropriate individualized determinations of probable cause.

56.     Defendant Esposito suggested, endorsed, ratified, or enacted a policy, practice, or procedure on November 17, 2011 of not issuing summonses for Disorderly Conduct and other summons-eligible offenses in connection with planned OWS-associated protests.

57.     Defendant Esposito suggested, endorsed, ratified, or enacted a policy, practice, or procedure on December 17, 2011 of having assigned arresting officers speak with NYPD Legal Bureau and/or CJB officers as part of the mass arrest processing procedures.

58.     Defendant Esposito knew or should have known that processing the anticipated mass arrests as DAT's at a Mass Arrest Processing Center ("MAPC") would unnecessarily increase their arrest to release time.

59.     In Plaintiffs' cases, their arrest to release time was around double that of others similarly situated.

60.     Upon information and belief, Defendant Esposito and other unidentified NYPD supervisors enacted the no-summons policy, and the other mass arrest-related policies and practices complained of herein, in order to keep persons arrested in morning protests from participating in the anticipated evening protest on or near the Brooklyn Bridge.

61.     Defendant Esposito knew or should have known that the NYPD's November 17, 2011 mass arrest processing plans would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations.

62.     On the morning of November 17, 2011, Defendant McCarthy was a NYPD Deputy Chief, and as such was a high-raking supervisor and policymaking official on the scene who was actually responsible for making command and control decisions as well as all supervisory decisions with respect to all fellow officers on the scene.

63.     On the morning of November 17, 2011, Defendant Groht was a NYPD Lieutenant, and as such was a supervisor and who was actually responsible for making supervisory decisions and undertaking other supervisory responsibilities with respect to fellow officers on the scene.

64.     On the morning of November 17, 2011, Defendant Papola was a NYPD Sergeant, and as such was a supervisor and who was actually responsible for making supervisory decisions and undertaking other supervisory responsibilities with respect to fellow officers on the scene.

65.     On the morning of November 17, 2011, Defendants Almonte, Conforti, Downes, Tverdokhleb, and Maldonado were all NYPD Officers under the command and supervision of Defendants Esposito, McCarthy, Groht, and Papola.

66.     On the morning of November 17, 2011, all other Defendants were under Defendant Esposito in the chain of command.

67.     On the morning of November 17, 2011, Defendant Esposito actually directed and/or supervised Defendants McCarthy's, Groht's, and/or Papola's activities with respect to giving dispersal orders and/or directing, supervising, or assisting in arrests or arrest processing.

68.     At some time around or after 9:00AM on November 17, 2011, Defendant Esposito gave, and/or caused to be given, dispersal orders to perceived protesters in the vicinity of Plaintiffs' arrests.

69.     At some time around or after 9:00AM on November 17, 2011, Defendant McCarthy gave, and/or caused to be given, dispersal orders to perceived protesters in the vicinity of Plaintiffs' arrests.

70.     At some time around or after 9:00AM on November 17, 2011, Defendant Groht gave, and/or caused to be given, dispersal orders to perceived protesters in the vicinity of Plaintiffs' arrests.

71.     At some time around or after 9:00AM on November 17, 2011, Defendant Papola gave, and/or caused to be given, dispersal orders to perceived protesters in the vicinity of Plaintiffs' arrests.

72.     At some time around or after 9:00AM on November 17, 2011, Defendants Esposito, McCarthy, Groht, and Papola directed and/or supervised Defendants Almonte, Conforti, Downes, Tverdokhleb, and Maldonado, and other NYPD officers, with respect to effecting Plaintiffs' arrests and/or processing Plaintiffs' arrests.

73.     When Defendants Defendants Esposito, McCarthy, Groht, and Papola gave or caused to be given dispersal orders and/or directed and/or supervised Plaintiffs' arrests,

Defendants did not have probable cause to believe that any Plaintiff had committed Disorderly Conduct or any other offense.

74.     Plaintiffs were each detained and arrested by NYPD officers, including the Defendants.

75.     Each Plaintiff was eventually transported to the MAPC at One Police Plaza for mass arrest processing.

76.     After between approximately fifteen and twenty hours each in police custody, each Plaintiff was eventually released with Desk Appearance Tickets ("DAT"s), except for Ms. Catlin.

77.     The average time from arrest to release on a DAT in Manhattan is less than seven hours.

78.     On later appearing in court, each Plaintiff aside from Mr. Case and Ms. Catlin was charged with violations and pleaded not guilty to the charges.

79.     Plaintiff Case eventually pleaded guilty to a Disorderly Conduct violation to resolve his case.

80.     With that exception, the Plaintiffs returned to court and eventually accepted Adjournments in Contemplation of Dismissal ("ACD"s) to resolve the criminal cases against them.

**PLAINTIFF BENJAMIN CASE**

81.     Prior to Mr. Case's arrest, Mr. Case was engaged in peaceful, First Amendment-protected conduct.

82.     Defendant Downes and other unidentified NYPD officers arrested Mr. Case at some time after 9:00AM and before 10:15AM in the vicinity of William Street and Beaver Street.

83.     Without first having given a lawful dispersal order and meaningful opportunity to comply, police began to make arrests.

84.     Defendant Downes approached Mr. Case with his baton cocked and told Mr. Case that he was under arrest.

85.     Defendant Downes then rear-cuffed Mr. Case with plastic flex-cuffs.

86.     Defendant Downes then escorted Mr. Case to a Prisoner Transport Vehicle.

87.     After Mr. Case got to the Prisoner Transport Vehicle, Defendant Almonte was assigned to process Mr. Case's arrest by an NYPD supervisor.

88.     Upon information and belief, Defendant Almonte was assigned to process, and did process, other arrests that morning.

89.     As part of Defendant Almonte's mass arrest processing duties, several Polaroid photographs of Defendant Almonte and Mr. Case were taken by fellow NYPD officers.

90.     As part of Defendant Almonte's mass arrest processing duties, several Polaroid photographs of Defendant Almonte and other arrestees whose arrests Defendant Almonte was assigned to process were taken by fellow NYPD officers.

91.     As part of Defendant Almonte's mass arrest processing duties, Defendant Almonte met with a supervisor from the NYPD's Legal Bureau.

92.     As part of Defendant Almonte's mass arrest processing duties, Defendant Almonte met with a supervisor from the NYPD's CJB.

93.   As part of Defendant Almonte's mass arrest processing duties, Defendant Almonte filled out NYPD paperwork regarding Mr. Case's arrest.

94.   As part of Defendant Almonte's mass arrest processing duties, Defendant Almonte filled out NYPD paperwork regarding another OWS-related arrest or arrest(s) on November 17, 2011.

95.   Mr. Case remained rear-cuffed in the plastic flex-cuffs for around five hours.

96.   The flex-cuffs were too tight and hurt Mr. Case.

97.   Mr. Case asked to use the bathroom three hours during that approximately five-hour period and was denied permission to use the bathroom each time.

98.   As a result of the Defendants' decisions to arrest Plaintiff, to issue Plaintiff a DAT rather than a summons, and to subject Plaintiff to excessively long mass arrest processing, Mr. Case was in NYPD custody until after 11:30PM on November 11, 2011.

99.   As a result of the Defendants' mass arrest processing policies, procedures, and practices, Defendants Almonte provided false and misleading information to the Office of the District Attorney of New York County ("DANY").

100.   In an accusatory instrument sworn to by Defendant Almonte, he swore that, on November 17, 2011, at about 10:15 hours on the corner of William and Beaver Streets, in the County and State of New York, he observed

> …defendant, standing in a group of approximately 70 individuals, in the middle of the roadway at the above location.
>
> Deponent states that deponent observed the defendant refuse to comply with repeated lawful orders to disperse from the intersection given by Sergeant Lawrence Papola, shield # 03646, a uniformed member of the New York City Police Department.
>
> Deponent states that after the above orders were given, deponent observed the defendant seated on the ground at the above location and the defendant had

both of defendant's arms interlocked with the arms of two other individuals. Deponent further states that when police officers attempted to separate the defendant from said other persons, the defendant tightened defendant's arms to prevent the deponent from removing the defendant from said other persons.

Deponent further states that the defendant's above stated conduct prevented the deponent from conducting a lawful duty and official function, specifically a police operation and to disperse persons from the above location.

Deponent further states that the above-described conduct cause a public inconvenience and disturbance in that the defendant and the other individuals were obstructing vehicular traffic and preventing any vehicles from being able to drive on the road at the above location.

101.     Based on that accusatory instrument, Mr. Case was charged with violating New York State Penal Law ("PL") §§ 240.20(5) and 240.20(6) (Disorderly Conduct), as well as PL § 190.05 (Obstruction of Governmental Administration in the Second Degree).

102.     Mr. Case eventually pleaded guilty to a Disorderly Conduct violation to resolve his case.

103.     As a result of the foregoing, Plaintiff was deprived of his liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## PLAINITFF ELIZABETH CATLIN

104.     Prior to Ms. Catlin's arrest, Ms. Catlin was engaged in peaceful, First Amendment-protected conduct.

105.     Unidentified NYPD officers arrested Ms. Catlin at some time after 9:00AM and before 9:30AM in the vicinity of the Southwest corner of Pine Street and William Street.

106.     Without first having given a lawful dispersal order and meaningful opportunity to comply, police began to make arrests.

15

107.    An unidentified NYPD officer stepped on the right side of Plaintiff's face with his boot.

108.    An unidentified NYPD officer then rear-cuffed Ms. Catlin with plastic flex-cuffs.

109.    Defendant Conforti was not personally involved in physically arresting Ms. Catlin or putting her in handcuffs.

110.    Defendant Conforti was assigned to process, and did process, Ms. Catlin's arrest.

111.    Upon information and belief, Defendant Conforti was assigned to process, and did process, other arrests that morning.

112.    As part of Defendant Conforti mass arrest processing duties, several Polaroid photographs of Defendant Conforti and Ms. Catlin were taken by fellow NYPD officers.

113.    As part of Defendant Conforti's mass arrest processing duties, several Polaroid photographs of Defendant Conforti and other arrestees whose arrests Defendant Conforti was assigned to process were taken by fellow NYPD officers.

114.    As part of Defendant Conforti's mass arrest processing duties, Defendant Conforti met with a supervisor from the NYPD's Legal Bureau.

115.    As part of Defendant Conforti's mass arrest processing duties, Defendant Conforti met with a supervisor from the NYPD's CJB.

116.    As part of Defendant Conforti's mass arrest processing duties, Defendant Conforti filled out NYPD paperwork regarding Ms. Catlin's arrest.

117.    As part of Defendant Conforti's mass arrest processing duties, Defendant Conforti filled out NYPD paperwork regarding another OWS-related arrest or arrest(s) on November 17, 2011.

118.    Ms. Catlin remained rear-cuffed in the plastic flex-cuffs for an excessive period of time.

119.    The flex-cuffs were too tight and hurt Ms. Catlin.

120.    Through the time Ms. Catlin was in his custody, Ms. Catlin had a visible blood blister or bruise on her face where the NYPD officer had stepped on her face.

121.    Defendant Conforti saw that Ms. Catlin was injured and/or knew or should have known that Ms. Catlin was injured.

122.    Upon information and belief, Defendant Conforti did nothing to report Ms. Catlin's injury.

123.    Upon information and belief, Defendant Conforti did nothing to report the use of force that caused Ms. Catlin's injury.

124.    As a result of the Defendants' decisions to arrest Plaintiff, to suggest to DANY arrest charges including Obstruction of Governmental Administration, and to subject Plaintiff to excessively long mass arrest processing, Ms. Catlin was in NYPD custody for approximately thirty-eight hours before she was arraigned before a New York City Criminal Court judge.

125.    As a result of the Defendants' mass arrest processing policies, procedures, and practices, Defendants Conforti provided false and misleading information to DANY.

126.    In an accusatory instrument sworn to by Defendant Conforti, shield 26403 of the Patrol Boro Queens South Task Force, Officer Conforti swore that, on November 17, 2011, at about 9:30 hours on the Southwest corner of Pine Street and William Street in the County and State of New York, he observed Ms. Catlin and two others, whose names are omitted for privacy reasons, as follows:

> Deponent states the deponent observed defendant **[OMITTED]** obstructing pedestrian traffic, as follows: deponent observed defendant **[OMITTED]**in a

crowd of approximately fifty (50) people, sitting in the middle of the street, locking arms with each other, at the above location. Deponent further states that defendant **[OMITTED]** and others were blocking vehicular traffic in that cars could not drive down Pine Street or William Street.

Deponent further states that deponent observed Deputy Chief Brian McCarthy of the Patrol Services Bureau, repeatedly state to defendant **[OMITTED]** and others, in substance: YOU ARE BLOCKING TRAFFIC. YOU MUST STAND UP AND DISPERSE OR YOU WILL BE ARRESTED. YOU DO NOT HAVE A PERMIT TO BE HERE.

Deponent further states that defendant **[OMITTED]** remained sitting with defendant **[OMITTED]**'s armed linked and did not move. Deponent further states that in attempting to arrest defendant **[OMITTED]**, deponent had to unlink defendant **[OMITTED]**'s arms and carry defendant **[OMITTED]**, causing deponent to have difficulty performing deponent's official function in ensuring that traffic could freely flow.

Deponent further states that deponent observed defendant **[OMITTED]** obstructing pedestrian traffic, as follows: deponent observed defendant **[OMITTED]** in a crowd of approximately fifty (50) people, sitting in the middle of the street, locking arms with each other, at the above location. Deponent further states that defendant **[OMITTED]** and others were blocking vehicular traffic in that cars could not drive down Pine Street or William Street.

Deponent further states that deponent observed Deputy Chief Brian McCarthy of the Patrol Services Bureau, repeatedly state to defendant **[OMITTED]** and others, in substance, YOU ARE BLOCKING TRAFFIC. YOU MUST STAND UP AND DISPERSE OR YOU WILL BE ARRESTED. YOU DO NOT HAVE A PERMIT TO BE HERE.

Deponent further states that defendant [**OMITTED**] remained sitting with defendant's armed linked and did not move. Deponent further states that deponent observed another New York City Police Officer attempting to arrest defendant [**OMITTED**], and observed said Officer have to unlink defendant **[OMITTED]**'s arms in order to arrest defendant [**OMITTED**], causing said Officer to have difficulty performing said Officer's official functions in ensuring that traffic could freely flow.

Deponent states that deponent observed defendant Catlin obstructing pedestrian traffic, as follows: deponent observed defendant in a crowd of approximately fifty (50) people, sitting in the middle of the street, locking arms with each other, at the above location. Deponent further states that defendant Catlin and others were blocking vehicular traffic in that cars could not drive down Pine Street or William Street.

18

Deponent further states that defendant Catlin remained sitting with defendant Catlin's armed linked and did not move. Deponent further states that deponent observed another New York City Police Officer attempting to arrest defendant Catlin, and observed said Officer have to unlink defendant Catlin's arms in order to arrest defendant Catlin, causing said Officer to have difficulty performing said Officer's official functions in ensuring that traffic could freely flow.

127.    Based on that accusatory instrument, Ms. Catlin was charged with violating PL §§ 240.20(5) and 240.20(6) (Disorderly Conduct), as well as PL § 190.05 (Obstruction of Governmental Administration in the Second Degree) and Parading Without a Permit in violation of New York City Administrative Code  § 10-110.

128.    The Parading Without a Permit violation was dismissed by DANY at Ms. Catlin's arraignment.

129.    Ms. Catlin eventually accepted an ACD to resolve the criminal case against her.

130.    The wound on Ms. Catlin's face caused her pain for several days.

131.    The wound on Ms. Catlin's face was visible for weeks thereafter.

132.    As a result of the foregoing, Plaintiff was deprived of her liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**PLAINTIFF JENNIFER KLEIN**

133.    Prior to Ms. Klein's arrest, Ms. Klein was engaged in peaceful, First Amendment-protected conduct.

134.    Unidentified NYPD officers arrested Ms. Klein at some time around 9:00AM and in the vicinity of the corner of Pine Street and William Street.

135.    Without first having given a lawful dispersal order and meaningful opportunity to comply, police began to make arrests.

136.    An unidentified NYPD officer rear-cuffed Ms. Klein with plastic flex-cuffs.

137.   Defendant Tverdokhleb was subsequently assigned to process Ms. Klein's arrest.

138.   Defendant Tverdokhleb was assigned to process, and did process, other arrests that morning.

139.   As part of Defendant Tverdokhleb mass arrest processing duties, several Polaroid photographs of Defendant Tverdokhleb and Ms. Klein were taken by fellow NYPD officers.

140.   As part of Defendant Tverdokhleb's mass arrest processing duties, several Polaroid photographs of Defendant Tverdokhleb and other arrestees whose arrests Defendant Tverdokhleb was assigned to process were taken by fellow NYPD officers.

141.   As part of Defendant Tverdokhleb's mass arrest processing duties, Defendant Tverdokhleb met with a supervisor from the NYPD's Legal Bureau.

142.   As part of Defendant Tverdokhleb's mass arrest processing duties, Defendant Tverdokhleb met with a supervisor from the NYPD's CJB.

143.   As part of Defendant Tverdokhleb's mass arrest processing duties, Defendant Tverdokhleb filled out NYPD paperwork regarding Ms. Klein's arrest.

144.   As part of Defendant Tverdokhleb's mass arrest processing duties, Defendant Tverdokhleb filled out NYPD paperwork regarding another OWS-related arrest or arrest(s) on November 17, 2011.

145.   Ms. Klein remained rear-cuffed in the plastic flex-cuffs for several hours.

146.   The flex-cuffs were too tight and hurt Ms. Klein.

147.   As a result of the Defendants' decisions to arrest Plaintiff, to issue Ms. Klein a DAT rather than a summons, and to subject Plaintiff to excessively long mass arrest processing, Ms. Klein was in NYPD custody until approximately 11:00PM on November 17, 2011.

148.    As a result of the Defendants' mass arrest processing policies, procedures, and practices, Defendants Tverdokhleb provided false and misleading information to DANY.

149.    In an accusatory instrument sworn to by Defendant Tverdokhleb, he swore that, on November 17, 2011, at about 09:25 hours on the corner of Pine Street and Nassau, in the County and State of New York, he observed

> …defendant standing amongst a group of over two-hundred (200) individuals in the middle of the street at the above-listed location. Deponent further states that the actions of the defendant and others obstructed all vehicular traffic in that no cars could drive through the intersection.

> Deponent further states that deponent observed Lieutenant David Groht of the 17[th] Precinct tell the defendant and others multiple times that they were obstructing all vehicular traffic and were ordered to leave the roadway. Deponent further states that deponent observed defendant refuse to leave the roadway after being told multiple times to move. Deponent further states that defendant's actions caused public inconvenience, annoyance, and alarm.

150.    Based on that accusatory instrument, Ms. Klein was charged with violating PL §§ 240.20(5) and 240.20(6) (Disorderly Conduct).

151.    Ms. Klein eventually accepted an ACD to resolve the criminal case against her.

152.    As a result of the foregoing, Plaintiff was deprived of her liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**PLAINITFF MARK KUSHNEIR**

153.    Prior to Mr. Kushneir's arrest, Mr. Kushneir was engaged in peaceful, First Amendment-protected conduct.

154.    Unidentified NYPD officers arrested Mr. Kushneir at some time shortly after 9:00AM in the vicinity of Broadway and Exchange Place.

155.    Defendant Esposito was personally on the scene in the vicinity of Broadway and Exchange Place.

156.    Without first having given a lawful dispersal order and meaningful opportunity to comply, police began to make arrests.

157.    An unidentified NYPD officer rear-cuffed Mr. Kushneir with plastic flex-cuffs.

158.    Well after Mr. Kushneir got to the Prisoner Transport Vehicle, Defendant Maldonado was assigned to process Mr. Kushneir's arrest by an NYPD supervisor.

159.    Upon information and belief, Defendant Maldonado was assigned to process, and did process, other arrests that morning.

160.    As part of Defendant Maldonado's mass arrest processing duties, several Polaroid photographs of Defendant Maldonado and Mr. Kushneir were taken by fellow NYPD officers.

161.    As part of Defendant Maldonado's mass arrest processing duties, several Polaroid photographs of Defendant Maldonado and other arrestees whose arrests Defendant Maldonado was assigned to process were taken by fellow NYPD officers.

162.    As part of Defendant Maldonado's mass arrest processing duties, Defendant Maldonado met with a supervisor from the NYPD's Legal Bureau.

163.    As part of Defendant Maldonado's mass arrest processing duties, Defendant Maldonado met with a supervisor from the NYPD's CJB.

164.    As part of Defendant Maldonado's mass arrest processing duties, Defendant Maldonado filled out NYPD paperwork regarding Mr. Kushneir's arrest.

165.    As part of Defendant Maldonado's mass arrest processing duties, Defendant Maldonado filled out NYPD paperwork regarding another OWS-related arrest or arrest(s) on November 17, 2011.

166.    Mr. Kushneir remained rear-cuffed in the plastic flex-cuffs for around five hours.

167.    The flex-cuffs were too tight and hurt Mr. Kushneir.

168.    As a result of the Defendants' decisions to arrest Plaintiff, to issue Plaintiff a DAT rather than a summons, and to subject Plaintiff to excessively long mass arrest processing, Mr. Kushneir was in NYPD custody until around or after 11:30PM on November 11, 2011.

169.    As a result of the Defendants' mass arrest processing policies, procedures, and practices, Defendants Maldonado provided false and misleading information to DANY.

170.    In an accusatory instrument sworn to by Defendant Maldonado, he swore that, on November 17, 2011, at about 9:15 hours on the corner of Broadway and Exchange Place, in the County and State of New York, he observed

> …defendant standing in the middle of the sidewalk at the above-mentioned location with approximately one-hundred others. Deponent further states that the action sof the defendant and the above-mentioned others caused public inconvenience and annoyance, in that the defendant and others completely blocked the sidewalks and prevented use fo the sidewalk by pedestrians, and that said pedestrians were forced to walk in the street to pass through the area.

171.    Based on that accusatory instrument, Mr. Kushneir was charged with violating PL § 240.20(5) (Disorderly Conduct).

172.    Mr. Kushneir eventually accepted an ACD to resolve the case.

173.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## FIRST CAUSE OF ACTION

### DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

174. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

175. Defendants, under color of state law, unlawfully seized and arrested Plaintiffs.

176. Defendants did not have probable cause to arrest Plaintiffs, nor was it objectively reasonable for Defendants to believe that they did have probable cause to arrest Plaintiffs.

177. Defendants' decision to arrest Plaintiffs was based upon Plaintiffs' First Amendment-protected expression, and not upon Plaintiffs' violation of any provision of the law.

178. By their conduct and actions and/or omissions in depriving Plaintiffs of their freedoms to be let alone, to move freely, to assemble, to associate, and to enjoy their property, in seizing them, in falsely arresting them, in assaulting and battering them, in maliciously abusing process against them, in retaliating against them for the exercise of constitutionally protected rights, in inflicting emotional distress upon them, in violating their rights to due process and equal protection, and/or for failing to remedy the aforementioned violations after having witnessed them or having been informed of them by report or appeal, and/or by failing properly to train, supervise, or discipline employees of the Defendant CITY OF NEW YORK under their supervision, Defendants, acting under color of law and without lawful justification, intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, deprived plaintiffs of the equal protection of the laws and/or of equal privileges and immunities under the laws, and thereby caused injury and damage in violation of Plaintiffs' constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First, Fourth, , and Fourteenth Amendments.

24

179.     By the conduct described above, Defendants, under color of state law, subjected

Plaintiffs to the foregoing acts and omissions without due process of law and in violation of the

First, Fourth, and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. §

1983, thereby depriving Plaintiffs of their rights, privileges and immunities, including, without

limitation, deprivation of the following constitutional rights:

    a.  Freedom to engage in protected speech, expression and association, without undue constraint or governmental retaliation;

    b.  Freedom from unreasonable seizures of their persons, including but not limited to the excessive use of force;

    c.  Freedom from arrest without probable cause;

    d.  Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which Plaintiffs were aware and did not consent;

    e.  Freedom from deprivation of liberty and property without due process of law;

    f.  Freedom from malicious abuse of process;

    g.  The enjoyment of equal protection, privileges and immunities under the laws.

180.     As a result of the foregoing, Plaintiffs were deprived of their liberty, suffered

bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and

were otherwise damaged and injured.

## SECOND CAUSE OF ACTION

**SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS
UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

181.     Plaintiffs incorporate by reference the allegations set forth in all preceding

paragraphs as if fully set forth herein.

182.     By failing to remedy the wrongs committed by his or her subordinates, in failing

to properly train, screen, supervise, or discipline his or her subordinates, and by personally

participating in the constitutional injuries set forth above, Defendants ESPOSITO,

MCCARTHY, GROHT, and PAPOLA caused damage and injury in violation of plaintiff's rights

guaranteed under the United States Constitution, including its First, Fourth, and Fourteenth

Amendments, through 42 U.S.C. §1983.

183.    As a result of the foregoing, Plaintiffs were deprived of their liberty, suffered

bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and

were otherwise damaged and injured.

## THIRD CAUSE OF ACTION

### FAILURE TO INTERVENE

184.    Plaintiffs incorporate by reference the allegations set forth in all preceding

paragraphs as if fully set forth herein.

185.    Members of the NYPD have an affirmative duty to assess the constitutionality of

interactions between their fellow members of service and civilians and to intervene where they

observe another member of the Police Department or other law enforcement agency employing

unjustified and excessive force against a civilian or falsely arresting a civilian.

186.    Defendants were present for the above-described incident and witnessed other

defendants unlawfully arrest the Plaintiffs.

187.    Defendants' use of force against Plaintiffs was obviously excessive and

unjustified under the circumstances yet Defendants who were not involved in the obviously

unlawful uses of force failed to take any action or make any effort to intervene, halt or protect

the Plaintiffs from being subjected to excessive force by other Defendants.

188.    Plaintiffs' arrests and the initiation of criminal charges against them were clearly

without probable cause or other legal justification, and was based on facts alleged by Defendants,

which Defendants knew to be false, yet Defendants failed to take any action or make any effort to intervene, halt or protect Plaintiffs from being unlawfully and wrongfully arrested and prosecuted.

189.    As a result of Defendants' violations of Plaintiffs' constitutional rights by failing to intervene in other Defendants' clearly unconstitutional use of force and Plaintiffs' unconstitutional arrests and prosecutions, Plaintiffs were deprived of their liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## FOURTH CAUSE OF ACTION

### FALSE ARREST

190.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

191.    As a result of Defendants' conduct as described above, Plaintiffs were subjected to illegal, improper, and false arrest by Defendants and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege, or consent.

192.    As a result of the foregoing, Plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## FIFTH CAUSE OF ACTION

### EXCESSIVE USE OF FORCE

193.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

194.    The level of force employed by Defendants was objectively unreasonable and in violation of Plaintiffs' constitutional rights.

195.    As a result of the foregoing, Plaintiffs were subjected to excessive force and sustained physical and emotional injuries.

## SIXTH CAUSE OF ACTION

### FIRST AMENDMENT

196.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

197.    In detaining, assaulting, and arresting Plaintiffs, in prosecuting Plaintiffs, and in implementing, enforcing, encouraging, sanctioning, and/or ratifying policies, practices, and/or customs punishing peaceful protest, Defendants violated Plaintiffs' rights to speak, assemble, associate, and petition the government for redress of grievances peaceably in retaliation for their speaking out on a matter of public concern.

198.    As a result of the foregoing, Plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured, and Defendants chilled and created the risk of chilling conduct protected by the First Amendment.

## SEVENTH CAUSE OF ACTION

### MALICIOUS ABUSE OF PROCESS

199.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

200.    Defendants issued legal process in the form of police records and sworn statements in criminal court complaints against plaintiffs to detain and prosecute Plaintiffs

201.    Defendants arrested Plaintiffs in order to obtain a collateral objective outside the legitimate ends of the legal process.

202.    Defendants acted with malicious intent to do harm to Plaintiffs without excuse or justification.

203.    As a result of the foregoing, Plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## EIGHTH CAUSE OF ACTION

### SELECTIVE ENFORCEMENT

204.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

205.    Defendants' use of the New York State disorderly conduct statute against Plaintiffs, but not others similarly situated, was invidiously discriminatory, malicious, purposeful, and/or arbitrary and capricious.

206.    Defendants' selective enforcement of the New York State disorderly conduct statute against Plaintiffs violated Plaintiffs' constitutional rights under the Fourth, , and Fourteenth Amendments to the United States Constitution.

207.    As a result of the foregoing, Plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## NINTH CAUSE OF ACTION

### MONELL CLAIM AGAINST DEFENDANT CITY THROUGH 42 U.S.C. § 1983

208.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

209.    All of the acts and omissions by the named and unnamed individual police officer Defendants described above were carried out pursuant to policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the Defendant CITY and its agency, the NYPD.

210.    Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police Defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

211.    The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

212.    The aforementioned customs, practices, procedures and rules of the CITY and the NYPD includes, but is not limited to:

    a.    The policy and practice of failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to effecting arrests in connection with First Amendment assemblies;

    b.    The NYPD's use of force and use of force reporting policies and practices;

    c.    The policy and practice of treating perceived "groups" of people as a "unit" for "mass arrest" probable cause determination purposes without ensuring that

lawfully authorized and constitutionally significant notice, and a meaningful
opportunity to disperse, were given and disregarded prior to treating the
perceived "group" as a "unit";

d.  The policy and practice of applying PL § 240.20 (5) (Disorderly Conduct –
    Blocking Pedestrian or Vehicular Traffic) in circumstances where there is no
    lawful authority to arrest or detain perceived "groups" of people;

e.  The policy and practice of applying PL § 240.20 (6) (Disorderly Conduct –
    Failure to Obey Lawful Dispersal Order) in circumstances where neither
    lawful dispersal orders, nor meaningful opportunities to disperse, were in fact
    given;

f.  The use of arrests in lieu of issuing summonses for summons-eligible
    offenses;

g.  The use of police resources to corral and trap perceived participants in First
    Amendment assemblies;

h.  The policy and practice of assigning "arrest teams" of officers who had not
    witnessed the conduct allegedly giving rise to the need for arrests to "process"
    the arrests of multiple arrestees, including by filling out NYPD paperwork and
    swearing out accusatory instruments containing false information; and

i.  The policy and practice of inserting NYPD Legal Bureau and CJB agents into
    a special Mass Arrest Processing Plan using a centralized Mass Arrest
    Processing Center that manufactured false business and court records after the
    fact designed to give the impression that assigned arresting officers witnessed
    or knew things they had not, in fact, witnessed or known of.

213.   The aforementioned customs, practices, procedures and rules of the CITY and the NYPD were enacted based on Plaintiffs' First Amendment protected activity and not for any legitimate law enforcement purpose.

214.   As a result of the foregoing, Plaintiffs were deprived of their liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## JURY DEMAND

215.   Plaintiffs demand a trial by jury in this action of all issues pursuant to Fed. R. Civ. P. 38(b).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief:

A.   Compensatory damages against the Defendants jointly and severally; and

B.   Punitive damages against the individual Defendants; and

C.   Attorney's fees and costs pursuant to 42 USC §1988; and

D.   Such other and further relief as the Court deems just and proper.

DATED:      New York, New York
            November 17, 2014

Respectfully submitted,

Gideon Orion Oliver
*Attorney for Plaintiffs*
277 Broadway, Suite 1501
New York, NY  10007
t: 646-263-3495