UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BENJAMIN CASE, ELIZABETH CATLIN, JENNIFER
KLEIN, and MARK KUSHNEIR,

Plaintiffs,

-against-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT ("NYPD") CHIEF OF
DEPARTMENT JOSEPH ESPOSITO, NYPD DEPUTY
CHIEF BRIAN MCCARTHY, NYPD LIEUTENANT
DAVID GROHT, NYPD SERGEANT LAWRENCE
PAPOLA, SHIELD NO. 03646, NYPD OFFICER
BENJAMIN ALMONTE, SHIELD NO. 29182, NYPD
OFFICER DANIEL CONFORTI, SHIELD NO. 26403,
NYPD OFFICER FIRST NAME UNKNOWN ("FNU")
DOWNES, SHIELD NO. UNKNOWN, NYPD
OFFICER DMITRY TVERDOKHLEB, SHIELD NO.
27018, and NYPD OFFICER MICHAEL
MALDONADO, SHIELD 23573,

Defendants.

---

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #: _____
DATE FILED: 2 | 10 | 17

14 Civ. 9148 (AT) (RLE)

**MEMORANDUM**
**AND ORDER**

ANALISA TORRES, District Judge:

Plaintiffs, Benjamin Case, Elizabeth Catlin, Jennifer Klein, and Mark Kushneir, bring

this action pursuant to 42 U.S.C. § 1983 against the City of New York (the "City") and nine

individual defendants employed by the New York City Police Department ("NYPD"), alleging

that their constitutional rights were violated in connection with their participation in an Occupy

Wall Street ("OWS") protest in Manhattan. Defendants move to dismiss the second amended

complaint (hereinafter "complaint")[1] pursuant to Federal Rule of Civil Procedure 12(b)(6). For

the reasons stated below, the motion is GRANTED in part and DENIED in part.

---

[1] Counsel for Plaintiffs informs the Court that Case, Catlin, and Klein have withdrawn their false arrest claims, and that all four Plaintiffs have withdrawn the malicious abuse of process claims asserted in the complaint. *See* Oliver Decl. ¶¶ 6-7, ECF No. 63.

# BACKGROUND[2]

I.      Events of November 17, 2011

On the morning of November 17, 2011, Plaintiffs were arrested while "peacefully assembling and demonstrating with others in the Wall Street area in connection with an OWS-related demonstration." SAC ¶¶ 103, 154, 189, ECF No. 41; *see also id.* ¶¶ 233, 264. They assert that, prior to their arrests, neither they "nor other non-NYPD persons present were causing or creating the risk of any substantial blockage of vehicular or pedestrian traffic, or any other serious public ramifications," *id.* ¶¶ 158, 193, 237, 269, such as "real public inconvenience, annoyance, and/or alarm," *id.* ¶¶ 183, 221, 259, 290. They allege that, "[w]ithout first having given a clearly communicated dispersal order or clearly communicated orders . . . and a meaningful opportunity . . . to comply, police began to make arrests." *Id.* ¶¶ 159, 194, 238, 270. Facts specific to each plaintiff are set forth below.

*Benjamin Case.*  Case was arrested by Officer Downes[3] and unidentified NYPD officers between 9:00 a.m. and 10:15 a.m. in the vicinity of William and Beaver Streets. *Id.* ¶ 157. Downes rear-cuffed Case with plastic flex-cuffs, then escorted him to a prisoner transport vehicle after which Officer Benjamin Almonte was assigned to process Case's arrest. *Id.* ¶¶ 161-63. For "around five hours," Case remained rear-cuffed in the plastic flex-cuffs, which were too tight and hurt him. *Id.* ¶¶ 171-72. He was issued a Desk Appearance Ticket ("DAT")[4] and remained in NYPD custody until after 11:30 p.m. *Id.* ¶ 174. Case was charged with violating

---

[2] The following facts are taken from the complaint and accepted as true for the purposes of this motion. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[3] The complaint states that Downes' first name is unknown.  SAC ¶ 15.

[4] The complaint defines a DAT as "an appearance ticket issued in lieu of [more prolonged] detention, at the direction of a [NYPD] desk officer, for misdemeanors, violations, and certain Class 'E' felonies for hospitalized prisoners." *Id.* ¶ 29.

sections 240.20(5) and 240.20(6) of the New York Penal Law (disorderly conduct), as well as

section 195.05 (obstruction of governmental administration ("OGA") in the second degree); Case

eventually pleaded guilty to the disorderly conduct violation. *Id.* ¶¶ 177, 187. The complaint

alleges that Almonte and Sergeant Lawrence Papola "provided false and misleading

information" to the district attorney, *id.* ¶ 175, including in an accusatory instrument sworn to by

Almonte in which he stated that he observed Case "standing in a group of approximately 70

individuals, in the middle of the roadway," and observed him "refuse to comply with [Papola's]

repeated lawful orders to disperse" by sitting on the ground, interlocking his arms with others

and tightening his arms to prevent Almonte from removing him, *id.* ¶ 176. Case claims that

Almonte did not actually observe the events leading up to Case's arrest. *Id.* ¶ 179.

*Elizabeth Catlin.* Between 9:00 a.m. and 9:30 a.m. in the vicinity of Pine and William

Streets, unidentified NYPD officers arrested Catlin. *Id.* ¶ 192. She alleges that an officer

stepped on the right side of her face with his boot, which produced a blood blister or bruise that

remained visible on her face for weeks thereafter and caused her pain for several days. *Id.*

¶¶ 195, 208, 226-27. An unidentified officer then rear-cuffed her with plastic flex-cuffs, which

were too tight and hurt her. *Id.* ¶ 196. Catlin remained cuffed for "an excessive period of time."

*Id.* ¶¶ 206-07. Officer Daniel Conforti processed Catlin's arrest. *Id.* ¶ 198. The complaint

alleges that Conforti knew or should have known that Catlin was injured, but that he did nothing

to report her injury or the use of force that caused it. *Id.* ¶¶ 209-11. Catlin was in NYPD

custody for approximately 38 hours before she was arraigned in New York City Criminal Court

and released on her own recognizance. *Id.* ¶ 212. She was charged with violating sections

195.05, 240.20(5), and 240.20(6) of the New York Penal Law as well as parading without a

permit in violation of New York City Administrative Code section 10-110. *Id.* ¶ 215. The

3

parading without a permit violation was dismissed at her arraignment. *Id.* ¶ 218. Catlin

eventually accepted an adjournment in contemplation of dismissal ("ACD") to resolve the

charges.[5] *Id.* ¶ 225. The complaint alleges that Conforti and Deputy Chief Brian McCarthy

"provided false and misleading information" to the district attorney, *id.* ¶ 213, including in an

accusatory instrument sworn to by Conforti in which he stated that he observed the following:

Catlin "obstructing pedestrian traffic" by sitting in the middle of the street and locking arms in a

crowd of approximately 50 people; McCarthy repeatedly telling Catlin and others that they must

disperse or would be arrested, Catlin remaining sitting with her arms linked; and an officer

unlinking Catlin's arms in order to arrest her, *id.* ¶ 214. Catlin claims that Conforti did not

actually observe the events leading up to her arrest. *Id.* ¶ 216.

*Jennifer Klein.* At about 9:00 a.m., in the vicinity of Pine and William Streets,

unidentified officers arrested Klein. *Id.* ¶ 236. An officer rear-cuffed her with plastic flex-cuffs.

*Id.* ¶ 239. Officer Dmitry Tverdokhleb was assigned to process Klein's arrest. *Id.* ¶ 240. For

several hours, Klein remained rear-cuffed in the plastic flex-cuffs, which were too tight and hurt

her. *Id.* ¶¶ 248-49. Klein was issued a DAT and remained in NYPD custody until

approximately 11:00 p.m. *Id.* ¶ 250. She was charged with violating sections 240.20(5) and

240.20(6) of the New York Penal Law and eventually accepted an ACD to resolve the charges.

*Id.* ¶¶ 253, 262. The complaint alleges that Tverdokhleb and Lieutenant David Groht "provided

false and misleading information" to the district attorney, *id.* ¶ 251, including in an accusatory

instrument sworn to by Tverdokhleb in which he stated that he observed Groht tell Klein, who

was standing in a group of over 200 people in the middle of the street, "multiple times that [she

---

[5] A court may resolve charges through an ACD with the consent of the prosecutor and the defendant. N.Y. Crim.
Proc. Law § 170.55. An ACD is not a decision on the merits and is considered neither a favorable nor unfavorable
disposition.

and the others] were obstructing all vehicular traffic and were ordered to leave the roadway," but that Klein refused to move, *id.* ¶ 252. Klein claims that Tverdokhleb was not at the scene when she was arrested and did not actually observe the events leading up to her arrest. *Id.* ¶ 254.

*Mark Kushneir.* Unidentified officers arrested Kushneir shortly after 9:00 a.m. in the vicinity of Broadway and Exchange Place. *Id.* ¶ 266. An unidentified officer rear-cuffed him with plastic flex-cuffs. *Id.* ¶ 271. Well after Kushneir arrived at a prisoner transport vehicle, Officer Michael Maldonado was assigned to process Kushneir's arrest. *Id.* ¶ 272. For "around five hours," Kushneir remained rear-cuffed in the plastic flex-cuffs, which were too tight and hurt him. *Id.* ¶¶ 280-81. Kushneir was issued a DAT and held in NYPD custody until "around or after" 11:30 p.m. *Id.* ¶ 282. He was charged with violating section 240.20(5) of the New York Penal Law, for which he ultimately accepted an ACD. *Id.* ¶¶ 285, 291. The complaint alleges that Maldonado "provided false and misleading information" to the district attorney, *id.* ¶ 283, including in an accusatory instrument he swore to in which he stated that he observed Kushneir "standing in the middle of the sidewalk" with approximately 100 other people, such that they "completely blocked the sidewalks" and prevented their use by pedestrians, *id.* ¶ 284. Kushneir claims that Maldonado did not actually observe the events leading up to Kushneir's arrest. *Id.* ¶ 286.

II.     NYPD Policies and Practices

Plaintiffs allege that their unlawful treatment by the NYPD on November 17, 2011, resulted from two specific policies concerning large protests that were adopted by the City in the fall of 2011. *Id.* ¶¶ 73-81. First, during meetings attended by Chief of Department Joseph Esposito[6] and others, the City refined and adopted a "policy and practice related to OWS of

---

[6] The complaint alleges that Esposito was "the highest-ranking uniformed police officer" from about 2000 to 2013. SAC ¶¶ 22-23.

denying persons arrested at demonstrations individual consideration for release with summonses (the 'No-Summons Policy')." *Id.* ¶¶ 64-65. Second, the City refined and adopted a "policy and practice related to the centralized processing of arrestees in a single mass arrest processing center including the involvement of NYPD Legal Bureau and Criminal Justice Bureau agents in the creation of boilerplate NYPD documents containing false information, all as part of an unreasonably lengthy and punitive mass arrest processing plan (the 'MAPP')." *Id.* ¶ 66. According to Plaintiffs, the No-Summons Policy and MAPP specifically targeted demonstrations "perceived to be associated with OWS." *Id.* ¶ 67.

Plaintiffs also allege that these two policies departed from the official procedures set forth in the NYPD Patrol Guide. *Id.* ¶ 69. According to Plaintiffs, the Patrol Guide provides that "persons detained or arrested for non-criminal violations such as those for which plaintiffs were presumably detained, as well as most misdemeanor offenses, who are carrying proper identification and have no outstanding arrest warrants, are normally eligible for individualized determinations of eligibility for release with a Universal Summons[7] or DAT rather than being held in custody for arraignment." *Id.* Plaintiffs allege that the substitution of the No-Summons Policy and MAPP in place of the standard procedures resulted in longer detainment periods for OWS protestors. *Id.* ¶¶ 70-74. Plaintiffs claim that these policies derived from "ill-will toward [Plaintiffs'] perceived association with OWS," *id.* ¶ 78, and Defendants' desire to "deter and/or prevent [Plaintiffs] from participating in further OWS-related demonstrations," *id.* ¶ 80.

Plaintiffs also claim that the NYPD used similar policies and practices against protestors during the 2004 Republican National Convention (the "RNC"), *id.* ¶¶ 36-47, for which Esposito

---

[7] The complaint defines a Universal Summons as "legal process issued in lieu of more prolonged detention by NYPD officers for certain violations and misdemeanors." *Id.* ¶ 30.

helped plan the police response, *id.* ¶¶ 34-35. According to Plaintiffs, the City's RNC policies

resulted in unconstitutional actions, including the widespread failure to make individualized

determinations of probable cause, *id.* ¶ 43, the use of excessive force by police officers, *id.* ¶ 44,

and excessively long detention periods for arrestees, *id.* ¶ 45, such that the New York State

Supreme Court went so far as to hold the City "in contempt of court for failing to release

hundreds of arrestees who had been detained in excess of 24 hours without justification for the

delay, some of whom had been detained for more than 72 hours," *id.* ¶ 46. Plaintiffs note that

over 1,800 arrests were made in connection with the 2004 RNC, *id.* ¶ 42, the vast majority of

which resulted in dismissals, *id.* ¶ 51. Plaintiffs allege that, despite dozens of lawsuits and a

decade of litigation over the NYPD's RNC-related conduct—which ultimately cost the City tens

of millions of dollars in judgments and settlements, *id.* ¶¶ 48-49, 54-55, unfavorable coverage in

the media, *id.* ¶ 54, and complaints to the Civilian Complaint Review Board, *id.*—the City has

failed to modify the NYPD's policies and practices regarding crowd control, mass arrest, and

prosecution, and has failed to train, supervise, and discipline NYPD officers "in connection with

properly policing First Amendment assemblies," *id.* ¶¶ 55-56.

Indeed, Plaintiffs allege that, in the years following the 2004 RNC and prior to the advent

of OWS, the NYPD continued to employ these problematic policies and practices in connection

with its years-long crackdown on "Critical Mass" bicycle rides, *id.* ¶ 50, which similarly resulted

in multiple litigations, one of which settled for approximately $1 million, *id.* ¶ 53.

Based on the above allegations, Plaintiffs assert that the City and Esposito knew or

should have known that the "NYPD's plans for policing and mass arrest processing in

connection with protests planned for November 17, 2011 would result in unlawful arrests,

excessive use of force, excessive detentions, malicious abuse of process, and . . . other unlawful

conduct." *Id.* ¶¶ 101-02.

## DISCUSSION

I.    Motion to Dismiss Standard

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for

more than a sheer possibility that a defendant has acted unlawfully." *Id.* Legal conclusions and

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements," are not entitled to a presumption of truth. *Id.* On a motion to dismiss, the Court

must draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns*, 493 F.3d at 98.

II.   False Arrest Claim

Only Kushneir asserts a false arrest claim. "A § 1983 claim for false arrest, resting on the

Fourth Amendment right of an individual to be free from unreasonable seizures, . . . is

substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101

F.3d 845, 852 (2d Cir. 1996). "Under New York law, a plaintiff claiming false arrest must show,

*inter alia*, that the defendant intentionally confined him without his consent and without

justification." *Id.* "The existence of probable cause to arrest constitutes justification and 'is a

complete defense to an action for false arrest.'" *Id.* (quoting *Bernard v. United States*, 25 F.3d

98, 102 (2d Cir. 1991)). "In general, probable cause to arrest exists when the officers have

knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Id.*

As an initial matter, a "plaintiff can under no circumstances recover if he was convicted of the offense for which he was arrested." *Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir. 1986). In connection with his arrest, Kushneir was charged with disorderly conduct in violation of the New York Penal Law section 240.20(5), SAC ¶ 285, which he resolved by accepting an ACD, *id.* ¶ 291. Unlike a conviction, an ACD leaves open the question of guilt, *see Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980), and does not bar Kushneir from pursuing his false arrest claim, *see Wahhab v. City of New York*, 386 F. Supp. 2d 277, 293 (S.D.N.Y. 2005); *see also MacNamara v. City of New York*, 275 F.R.D. 125, 147 n.18 (S.D.N.Y. 2011).

The next question is whether there was probable cause for Kushneir's arrest. Section 240.20(5) provides that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e obstructs vehicular or pedestrian traffic." N.Y. Penal Law § 240.20(5). The Second Circuit has required a showing that the putative offender was "actually and immediately blocking" the pedestrian or vehicular traffic in question. *Zellner v. Summerlin*, 494 F.3d 344, 372 (2d Cir. 2007). Further, "New York courts have interpreted this statute to permit punishment only where the conduct at issue does more than merely inconvenience pedestrian or vehicular traffic." *Jones v. Parmley*, 465 F.3d 46, 59 (2d Cir. 2006). Where, as here, a disorderly conduct statute is applied in the context of "political demonstrations and protests—activities at the heart of what the Bill of

Rights was designed to safeguard," First Amendment considerations come into play. *Id.* at 56. "Indeed, the [Supreme] Court has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they . . . simply fear possible disorder." *Id.*

Kushneir claims that he was not "causing or creating the risk of any substantial blockage of vehicular or pedestrian traffic." SAC ¶ 269. The pleadings do not suggest that he was "actually and immediately blocking" the pedestrian or vehicular traffic in question. *Zellner*, 494 F.3d at 372. Rather, the complaint alleges that Esposito and "other unidentified NYPD supervisors" set up barricades and parked police vehicles in order to prevent traffic from passing through the areas in which they expected Plaintiffs' protest activities to take place. SAC ¶ 110. Although the complaint quotes a statement allegedly made by Maldonado averring that he observed Kushneir and approximately 100 other people "cause[] public inconvenience and annoyance" by "completely block[ing] the sidewalks" from pedestrian use, *id.* ¶ 284, the complaint also asserts that this sworn statement was "false and misleading" and that Maldonado did not actually observe the conduct leading up to Kushneir's arrest, *id.* ¶¶ 283, 286. Taking the pleadings in the light most favorable to Plaintiffs, there is an insufficient factual foundation to support a finding of probable cause to arrest Kushneir for violating section 240.20(5).

Defendants argue that Kushneir's false arrest claim must fail because there was probable cause to arrest him for violating another disorderly conduct provision, section 240.20(6), which states that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof[,] [he] congregates with other persons in a public place and refuses to comply with a lawful order of the police to

disperse."[8]  N.Y. Penal Law § 240.20(6).  Defendants contend that Plaintiffs admit that dispersal

orders were issued, *see, e.g.*, SAC ¶¶ 130-34, 140, and that, therefore, there was probable cause

to arrest Kushneir for not complying.  Def. Mem. 7-8, ECF No. 50; Def. Reply 2-3, ECF No. 69.

However, Kushneir contends that Defendants arrested him "[w]ithout first having given a clearly

communicated dispersal order or clearly communicated orders to [Kushneir] and a meaningful

opportunity . . . to comply."  SAC ¶ 270.

      "[W]hether the police had probable cause to arrest [Plaintiff] for defying a police order

turns on two factors.  The first is whether, and to what extent, the police communicated their

orders to the entire crowd."  *Dinler v. City of New York*, No. 04 Civ. 7921, 2012 WL 4513352, at

*10 (S.D.N.Y. Sept. 30, 2012) (citing *Vodak v. City of Chicago*, 639 F.3d 738, 745 (7th Cir.

2011) ("[B]efore the police could start arresting peaceable demonstrators for defying their orders

they had to communicate the orders to the demonstrators.")).  "The second is whether the

demonstrators were given an opportunity to comply with those orders—that is, whether they

indeed refused to do so."  *Id.; see also Adams v. City of New York*, No. 15 Civ. 6741, 2016 WL

1169520, at *3 (S.D.N.Y. Mar. 22, 2016) ("Section 240.20(6) requires that, in addition to the

requisite intent, an arrestee must refuse to comply with a lawful dispersal order." (emphasis

omitted)).  Plaintiffs allege that the dispersal orders were not sufficiently communicated to

Kushneir, and that Kushneir was not given an opportunity to comply.  Accordingly, the Court

cannot conclude at this stage that there was probable cause to arrest Kushneir.

      Defendants argue that Kushneir has pleaded only "threadbare legal conclusions that his

arrest was improper."  Def. Reply 2.  However, Plaintiffs are not required to set forth a lack of

---

[8] Although Kushneir was charged only under section 240.20(5), the offense for which a plaintiff was arrested "need not be the same as, or even 'closely related' to, the offense" later cited as probable cause for the arrest.  *Garcia v. Does*, 779 F.3d 84, 90 n.7 (2d Cir. 2014).

probable cause in their complaint.  Under New York law, a plaintiff need not allege "want of probable cause" when stating a false arrest claim based on a warrantless arrest.  *Broughton*, 335 N.E.2d 310, 315 (1975).  Indeed, "[w]henever there has been an arrest and imprisonment without a warrant" the arrest is presumptively "unlawful." *Broughton v. State*, 335 N.E.2d 310, 315 (1975); *see also Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007) ("Where an officer makes an arrest without a warrant, the presumption arises that the plaintiff's arrest was unlawful.").  It is the defendant who bears the burden "of proving that probable cause existed for the plaintiff's arrest" as an affirmative defense. *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (citing *Broughton*, 335 N.E.2d at 315).

Defendants argue that, even if probable cause was lacking, they are entitled to qualified immunity.  Def. Mem. 8.  A qualified immunity defense against a false arrest suit requires a showing of "arguable probable cause," *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013) (internal quotation marks omitted), a "formidable hurdle . . . [that] is usually not successful," *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006) (quoting *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004)).  "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Zalaski*, 723 F.3d at 390.  At this stage, based solely on the allegations in the complaint, the Court cannot conclude that Defendants are entitled to qualified immunity based on arguable probable cause.  Plaintiffs clearly allege that the dispersal orders given were neither sufficiently communicated nor followed by an opportunity to comply.  A determination as to whether it was reasonable for the arresting officers to believe that their arrests were lawful requires further factual development.

Accordingly, Defendants' motion to dismiss Kushneir's false arrest claim is DENIED.

III.    Excessive Force Claims

A claim of excessive use of force during an arrest is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 394 (1989). The question is whether Defendants' use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. All four Plaintiffs allege that they were tightly handcuffed for hours or "an excessive period of time." SAC ¶¶ 171-72, 206-07, 248-49, 280-81. In addition, Catlin alleges that an unidentified officer stepped on her face with his boot, causing her pain and injury. *Id.* ¶¶ 195, 208, 226-27.

A.  Tight Handcuffs

"Although handcuffs must be reasonably tight to be effective, overly tight handcuffing can constitute excessive force." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (citation omitted). "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiffs'] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists*." *Id.* (quoting *Esmont v. City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005)). "Courts in this Circuit have generally found that handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising." *Omor v. City of New York*, No. 13 Civ. 2439, 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015); *see also Lynch*, 567 F. Supp. 2d at 468-69 (collecting cases).

Although all four Plaintiffs claim that they were handcuffed too tightly, they fail to allege that they complained about their handcuffs, that Defendants ignored such complaints, and that

they suffered injuries caused by the handcuffs.  And although Plaintiffs assert that they were handcuffed for periods of time such as four hours or "several hours," courts in this district have found allegations of similar or much longer periods of uncomfortable handcuffing insufficient to state a claim for excessive force.  *See, e.g.*, *Omor*, 2015 WL 857587, at *7 (four to five hours); *Bender v. City of New York*, No. 09 Civ. 3286, 2011 WL 4344203, at *6 (S.D.N.Y. Sept. 14, 2011) (dismissing excessive force claim where plaintiff alleged that she was handcuffed "extremely tightly for nearly fourteen hours leaving indentations in plaintiff's forearms for over six hours").  Plaintiffs, therefore, have failed to state an excessive force claim based on Defendants' use of handcuffs.

B.  Catlin's Injury

As to the remaining claim of excessive force alleged by Catlin, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396.  "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment."  *Id.* (citation omitted) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  Catlin asserts that, while she was engaging in peaceful assembly, an officer stepped on her face with his boot, causing her pain for several days and a wound that remained visible for weeks thereafter.  SAC ¶¶ 189, 195, 208, 226-27.  The allegations here plead more than a "push or shove" necessary to effect an arrest.  *See Graham*, 490 U.S. at 396.

However, for the reasons set forth in more detail in Section VIII, *infra*, Catlin has failed to sufficiently plead the personal involvement of any of the Defendants, "a prerequisite to an award of damages under § 1983."  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).  Because

the Court will dismiss this claim based on lack of personal involvement, the Court need not address Defendants' qualified immunity arguments.

Accordingly, Defendants' motion to dismiss Case, Klein, and Kushneir's excessive force claim is GRANTED.  Defendants' motion to dismiss Catlin's excessive force claim is granted in Section VIII of this opinion.

IV.    Excessive Detention Claim

"[T]he Fourth Amendment provides the proper analytical framework" for claims that police conduct "unconstitutionally prolonged [an arrestee's] postarrest detention." *Bryant v. City of New York*, 404 F.3d 128, 135, 36 (2d Cir. 2005).  "In the context of pretrial detention, the Supreme Court has held that, when there has been a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention." *Id.*  "[A] jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement." *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).  In sum, "[w]hat is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours." *Bryant*, 404 F.3d at 138.  In New York, because probable cause determinations are made at arraignments, the Fourth Amendment thus requires that an arrestee be arraigned within 48 hours. *Id.*

The complaint alleges that Case, Klein, and Kushneir were each detained for about 15 to 20 hours, SAC ¶ 143, while Catlin was detained for about 38 hours, *id.* ¶ 212.  Because none of the Plaintiffs were detained in excess of 48 hours, their detention periods were presumptively reasonable.

"This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours." *McLaughlin*, 500 U.S. at

56.  A plaintiff may have an excessive detention claim if she can show that her probable cause

determination was "delayed unreasonably." *Id.*; *see Bernshtein v. City of New York*, No. 08 Civ.

2906, 2010 WL 2541617, at *1 (S.D.N.Y. June 22, 2010) ("It is undisputed that Plaintiff was

detained for less than 48 hours, but that does not end this inquiry.  The issue here is not the

number of hours Plaintiff was detained, but whether her detention was 'delayed

unreasonably.'").  However, a plaintiff "whose arraignment has been delayed less than forty-

eight hours bears the burden of proving the delay was unreasonable . . . and in evaluating the

reasonableness of such delay, 'courts must allow a substantial degree of flexibility' and 'cannot

ignore' the 'practical realities' attendant large metropolitan criminal justice systems." *Iron v.

Ricks*, No. 02 Civ. 4806, 2003 WL 21203409, at *11 (S.D.N.Y. May 22, 2003) (quoting

*McLaughlin*, 500 U.S. at 56-57).  "Examples of unreasonable delay are delays for the purpose of

gathering additional evidence to justify the arrest, a delay motivated by ill will against the

arrested individual, or delay for delay's sake." *McLaughlin*, 500 U.S. at 56.

Plaintiffs claim that their release was delayed "to deter and/or prevent them from

participating in further OWS-related demonstrations," SAC ¶ 80, and, more specifically, that

they and others were arrested on the morning of November 17, 2011 to prevent them from

participating in another OWS protest planned for that evening on the Brooklyn Bridge, *id.* ¶¶ 96-

99, 120.[9]  The complaint alleges that the NYPD, wishing to avoid a repeat of a mass OWS

protest on the bridge the month before, set out to make arrests of OWS demonstrators that

morning as a "proactive" measure.  *Id.* ¶ 99.  The Court finds that these allegations, at this stage,

plausibly support Plaintiffs' claim that they spent more time in detention than was necessary and

that the reason for the delay was to prevent them from participating in further protests "based on

---

[9] The complaint also alleges that Plaintiffs were detained "for the purpose of gathering additional evidence to justify the arrest," SAC ¶ 77, but this allegation is conclusory.

ill-will toward their perceived association with OWS." *Id.* ¶ 78. *See Pesola v. City of New York*, No. 15 Civ. 1917, 2016 WL 1267797, at *9 (S.D.N.Y. Mar. 30, 2016) (concluding that, where the plaintiffs alleged that their pre-arraignment delays were punishments for refusing to submit to iris scans, and even though "[t]here may be some set of facts brought out in discovery . . . that makes each delay appear reasonable, . . . [a]t this early stage and on the facts alleged, [the plaintiffs'] excessive detention claims cannot be dismissed"); *Sorensen v. City of New York*, No. 98 Civ. 3356, 2003 WL 169775, at *4 (S.D.N.Y. Jan. 23, 2003) (concluding that "[t]he question of whether the City intentionally delayed plaintiff's arraignment is one of intent" and "a question for the trier of fact"); *see also MacNamara*, 275 F.R.D. at 150 ("The central and predominant focus of the class action suit is not the mere length of detention for RNC arrestees, but the existence of a policy to detain them longer than would otherwise be required. Such a policy, if proven, would surely demonstrate that the probable cause determinations for individual RNC arrestees were unreasonably and deliberately delayed.").

The Court also finds that Defendants are not entitled to qualified immunity on this claim. "The rule . . . that officers cannot intentionally delay an arraignment for no reason—was 'clearly established' at the time of [P]laintiffs' arrest and detention. No reasonable officer could have believed it was permissible to intentionally delay a plaintiff's arraignment based on ill will or delay for delay's sake." *Allen v. City of New York*, No. 03 Civ. 2829, 2007 WL 24796, at *18 (S.D.N.Y. Jan. 3, 2007). Further, "[t]he fact that [D]efendants contest the version of event[s] presented by [P]laintiffs of course does not entitle them to qualified immunity." *Id.*; *see also Curry v. City of Syracuse*, 316 F.3d 324, 334 (2d Cir. 2003) ("Where the circumstances are in dispute, and contrasting accounts present [unresolved] factual issues . . . , a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity.").

Accordingly, Defendants' motion to dismiss Plaintiffs' excessive detention claim is DENIED.

## V.     Right to a Fair Trial Claim

Plaintiffs claim that Defendants violated their right to a fair trial under the Sixth Amendment by swearing out false statements against Plaintiffs in accusatory instruments.  SAC ¶¶ 350-56.  "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."  *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *see also Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015).  A plaintiff need not have actually proceeded to trial in order to have an actionable § 1983 claim based on the denial of this right.[10]  *See Ricciuti*, 124 F.3d at 127 (considering § 1983 claim for right to a fair trial where the plaintiffs' criminal charges were dismissed pre-trial); *Canario v. City of New York*, No. 05 Civ. 9343, 2006 WL 2015651, at *1 (S.D.N.Y. July 12, 2006) (same).  Rather, the allegedly false information must be material such that it "would likely influence the jury *if* it arrived at a jury." *Garnett v. Undercover Officer C0039*, No. 13 Civ. 7083, 2015 WL 1539044, at *8 (S.D.N.Y. Apr. 6, 2015).  Further, the plaintiff must "suffer[] a deprivation of liberty as a result." *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012); *see also Schiller v. City of New York*, No. 04 Civ. 10178, 2008 WL 200021, at *10 (S.D.N.Y. Jan. 23, 2008) ("The limiting factor appears to be not whether the plaintiff went to trial but whether the falsification caused material harm.").

---

[10] Moreover, a plaintiff's guilty plea in the prior proceeding does not preclude the plaintiff from pursuing a § 1983 claim based on the right to a fair trial.  *See Powers v. Coe*, 728 F.2d 97, 102 (2d Cir. 1984).

Plaintiffs allege that Defendants' sworn affidavits contained false accusations against Plaintiffs. Specifically, they claim that Almonte, Conforti, Tverdokhleb, and Maldonado each falsely swore that they had observed the conduct of Case, Catlin, Klein, and Kushneir, respectively. SAC ¶¶ 175-80, 213-17, 251-56, 283-87. The complaint further alleges that the district attorney decided to lodge charges against Plaintiffs based on these false statements. SAC ¶¶ 177, 215, 253, 285. Accepting these factual allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that the complaint adequately alleges that these were materially false statements that would likely influence a jury's decision and that caused Plaintiffs a deprivation of their liberty. *See* Mem. and Order on Recons., *Marom v. City of New York*, No. 15 Civ. 2017, ECF No. 66, at 2-6 (S.D.N.Y. July 29, 2016) (reinstating plaintiffs' fair trial claims on reconsideration); *Henry v. City of New York*, No. 02 Civ. 4824, 2003 WL 22077469, at *4 (S.D.N.Y. Sept. 8, 2003) (finding, on motion for summary judgment, that question of fact remained as to "whether Plaintiff's deprivation of liberty (his incarceration between his arrest and his release) was caused by the fabrication of evidence").

Further, Defendants are not entitled to qualified immunity on this claim. "Qualified immunity is unavailable on a claim for denial of the right to a fair trial where that claim is premised on proof that a defendant knowingly fabricated evidence and where a reasonable jury could so find." *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015); *see also Jovanovic v. City of New York*, No. 04 Civ. 8437, 2006 WL 2411541, at *13 (S.D.N.Y. Aug. 17, 2006) ("The right to a fair trial free of fabricated evidence is basic to our Constitution and was clearly established at the time that [the Defendant] allegedly acted. Any reasonable officer would have known that [p]laintiff's rights would be violated by . . . making false statements to prosecutors." (citation omitted)).

19

Accordingly, Defendants' motion to dismiss Plaintiffs' right to a fair trial claim is

DENIED.

VI.   First Amendment Claims

A. Retaliation

Plaintiffs assert a First Amendment retaliation claim.  SAC ¶¶ 322-28.  As an initial

matter, the existence of probable cause will defeat a First Amendment claim "premised on the

allegation that defendants prosecuted a plaintiff out of a retaliatory motive, in an attempt to

silence [plaintiff]."  *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012).  Accordingly,

because Case pleaded guilty to disorderly conduct, SAC ¶ 187, there was probable cause to arrest

him, and his First Amendment retaliation claim must be dismissed.  *See Cameron*, 806 F.2d at

387 ("[A] conviction of the plaintiff following the arrest is viewed as establishing the existence

of probable cause.").

The Court rejects Defendants' contention that there was probable cause to arrest Catlin

and Klein based on the allegations in the complaint.  As discussed in the context of Kushneir's

false arrest claim, nothing in the complaint suggests that the dispersal orders were sufficiently

communicated to Catlin and Klein or that either was given an opportunity to comply with the

orders.[11]  *See* SAC ¶¶ 194, 222-23, 238, 260-61.  The Court cannot conclude based solely on the

---

[11] Catlin and Klein were charged with additional provisions as compared to Kushneir, but this does not change the analysis.  In addition to also being charged with New York Penal Law section 240.20(5), Kushneir's sole charge, Klein was charged with section 240.20(6), and Catlin was charged with sections 195.05, 240.20(6), and parading without a permit in violation of New York City Administrative Code section 10-110.  The Court considered section 240.20(6) in its analysis of Kushneir's false arrest claim, and the same analysis applies to Catlin and Klein.  As for section 195.05, that provision states in relevant part that "[a] person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act."  Because there is a "dispute as to the pertinent events and the knowledge of the officers," the Court cannot decide as a matter of law that probable cause existed to support this charge.  *See Weyant*, 101 F.3d at 852.  Finally, Catlin and Klein, like Kushneir, resolved their charges by way of an ACD (except for Catlin's parading without a permit charge, which was dismissed at arraignment).

pleadings that there was probable cause as a matter of law to arrest Catlin and Klein.  Therefore,

Catlin, Klein, and Kushneir are not precluded from asserting a First Amendment retaliation

claim.

 "To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right

protected by the First Amendment; (2) the defendant's actions were motivated or substantially

caused by his exercise of that right; and (3) the defendant's actions caused him some injury."

*Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).  Plaintiffs satisfy the first

element because they plausibly allege that they were engaged in conduct protected by the First

Amendment, SAC ¶¶ 154, 189, 233, 264 (alleging that they were "peacefully assembling and

demonstrating . . . in connection with an OWS-related" event).  *See Jones*, 465 F.3d at 56 ("The

Supreme Court has declared that the First Amendment protects political demonstrations and

protests—activities at the heart of what the Bill of Rights was designed to safeguard."); *Church*

*of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("It is well

established that '[t]he First Amendment affords protection to symbolic or expressive conduct as

well as to actual speech.'" (quoting *Virginia v. Black*, 538 U.S. 343 (2003))).

 Plaintiffs also satisfy the second element by plausibly alleging that their treatment by the

NYPD was motivated or substantially caused by their First Amendment activity.  SAC ¶¶ 75-80.

The Second Circuit has acknowledged that a defendant's motive and intent are "both difficult to

plead with specificity in a complaint," and therefore "[i]t is sufficient to allege facts from which

a retaliatory intent on the part of the defendants reasonably may be inferred."  *Dougherty v.*

*Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002).  The Court finds

that the sequence of events alleged by Plaintiffs—that they were arrested while participating in

an OWS protest—is sufficient to infer Defendants' retaliatory motive.  *See, e.g., Meyers v. City*

*of New York*, No. 14 Civ. 9142, 2015 WL 6503825, at *12 (S.D.N.Y. Oct. 27, 2015) (holding

that the plaintiff's allegation that NYPD officers arrested him and his fellow demonstrators while

they were engaged in First Amendment speech implied "a motivation substantially caused by

that speech" and thus met the second element for a First Amendment retaliation claim).

Plaintiffs can satisfy the third element—injury—by showing "*either* that [their] speech

has been adversely affected by the government retaliation or that [they have] suffered some other

concrete harm." *Dorsett*, 732 F.3d at 160. This element is easily met here. Not only was

Plaintiffs' speech silenced when they were arrested and subsequently held in custody, but they

also suffered "some other concrete harm" in the form of criminal charges. *See Smith v.*

*Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (holding that the "issuance of the tickets was an

injury in that it subjected [plaintiff] to a state action requiring that she either appear in court, pay

a fine, or both").

Finally, Defendants are not entitled to qualified immunity on this claim. "[W]hen

determining a motion to dismiss on qualified immunity grounds in advance of full merits

discovery, . . . the question to be answered is whether a reasonable Government officer,

confronted with the facts as alleged by plaintiff, could reasonably have believed that his actions

did not violate some settled constitutional right." *Torres v. Village of Sleepy Hollow*, 379 F.

Supp. 2d 478, 483 (S.D.N.Y. 2005). "A citizen has a settled right not to suffer retaliation for the

exercise of his First Amendment rights." *Id.* at 486. The complaint clearly alleges that Plaintiffs

were engaged in First Amendment protected activity at the time of their arrests. *See Jones*, 465

F.3d at 56. And the complaint adequately alleges a retaliatory motive on the part of the officers

in arresting Plaintiffs. Because it would have been objectively unreasonable for those officers to

believe that arresting Plaintiffs for exercising their First Amendment rights was lawful, qualified

immunity is not available to Defendants at this time.  *See DePace v. Flaherty*, 183 F. Supp. 2d

633, 641-42 (S.D.N.Y. 2002).

Accordingly, Defendants' motion to dismiss Case's First Amendment retaliation claim is

GRANTED.  Defendant's motion to dismiss Catlin, Klein, and Kushneir's first Amendment

Retaliation claims is DENIED.

### B. Time, Place, and Manner Restriction

In addition to their retaliation claim, Plaintiffs assert a separate claim that "the restrictions

imposed by defendants on plaintiffs' First Amendment rights" constituted unconstitutional time,

place, and manner restrictions.  SAC ¶ 329.  As to exactly which "restrictions" Plaintiffs are

challenging, the complaint broadly asserts that the NYPD policies and practices alleged in

relation to Plaintiffs' *Monell* claims violated their First Amendment rights.  *Id.* ¶ 330.  In their

opposition, Plaintiffs appear to clarify that their challenge is directed at the New York Penal Law

provisions under which they were charged as well as the No-Summons Policy and the MAPP.

Pl. Opp. 36 n.8, 44, 45, ECF No. 62.  Plaintiffs challenge these penal law provisions and policies

not on their face but as applied, contending that they gave Defendants "unbridled discretion . . .

to permit or deny protected expression without limitation" and were, consequently,

unconstitutionally enforced against them.  *Id.* at 44, 45 & n.11.[12]

"Expression, whether oral or written or symbolized by conduct, is subject to reasonable

time, place, or manner restrictions."  *Clark v. Community for Creative Non-Violence*, 468 U.S.

---

[12] Plaintiffs also challenge the policies and penal law provisions "to the extent the Defendants seek to construe them as strict liability offenses."  Pl. Opp. 45; *see also* SAC ¶ 329 (claiming that the restrictions imposed by Defendants "[a]mounted to the imposition of strict liability on plaintiffs for participating in protected conduct.").  However, this is tantamount to Plaintiffs' contention that Defendants had "unbridled discretion" to arrest Plaintiffs under these laws and policies, and the Court does not construe this as a separate claim.  *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002) ("[E]ven content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression.  Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content.").

288, 293 (1984).  The government may impose such restrictions in public forums such as streets,

sidewalks, and parks, *see Snyder v. Phelps*, 562 U.S. 443, 456 (2011); *Hotel Emps. & Rest.*

*Emps. Union v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 544 (2d Cir.

2002), if they (1) are content-neutral, or "justified without reference to the content of the

regulated speech," (2) "are narrowly tailored to serve a significant governmental interest," and

(3) "leave open ample alternative channels for communication of the information," *Clark*, 468

U.S. at 293.  Although the "time, place, and manner" doctrine is traditionally invoked in the

context of an *ex ante* restriction, *see, e.g., Marcavage v. City of New York*, 689 F.3d 98, 101 (2d

Cir. 2012) (assessing reasonableness of the NYPD's "three-zone system" for pedestrian control

at the 2004 RNC that included "a demonstration area, a frozen area (with no pedestrian traffic),

and a no-demonstration area"), the Second Circuit has acknowledged that a police officer's on-

the-spot oral order to demonstrators can be analyzed under the time, place, and manner rubric,

*see Zalaski*, 723 F.3d at 388-89 (affirming judgment of district court that, among other things,

determined that the defendant police officer's order to demonstrators "was content-neutral and a

reasonable time, place, and manner restriction"); *see also* SAC ¶ 153 (describing a case in which

a New York City Criminal Court judge, in acquitting "Flood Wall Street protestors" arrested for

sitting in the street despite the issuance of dispersal orders, found that the police officer's order

to disperse "was not narrowly tailored and did not afford defendants ample alternative channels

for communication").  The Court therefore will construe Plaintiffs' "as applied" time, place, and

manner challenge as a challenge specifically to the allegedly improper dispersal orders

Defendants issued and used as justification for Plaintiffs' arrests.

      As to the first requirement, a restriction "that serves purposes unrelated to the content of

expression is deemed neutral, even if it has an incidental effect on some speakers or messages

but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The "principal inquiry in determining content neutrality . . . is whether the government has adopted a [restriction] of speech because of disagreement with the message it conveys." *Id.* Plaintiffs allege that "Defendants' police responses to plaintiffs' actions on November 17, 2011 . . . were based on the content of plaintiffs' speech, not their conduct," SAC ¶ 149, and that they were subjected to the No-Summons Policy and the MAPP "because the NYPD believed they had participated in political protest related to OWS," *id.* ¶ 68. However, the complaint also contains numerous allegations that other large demonstrations not associated with OWS—such as in connection with the 2002 World Economic Forum, anti-war protests in 2003, and the 2004 RNC, *see id.* ¶¶ 26, 33—met similar police responses and policies. Here, the complaint's allegations suggest that Defendants' orders to disperse was motivated not by disagreement with the particular subject matter of OWS, but rather by the fact that Plaintiffs were participating in a large demonstration. The Court thus finds that the restriction here-the allegedly improper dispersal orders--was content-neutral.

As to the second requirement, "[a]s a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981). The state has a strong interest in "ensuring the public safety and order" and "promoting the free flow of traffic on public streets and sidewalks." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994). The Supreme Court has clarified that "the requirement of narrow tailoring is satisfied 'so long as the . . . [restriction] promotes a substantial governmental interest that would be achieved less effectively absent the [restriction]." *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). Additionally, the means chosen cannot be

substantially broader than necessary to achieve that interest. *Id.* at 800. The restriction must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 799.

In cases involving a police officer's oral order issued in the field, however, some courts have found that the tailoring requirement calls for a more heightened review requiring that the restriction burden no more speech than necessary to serve the proffered government interest. *See McTernan v. City of York*, 564 F.3d 636, 655-56 (3d Cir. 2009). The Third Circuit, for instance, looked to *Madsen v. Women's Health Center*, where the Supreme Court "mandated a 'more searching' review where a restriction takes the form of an injunction, rather than a legislative enactment." *Id.* at 654 (quoting *Madsen*, 512 U.S. at 768). The Third Circuit explained that the *Madsen* Court identified two risks warranting a "more stringent application of general First Amendment principles." *Id.* (quoting *Madsen*, 512 U.S. at 768). The Third Circuit stated: "First, injunctions do not emanate from deliberative, democratic decision making processes . . . . Second, injunctions, which target discrete groups rather than society generally, may not attract public scrutiny, increasing the likelihood that unreasonable injunctions will escape public condemnation." *Id.* at 654-55. Likening on-the-spot police orders to injunctions, the Third Circuit reasoned:

> [A] police directive, issued by officers in the field, poses risks similar to those presented by an injunction, warranting heightened scrutiny. First, a police directive, like an injunction, does not embody the popular will but, rather, represents an exercise of executive authority. The absence of democratic involvement was particularly stark here. Sergeant Barth, apparently, conceived the restriction without meaningful public input and without reference to formal policy or administrative channels. Further, Sergeant Barth's directive did not result from deliberative, democratic processes—that is, it was not the product of a "legislative choice regarding the promotion of particular societal interests." Democratic input is especially critical in formulating speech restrictions, which must carefully balance constitutional rights against public safety imperatives. Further, as

in *Madsen*, the directives here, which focused on First Amendment activity at a single reproductive health clinic, might easily escape public scrutiny, requiring more vigilant judicial oversight. Hence, a directive issued by officers in the field, such as the one issued by Sergeant Barth, presents constitutional hazards similar to those identified with injunctions in *Madsen*.

Police directives, in fact, present potentially greater opportunities for arbitrary enforcement than injunctions. Whereas injunctions are written, police directives are oral. Oral directives often lack the precision and specificity required of federal injunctions. Moreover, oral police directives are less amenable to judicial, executive, and public oversight.

*Id.* at 655 (citation omitted) (quoting *Madsen*, 512 U.S. at 765). The Third Circuit then found, applying heightened scrutiny to the case at hand, that fact issues precluded summary judgment on the tailoring requirement.[13]  *Id.* at 656.

Here, however, at the motion to dismiss stage, the Court need not reach the question of whether a "more searching" review is required. Even under a less demanding level of review, the Court cannot conclude, based on the allegations in the complaint and without further factual development, that the requirements of "narrow tailoring" and "ample alternative channels of communication" were met. *See Pouillon v. City of Owosso*, 206 F.3d 711, 717-18 (6th Cir. 2000) (finding that the question "whether requiring [the plaintiff protestor] to move to the sidewalk was a reasonable time, place, and manner restriction that, as the First Amendment requires, left open ample alternative

---

[13] In *McTernan*, the defendant officer, citing traffic safety, had advised plaintiff and other protestors that they were "prohibited from standing or lingering in, or 'walking aimlessly' through," a public street from which they were protesting an adjacent abortion clinic. *Id.* at 643. The Third Circuit found that it was error for the district court to have concluded, as a matter of law, that excluding the Plaintiff from the street constituted the least restrictive means of protecting public safety. *Id.* at 656. Although the court did not question that traffic safety is a "significant" governmental interest, the court doubted "whether the safety issues are sufficiently defined, on the record before us, to sustain summary judgment that the restriction was 'narrowly tailored' to that interest." *Id.* The court also noted that "significant fact questions persist[ed]" due to "a paucity of evidence as to the safety hazards presented by the protesters' activities in the alley"; absent this information, the court was "hard pressed to conclude that [the defendant officer] selected the 'least burdensome' alternative to promote traffic safety in the alley as a matter of law." *Id.*

channels of communication . . . should have gone to the jury," where dispute existed as to whether ordering the protestor to return to the sidewalk would inhibit his protest). Furthermore, because the Court cannot conclude that Plaintiffs were arrested pursuant to a valid time, place, and manner restriction, and it was clearly established then that, absent such a valid restriction, arresting Plaintiffs for participating in the OWS demonstration was a First Amendment violation, Defendants are not entitled to qualified immunity at this time. *See Occupy Columbia v. Haley*, 738 F.3d 107, 124-25 (4th Cir. 2013).

Accordingly, Defendants' motion to dismiss Plaintiffs' First Amendment claim based on an unconstitutional time, place, and manner restriction is DENIED.[14]

VII.   Fourteenth Amendment Claims

A.   Equal Protection

Plaintiffs claim that the NYPD policies and practices alleged in relation to their *Monell* claims, discussed below, violated their Fourteenth Amendment rights to equal protection under the laws.   Plaintiffs base their equal protection claim on a selective enforcement theory, asserting that those policies and practices "target[ed] perceived participation in OWS demonstration." SAC ¶ 345; *see* Pl. Opp. 43.   To establish a violation of equal protection based on selective enforcement, Plaintiffs must show: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional

---

[14] Case's guilty plea does not foreclose him from asserting this claim. *See, e.g., Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 941-42, 951 (9th Cir. 2011) (holding that city ordinance prohibiting persons from "stand[ing] on a street or highway and solicit[ing] . . . employment . . . from an occupant of any motor vehicle" was an unconstitutional restriction on day laborers' First Amendment rights, where day laborers arrested under the ordinance had entered guilty pleas); *Wilson v. Lexington-Fayette Urban County Gov't*, 201 F. App'x 317, 320, 323-24 (6th Cir. 2006) (analyzing plaintiff's time, place, and manner challenge to an ordinance to which he had pleaded guilty of violating).

rights, or malicious or bad faith intent to injure a person." *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999).

Plaintiffs' cannot maintain their equal protection claim because they fail to adequately allege that they were treated differently from "others similarly situated." *Id.*   Although Plaintiffs assert that they were subjected to non-standard policing policies (the No-Summons Policy and the MAPP) that resulted in their being "held in custody for longer than similarly situated 'non-OWS related' arrestees would have been," SAC ¶ 74; *see also id.* ¶ 119 ("In Plaintiffs' cases, their arrest to release time was around double that of others similarly situated."), these allegations do not satisfy the "similarly situated" requirement of "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000).  Plaintiffs need not show "that both cases are identical." *Id.* But here, Plaintiffs fail to cite even one comparative case where Defendants applied a different policy to demonstrators.  Indeed, the complaint alleges that other large demonstrations not associated with OWS were also subjected to policies similar to the No-Summons Policy and MAPP.[15]  The Court thus concludes that Plaintiffs fail to state a claim for violation of their right to equal protection.  *See Marom v. City of New York*, No. 15 Civ. 2017, 2016 WL 916424, at *13-14 (S.D.N.Y. Mar. 7, 2016).

Accordingly, Defendants' motion to dismiss Plaintiffs' equal protection claim is GRANTED.

---

[15] Although Plaintiffs also allege that, under the leadership of a new mayor, the NYPD has been more accommodating of protests "far more disruptive" than the conduct Plaintiffs here were charged with, SAC ¶ 150, this allegation does not save their claim.  Plaintiffs refer to the "Flood Wall Street" protests of September 2014 as a comparison, but the only differential treatment alleged is that the City allowed the Flood Wall Street protesters to occupy the same areas in which Plaintiffs were arrested for a longer period of time, before also eventually subjecting them to mass arrests after dispersal orders. *Id.* ¶¶ 151, 153.

B.  Due Process

Plaintiffs also broadly plead violations of their right to due process.  *See* SAC ¶¶ 294-95. In their opposition, however, they argue only that their right to due process was violated because the Penal Law provisions under which Plaintiffs were charged did not provide adequate notice of the prohibited conduct.  Pl. Opp. 41 n.9.  This claim, however, cannot stand because Plaintiffs do not specifically allege that the Penal Law provisions violated their due process rights.  *See* SAC ¶¶ 294-95 (asserting generally that Defendants' "conduct and actions and/or omissions" deprived them of due process).  Plaintiffs make a passing reference to "vagueness and overbreadth concerns" in the context of their First Amendment claims, *id.* ¶ 329, but again fail to specify that they are challenging the Penal Law provisions.  A claim that is asserted in a brief but not in a pleading is not a properly pleaded claim, and the Court will not deem the pleading amended by the brief.  *See Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 836 (S.D.N.Y. 1988).

To the extent Plaintiffs also are asserting a substantive due process claim, this also fails. "[W]here another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of "substantive due process."'" *Kia P. v. McIntyre*, 235 F.3d 749, 757-58 (2d Cir. 2000) (quoting *Conn v. Gabbert*, 526 U.S. 286, 293 (1999)); *see also Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process.").  This is so because, as the Supreme Court has observed, "the guideposts for responsible decisionmaking" in the "unchartered area" of substantive due process "are scarce and open-ended." *Albright v. Oliver*,

510 U.S. 266, 271-72 (1994) (plurality opinion).  As a result, the Supreme Court has "always been reluctant to expand the concept of substantive due process" and has limited the availability of such claims to those which are not covered under other constitutional amendments.  *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998).  The Court concludes, therefore, that, because all of Plaintiffs' constitutional claims are covered under either First, Fourth, or Sixth Amendment standards and the Equal Protection Clause, they do not have an additional substantive due process cause of action under the Fourteenth Amendment.  *See Velez*, 401 F.3d at 94 (holding that the "plaintiff's substantive due process claim is either subsumed in her more particularized allegations," raising First Amendment and Equal Protection Clause claims, "or must fail.").

Accordingly, Defendants' motion to dismiss Plaintiffs' due process claim is GRANTED.

VIII.   Personal Involvement of Individual Defendants

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Colon*, 58 F.3d at 873 (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).  Plaintiffs' surviving claims are Kushneir's false arrest claim; Catlin's claim for excessive force; Catlin, Klein, and Kushneir's First Amendment retaliation claims; and all Plaintiffs' excessive detention, right to fair trial, and time, place, and manner claims.  If the complaint fails to plausibly allege the personal involvement of the individual defendants in each of those claims, the respective claims must be dismissed as to those particular defendants.

Each Plaintiff asserts claims against the police officer who, they allege, actually arrested them and processed their arrests, or, in the case of Catlin's excessive force claim, "cannot [be] rule[d] out" as the officer who stepped on her face.  SAC ¶ 197.  Plaintiffs also wish to hold "supervisory defendants"—Esposito, McCarthy, Groht, and Papola—liable for directing and supervising the misconduct of the subordinate officers.  *See id.* ¶¶ 191, 235, 268, 297-300.  In

analyzing claims against supervisory defendants, courts in the Second Circuit have looked to *Colon v. Coughlin*, which held that personal involvement of a supervisor may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873.[16]

With regard to the first factor in particular, the Second Circuit has clarified that the "direct participation" theory of supervisory liability refers to "personal participation by one who has knowledge of the facts that rendered the conduct illegal," but also encompasses personal participation that may be considered "indirect," "such as ordering or helping others to do the unlawful acts, rather than doing them him- or herself." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (footnote omitted).

A.  False Arrest Claim

Kushneir asserts his false arrest claim against Maldonado and Esposito.  SAC ¶ 56.  As to Maldonado, Kushneir alleges sufficient facts to establish that Maldonado processed his arrest. *Id.* ¶¶ 272-74, 278, 284.  This is sufficient to render plausible Maldonado's personal involvement

---

[16] The Supreme Court's decision in *Ashcroft v. Iqbal*, which imposed a limitation on supervisory liability, has "engendered conflict within [the] Circuit about the continuing vitality of the supervisory liability test set forth in *Colon.*"  *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012).  In the wake of *Iqbal*, district courts in the Second Circuit have disagreed on the continuing vitality of the second, fourth, and fifth *Colon* factors, with some suggesting that the viability of those factors "depends on the underlying constitutional claim."  *Marom*, 2016 WL 916424, at *14.  Courts appear to agree, however, that the third factor remains viable regardless of the underlying claim.  *Id.*  Because the relevant allegations with regard to the supervisory Defendants here sound only in the first and third factors, the Court need not concern itself with *Iqbal*'s ramifications on this analysis.

in Kushneir's false arrest, even though Maldonado may not have been present when Kushneir was seized, *see id.* ¶ 286.  *See Marom*, 2016 WL 916424, at *16 (finding that plaintiffs stated a false arrest claim against two officers who did not personally arrest plaintiffs but filled out their "arresting paperwork").

As to Esposito, Kushneir alleges that, at the time of his arrest, Esposito "was personally on the scene in the vicinity of Broadway and Exchange Place," SAC ¶ 267, where Kushneir was arrested, *id.* ¶ 266; "made the determination to engage in [the] mass arrests, and communicated that determination to [his] subordinates," *id.* ¶ 129; and "ordered, directed, and/or otherwise supervised the mass detention and arrests," *id.* ¶ 268.  The complaint also alleges that Esposito took part in giving the allegedly inadequate dispersal orders just prior to Plaintiffs' arrests, *id.* ¶¶ 130-31, and in maintaining control of the traffic in the vicinity, including by setting up NYPD barricades to prevent the passage of traffic through the protest areas, *id.* ¶ 110.  The Court finds that these allegations provide a plausible basis from which to conclude that Esposito participated directly in Kushneir's arrest.  *See Provost*, 262 F.3d at 155; *Carpenter v. City of New York*, 984 F. Supp. 2d 255, 262, 269 (S.D.N.Y. 2013) (finding, on motion for summary judgment, that the plaintiffs "submitted sufficient evidence to show that" Esposito was either "present for or partook in the alleged" use of excessive force where the facts indicated that Esposito only "authorized their arrest"); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 395 (S.D.N.Y. 2013) (finding allegations that sergeant instructed officer to use a taser on the plaintiff a second time, which plausibly constituted excessive force, provided plausible basis for sergeant's direct participation); *cf. id.* at 386 (dismissing excessive force claim against lieutenant where complaint alleged that he "was never present at the scene" and did "not allege that he issued any orders to the officers who were present").

33

B.  Excessive Force Claim

Catlin asserts her excessive force claim against Conforti, McCarthy, and Esposito.  The complaint alleges that before Catlin was arrested, "an unidentified NYPD officer stepped on the right side of plaintiff's face with his boot," SAC ¶ 195, and "rear-cuffed" Catlin "with plastic flex-cuffs," *id.* ¶ 196.  The complaint then pleads that Conforti processed Catlin's arrest.  *Id.* ¶ 198.  Instead of identifying the officer who stepped on her face, the complaint states that, "at this time, . . . Catlin cannot rule out that defendant Conforti was the officer who stepped on her face or put her in cuffs."  *Id.* ¶ 197.  Catlin's statement that she "cannot rule out" that Conforti was the officer who stepped on her face is insufficient to plausibly allege his personal involvement in the excessive force used against her.  *See Iqbal*, 556 U.S. at 678.  The complaint indicates that Catlin does not know who stepped on her, and, without more, the Court is unable to "draw the reasonable inference that defendant is liable for the misconduct alleged."  *Id.*

As to McCarthy, Catlin alleges that he was "on the scene" and that he "directed and/or supervised [] Conforti and other NYPD officers in making arrests, including" Catlin's.  SAC ¶ 191.  However, Catlin does not claim that McCarthy was involved in the excessive force used against her.  Because a plaintiff "cannot bring a Section 1983 claim against [an individual] based solely on [his] supervisory capacity or the fact that [he] held high positions of authority," *Hobson v. Fischer*, No. 10 Civ. 5512, 2011 WL 891314, at *3 (S.D.N.Y. Mar. 14, 2011) (quoting *Thomas v. Coombe*, No. 95 Civ. 10342, 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998)), the Court finds that Catlin has not plausibly alleged McCarthy's personal involvement.

The same is true for Esposito.  The complaint alleges that he was present in the area of the protest, and made the determination to participate in the mass arrests that resulted in the use

of excessive force during Catlin's arrest.  However, Catlin has not provided any facts suggesting a plausible basis for Esposito's personal involvement in the excessive force she alleges.

Accordingly, Defendants' motion to dismiss Catlin's excessive force claim is GRANTED.

### C.  Excessive Detention Claim

Plaintiffs generally assert their excessive detention claims against the subordinate officers who arrested them and/or processed their arrests, the higher-ranking supervisors who directly oversaw the subordinate officers, and Esposito.  The complaint sufficiently alleges the personal involvement of Almonte, Conforti, Tverdokhleb, and Maldonado in the respective excessive detention of Case, Catlin, Klein, and Kushneir, because the pleadings allege that these subordinate officers were involved in processing each plaintiff's arrest.  Case's allegations regarding Downes, however, indicate that Downes' involvement in Case's arrest ended once Case was arrested and sent to the prisoner transport vehicle.  SAC ¶¶ 160-63.  The complaint establishes that Almonte, not Downes, was involved in processing Case's arrest.  *Id.* ¶ 63.  Thus, the Court finds that Downes cannot be held liable for Case's excessive detention, which relates to the period between arrest and release.  As to the subordinate officers' direct supervisors— Papola, McCarthy, and Groht—the complaint summarily alleges that the supervisors were personally involved in each plaintiff's arrest processing, but in support states only that the supervisors "allegedly gave dispersal orders" and "directed and/or supervised" the subordinate officers in making Plaintiffs arrests—actions that, as described, are not plausibly related to each Plaintiff's post-arrest detention periods.  *Id.* ¶¶ 156, 191, 251.

As to Esposito, however, the complaint alleges that he gave the go-ahead to the subordinate officers to make the mass arrests in which Plaintiffs were seized, *see id.* ¶ 129, and

that he did so in order to prevent the protestors from, *inter alia*, engaging in protests on the Brooklyn Bridge later that evening, *id.* ¶¶ 95-99, 120. This is sufficient to render plausible Esposito's direct participation in Plaintiffs' excessive detentions, which Plaintiffs claim were partly a product of the NYPD's "proactive" measures, ordered by Esposito, to prevent participation in those evening protests, *id.* ¶¶ 99-100. *See Provost*, 262 F.3d at 155.

Accordingly, Defendants' motion to dismiss Plaintiffs' excessive detention claim is GRANTED as to Downes, Papola, McCarthy, and Groht, and DENIED as to all other individual Defendants.

### D. Right to a Fair Trial Claim

Plaintiffs generally assert their right to fair trial claims against the subordinate officers who arrested them and/or processed their arrests, the higher-ranking supervisors who directly oversaw the subordinate officers, and Esposito. The complaint alleges that Almonte, Conforti, Tverdokhleb, and Maldonado each falsely swore that they had observed the pre-arrest conduct of Case, Catlin, Klein, and Kushneir, respectively. SAC ¶¶ 175-80, 213-17, 251-56, 283-87. Plaintiffs claim that the officers' false statements formed the basis of the district attorney's decision to charge them. *Id.* ¶¶ 177, 215, 253, 285. The Court finds that these allegations are sufficient to show personal involvement in the facts underlying Plaintiffs' right to fair trial claims.

As to Downes, however, the complaint does not allege that his involvement in Case's arrest extended beyond his seizure and removal to the prisoner transport vehicle, *id.* ¶¶ 160-62, and the Court thus finds no plausible basis for Downes' personal involvement in any violation of Case's fair trial rights. As to Papola, McCarthy, and Groht, the complaint contains only broad assertions insufficient to plausibly allege their personal involvement in the falsification of the

accusatory instruments.  The most the complaint alleges is that these officers, along with their

subordinates Almonte, Conforti, and Tverdokhleb, "provided false and misleading information"

to the district attorney.  *Id.* ¶¶ 175, 213, 235.  Unlike its allegations as to the subordinate officers,

however, the complaint does not supply any factual detail indicating the nature of the

purportedly false information provided by the supervisors.  *See, e.g.*, *id.* ¶ 252 (alleging only that

Tverdokhleb swore to the information provided in the accusatory instrument).  The complaint

also alleges broadly that Papola, McCarthy, and Groht were, as supervisors, responsible for, *inter*

*alia*, ensuring the accuracy of their subordinates' arrest processing paperwork, *id.* ¶¶ 136-38, but

again provides no factual detail from which it would be reasonable to infer that they were

personally involved in the alleged falsification of information relating to Plaintiffs.

As to Esposito, the complaint contains only bare allegations that he directly participated in the

falsification of information that forms the basis of Plaintiffs' right to fair trial claims.  *See, e.g.*,

*id.* ¶ 135 (broadly asserting that Esposito was responsible for "ensur[ing] the accuracy" of "arrest

processing paperwork").

The complaint alleges, however, that Esposito may have "design[ed] and implement[ed]"

policies which violated Plaintiffs' fair trial rights.  *Id.* ¶ 27.  First, Plaintiffs allege that he

"played a central role . . . in designing and implementing" the following policies and practices

relevant to Plaintiffs' right to fair trial claims by:

- "assigning 'arrest teams' of officers who had not witnessed the conduct allegedly giving rise to the need for arrests to 'process' the arrests of multiple arrestees, including by . . . swearing out accusatory instruments containing false information"; and

- "inserting NYPD Legal Bureau and CJB agents into a special Mass Arrest Processing Plan using a centralized Mass Arrest Processing Center that manufactured false business and court records after the fact designed to give the impression that assigned arresting officers witnessed or knew things they had not, in fact, witnessed or known of."

*Id.* ¶ 27.  Second, Plaintiffs allege that Esposito "suggested, endorsed, ratified, and/or enacted a policy, practice, or procedure on November 17, 2011 of having assigned arresting officers speak with NYPD Legal Bureau and/or CJB officers as part of the mass arrest processing procedures." *Id.* ¶ 114.

However, the complaint fails to describe what "central role" Esposito played in "designing and implementing" the alleged policies.  *See id.* ¶ 27.  Without more than these two allegations broadly describing Esposito's role with respect to these policies, the Court cannot conclude that he was personally involved in the violation of Plaintiffs' fair trial rights.  *See Richardson v. Dep't of Correction*, No. 10 Civ. 6137, 2011 WL 710617, at *3 (S.D.N.Y. Feb. 28, 2011) ("The conclusory allegations of [the supervisory defendant's] implementation of [prison rules] is insufficient to establish his personal involvement in any allegedly unconstitutional custom or policy."); *Davis v. City of New York*, No. 00 Civ. 4309, 2000 WL 1877045, at *9 (S.D.N.Y. Dec. 27, 2000) (merely asserting that a defendant "was actively involved in" an incident is conclusory and insufficient to establish the defendant's personal involvement in the alleged unconstitutional policy).

Accordingly, Defendants' motion to dismiss Plaintiffs' right to fair trial claim is GRANTED as against Downes, Papola, McCarthy, Groht, and Esposito, and DENIED as to all other individual defendants.

### E.  First Amendment Claims

Plaintiffs generally assert their First Amendment retaliation and time, place, and manner claims against the subordinate officers who arrested them and/or processed their arrests, the higher-ranking supervisors who directly oversaw the subordinate officers, and Esposito.

1. Retaliation

Kushneir's First Amendment retaliation claim arises from the same factual allegations as his false arrest claim—that Defendants arrested him without probable cause because he was participating in an OWS demonstration. The claim is analyzed for personal involvement in the same manner. *See Marom*, 2016 WL 916424, at *18. Thus, for the reasons explained in the personal involvement analysis related to Kushneir's false arrest claim, Kushneir adequately alleges that both Maldonado and Esposito were personally involved in retaliating against him.

Catlin, like Kushneir, sets forth a number of allegations showing that Conforti processed her arrest. SAC ¶¶ 197-98, 200, 204, 214. Because the arrest processing constitutes part of the alleged retaliatory action taken against Catlin, these allegations are sufficient to show Conforti's personal involvement. As to McCarthy, Catlin alleges that he was "on the scene" and "gave dispersal orders, represented that there was no permit for the conduct the protestors were allegedly engaging in, and directed and/or supervised . . . Conforti and other NYPD officers in making arrests," including Catlin's. *Id.* ¶ 191. This is sufficient to render plausible McCarthy's direct participation, and thus personal involvement, in the retaliation that forms the basis of Catlin's claim. *See Carpenter*, 984 F. Supp. 2d at 262, 269.

Similarly, Klein sufficiently alleges the personal involvement of Tverdokhleb and Groht in retaliation against her. She sets forth a number of allegations establishing that Tverdokhleb processed her arrest, SAC ¶¶ 240, 242, 246, 252, and that Groht was "on the scene" and "gave dispersal orders and directed and/or supervised . . . Tverdokhleb and other NYPD officers in making arrests," including Klein's, *id.* ¶ 235.

Although, unlike Kushneir, Catlin and Klein do not specifically allege that Esposito was in their immediate vicinity at the time of their arrests, the complaint does place Esposito in the

protest areas at the time of Plaintiffs' arrests, and further alleges that he made the determination to engage in the arrests, which he communicated to his subordinates, *id.* ¶ 129, and took part in maintaining control of the traffic in the area and giving the allegedly inadequate dispersal orders just prior to Plaintiffs' arrests, *id.* ¶¶ 110, 130-31.  The Court finds that these allegations provide a plausible basis to conclude that Esposito participated directly in the First Amendment retaliation alleged by Catlin and Klein, as well as Kushneir.  *See Carpenter*, 984 F. Supp. 2d at 262, 269.

### 2.  Time, Place, and Manner Restriction

Kushneir, Klein, and Case fail to plausibly allege the personal involvement of Maldonado, Tverdokhleb, and Almonte with respect to their time, place, and manner claims. They specifically allege that these officers were not on the scene at the time of each Plaintiff's arrest, SAC ¶¶ 178, 254, and/or did not personally observe the conduct leading up to the arrests, *id.* ¶¶ 179, 255, 286.  Plaintiffs do not allege that these officers otherwise took part in the events leading up to the arrests, claiming only that they were involved in the subsequent processing of the arrests.  Thus, there is no basis to conclude that Maldonado, Tverdokhleb, and Almonte were personally involved in the events leading up to Plaintiffs' arrests that form the basis of Plaintiffs' First Amendment time, place, and manner challenge.

Plaintiffs do, however, sufficiently allege the personal involvement of the supervisors. As to McCarthy, Groht, and Papola, Plaintiffs allege that these officers were "on the scene" of the arrests and actually gave the dispersal orders.  *Id.* ¶¶ 132-34, 156, 191, 235.  The complaint goes even further with Esposito, alleging that he was present in the protest areas at the time of Plaintiffs' arrests, *id.* ¶ 104; made the determination to engage in the arrests, which he communicated to his subordinates, *id.* ¶ 129; and took part in maintaining control of the traffic in

the area and giving the allegedly inadequate dispersal orders just prior to Plaintiffs' arrests, *id.* ¶¶ 110, 130-31. These allegations are sufficient to render plausible the direct participation, and thus personal involvement, of the supervisory defendants with respect to Plaintiffs' time, place, and manner claims. *See Carpenter*, 984 F. Supp. 2d at 262, 269.

Case sufficiently alleges the personal involvement of Downes, claiming that Downes arrested and handcuffed him, SAC ¶¶ 160-61, rendering plausible Downes' direct participation in the events leading up to the arrest that constituted the allegedly unconstitutional restriction.

In contrast, Catlin has not sufficiently pleaded that Conforti directly participated in Catlin's arrest. The complaint alleges that Conforti "cannot [be] rule[d] out" as the officer who handcuffed Catlin. *Id.* ¶ 197. As with Catlin's excessive force claims, this allegation is insufficient to plausibly allege Conforti's personal involvement in the arrest.

Accordingly, Defendants' motion to dismiss Plaintiffs' First Amendment claim based on an unconstitutional time, manner, and place restriction is GRANTED as to Maldonado, Tverdokhleb, Almonte, and Conforti, and DENIED as to all other individual defendants.

IX.    Failure to Intervene

Plaintiffs also claim that the individual Defendants are liable for failing to intervene to prevent the violation of their constitutional rights. Because a "failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim," *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012); *see also Feinberg v. City of New York*, No. 99 Civ. 12127, 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004), Plaintiffs' failure to intervene claims are assessed only as they relate to their surviving claims.

Further, a defendant "cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop [himself] from committing that violation." *Marom*, 2016 WL

916424, at *19. Therefore, Plaintiffs may not assert a failure to intervene claim against a defendant who they have plausibly alleged was personally involved in the underlying violation. Pursuant to the Court's conclusions above, Plaintiffs may only assert failure to intervene claims against Downes, Papola, McCarthy, and Groht for failing to intervene to prevent Plaintiffs' excessive detentions; Downes, Papola, McCarthy, Groht, and Esposito for failing to intervene to prevent the denial of Plaintiffs' right to a fair trial; and Maldonado, Tverdokhleb, and Almonte for failing to intervene to prevent the application of an unconstitutional time, place, and manner restriction against Plaintiffs.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested or (3) that any constitutional violation has been committed by a law enforcement official." *Id.* (citations omitted). However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Id.*

Plaintiffs fail to plausibly allege that Downes had a "realistic opportunity" to prevent Case's excessive detention or the violation of his fair trial rights for the same reasons they cannot show his personal involvement in the underlying violations. *See id.* Nothing in the complaint suggests that Downes' involvement in Case's arrest extended beyond executing the arrest itself and sending Case to the prisoner transport vehicle. SAC ¶¶ 160-63. Thus, the Court finds that Downes cannot be held liable for failing to intervene on these two claims.

As to Papola, McCarthy, and Groht, the complaint's broad allegations that they "directed and/or supervised" the subordinate officers in making arrests, *id.* ¶¶ 156, 191, 251, were responsible for ensuring the accuracy of their subordinates' arrest processing paperwork, *id.* ¶¶ 136-38, and, along with their subordinates, "provided false and misleading information" to the district attorney, *id.* ¶¶ 175, 213, 235, fail to raise a reasonable inference that they had a "realistic opportunity" to prevent Plaintiffs' excessive detentions and the violation of their fair trial rights. *See Anderson*, 17 F.3d at 557.

Similarly, with respect to the failure to intervene claim against Esposito, the complaint broadly asserts that Esposito was responsible for "ensur[ing] the accuracy" of "arrest processing paperwork," SAC ¶ 135, and that he "suggested, endorsed, ratified, and/or enacted," *id.* ¶ 114, or played a "central role" in "designing and implementing," policies pursuant to which subordinate officers swore out accusatory instruments containing false information, *id.* ¶ 27. These vague allegations provide no plausible basis to conclude that Esposito had a realistic opportunity to intervene to prevent the falsification of Plaintiffs' accusatory instruments. Thus, he cannot be held liable for failing to intervene to prevent the denial of Plaintiffs' fair trial rights.

Finally, for the same reasons Plaintiffs cannot show their personal involvement in the underlying violations, there are no allegations that Maldonado, Tverdokhleb, or Almonte had a "realistic opportunity" to prevent the application of an unconstitutional time, place, and manner restriction against Kushneir, Klein, or Case, respectively. *See Anderson*, 17 F.3d at 557. As noted above, Plaintiffs specifically allege that these officers were not on the scene at the time of each Plaintiff's arrest, SAC ¶¶ 178, 254, or did not personally observe the conduct leading up to the arrests, *id.* ¶¶ 179, 255, 286, and they do not otherwise allege that these officers were present for the events leading up to Plaintiffs' arrests.

Accordingly, Defendants' motion to dismiss Plaintiffs' failure to intervene claim is GRANTED as to all defendants.

X.     *Monell* Claims

Finally, Plaintiffs seek to hold the City liable for the deprivation of their constitutional rights. A municipality may be held liable under § 1983 only if the plaintiff's injury is the result of a municipal policy, custom, or practice. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To establish a municipal policy or custom, a plaintiff must allege that: (1) "a particular municipal action *itself* violates federal law, or directs an employee to do so," *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997); (2) an "authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right," *id.* at 405; (3) unconstitutional "practices [are] so persistent and widespread as to practically have the force of law," *Connick v. Thompson*, 563 U.S. 51, 61 (2011); or (4) a municipality's failure to train its employees "about their legal duty to avoid violating citizens' rights" amounts to "deliberate indifference," *id.* Moreover, "there must be a 'direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation.'" *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 531 (S.D.N.Y. 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). "[T]he mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (alteration in original) (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)).

Plaintiffs argue that the City is liable under the theory that it failed to train its police officers. Pl. Opp. 50-59; *see also* SAC ¶ 362. To state a claim for municipal liability against the City, the complaint must demonstrate a "direct causal link between" the alleged failure to train and the constitutional deprivation. *Triano*, 895 F. Supp. 2d at 531. Further, "a municipality's

failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 563 U.S. at 61 (quoting *Canton*, 489 U.S. at 388). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quoting *Bryan Cty.*, 520 U.S. at 410). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* "The city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Id.* at 61-62 (quoting *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)).

Generally, "[a] pattern of similar constitutional violations by untrained employees is . . . necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (internal quotation mark omitted). "Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"— necessary to trigger municipal liability.'" *Id.* (quoting *Bryan Cty.*, 520 U.S. at 407).

At the motion to dismiss stage, the Second Circuit uses a three-prong test to determine whether a plaintiff has demonstrated a municipality's "deliberate indifference" in the context of a failure to train claim. *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992). "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." *Id.* at 297 (quoting *Canton*, 489 U.S. at 390 n.10). "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the

sort that training or supervision will make less difficult or that there is a history of employees

mishandling the situation." *Id.* And, third, "the plaintiff must show that the wrong choice by the

city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at

298. Where all three elements are established a plaintiff has stated a plausible *Monell* claim

based on a failure to train. *Id.*; *see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130

n.10 (2d Cir. 2004).

In *Marom v. City of New York*,[17] another case brought by OWS demonstrators and

involving a virtually identical set of allegations in support of their failure to train claim, the

Honorable P. Kevin Castel concluded that the plaintiffs failed to meet this test. 2016 WL

916424. He found that, although they satisfied the first and third elements, *see id.* at \*22 ("It is

plausible to infer from the [complaint], and is [a] matter of general common sense, that NYPD

decision makers are aware that their officers, at some point, will need to arrest protestors taking

part in a large demonstration, and that NYPD officers mishandling large protests could cause

constitutional deprivations." (citations omitted)), plaintiffs "fail[ed] to plausibly allege that there

is a history of the NYPD mishandling mass protesting situations on a scale that could be

reasonably construed as setting out a pattern or practice of constitutional abuse," *id.* There, as

here, the plaintiffs argued that a pattern of the NYPD causing similar constitutional deprivations

was supported by their allegations regarding the 2004 RNC protests and "various other section

1983 lawsuits brought against the City." *Id.* at \*22. Judge Castel was unpersuaded, finding that:

> the allegations regarding the RNC protest are plaintiffs' own conclusions,
> unsupported by facts, that the NYPD's actions in 2004 caused a substantial
> number of constitutional violations. And, the allegations concerning
> previous section 1983 lawsuits fail to explain which—if any—lawsuits led
> to findings of liability against the NYPD for constitutional violations,
> beside the one conviction of an NYPD officer. (FAC ¶ 26). They also do
> not allege that testimony was taken during any of those lawsuits that shows

---

[17] The plaintiffs in *Marom* were represented by the same counsel as Plaintiffs here.

a pattern and practice of constitutional abuse. Plaintiffs do cite a joint study produced by The Global Justice Clinic at NYU Law School and the Walter Leitner International Human Rights Clinic at Fordham Law School, but that paper references 130 "alleged incidents of physical force [in New York City] ... which warrant investigation by authorities." (Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street (July 25, 2015), p.1, http://hrp.law.harvard.edu/criminal-justice/suppressing-protest-human-rights-violations-in-the-us-response-to-occupy-wall-street/). Neither a newspaper report nor an academic paper reporting on incidents that ought to be investigated is a showing of anything entitled to a presumption of truth.

*Id.*

This Court, however, finds otherwise and concludes that Plaintiffs adequately state a *Monell* claim based on the City's failure to train. Plaintiffs point to a number of cases spanning the period from 2000 to 2012 that demonstrate "a pattern and practice of constitutional abuse" involving the use of mass arrest policies and practices similar to the ones that led to their constitutional deprivations. *See SAC* ¶ 26. For example:

- *Mandal v. City of New York*, Nos. 02 Civ. 1234, 02 Civ. 1367, 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007), where, following a trial in which "[a]pproximately thirty-eight Plaintiffs prevailed," a "jury found that between May 1, 2001 and July 13, 2001, the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs";

- MacNamara v. City of New York No. 04 Civ. 9216, 2007 WL 3196295, at *1, brought by demonstrators arrested during the 2004 RNC, and in which the Honorable James C. Francis noted that the Honorable Kenneth M. Karas stated that "one reasonable interpretation" of the deposition testimony of one of the arresting officers "is that he included false information in the narrative section of his booking report because he was instructed to do so by a Lieutenant in the NYPD Legal Bureau," and that, "[m]ore disturbing still, [the officer's] testimony appears to indicate that this unlawful act was not an isolated incident,";

- *Dinler*, 2012 WL 4513352, at *3-12, in which the Honorable Richard J. Sullivan granted the plaintiffs' motions for summary judgment on their false arrest claims relating to a mass arrest at the 2004 RNC;

- *Osterhoudt v. City of New York*, No. 10 Civ. 3173, 2012 WL 4481927, at *1-2 (E.D.N.Y. Sept. 27, 2012), in which the plaintiff alleged that he observed, on

election night in November 2008, "NYPD officers picking fights and indiscriminately arresting bystanders," and was "swept up in the mass arrests, . . . charged with obstructing governmental administration, resisting arrest, and disorderly conduct and detained for 17 hours before his charges were adjourned in contemplation of dismissal"; and where the court denied defendants' motion to dismiss the plaintiff's *Monell* claims, which the plaintiff supported "by citing other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 Republican National Convention, and the World Economic Forum," including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis";

- and more, *see* SAC ¶ 26.[18]

"[I]n the context of Rule 12, where plausibility is in issue, it is hard to ignore these cases, which suggest that the conduct complained of is not limited to the four corners of [Plaintiffs'] complaint." *Osterhoudt*, 2012 WL 4481927, at *1. In addition, Plaintiffs cite numerous lawsuits in which similar mass arrest-related policies and practices were, or are currently being, challenged, but for which no findings of liability have yet to be made. However, although these "citations to pending lawsuits and settlement agreements will not suffice to overcome summary judgment . . . they do permit a plausible inference of deliberate indifference." *Id.* at *2 (internal quotation marks omitted); *see also Colon v. City of New York*, Nos. 09 Civ. 8, 09 Civ. 9, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009) (denying motion to dismiss where plaintiff's allegation that officers manufactured drug evidence, combined with the court's "knowledge of cases in other federal and state courts," stated a plausible *Monell* claim). As the court in *Osterhoudt* acknowledged, "[s]hould such a de facto policy or practice of mass arrests exist, it

---

[18]In addition to these cases, Plaintiffs also allege that, as a result of the City's mass arrest policies and practices, "the New York State Supreme Court held [the] City in contempt of court for failing to release hundreds of arrestees who had been detained in excess of 24 hours without justification for the delay, some of whom had been detained for more than 72 hours." SAC ¶ 46. And, in another case, the New York City Criminal Court acquitted "Flood Wall Street protestors" who had been arrested after sitting in the street for over eight hours even after dispersal orders were made, finding that the police officer's order to disperse violated the First Amendment's time, place, and manner requirements. *Id.* ¶ 153.

will not likely be shown by direct evidence." 2012 WL 4481927, at *2.  Like the court in

*Osterhoudt*, this Court recognizes the "formidable hurdle" plaintiffs face at the pleading stage,

and finds that Plaintiffs have "nudged [their] claims across the line from conceivable to

plausible." *Id.* (quoting *Twombly*, 550 U.S. at 570).

     The analysis does not end here, however.  As noted above, Plaintiffs must demonstrate a

"direct causal link between" the alleged failure to train and their surviving claims.  Plaintiffs

claim that the City failed to properly train its police officers in the following eight policies and

practices:

1. "The use of police resources to corral and trap perceived participants in
   First Amendment assemblies";

2. "The policy and practice of failing to ensure that constitutionally
   meaningful and adequate dispersal orders and opportunities to disperse are
   given prior to effecting arrests in connection with First Amendment
   assemblies";

3. "The policy and practice of treating perceived 'groups' of people as a
   'unit' for 'mass arrest' probable cause determination purposes without
   ensuring that lawfully authorized and constitutionally significant notice,
   and a meaningful opportunity to disperse, were given and disregarded
   prior to treating the perceived 'group' as a 'unit'";

4. "The policy and practice of applying [New York Penal Law] § 240.20 (5)
   (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic) in
   connection with actual or perceived protest activity in circumstances
   where the person arrested neither created nor recklessly risked substantial
   disruption of vehicular or pedestrian traffic or other criminally significant
   public ramifications";

5. "The policy and practice of applying [New York Penal Law]§ 240.20 (6)
   (Disorderly Conduct – Failure to Obey Lawful Dispersal Order) in
   connection with actual or perceived protest activity in circumstances
   where neither lawful dispersal orders, nor meaningful opportunities to
   disperse, were in fact given";

6. "The use of arrests in lieu of individualized determinations related to
   arrestees' eligibility for releases with summonses for summons-eligible

offenses in connection with perceived OWS demonstrations (the 'No-Summons Policy')";

7. "The policy and practice of assigning 'arrest teams' of officers who had not witnessed the conduct allegedly giving rise to the need for arrests to 'process' the arrests of multiple arrestees, including by filling out NYPD paperwork and swearing out accusatory instruments containing false information"; and

8. "The policy and practice of inserting NYPD Legal Bureau and CJB agents into a special Mass Arrest Processing Plan using a centralized Mass Arrest Processing Center that manufactured false business and court records after the fact designed to give the impression that assigned arresting officers witnessed or knew things they had not, in fact, witnessed or known of."

SAC ¶ 361. The Court finds that all but the first of these alleged policies and practices bear a direct causal link to the constitutional violations implicated in Plaintiffs' surviving claims.[19] The first alleged practice regards the "use of police resources to corral and trap" demonstrators, but nowhere do Plaintiffs allege that this practice was used specifically against them or resulted in the violation of their constitutional rights. *See id.* ¶ 100 (alleging only that "Esposito and other NYPD officials . . . planned . . . to stop, detain, and effectively trap protestors" before mass arresting them). The second, third, fourth, and fifth alleged practices, on the other hand, concern the lawfulness and adequacy of the NYPD's dispersal orders and probable cause determinations, and bear a plausibly direct connection to Plaintiffs' false arrest and First Amendment claims. The sixth practice bears a direct connection to Plaintiffs' excessive detention claims, in that Plaintiffs allege that they were eligible for summonses and would have been released much sooner had they received summonses. Finally, the seventh and eighth alleged practices, which

---

[19] Because the excessive force claim was dismissed due to lack of personal involvement and not because Plaintiffs were unable to state a *prima facie* case, the Court may also consider whether Defendants' failure to train led to the use of excessive force. *See Caravalho v. City of New York*, No. 13 Civ. 4174, 2016 WL 1274575, at * 20 (S.D.N.Y. Mar. 31, 2016). However, the Court finds no such link between the alleged failure to train and the excessive force claim.

concern the NYPD's falsification of information in the context of mass arrest processing, bear a direct connection to Plaintiffs' right to fair trial claims.

Finally, as to each of the second to eighth alleged policies and practices, Plaintiffs' allegations give rise to the plausible inference that the City was deliberately indifferent in training its officers.  As discussed above, Plaintiffs claim that these specific practices were similarly applied in other cases, spanning the 10-year period leading up to the November 17, 2011 demonstration, to falsely arrest protestors for engaging in First Amendment activity, based on inadequate dispersal orders and resulting in charges such as disorderly conduct; to deny them individual consideration for summonses, leading to excessive detention periods; and to prosecute them based on false information.  Based on the dozens of lawsuits and decade of litigation over these incidents, Plaintiffs plausibly allege that the City knew or should have known that these policies and practices led to unconstitutional results.  Plaintiffs have set forth sufficient allegations to support their claim that the City failed to properly train its officers to ensure that similar constitutional violations would not be repeated, and this failure is the same training failure that led to Plaintiffs' constitutional deprivations.

Accordingly, Defendants' motion to dismiss Plaintiffs' § 1983 claim against the City is DENIED as to the false arrest, First Amendment, excessive detention, and right to fair trial claims.

## CONCLUSION

For the reasons stated above:

- Defendants' motion to dismiss Kushneir's false arrest claim is DENIED as to Maldonado and Esposito.
- Defendants' motion to dismiss Plaintiffs' excessive force claim is GRANTED.

- Defendants' motion to dismiss Plaintiffs' excessive detention claim is GRANTED as to Downes, Papola, McCarthy, and Groht and DENIED as to Almonte, Conforti, Tverdokhleb, Maldonado, and Esposito.
- Defendants' motion to dismiss Plaintiffs' right to a fair trial claim is GRANTED as to Downes, Papola, McCarthy, Groht, and Esposito, and DENIED as to Almonte, Conforti, Tverdokhleb and Maldonado.
- Defendants' motion to dismiss Case's First Amendment retaliation claim is GRANTED.  Defendants' motion to dismiss Kushneir, Klein and Catlin's claim is DENIED as to Maldonado, Esposito, Conforti, McCarthy, Tverdokhleb, and Groht.
- Defendants' motion to dismiss Plaintiffs' First Amendment claim based on an unconstitutional time, manner, and place restriction is GRANTED as to Maldonado, Tverdokhleb, Almonte, and Conforti, and DENIED as McCarthy, Groht, and Papola.
- Defendant's motion to dismiss Plaintiffs' equal protection claim is GRANTED.
- Defendants' motion to dismiss Plaintiffs' due process claim is GRANTED.
- Defendants' motion to dismiss Plaintiffs' failure to intervene claim is GRANTED
- Defendants' motion to dismiss Plaintiffs' § 1983 claim against the City is DENIED as to the false arrest, First Amendment, excessive detention, and right to fair trial claims.

SO ORDERED.

Dated: February 10, 2017
      New York, New York

_____
ANALISA TORRES
United States District Judge