Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 3   - - - - - - - - - - - - - - - - - -x
     BENJAMIN CASE, ELIZABETH CATLIN,
 4   JENNIFER KLEIN, and MARK KUSHNER,
 5                       Plaintiffs,
                    Index No. 14-cv-9148 (AT)
 6         -against-
 7   THE CITY OF NEW YORK, NEW YORK CITY
     POLICE DEPARTMENT ("NYPD") CHIEF OF
 8   DEPARTMENT JOSEPH ESPOSITO, NYPD
     DEPUTY CHIEF BRIAN MCCARTHY, NYPD
 9   LIEUTENANT DAVID GROHT, NYPD SERGEANT
     LAWRENCE PAPOLA, SHIELD NO. 03646, NYPD
10   OFFICER BENJAMIN ALMONTE, SHIELD NO.
     29182, NYPD OFFICER DANIEL CONFORTI,
11   SHIELD NO. 26403, NYPD OFFICER FIRST
     NAME UNKNOWN ("FNU") DOWNES, SHIELD NO.
12   UNKNOWN, NYPD OFFICER DMITRY TVERDOKHLEB,
     SHIELD NO. 27018, and NYPD OFFICER
13   MICHAEL MALDONADO, SHIELD 23573,
14                       Defendants.
     - - - - - - - - - - - - - - - - - -x
15
                     100 Church Street
16                   New York, New York
17                   September 12, 2017
                     2:21 p.m.
18
19
20
21   *** CONFIDENTIAL PORTION FROM PAGE 39, LINE
22         16 TO PAGE 47, LINE 06 ***
23
24
25   CAPTION CONTINUED ON NEXT PAGE
```

Page 2

```
 1
 2       EXAMINATION BEFORE TRIAL of SERGEANT
 3   BENJAMIN ALMONTE, the PLAINTIFF in the
 4   above-entitled action, held at the above
 5   time and place, taken before Garry J.
 6   Torres, a Shorthand Reporter and Notary
 7   Public of the State of New York, pursuant
 8   to the Federal Rules of Civil Procedure,
 9   and stipulations between Counsel.
10
11
...
25
```

NYC LAW DEPARTMENT RECEIVED 2017 SEP 27 A 10:42

```
                                                    Page 3
 1
 2    APPEARANCES:
 3
         GIDEON ORION OLIVER
 4            Attorney for Plaintiffs
              BENJAMIN XASE, ELIZABETH CATLIN,
 5            JENNIFER KLEIN, and MARK
               KUSHNER
 6            277 Broadway, Suite 1501
              New York, New York 10007
 7            TEL: (646) 263-3495
 8       BY:  GIDEON OLIVER, ESQ.
 9
10       NEW YORK CITY LAW DEPARTMENT
              Attorneys for Defendants
11            THE CITY OF NEW YORK
              100 Church Street
12            New York, New York 10007
              TEL: (212) 356-3518
13            EMAIL: arobinson@law.nyc.gov
14       BY:  AMY ROBINSON, ESQ.
15                *       *       *
16
17
18
19
20
21
22
23
24
25
```

Page 22

```
 1                    B. ALMONTE
 2       A.    Can you elaborate?
 3       Q.    Sure.  I asked you if you were
 4  involved in making or processing any
 5  arrests aside from the six that we had
 6  just discussed, the five at Mr. Case's
 7  arrest location and the one earlier and I
 8  believe you indicated, yes, you were
 9  involved in making or processing arrests
10  other than those six.
11             So I'm asking you now, what was
12  your involvement in making or processing
13  arrests aside from those six?
14       A.    Are you talking about what was
15  my function that day?
16       Q.    No.  Although what was your
17  function that day?
18       A.    Case and day I was assigned to
19  Brooklyn South Task Force.  We were
20  advised that we were going to a mass
21  demonstration in the city and we were
22  there to keep the traffic, pedestrians of
23  free moving traffic and we might encounter
24  protesters.
25       Q.    Okay.  We'll get back to that
```

1                B. ALMONTE
2    other task force from the city would then
3    meet at a location and assigned from head
4    quarters and then we would make spot
5    checks you can say, at different
6    locations.  I guess high priority
7    locations you can say.
8            So part -- during my time in
9    Brooklyn South Task Force, of the seven
10   years we did multiple assignments of Cobra
11   and multiple times of those assignments
12   was Wall Street also was one of the stops.
13        Q.    Are those kinds of spot checks
14   also called visits?
15        A.    Visits.
16        Q.    Fair enough.  Your memo book
17   entries indicate you arrived in the area
18   of Beaver and William at 9:45, correct?
19        A.    Yes.
20        Q.    As far as you know sitting here
21   today, is that when you actually arrived
22   there?
23        A.    I don't recall the time.  That's
24   what I wrote in my memo book.
25        Q.    Okay.  Fair enough.  And based

                    B. ALMONTE
on your memory, what happened next after
you arrived at the location?
     A.    Okay.  So we all -- we arrived
at the location.  At that point in time
again, we couldn't -- I couldn't tell you
exactly where I parked the van but I
remember I parked a distance away and we
all got out of the van, Sergeant Sobrado,
myself and others that were in the van at
the time.  We got out, formed a single
line walking Up to the intersection of
Williams and Beaver.
     Q.    Now, at this point to make life
hopefully easier for us, I'm going to show
you what's been marked as Almonte 1, which
is a crude Google Map printout of the
intersection and also what's been marked
as DOWNES 4, which is a different Google
Map printout of the intersection.
          MR. OLIVER:  I'm going to just
     put these in the front of the witness
     so that they're available for us to
     all try and orient ourselves.
     Q.    When you formed the line and

Page 92

B. ALMONTE

walked up to the intersection, referring to the map, can you tell me how you approached the intersection? From which street?

A. What I do recall is, I was walking up the same -- I believe the same direction of the vehicles that could not go through.

Q. Explain to me what you mean.

A. So we had to use -- we were walking up a single file. Sergeant in the front, I'm behind him and a couple of officers behind me in a single file walking down the street. Now, the street was that we were walking down -- I believe we were walking down the same direction of vehicles travelling that route.

Q. So you walking in the direction that traffic flows on one of the streets?

A. Correct.

Q. But do you know if it was William or Beaver?

A. No.

Q. Do you know if you approached

Veritext Legal Solutions
212-267-6868   www.veritext.com   516-608-2400

1                B. ALMONTE
2   the intersection from the south, the
3   north, the east or the west?
4        A.    Again, I was walking the same
5   direction as traffic.
6        Q.    But you don't know which street
7   you were walking on?
8        A.    I don't recall.
9        Q.    When you formed the line and you
10  were walking, were you walking in the
11  street, on the sidewalk or --
12       A.    On the street.
13       Q.    In the street. Okay. And were
14  there nonpolice vehicles that were behind
15  you when you were walking in the street?
16       A.    Yes.
17       Q.    And --
18       A.    Well, to the side of me. I was
19  you know, because there were cars that
20  were forced to be at a stop -- at a halt
21  you can say. So we walked between the
22  parked cars and the vehicles that were
23  trying to get through. We were walking
24  between that.
25       Q.    So the line that you formed

1      B. ALMONTE
2  walked in the street among traffic that
3  you say was stopped; is that right?
4      A.   Correct.
5      Q.   So did you weave between cars?
6      A.   No.
7      Q.   No?
8      A.   We walked pretty much safely
9  alongside of the parked vehicles on the
10 street side.
11     Q.   There were parked vehicles that
12 you were talking about?
13     A.   Right. To my recollection, yes.
14     Q.   So those were vehicles that were
15 parked, not vehicles that were trying to
16 proceed?
17     A.   Right. There were parked
18 vehicles on my left and there were
19 vehicles that were trying to proceed on my
20 right.
21     Q.   As you were walking with the
22 vehicle that were trying proceed on your
23 right, could you see why they were not
24 proceeding?
25     A.   Yes.

Page 95

1                    B. ALMONTE
2      Q.    Why were they not proceeding?
3      A.    At the intersection of Williams
4   and Beaver there was a large crowd
5   refusing to disperse in the middle of the
6   street.
7      Q.    Now, what do you mean by a large
8   crowd?
9      A.    Many people formed together or
10  standing together side to side in the
11  middle of the intersection refusing to
12  disperse.
13     Q.    So you're like -- how far away
14  are you when you first observe this large
15  crowd?
16     A.    Approximately -- I can say
17  approximately 25 feet.
18     Q.    When you first observed the
19  large crowd as you say, how many people
20  were in as what you characterized as large
21  crowd?
22     A.    Many people.
23     Q.    How many is many people in a
24  number?
25     A.    I would have to say more than

B. ALMONTE

Q. During that couple of minutes, what did you observe that you remember, if anything?

A. At the middle of the intersection on the street in the middle of Williams and Beaver intersection again, there was many people joined together in side to side at a halt in the middle of the intersection, protesting. When I say protesting I mean, being vocal to whatever they were saying or at that time and I remember at that specific time I believe we were waiting for the disorder control unit to come with their megaphone and give orders for them to disperse.

Q. Okay. So do you know -- at that point, do you know if there had been any orders to disperse that were given?

A. We were waiting for them to give orders. Upon them arriving then I observed Sergeant Papola from disorder control unit with a megaphone. I call it megaphone. Some people call it a bull horn but with a megaphone sort of in a

```
1                    B. ALMONTE
2    loud volume so people behind him -- I was
3    behind him.  I heard him clearly -- the
4    protestors in front of him to hear him
5    give the orders to disperse.
6         Q.    What orders to disperse did you
7    hear him give?
8         A.    He said along the lines that
9    they were obstructing I believe, vehicular
10   traffic and that they had to disperse the
11   location.
12        Q.    Is that a quote or a general --
13        A.    General.
14        Q.    How many times did you hear him
15   give that order?
16        A.    I believe either two or three
17   time.
18        Q.    How much time elapsed between
19   the first time he gave that order and the
20   last time he gave that order?
21        A.    A couple of minutes.
22        Q.    Is that around two minutes?
23        A.    It could have been anywhere
24   between two to five minutes.  I'm not too
25   sure.
```

1          B. ALMONTE
2     A.    Yes.
3     Q.    When you saw that video,
4  Sergeant Papola is speaking into a device,
5  an amplifier, right?
6     A.    That's correct.
7     Q.    Do you know Deputy Inspector
8  Raganella, R-A-G-A-N-E-L-L-A?
9     A.    I know him.
10    Q.    Did you see him on the video?
11    A.    I did see him on the video.
12    Q.    Where were you standing in
13 relation to the two of them?
14    A.    I was behind them.
15    Q.    Could you see yourself standing
16 behind them on the video when you watched
17 it?
18    A.    No.
19    Q.    When Sergeant Papola gave those
20 orders, he was in the road, right?
21    A.    Yes.
22    Q.    Behind him in the road were a
23 number of fellow police officers, right?
24    A.    Right.
25    Q.    When the -- when Sergeant Papola

```
 1                    B. ALMONTE
 2      Q.    Did you see Mr. Case locking
 3   arms with other people?
 4      A.    Yes.
 5      Q.    For how long did you see
 6   Mr. Case locking arms with other people
 7   before he was arrested?
 8      A.    After the final order was -- I'm
 9   going to go forward.  After the final
10   order was given, they were standing but
11   then when the final order was given, at
12   that point they interlocked arms and sat
13   on the intersection.  At that point we
14   went in to then arrest the individuals.
15   So I went in.  When I went in we all kind
16   of needed several help for each person
17   because they were interlocking.  So
18   everybody had to give an extra hand to try
19   to pry open the arms and -- so your
20   question was how long they -- how long was
21   he -- what was the question again?  I'm
22   sorry.
23      Q.    How long did you see Mr. Case
24   locking arms with other people before he
25   was arrested?
```

Page 120

1  B. ALMONTE
2  Q. Now, aside from the person who
3  you were involved in carrying to the
4  wagon, how did you come to be associated
5  with the arrests of Mr. Case and the other
6  four people -- the other three people?
7  I'm sorry.
8  MS. ROBINSON: Objection. You
9  can answer.
10  A. How did I -- I'm sorry.
11  Q. Sure. So you were involved in
12  carrying one person to the wagon, right?
13  A. To the location, yeah.
14  Q. Then when you got that location
15  there were other people whose arrests you
16  were assigned to process; is that right?
17  A. That's correct.
18  Q. Did you yourself pick who those
19  other four people would be or did someone
20  tell you who they would be?
21  A. No, they were chosen for me.
22  Q. Who chose them for you?
23  A. If I'm not mistaken it was
24  Lieutenant Hanlon.
25  Q. What did Lieutenant Hanlon tell

```
                                          Page 153
 1              B. ALMONTE
 2   arrest?
 3       A.    I am involved.  I believe I am
 4   involved in his prosecution.  I don't know
 5   what you're trying to get at.  I'm sorry.
 6       Q.    That's okay.  That's fine.  Any
 7   time you don't understand the question I
 8   can always rephrase it.
 9             So after Mr. Case was arrested
10   he was prosecuted, do you know that?
11       A.    Well, he was given desk
12   appearance ticket where he has to go to
13   court for the violations indicated.
14       Q.    Right.  What was suppose to
15   happen at court as far as you understood
16   it was that he was going to be prosecuted
17   for those violations, right?
18       A.    Yes.
19       Q.    So were you involved in that
20   prosecution?
21       A.    No, I was not.  The DAT -- I
22   don't recall.
23       Q.    Okay.  Fair enough.  Did you
24   sign a criminal court complaint charging
25   Mr. Case with violations?
```

Page 154

1         B. ALMONTE
2     A.    Yes.
3     Q.    So you were involved in the
4  prosecution?
5     A.    Yes.
6     Q.    Fair enough. Did there come a
7  time where you met with the prosecutor to
8  discuss what you observed Mr. Case do?
9     A.    Yes.
10    Q.    What did you tell the prosecutor
11 that you saw Mr. Case do?
12    A.    What I observed.
13    Q.    I'm asking you to describe what
14 you observed.
15    A.    More than what I already said
16 earlier?
17    Q.    No. So please describe for me
18 what you told the prosecutor with respect
19 to your observations about Mr. Case. What
20 did you tell the prosecutors?
21    A.    I don't recall exact -- my exact
22 words.
23    Q.    Okay. Did you tell the
24 prosecutor that you saw Mr. Case in a
25 group of approximately 70 individuals; if

```
 1
 2                    CERTIFICATION
 3
 4      I, GARRY J. TORRES, a Notary Public
 5   for and within the State of New York, do
 6   hereby certify:
 7      That the witness whose testimony as
 8   herein set forth, was duly sworn by me;
 9   and that the within transcript is a true
10   record of the testimony given by said
11   witness.
12      I further certify that I am not
13   related to any of the parties to this
14   action by blood or marriage, and that I am
15   in no way interested in the outcome of
16   this matter.
17      IN WITNESS WHEREOF, I have hereunto
18   set my hand this 21st day of September,
19   2017.
20
21
22
23
24
                   _____
25                   GARRY J. TORRES
```