Page 1

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   ------------------------------------------------ x

    BENJAMIN CASE, ELIZABETH CATLIN, JENNIFER KLEIN and

4   MARK KUSHNEIR,

                            Plaintiffs,      Index No.

5                                            14-cv-9148 (AT)

6          -against-

7   THE CITY OF NEW YORK, et al,

8                           Defendants.

9   ------------------------------------------------ x

10                          100 Church Street, 4th Floor

                            New York, New York 10007

11                          September 7, 2017

                            2:00 p.m.

12

13          DEPOSITION of LIEUTENANT DAVID GROHT, taken

14   by the Plaintiff in the above-entitled action, held

15   at the above time and place, taken before Corinne J.

16   Smith, a shorthand reporter and Notary Public within

17   and for the State of New York, pursuant to the

18   Federal Rules of Civil Procedure, Notice and

19   stipulations between counsel.

20   ************************************************

21

22

23

24

25

Page 2

```
 1
 2     A P P E A R A N C E S:
 3
 4              GIDEON ORION OLIVER, ATTORNEY AT LAW
                    Attorney for Plaintiffs
 5                  277 Broadway, Suite 1501
                    New York, New York 10007
 6
        BY:    GIDEON O. OLIVER, ESQ.
 7
 8
 9
                NEW YORK CITY LAW DEPARTMENT
10                  Attorneys for Defendants
                    100 Church Street, 4th Floor
11                  New York, New York 10007
12      BY:    AMY ROBINSON, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1

2                S T I P U L A T I O N S

3         IT IS HEREBY stipulated and agreed by and

4    among counsel for the respective parties hereto,

5    that the sealing and certification of the within

6    deposition shall be and the same hereby waived.

7         IT IS FURTHER STIPULATED AND AGREED that all

8    objections, except to the form of the question,

9    shall be reserved to the time of trial;

10        IT IS FURTHER STIPULATED AND AGREED that the

11   within deposition may be signed before any Notary

12   Public with the same force and effect as if signed

13   and sworn to before the court.

14         *                    *                    *

15

16

17

18

19

20

21

22

23

24

25

Page 34

```
1                      GROHT
2    clear that we're talking about the same thing,
3    right?
4         A    Yes.
5         Q    You had indicated that the, let's call it
6    a sally port, was to the south on Nassau Street of
7    the intersection with Pine.  And just in case I'm
8    wrong about the cardinal direction, it's the part
9    of Nassau Street that's closer to you as you're
10   looking at this map, right?
11        A    I believe so, yes.
12        Q    At any point after you arrived at that
13   location, was that sally port open so that
14   vehicular traffic could flow south on Nassau
15   Street?
16        A    I do not believe so, no.
17        Q    When you got there, did you see traffic
18   on Pine Street?
19        A    Yes.
20        Q    Describe what you saw with respect to
21   vehicular traffic on Pine Street when you first
22   arrived at this location?
23        A    Traffic was flowing east to west on Pine
24   Street.
25        Q    What else do you remember about vehicular
```

Page 35

1                          GROHT
2    traffic conditions at that location when you
3    arrived, if anything?
4        A     They came to a standstill and the
5    demonstrators stopped and blocked the
6    intersection.
7        Q     Did you ever see Jennifer Klein at that
8    intersection?
9        A     No.
10       Q     Did you see Jennifer Klein block traffic
11   at that intersection?
12       A     No.
13       Q     After you arrived at the location, what's
14   the next thing that you remember relating to this
15   incident?
16       A     A lot of standing around waiting.
17       Q     What next?
18       A     I was instructed to give verbal warnings
19   via bullhorn to request the demonstrators to move
20   from the street.
21       Q     About what time was it that you were
22   given that instruction?
23       A     I do not know.
24       Q     About how much time had you been there
25   before you were given that instruction?

Page 36

GROHT

1

2    A      Ten to fifteen minutes.

3    Q      Who gave you that instruction?

4    A      Possibly, not a hundred percent, Chief

5  Ward.

6    Q      When you say "possibly," can you unpack

7  for me what you mean by "possibly," please?

8    A      It might have been another chief,

9  probably was Chief Ward, but I do not recall.

10    Q      Tell me, please, everything that you

11  remember about the instruction that you were given

12  to give orders.

13    A      I was told to use a clear voice over

14  megaphone to instruct people that they were

15  violating the law and they had to leave or they

16  could be subject to arrest.

17    Q      Okay.  Then what did you do as a result

18  of receiving those instructions?

19    A      I stood up on a cement barrier, gave the

20  instructions over the bullhorn.

21    Q      Before you gave the instructions over a

22  bullhorn, did you ensure that there were fellow

23  officers placed elsewhere to help you know whether

24  your orders were audible?

25    A      Yes.  We put, I don't know which officer

Page 37

1                              GROHT

2      they were, at locations so they could hear me.

3      And if they could hear me, then it was assumed

4      that anyone in the crowd could hear me.

5          Q    Can you tell me who any of those officers

6      were who performed that function?

7          A    No.

8          Q    What was the next thing that you remember

9      happening?

10         A    Giving the instructions over the bullhorn

11     numerous times.

12         Q    How many times?

13         A    It would be a guess.

14         Q    Please don't guess, but I'll take an

15     estimation.

16         A    Estimated between 12 and 15 times.

17         Q    Over how long a total time period?

18         A    Approximately five minutes.

19         Q    Okay.  And then what happened?

20         A    Some arrests were being made.

21         Q    Did you have anything to do with those

22     arrests?

23         A    No.

24         Q    Did you order those arrests?

25         A    No.

Page 40

1                       GROHT

2     would start up again.  So not every time warnings

3     were given arrests were made.

4          Q     Understood.

5          A     On that day, I do not know if I had given

6     warnings over the bullhorn prior to that stoppage.

7          Q     Just so it's clear, when you say "that

8     stoppage," you mean the one at Pine and Nassau

9     Street that's partially depicted on the TARU

10    video, right?

11         A     Correct.

12         Q     On the date of the incident, do you know

13    under what circumstances a parade permit is

14    required by the department?

15         A     No.

16         Q     What's the next thing you remember about

17    the date of the incident?

18         A     The arrests were being made.

19         Q     Then what happened?

20         A     Eventually the street cleared, traffic

21    started flowing and the group went to another

22    location.

23         Q     At the time that you gave the first

24    direction over the bullhorn at Pine and Nassau on

25    the date of the incident, how many police officers

Page 44

```
 1                         GROHT
 2   were they?
 3       A    They were to get out of the street so
 4   vehicular traffic could flow.
 5       Q    So now you remember giving warnings to
 6   get out of the street as opposed to leave the
 7   area?
 8       A    Those warnings were, you do not have a
 9   parade permit, you're blocking the street, please
10   leave the area or get on the sidewalk so traffic
11   could flow.  I believe that's what I said.
12       Q    But you're not sure what you said?
13       A    No.
14       Q    When you gave those directions, were you,
15   yourself aware of what the conditions were with
16   respect to vehicular or pedestrian traffic on the
17   surrounding blocks?
18       A    No.  Just that area.
19       Q    What's the next thing you remember with
20   respect to the incident after the arrests began?
21       A    The street opened up, vehicles started
22   flowing and eventually the demonstrators moved to
23   another location.
24       Q    How much time elapsed between the last
25   direction that you gave and the first arrest that
```

```
1                          GROHT
2    occurred at the location?
3         A     I believe I was giving instructions while
4    people were being arrested, so I don't know when
5    the last instruction was made.
6         Q     Fair enough.  During the time that you
7    were at the location before arrests began, were
8    there pedestrians who were coming and going in the
9    area?
10        A     Repeat that, please.
11        Q     During the time that you were at the
12   location before arrests began, were there
13   pedestrians who were coming and going in the area?
14        A     There were pedestrians that were trying
15   to get through the crowd to get to work, yes.
16        Q     How do you know they were trying to get
17   through the crowd to get to work, did you talk to
18   them?
19        A     I remember some complaining that they
20   were trying to get to work.
21        Q     Did you see people who you perceived to
22   be demonstrators coming and going?
23        A     I don't understand the question.
24        Q     During the time that you were observing
25   the conditions at the intersection, did you see
```

Page 51

1

2                    C E R T I F I C A T E

3          I, CORINNE SMITH, a Shorthand Reporter and

4     Notary Public of the State of New York, do

5     hereby certify:

6     That the WITNESS whose examination is

7     hereinbefore set forth, was duly sworn, and

8     that such examination is a true record of the

9     testimony given by such WITNESS.

10    I further certify that I am not related to any

11    of the parties to this action by blood or

12    marriage; and that I am in no way interested in

13    the outcome of this matter.

14

15

16

17

18

19

20

21

22          CORINNE SMITH

23

24

25