Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 3    - - - - - - - - - - - - - - - - - -x
      BENJAMIN CASE, ELIZABETH CATLIN,
 4    JENNIFER KLEIN, and MARK KUSHNER,
 5                         Plaintiffs,
                         Index No. 14-cv-9148 (AT)
 6         -against-
 7    THE CITY OF NEW YORK, NEW YORK CITY
      POLICE DEPARTMENT ("NYPD") CHIEF OF
 8    DEPARTMENT JOSEPH ESPOSITO, NYPD
      DEPUTY CHIEF BRIAN MCCARTHY, NYPD
 9    LIEUTENANT DAVID GROHT, NYPD SERGEANT
      LAWRENCE PAPOLA, SHIELD NO. 03646, NYPD
10    OFFICER BENJAMIN ALMONTE, SHIELD NO.
      29182, NYPD OFFICER DANIEL CONFORTI,
11    SHIELD NO. 26403, NYPD OFFICER FIRST
      NAME UNKNOWN ("FNU") DOWNES, SHIELD NO.
12    UNKNOWN, NYPD OFFICER DMITRY TVERDOKHLEB,
      SHIELD NO. 27018, and NYPD OFFICER
13    MICHAEL MALDONADO, SHIELD 23573,
14                         Defendants.
      - - - - - - - - - - - - - - - - - -x
15                         100 Church Street
                           New York, New York
16
                           September 14, 2017
17                         11:31 a.m.
18        EXAMINATION BEFORE TRIAL of CHIEF JOE
19    ESPOSITO, the DEFENDANT in the
20    above-entitled action, held at the above
21    time and place, taken before Garry J.
22    Torres, a Shorthand Reporter and Notary
23    Public of the State of New York, pursuant
24    to the Federal Rules of Civil Procedure,
25    and stipulations between Counsel.
```

Page 2

```
 1
 2      APPEARANCES:
 3
           GIDEON ORION OLIVER
 4              Attorney for Plaintiffs
                BENJAMIN XASE, ELIZABETH CATLIN,
 5              JENNIFER KLEIN, and MARK
                 KUSHNER
 6              277 Broadway, Suite 1501
                New York, New York 10007
 7              TEL: (646) 263-3495
 8
 9      NEW YORK CITY LAW DEPARTMENT
                Attorneys for Defendants
10              THE CITY OF NEW YORK
                100 Church Street
11              New York, New York 10007
                TEL: (212) 356-3518
12              EMAIL: arobinson@law.nyc.gov
13      BY:  AMY ROBINSON, ESQ.
14
15      ALSO APPEARING:
16              DARA WEISS - CITY LAW DEPARTMENT
17              JONI FOSTER - NYPD
18              MICHAEL DECKER - GIDEON ORION
                               OLIVER LAW FIRM
19                   *        *        *
20
21
22
23
24
25
```

Page 3

1
2                    STIPULATIONS
3       IT IS HEREBY STIPULATED AND AGREED, by
4    and among counsel for the respective
5    parties hereto, that the filing, sealing
6    and certification of the within deposition
7    shall be and the same are hereby waived;
8       IT IS FURTHER STIPULATED AND AGREED
9    that all objections, except as to form of
10   the question, shall be reserved to the
11   time of the trial;
12      IT IS FURTHER STIPULATED AND AGREED
13   that the within deposition may be signed
14   before any Notary Public with the same
15   force and effect as if signed and sworn to
16   before the Court.
17                *        *        *
18
19
20
21
22
23
24
25

Page 15

```
 1                    J. ESPOSITO
 2   clarifying.  You didn't review the 49
 3   related to this incident to prepare for
 4   the dep, did you?
 5        A.    I don't think so.
 6            MR. OLIVER:  I'm going to show
 7        the witness what's been marked as
 8        Plaintiff's 4.  It's the 49.  Please
 9        review that.  Let me know when you
10        have finished.
11            THE WITNESS:  You want me to
12        review or you want me to read the
13        whole thing?  And I mean if I read it,
14        you're going to be here all day.
15            MR. OLIVER:  Well, it's totally
16        up to you.  That's your call.  I will
17        have follow-up questions.
18            THE WITNESS:  All right.
19            MR. OLIVER:  Have you reviewed
20        it?
21            THE WITNESS:  I'm going to
22        review it.
23            MR. OLIVER:  Okay.
24        A.    Okay.
25        Q.    Okay.  You've reviewed that
```

Page 24

1                J. ESPOSITO

2      Q.    Have you reviewed your time

3  sheet for that day?

4      A.    No.

5      Q.    Did you make a time sheet for

6  that day?

7      A.    Yes.

8      Q.    Did you put any comments on the

9  time sheet?

10     A.    I don't recall if I did

11  specifically but my practice would be,

12  yes.  I would put a comment in the end

13  whether it would it be Occupy Wall Street

14  I would make some comment.

15     Q.    Generally speaking, what were

16  the contents of the comments that you were

17  trying to make?

18     A.    Well, you want to say why you

19  worked so many hours.  If I recall

20  correctly, I came in around 4 or 5 in the

21  morning.  I didn't go home until late that

22  evening.  So I would put some comment.

23  Probably would have said regarding Occupy

24  Wall Street, the demonstration.  It could

25  be as simple as that.

Page 61

1               J. ESPOSITO

2    city are scheduled events.  Something that

3    we have prior knowledge of.  Unscheduled,

4    something generally refers to something

5    that pops up at the spur of the moment

6    that we don't know about.

7        Q.    So an event can be considered a

8    scheduled event even if it's not a

9    formally permitted event as long as the

10   police department knows about it, right?

11           MS. ROBINSON:  Objection.  You

12       can answer.

13       A.    Generally speaking, yeah.  That

14   term may be used.

15           MR. OLIVER:  And I don't have

16       the exhibit number in front of me but

17       I'm showing you the daily events sheet

18       Esposito 6.

19       Q.    It lists -- I know it's redacted

20   but it lists a number of events.  Like you

21   can see on the second page it lists a

22   number of Occupy Wall Street related

23   events.  Do you know if those events were

24   considered scheduled or unscheduled

25   events?

Page 62

```
 1               J. ESPOSITO
 2      A.    Don't know.
 3      Q.    Fair enough.  Regardless of
 4  whether an event is considered scheduled
 5  or unscheduled, the police department
 6  looks for certain information in order to
 7  plan for policing the event, right?
 8      A.    Sure.
 9      Q.    Like numbers of potential
10  participants?
11      A.    Yes.
12      Q.    What other information does the
13  police department look for in planning for
14  policing an event like the date of the
15  incident?
16      A.    We try and get as much
17  information as possible from a lot of
18  different sources.
19      Q.    So the information that's
20  particularly useful in putting together a
21  detail aside from numbers of potential
22  participants includes what?
23      A.    What the intention of the folks
24  showing up for.  What their intention is.
25      Q.    Let's say their intention is to
```

Page 75

```
 1                    J. ESPOSITO
 2      Kushner.
 3      A.      So what's the question?
 4      Q.      Sitting here today, do you have
 5  any personal knowledge based on your own
 6  direct observation that you can remember
 7  of Mr. Kushner's conduct prior to his
 8  arrest?
 9      A.      Yeah, sure.
10      Q.      Tell me what you know regarding
11  Mr. Kushner's conduct prior to his arrest.
12      A.      He was blocking pedestrian
13  traffic and refused to comply with our
14  orders to disperse.
15      Q.      Tell me what you observed with
16  respect to his blocking pedestrian traffic
17  and be as specific as you possibly can
18  please.
19      A.      Well, if you look at the photo,
20  you can see he is with a group of people
21  that have gone from the building line to
22  the curb with some type of barriers that
23  clearly are preventing people from walking
24  on the streets.  People who wanted to walk
25  on the streets were on the streets -- on
```

Page 77

1                    J. ESPOSITO

2    corner of Broadway and Exchange Place.

3    Does that refresh your recollection about

4    the location of this incident or does it

5    not?

6        A.    No.

7        Q.    So sitting here today you can't

8    tell me where you were when that photo was

9    taken?  You want to see it again?

10       A.    If the arrest location says

11   Broadway and Exchange --

12       Q.    That's what someone else says.

13   I'm asking what you know in your brain?

14       A.    Sitting here today, I don't

15   recall exactly where that was but

16   refreshing my memory with the arrest

17   report, if it says Broadway and Exchange

18   then it was Broadway and Exchange.

19       Q.    So is this what you remember now

20   that it was provide and Exchange?

21       A.    No, I don't remember it.

22       Q.    Okay.

23       A.    I'm looking at the documents and

24   listening to what you're saying and if

25   what you're saying is accurate then it was

Page 88

```
 1                  J. ESPOSITO
 2    them and again, the recorded
 3    message -- the message that disorder
 4    control gives would tell them to disperse
 5    also.
 6         Q.    When you say the message
 7    disorder control give would tell them to
 8    disperse, do you remember someone giving
 9    an order to disperses sitting here today?
10         A.    Yes.
11         Q.    What do you remember of the
12    contents of that order specifically?
13         A.    Just someone giving the order,
14    bullhorn with generally speaking, the
15    orders that I read earlier in the do
16    document you showed me.
17         Q.    Why did you yourself not use a
18    bullhorn to communicate the order that you
19    gave on the video?
20         A.    Not what I normally do.
21         Q.    Not your style you said?
22         A.    Not my general practice.
23         Q.    Not your general practice and
24    why not?
25         A.    Someone else's job.  I'm the
```

Page 89

```
1                    J. ESPOSITO
2    chief of department.  It's not my job, I
3    don't think, to get on the bullhorn and
4    give orders.
5         Q.    But you did give an order,
6    right?
7         A.    Yeah.
8         Q.    Why didn't you use a bullhorn to
9    give that order?
10        A.    I just chose not to.
11        Q.    Do you remember why you chose
12   not to?
13        A.    No.
14        Q.    When the other officer gave the
15   order or orders that you testified to how
16   much time elapsed between the first such
17   order that that officer gave and the order
18   that you gave that is depicted on that
19   video?
20        A.    I don't recall.
21        Q.    Can you estimate without asking
22   to you guess?
23        A.    No.
24        Q.    Did the officer who gave those
25   orders -- withdrawn.
```

Page 90

1              J. ESPOSITO

2          Did the officer who gave that

3     order or those orders do so at your

4     direction?

5          A.    Don't recall.  Most likely, yes.

6     I was on the scene.  So in those types of

7     situations it would be me directing the

8     orders to be given.

9          Q.    Do you know who the incident

10    commander was on the date of the incident?

11         A.    Not too sure.

12         Q.    When you watched the video, did

13    you see Chief Purtell on the video?

14         A.    Don't recall seeing him.

15         Q.    When you watched the video, did

16    you see Chief Gillotte on the video?

17         A.    Don't recall seeing him.

18         Q.    Let's say Chief Purtell was the

19    incident commander on paper.  Okay?

20    Assume that for argument's sake.  If you

21    were also at the same location where Chief

22    Purtell was who would be in charge?

23         A.    He would still be the incident

24    commander.

25         Q.    But your orders would supersede

```
1                    J. ESPOSITO
2   what happened next as far as you remember?
3       A.    After what?
4       Q.    After the events that are
5   depicted on those 30 seconds or minute of
6   video that you watched what happened next?
7       A.    I believe arrests were made.
8       Q.    Do you remember anything about
9   those arrests sitting here today?
10      A.    No.
11      Q.    So what happened after those
12  arrests were made that you do remember
13  about that day?
14      A.    I don't recall.
15      Q.    Now, before the order to
16  disperse was given were there
17  any -- before the first order to disperse
18  was given, did the police take any steps
19  to permit demonstrators to remain in the
20  area taking up less space on the sidewalk?
21      A.    Don't recall.
22      Q.    Is it your understanding of the
23  department's policies regarding policing
24  demonstrators that the department had a
25  policy to try and allow demonstrators to
```

Page 94

1                    J. ESPOSITO

2  continue demonstrating in a particular

3  location cordoned off by barricades or

4  some other means so that they were not

5  blocking pedestrian or vehicular traffic

6  and could continue their demonstration at

7  the location?

8            MS. ROBINSON:  Objection.  You

9     can answer.

10      A.    Yes.

11      Q.    Did that happen at that

12  location?

13      A.    I don't recall.

14      Q.    Were there any orders that were

15  given at that location by you or anyone

16  else directing demonstrators to move to

17  another designated area located nearby?

18      A.    I don't recall.

19      Q.    So there were over 200 arrests

20  that day according to the 49 that you read

21  earlier, do you remember that?

22      A.    Yes.

23      Q.    According to NYPD paperwork,

24  arrests were processed at the mass arrest

25  processing center at 1 Police Plaza.  Did

Page 119

1                    J. ESPOSITO

2   barricades along the sidewalk?

3        A.    Yes.

4        Q.    How did the people get through

5   the barricades to get into the street?

6        A.    From behind the crowd or on this

7   side of the crowd.  Both sides of the

8   crowd people would have to go into the

9   street around the barriers to continue on

10  their work because they couldn't stay on

11  the sidewalk.

12       Q.    Were the barriers that you're

13  talking about looked together?

14       A.    I still don't recall if I saw

15  barriers.

16       Q.    But you're certain that you saw

17  people go around demonstrators into the

18  street?

19       A.    Yes.

20       Q.    Now, is a person having to go

21  around other people, whether they're

22  demonstrators or not, into the street, is

23  that enough of a blockage of traffic for

24  the people you're calling demonstrators to

25  be subject to arrest for disorderly

Page 120

1                  J. ESPOSITO

2  conduct?

3      A.    If the demonstrators were

4  they're standing, they're conduct is

5  preventing a person from free access of

6  that sidewalk and forcing them for the

7  most part, to go into traffic or go into

8  the curb, in to the street, yeah, I think

9  that's enough.

10     Q.    Is it enough if it's just one

11 person who's forced to do by

12 demonstrators?

13     A.    I think legally I think you

14 could mistake a case for it.  I don't know

15 if we would do that but I think that

16 fulfills the statute.

17     Q.    You're familiar with the

18 disorderly conduct statute generally,

19 right?

20     A.    Generally.

21     Q.    You know there's one subdivision

22 that deals with the blockage of traffic,

23 right?

24     A.    I believe so.

25     Q.    There's one subdivision that

```
 1              J. ESPOSITO
 2      A.   I was attempting to.
 3      Q.   Do you know if you did?
 4      A.   Don't recall.
 5      Q.   Did you give any information
 6  about that conduct that led up to that
 7  person's arrest to any fellow officer
 8  after you engaged in the conduct that we
 9  just watched?
10      A.   Specifically on this incident?
11      Q.   Yes.
12      A.   I don't recall.  My general
13  conduct would have been to -- if I detain
14  someone I would hand that person off to an
15  officer and tell that officer why that
16  person was being arrested.
17      Q.   Okay.  Fair enough.
18      A.   I don't know if that did that in
19  that case.
20      Q.   Understood.
21           MR. OLIVER:  I'm going to
22      continue playing from 16 seconds in.
23           (Whereupon, a video was played.)
24           MR. OLIVER:  I'm pausing at 34
25      seconds in.
```

Page 146

```
 1                    J. ESPOSITO
 2   wouldn't be able to pick out of the list
 3   which lawsuits were over NYPD policies at
 4   demonstration, would you?
 5       A.     No.
 6       Q.     Some of the things that are
 7   different about large-scale-arrest
 8   processing as opposed to
 9   non-large-scale-arrest processing let's
10   say, the Polaroids, right?  Polaroid
11   photographs that get taken.
12       A.     During the large scale?
13       Q.     Right.
14       A.     Yes.
15       Q.     So Polaroid photographs with
16   mass arrest pedigree labels, right?
17       A.     Yes.
18       Q.     What's the point of that step in
19   the process?
20       A.     Number of different things.
21   It's better control.  So an officer can
22   readily identify and look, when you have a
23   mass arrest situation with a big crowd a
24   lot of confusion sometimes.  To avoid some
25   of that confusion we'll take a picture of
```

Page 155

1

2                              CERTIFICATION

3

4        I, GARRY J. TORRES, a Notary Public

5    for and within the State of New York, do

6    hereby certify:

7        That the witness whose testimony as

8    herein set forth, was duly sworn by me;

9    and that the within transcript is a true

10    record of the testimony given by said

11    witness.

12        I further certify that I am not

13    related to any of the parties to this

14    action by blood or marriage, and that I am

15    in no way interested in the outcome of

16    this matter.

17        IN WITNESS WHEREOF, I have hereunto

18    set my hand this 21st day of September,

19    2017.

20

21

22

23

24

25        _____

              GARRY J. TORRES