UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

BENJAMIN CASE, JENNIFER KLEIN and MARK KUSHNEIR,

                                 Plaintiffs,

        -against-

THE CITY OF NEW YORK, CHIEF OF DEPARTMENT JOSEPH ESPOSITO, LIEUTENANT DAVID GROHT, SERGEANT LAWRENCE PAPOLA, OFFICER BENJAMIN ALMONTE, OFFICER DMITRY TVERDOKHLEB and OFFICER MICHAEL MALDONADO,

                                 Defendants.

**DEFENDANTS' LOCAL CIVIL RULE 56.1 STATEMENT**

14-CV-9148 (AT) (BM)

Defendants City of New York, Joseph Esposito, David Groht, Lawrence Papola, Dmitry Tverdokhleb, Benjamin Almonte and Michael Maldonado, by their attorney Zachary W. Carter, Corporation Counsel of the City of New York, submit this statement pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, setting forth the material facts to which they contend there is no genuine issue to be tried.

### November 17, 2011—Shut Down Wall Street

1. November 17, 2011, was the two month anniversary of Occupy Wall Street ("OWS"). OccupyWallSt.org., Ex. C, OccupyWallStreet.org, November 17th International Day of Action, D1347-1349,

2. Organizers of OWS put out a "Call to Action," calling upon the 99 percent to participate in a national day of direct action by gathering at 7:00 a.m., before the ring of the New York Stock Exchange bell, to confront Wall Street. Id.

3. The highest ranking uniformed officer of the NYPD, Chief of Department Joseph Esposito, testified that the NYPD had information that demonstrators were planning to prevent

the Stock Exchange from opening on November 17, 2011.  Ex. K, Esposito Dep., 59:2-13, 59:24-60:10.

### Benjamin Case

4.      On November 17, 2011, Benjamin Case a resident of Providence, Rhode Island, was in New York City participating in an OWS protest.  Ex. D, Case Dep., 6:19-25, 15:22-24.

5.      Case described the events of November 17, 2011, as a planned action for the second month anniversary of OWS and a protest of the eviction of Zuccotti Park, which included a series of marches and demonstrations around the Wall Street area.  Ex. D, Case Dep., 19:18-25.

6.      Case arrived at what is called the "Big Red Cube," in the Wall Street area on November 17, 2011, where groups of people had gathered at between 6:30—7:00 a.m., and plans were made for marches taking off in different directions.  Ex. D, Case Dep., 25:3-10, 28:3-5.

7.      Case stated that on November 17, 2011, he was involved in shutting down Wall Street as a protest action. Ex. D, Case Dep., 22:6-15.

8.      Case understood "shutting down Wall Street" to mean clogging the streets and sidewalks in the Wall Street area. Ex. D, Case Dep., 21:22-22:1.

9.      Referring to November 17, 2011, Case blogged, "we clogged up Wall Street before the opening bell."  Ex. D, Case Dep., 36:14-20, Case Blog, P533.

10.     Case arrived at the location of Beaver and William Streets in the Wall Street area at approximately 9:45—10:00 a.m. on November 17, 2011.  Ex. D, Case Dep., 28:21-24.

11.     Case was in a group of protesters in the middle of the intersection of William and Beaver Streets. Ex. D, Case Dep., 34:4-10.

12.     At approximately 9:45 a.m., on November 17, 2011, Officer Benjamin Almonte walked up to the intersection of Williams and Beaver Streets in lower Manhattan. Ex. H, Almonte Dep., 90:16-19, 91:11-13.

13.     While proceeding to the intersection, Almonte observed that vehicles could not get through the intersection. Ex. H, Almonte Dep., 92:6-9.

14.     As he proceeded to the intersection, cars were forced at a stop; Almonte and the officers with him walked between the parked cars on the street to his left and the vehicles that were trying to get through on his right. Ex. H, Almonte Dep., 93:18-24, 94:17-20.

15.     The vehicles were not able to proceed through the intersection at Williams and Beaver Streets, because there was a large crowd in the middle of the intersection; Case was in the crowd. Ex. H, Almonte Dep., 95:2-12, 109:25-110:3.

16.     Thereafter, Sgt. Lawrence Papola began to give orders to the crowd to disperse. Almonte Dep., Ex. H, 106:20-107:11.

17.     Prior to his arrest, Case heard police give orders over a loudspeaker to leave the area. Ex. D, Case Dep., 32:13-15.

18.     Video of the incident depicts Papola give the following orders using a microphone:

> *My name is Sgt. Lawrence Papola. You are unlawfully obstructing vehicular or pedestrian traffic. I am ordering you to leave this roadway or sidewalk. If you do so voluntarily, no charges will be placed against you. If you refuse to leave, you will be arrested and charged with disorderly conduct or other pertinent traffic infractions.*

Ex. M, Rivera Video, 2 of 2, No. 340, 00:15-00:54:



19.     Video of the incident depicts Papola repeat the orders given in ¶14 with a final warning:

> *My name is Sgt. Lawrence Papola.  You are unlawfully obstructing vehicular or pedestrian traffic.  I am ordering you to leave this roadway or sidewalk.  If you do so voluntarily, no charges will be placed against you.  If you refuse to leave, you will be arrested and charged with disorderly conduct or other pertinent traffic infractions—this was your final warning.*

Ex. M, Rivera Video, 2 of 2, No. 340, 01:11-01:34.

20.     Video of the incident depicts Papola state the following:

> *Since you have refused to leave this roadway, I am ordering your arrest on the charge of disorderly conduct.*

Ex. M, Rivera Video, 2 of 2, No. 340, 01:48-01:53.

21.     After hearing the final arrest warning, the group of protesters, including Case, sat down in the intersection.  Ex. M, Rivera Video, 2 of 2, No. 340, 02:03.

4



22.     Subsequently, Case laid down in the intersection.  Ex. D, Case Dep., 33:10-13; Ex. M, Rivera Video, 2 of 2, No. 340, 02:03, 02:05:



23. While at the location of his arrest in the middle of the intersection, and prior to his arrest, Case locked arms with other protesters. Ex. D, Case Dep., 33:16-18; Ex. H, Almonte Dep., 112:2-4.

24. When asked if he complied with police orders, Case stated that he discussed it with a fellow protester, whom he was sitting with in the street. Ex. D, Case Dep. 32:25-33:5.

25. Case was lying on his back when he was approached by officers and was arrested at approximately 10:00 a.m. Ex. D, Case Dep., 30:21-31-16.

26. While on his back, an officer rolled him onto his stomach, cuffed him and instructed him to tuck his knees in and roll to get to his feet. Ex. D, Case Dep., 31:15-22.

27. Two days prior to the date of incident, Case stated in a chat to a friend that "the likelihood that I will be arrested on Thursday is high." Ex. D, Case Dep., 22:25-23:1; Ex. P, Case Chat Transcript, P524.

28. When asked if he got arrested on November 17, 2011, to send a message to Michael Bloomberg and the corporations; Case stated, "I would say that was one of the purposes to attending the protest." Ex. D, Case Dep., 36:14-18; Ex. O, Case Blog, P533.

29. Case blogged "Wall Street brokers shouted at us on the 17th as we barred them from getting to work." Ex. D, Case Dep., 37:9-21; Ex. O, Case Blog, P535.

30. Following Case's arrest, a white van, black SUV and another white van can be seen proceeding east on Beaver Street. Ex. M, Rivera Video, 2 of 2, No. 340, 06:16-06:19.

31. Another white van followed by other vehicles, including a white box truck, can be seen being able to proceed north on Williams Street. Ex. M. Rivera Video, 2 of 2, No. 340, 06:19-06:22.

32. Almonte was assigned Case's arrest. Ex. H, Almonte Dep., 120:2-24.

33.     Almonte's function on November 17, 2011, was to keep free moving traffic. Ex. H, Almonte Dep., 22:18-24.

34.     Almonte processed Case's arrest and swore out the criminal court complaint. Ex. H, Almonte Dep., 153:23-154:1.

35.     Case was issued a Desk Appearance Ticket ("DAT") and released. Ex. A, Amended Complaint ¶143.

36.     Case suffered no physical or psychological injuries as a result of his arrest on November 17, 2011. Ex. D, Case Dep., 39:22-40:10.

37.     Case made one court appearance following his arraignment on March 12, 2012. Ex. Q, Record of Court Action.

38.     Case pled guilty to disorderly conduct pertaining to his arrest on November 17, 2011. Ex. D, Case Dep., 43:10-13; Ex. Q, Record of Court Action.

### Jennifer Klein

39.     On November 17, 2011, Jennifer Klein, a resident of New Haven, Connecticut, came to New York City to protest in front of the New York Stock Exchange in connection with OWS. Ex. E, Klein Dep., 6:23:25, 27:7:10.

40.     Klein arrived at the intersection of Pine and Nassau Streets in lower Manhattan at 8:30 a.m., on November 17, 2011. Ex. E, Klein Dep., 20:13-21, 35:4-5.

41.     When Lt. David Groht arrived at the intersection of Pine and Nassau Streets, traffic was flowing east to west on Pine Street. Ex. I, Groht Dep., 34:17-24.

42.     It was Klein's intention to march down the Pine Street to the Stock Exchange and to demonstrate in front of the Stock Exchange. Ex. E, Klein Dep., 26:22-27:14.

43. When asked if she intended to shut down the Stock Exchange, Klein testified that she thought a rally in front of the stock exchange could temporarily block some access to it. Ex. E, Klein Dep., 27:7:14.

44. Klein wanted to make a right onto Nassau Street proceed to the Stock Exchange; however there were police barriers set up on Nassau Street preventing access. Ex. E, Klein Dep., 20:13-18.

45. Klein remained in the intersection of Pine and Nassau Streets in a crowd of over 200 people for nearly an hour. Ex. E, Klein Dep., 20:2-4.

46. Demonstrators, including Ms. Klein, then came to a standstill at that location and blocked the intersection. Ex. I, Groht Dep., 34:25-35:6.

47. Police officers formed a line across Nassau Street just south of Pine Street in the direction of the Stock Exchange to protect the area. Ex. J, Tverdokhleb Dep., 58:20-59:5.

48. When Officer Dmitry Tverdokhleb arrived at the intersection of Nassau and Pine Streets, protesters were blocking the entire intersection. Ex. J, Tverdokhleb Dep., 63:19-25.

49. Tverdokhleb first observed Klein at approximately 8:30 a.m., standing in the middle of the intersection of Pine and Nassau Streets. Ex. J, Tverdokhleb Dep., 68:16-70:18.

50. When Tverdokhleb was ordered to begin extracting protesters from the crowd, he observed Klein sitting in the intersection. Ex. J, Tverdokhleb Dep., 91:21-23, 93:9-18.

51. Klein saw Groht get up upon the barrier with a bullhorn instructing people that they were blocking the street, they were blocking traffic, and if they did not move, they would be arrested. Ex. E, Klein Dep., 21:19-24

52.	At approximately 8:45 a.m., Groht climbed up on top of a cement barrier and gave instructions using a bullhorn. Ex. I, Groht Dep., 36:19-20, Ex. N, Kilcoyne Video, VTS.01_2, 05:10:



53.	Video of the incident depicts Groht giving the following orders using the bullhorn:

> *Be advised, you do not have a parade permit. You are blocking the street. Please get on the sidewalk and stop blocking the street or you are subject to arrest.\*\*\*Be advised you do not have a parade permit. Please return to the sidewalk, you are blocking the intersection.\*\*\* Be advised you do not have a parade permit. For your safety, you must leave the street. You are blocking traffic and cannot obstruct vehicular traffic. Failure to comply will result in your arrest.\*\*\*For your safety please exit the street. You do not have a parade permit Failure to comply will result in your arrest for obstructing vehicular traffic.\*\*\*Be advised, you do not currently have a parade permit. You are obstructing vehicular traffic. Please leave the street or you are subject to arrest.\*\*\*You do not have a parade permit. You are subject to arrest for obstructing the street.*

Ex. M, Rivera Video, 1 of 2, No. 329, 00:15-02:28.

54.	 Fellow officers were placed a locations in the crowd to ensure that the instructions given by Groht could be heard by the crowd. Ex. I, Groht Dep., 36:21-37:4.

9

55.     Klein admits to hearing Groht giving at least six orders before she was arrested but was not surprised to learn that he gave orders at least fifteen times with the bullhorn before she was arrested. Ex. E, Klein Dep., 22:15-17, 44:17-20.

56.     After giving these orders, the video pans over the crowd, and Klein can been seen in the upper right hand corner of the screen standing in the intersection:



Ex. M, Rivera Video, 1 of 2, No. 329, 02:29.

57.     Although Klein testified that she stood up when she heard the officer with the megaphone give the orders, video depicts Klein sitting down in the street disappearing from view a few seconds later. Ex. M, Rivera Video, 1 of 2, No. 329, 02:44.

58.     Groht got down from the cement block and moved into the crowd in the street and continued giving orders to leave the street. Ex. M, Rivera Video, No. 330, 00:47-01:04, 02:10-03:44, 04:24-05:57.

10

59.     People who worked in the area complained to Groht that they were trying to get through the crowd to get to work.  Ex. I, Groht Dep., 45:11-20.

60.     While still sitting in the middle of the intersection, Groht can be seen giving orders via bullhorn to leave the intersection within a few feet of Klein.  Ex. N, Kilcoyne Video, VTS_01_3, 04:52:



61.     Klein testified that she sat down in the street because she was surrounded by police. Ex. E, Klein Dep., 30:4-7.

62.     The still below shows Klein five seconds prior to her sitting down in the intersection; there are no officers near her:



Ex. M, Rivera Video, 1 of 2, No. 329, 02:39.

63.     Klein testified that the only way that she could express and defend her First Amendment rights was to sit down and that she was sitting in the intersection for only two minutes before she was arrested. Ex. E, Klein Dep., 30:12-16.

64.     Video depicts Klein sitting in the intersection at 9:01 a.m.; she was arrested at approximately 9:25 a.m. Ex. N, Kilcoyne Video, VTS_01_3, 04:52; Ex. T, Klein Criminal Complaint.

65.     Klein observed an office supply truck and a van in the intersection. Ex. E, Klein Dep., 31:12-14, 39:12-17.

66. An entire line of traffic, including the office supply truck and a van, were at a standstill and could not proceed at the intersection of Pine and Nassau Streets:



Ex. N, Kilcoyne Video, VTS_01_2, 04:25.

67. Klein defines "occupation" as a "space where people take collective action through physically occupying it in order to express grievances or assert rights." Ex. E, Klein Dep., 24: 3-9.

68. Klein testified, "we were occupying the street in the same sense that I was not leaving." Ex. E, Klein Dep., 37:22-24.

69. Klein stated in an e-mail, "we occupied at Nassau and Pine Street about a block from the New York Stock Exchange." Ex. S, Klein E-mail, P474.

70. Klein stated in another e-mail, "I do feel we sort of made a collective decision to defend public streets and our rights to occupy them together." Ex. E, Klein Dep., 41:3-6; Ex. S, Klein E-mail, P479.

71.     Klein also e-mailed, "we just rather calmly and determinably decided we should hold the line together." Ex. E, Klein Dep., 42:4-11; Ex. S, Klein E-mail, P479.

72.     Klein testified that she occupied Pine and Nassau Streets. Ex. E, Klein Dep., 41:21-42:3.

73.     Klein testified that she decided that she was going to stay at that intersection until she was allowed to proceed with the march. Ex. E, Klein Dep., 30:5-11.

74.     While still in the middle of the intersection of Pine and Nassau Streets, Klein was arrested at approximately 9:25 a.m., and charged with disorderly conduct. Ex. T, Klein Criminal Complaint.

75.     Klein was handcuffed and handed over to Tverdokhleb at her arrest location; he was assigned to process her arrest. Ex. J, Tverdokhleb Dep., 96:16-18, 97:18-23.

76.     Klein was issued a DAT and released. Ex. A, Amended Complaint ¶143.

77.     After the arrests were made at the intersection of Pine and Nassau Streets, the intersection cleared, traffic started flowing and the protestors went to another location. Ex. I, Groht Dep., 40:16:22, 44:19-23.

78.     Klein did not suffer any physical injuries as a result of her arrest. Ex. E, Klein Dep., 50:7-11.

79.     Klein testified that the emotional injuries she sustained consisted of the stress of being in a cell and not being able to fulfill a professional commitment due to her arrest. Ex. E, Klein Dep., 50:18-51:2. Klein received no psychological treatment for these alleged injuries. Ex. E, Klein Dep., 51:16-18.

80.     Klein e-mailed a friend on November 18, 2011, "they kept us cuffed and penned for a couple of hours on the street and then in jail all day until 11:00 p.m. at night! Fortunately, where

we were everyone was in high spirits and unhurt. (One of the officers who finally processed us said my grad students, who were with me, should all get A+'s for the semester!))." Ex. E, Klein Dep., 53:17-23, Ex. T, Klein E-Mail, P471.

81.     Klein accepted an ACD, because the criminal court judge was handing out significant jail time to other people. Ex. E, Klein Dep., 54:16-55:4.

### **Mark Kushneir**

82.     On November 17, 2011, Mark Kushneir[1], went to the Wall Street area of Manhattan via the Brooklyn Bridge to march to the Stock Exchange in connection with OWS. Ex. F, Kushneir Dep., 17:10-14, 28:2-8.

83.     Kushneir arrived in the Wall Street area at approximately 6:30 a.m. Ex. F, Kushneir Dep., 17:14-18.

84.     Kushneir participated in OWS on November 17, 2011, responding to a call put out via flyers, word of mouth and e-mail chains for a day of protest. Ex. F, Kushneir Dep., 18:8-12, 22:9-13.

85.     Kushneir intended to participate in the process of shutting down Wall Street. Ex. F, Kushneir Dep., 32:22-33:3.

86.     According to Kushneir, part of the protesting on November 17, 2011, included blocking streets or sidewalks. Ex. F, Kushneir Dep., 33:4-7.

87.     Kushneir's intent was to put on many performances or skits depicting homes being foreclosed upon with cardboard houses as props. Ex. F, Kushneir Dep., 18:12-23.

---

[1] Plaintiff Kushneir was arrested under the name Steven Kushner.

88. Prior to the day's events, Kushneir attended an OWS organizational meeting with a large number of people in which what should be going happening on November 17, 2011, was laid out. Ex. F, Kushneir Dep., 20:8-16.

89. Shutting down Wall Street was discussed at the organizational meeting. Ex. F, Kushneir Dep., 21:10-22:6.

90. As he was marching toward the Stock Exchange with his cardboard house, Kushneir was in a group of anywhere from 50 to 200 people. Ex. F, Kushneir Dep., 26:2:8.

91. Kushneir was in the front of that group. Ex. F, Kushneir Dep., 26:9-11.

92. Other people who were not in the group were standing around watching Kushneir and the group with their cardboard houses as they were demonstrating and chanting. Ex. F, Kushneir Dep., 27:8-15.

93. These people looked like they were going to work, some were on their way to work, some cursed at the protesters, some responded positively. Ex. F, Kushneir Dep., 27:8-22.

94. At various points along the march route, Kushneir heard officers ordering crowds of people to move or disperse. Ex. F, Kushneir Dep., 28:14-18.

95. At some point, Kushneir arrived at the location of Broadway and Exchange Place—the location of his arrest, and at that location, there were approximately 20 police officers. Ex. F, Kushneir Dep., 26:12-27:4.

96. Kushneir and others formed a line, standing side by side, with their cardboard boxes fully blocking the sidewalk from building to curb. Ex. M, Rivera Video, 1 of 2, No. 332, 00:10:



97. Chief of Department Joseph Esposito was present at the location of Broadway and Exchange Place when the photo in the preceding paragraph was taken. Ex. K, Esposito Dep., 73:13-15; Ex. M, Rivera Video, 1 of 2, No. 332, 00:10.

98. While at this location, Esposito observed Kushneir in a group of protesters lined up on the sidewalk from the building line to the curb blocking pedestrian traffic. Ex. K, Esposito Dep., 75:10-24.

99. Esposito observed an officer with a bullhorn give the group orders to disperse or be subject to arrest. Ex. K, Esposito Dep., 13:9-14:5, 22:19-25, 86:8-12, 88:6-10.

100. Esposito observed more than one pedestrian who tried to come through the protesters but were unable to do so. Ex. K, Esposito Dep., 117:23-118:11.

101.    Esposito gave the final order for the crowd to disperse giving them one last chance to comply.  Ex. K, Esposito Dep., 85:24-86:17.

102.    The crowd, including Kushneir, could have dispersed by turning around and walking in the opposite direction.  Ex. K, Esposito Dep., 87:4-9, 140:12-13, 144:18-25.

103.    Officer Benjamin Almonte arrived at the location of Broadway and Exchange Place and witnessed the group, including Kushneir, standing side by side on the sidewalk.  Ex. H, Almonte Dep., 70:7-20.

104.    Almonte and other officers were instructed to form a line approximately fifteen feet in front of the protesters.  Ex. H, Almonte Dep., 68:9:12-15.

105.    After the line was formed, Almonte observed Esposito give orders to the crowd, including Kushneir. Ex. H, Almonte Dep., 73:13-24.

106.    Esposito shouted the orders standing within approximately three feet of Kushneir while Kushneir was looking directly at him. Ex. M, Rivera Video, 1 of 2, No. 332, 00:10:



107. "Chief Esposito was standing right in front of me."  Ex. F, Kushneir Dep., 29:1.

108. After Esposito gave his final order, the crowd did not disperse—they formed a wedge or shield with their cardboard boxes.  Ex. H, Almonte Dep., 76:7:15.

109. Esposito then gave instructions to the officers to make arrests. Ex. K, Esposito Dep., 91:23-92:4; Ex. H, Almonte Dep., 76:16-21, 77:15-21.

110. Kushneir was arrested at approximately 9:00 a.m., when it seemed like people were all going to work.  Ex. F, Kushneir Dep., 30:19-21.

111. Kushneir was charged with disorderly conduct and obstructing governmental administration and issued a DAT. Ex. U, Kushneir Criminal Complaint; Ex. A, Amended Complaint ¶143.

112. Kushneir's arrest was processed by Officer Michael Maldonado, who also swore out the criminal court complaint.  Ex. V, Maldonado Memo Book Entries, D21-24; Ex. W, Maldonado Scratch (handwritten) Arrest Report; Ex. L, Maldonado Dep., 75:9-76:12; Ex. U, Kushneir Criminal Complaint.

113. While Maldonado did not recall Kushneir at his deposition some six years after the date of incident, he knows that he would not have sworn out the criminal court complaint if he had not seen Kushneir's conduct before his arrest.  Ex. L, Maldonado Dep., 86:21-87:11.

114. Kushneir accepted an ACD and made one court appearance.  Ex. F, Kushneir Dep., 38:22-24; Ex. A, Amended Complaint ¶148.

115. Kushneir suffered no physical or emotional injuries as a result of his arrest.  Ex. F, Kushneir Dep., 38:4-39:11.

116. Kushneir continued to participate in demonstrations after November 17, 2011.  Ex. F, Kushneir Dep., 40:9-14.

117. Maldonado observed a group of protesters blocking the sidewalk with houses; Kushneir was in the front. Ex. L, Maldonado Dep., 15:23-24, 53: 8-10, 77:16-23.[2]

118. Maldonado observed Esposito give warnings to the crowd of protesters as they were blocking pedestrian traffic. Ex. L, Maldonado Dep., 16:20-24, 56:22-23.

119. Maldonado observed the protesters fail to comply with Esposito's orders—"they wouldn't move." Ex. L, Maldonado Dep., 53:11-16.

120. Case was in custody for approximately thirteen hours. Ex. X, NYPD OLPA form.

121. Klein was in custody for approximately thirteen hours. Ex. Y, NYPD OLPA form.

122. Kushneir was in custody for approximately twelve hours. Ex. Z, NYPD OLPA form.

Dated: New York, New York
       January 11, 2019

                                                          ZACHARY W. CARTER
Corporation Counsel - City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-3518

By: /s/
    Amy Robinson
    New York City Law Department
    Special Federal Litigation Division

TO:
Gideon Oliver, Esq. (*via* ECF)
277 Broadway, Suite 1501
New York, NY 10007

---

[2] Paragraphs 117-122 were inadvertently omitted from defendants' 56.1 statement, which accompanied defendants' pre-motion letter.