Index No. 14-CV-9148 (AT)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BENJAMIN CASE, JENNIFER KLEIN and MARK
KUSHNEIR,

Plaintiffs,

-against-

THE CITY OF NEW YORK, CHIEF OF
DEPARTMENT JOSEPH ESPOSITO, LIEUTENANT
DAVID GROHT, SERGEANT LAWRENCE PAPOLA,
OFFICER BENJAMIN ALMONTE, OFFICER
DMITRY TVERDOKHLEB and OFFICER MICHAEL
MALDONADO,

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

Of Counsel: *Amy Robinson*
Tel: (212) 356-3518
Matter #: 2015-009624

Pages

# TABLE OF CONTENTS

**<u>Page</u>**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 1

STANDARD OF REVIEW ................................................................................................ 10

**PLAINTIFFS' DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER §1983 CLAIM MUST BE DISMISSED** ....................................................... 11

**PROBABLE CAUSE EXISTED FOR KUSHNEIR'S ARREST AND DEFENDANTS ESPOSITO AND MALDONADO ARE ENTITLED TO QUALIFIED IMMUNITY** ................................................................................... 11

**PLAINTIFFS' FIRST AMENDMENT TIME, PLACE, MANNER CLAIM AGAINST DEFENDANTS ESPOSITO, PAPOLA AND GROHT MUST BE DISMISSED** .......................................................................... 20

**PLAINTIFFS' EXCESSIVE DETENTION THEORY FAILS AS A MATTER OF LAW, AND UNDER THE FACTS OF THIS CASE** ................................... 23

**PLAINTIFFS' FAIR TRIAL CLAIM MUST BE DISMISSED** ............................ 26

**PLAINTIFFS' MONELL CLAIM MUST BE DISMISSED** .................................. 29

CONCLUSION .................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**                                                                                                **Pages**

Abdul-Rahman v, City of New York,
   2012 U.S. Dist. LEXIS 45653 (E.D.N.Y. 2012)....................................................................27

Akinnagbe v. City of New York,
   128 F. Supp. 3d 539 (E.D.N.Y. 2015) ....................................................................................23

Anderson v. Creighton,
   483 U.S. 635 (1987)................................................................................................................18

Atwater v. Lago Vista,
   532 U.S. 318 (2001)................................................................................................................25

Berg v. City of New York,
   2018 U.S. App. 20646 (2d Cir. 2018)....................................................................................19

Bernard v. United States,
   25 F.3d 98 (2d Cir. 1994)........................................................................................................12

Bradway v. Gonzales,
   26 F.3d 313 (2d Cir. 1994)......................................................................................................18

Brown v. City of New York,
   2014 U.S. Dist. LEXIS 83513 (S.D.N.Y. 2014) ....................................................................17

Brown v. City of New York,
   2017 U.S. App. LEXIS 11937 (2d Cir. 2017) ........................................................................19

Bryant v. City of New York.,
   404 F.3d 128 (2d Cir. 2005)..............................................................................................24, 26

C.G. v. City of New York,
   2013 U.S. Dist. LEXIS 153020 (E.D.N.Y. 2013)..................................................................17

Caravalho v. City of New York,
   2018 U.S. App. 10785 (2d Cir. 2018).....................................................................................19

Caravalho v. City of New York,
   2018 U.S. App. LEXIS 10785 (2d Cir. 2018) ........................................................................24

Caravalho v. City of NewYork,
   No. 13-cv-4174 (PKC)(MHD), 2016 U.S. Dist. LEXIS 44280
   (S.D.N.Y. Mar. 31, 2016) .......................................................................................................30

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986)................................................................................................................11

**Cases** **Pages**

City of Los Angeles v. Heller,
  475 U.S. 796 (1986)................................................................30

Concerned Jewish Youth v. McGuire,
  621 F.2d 471 (2d Cir. 1980)......................................................13

Covington v. City of New York,
  171 F.3d 117 (2d Cir. 1999)......................................................12

Cox v. Louisiana,
  379 U.S. 536 (1965)................................................................22

Crenshaw v. City of Mount Vernon,
  372 Fed. Appx. 202 (2d Cir. 2010)...............................................15

Crowell v. Kirkpatrick,
  400 F. App'x 592 (2d Cir. 2010) .................................................18

Cty. of Riverside v. McLaughlin,
  500 U.S. 44 (1991)..............................................................24, 25

Devenpeck v. Alford,
  543 U.S. 146 (2004)............................................................12, 13

Dinler v. City of New York,
  2012 U.S. Dist. LEXIS 141851 (S.D.N.Y. 2012) ..................................26

Faruki v. City of New York,
  517 Fed. Appx. 1 (2d. Cir. 2013) ................................................27

Garcia v. City of New York,
  2015 U.S. App. LEXIS 2762 (2d Cir. 2015) .......................................19

Garcia v. Doe,
  779 F.3d 84 (2d Cir. 2015)...............................................10, 18, 19

Garnett v. Undercover Officer C0039,
  838, F.3d 265, 279 (2d Cir. 2016).................................................27

Harlow v. Fitzgerald,
  457 U.S. 800 (1982)................................................................23

Haus v. City of New York,
  2011 U.S. Dist. LEXIS 155735 (S.D.N.Y. 2011)................................22, 26

**Cases**                                                                              **Pages**

Higginbotham v. City of New York,
    2018 U.S. App. LEXIS 20637 (2d Cir. 2018) ........................................................19

Hope v. Pelzer,
    536 U.S. 730 (2002)........................................................................................................22

Hunter v. Bryant,
    502 U.S. 224 (1991)........................................................................................................20

Jaegly v. Couch,
    439 F.3d 149 (2d Cir. 2006)......................................................................................12, 13

Johnson v. City of New York,
    2008 U.S. Dist. LEXIS 78984 (S.D.N.Y 2008) ............................................................17

Johnson v. Newburgh Enlarged School District,
    239 F.3d 246 (2d Cir. 2001)...........................................................................................23

Kass v. City of New York,
    2017 U.S. App. LEXIS 13259 (2d Cir. 2017) ...............................................................19

Kass v. City of New York,
    864 F.3d 200 (2d Cir. 2017)...........................................................................................16

In re Kendell R.,
    897 N.Y.S.2d 83 (N.Y. Sup. Ct. 1st Dep't 2010) ..........................................................16

Lebowitz v. City of New York,
    2015 U.S. App. LEXIS 9106 (2d Cir. 2015) .................................................................19

Lebowitz v. City of New York,
    606 Fed. Appx. 17 (2d Cir. 2015)..................................................................................24

Lennon v. Miller,
    66 F.3d 416 (2d Cir. 1995)........................................................................................17, 19

Los Angeles v. Heller,
    47 U.S. 796 (S. Ct. 1986)...............................................................................................30

Marcavage v. City of New York,
    2010 U.S. Dist. LEXIS 107724 (S.D.N.Y. 2010) .........................................................17

Marcavage v. City of New York,
    689 F.3d 98 (2d Cir. 2012)...........................................................................10, 12, 15, 20

**Cases**                                                                                      **Pages**

Marom v. City of New York,
    2016 U.S. Dist. LEXIS 140720 (S.D.N.Y. 2016) ................................................................ 27

Mastrovincenzo v. City of New York,
    435 F.3d 78 (2d Cir. 2006) ................................................................................................ 12, 21

Mediavilla v. City of New York,
    2016 U.S. Dist. LEXIS 192198 (S.D.N.Y. 2016) ........................................................ 11, 16, 17

Mesa v. City of New York,
    2013 Dist. Ct. LEXIS 1097, 2016 WL 5900217 (S.D.N.Y. 2013) ........................................ 28

Monell v. Department of Social Services of the City of New York,
    436 U.S. 658 (1978) ............................................................................................................ 30, 31

Mozzochi v. Borden,
    959 F.2d 1174 (2d Cir. 1992) .................................................................................................. 12

Murphy v. Lynn,
    118 F.3d 938 (2d Cir. 1997) .................................................................................................... 27

O'Neill v. Town of Babylon,
    986 F.2d 646 (2d Cir. 1993) .................................................................................................... 12

Occupy Nashville v. Haslam,
    769 F.3d 434 (6th Cir. 2014) ................................................................................................... 18

Papineau v. Parmley,
    465 F.3d 46 (2d Cir. 2006) ...................................................................................................... 22

Patterson v. Westchester County,
    2014 U.S. Dist. LEXIS 50763 (S.D.N.Y. 2014) ..................................................................... 30

Pluma v. City of New York,
    2017 U.S. App. LEXIS 6096 (2d Cir. 2017) ........................................................................... 19

Plumhoff v. Rickard,
    134 S. Ct. 2012 (2014) ............................................................................................................ 18

Ricciuti v. N.Y.C. Transit Auth.,
    124 F.3d 123 (2d Cir. 1997) .................................................................................................... 27

Saucier v. Katz,
    533 U.S. 194 (2001) ................................................................................................................. 22

**Cases**                                                                                                   **Pages**

Scott v. Harris,
    550 U.S. 372 (U.S. 2007)....................................................................................10

Sforza v. City of New York,
    2009 U.S. Dist. LEXIS 27358 (S.D.N.Y.2009) ...............................................11

Shamir v. City of New York,
    2015 U.S. App. LEXIS 18420 (2d Cir. 2017) ..................................................19

Singer v. Fulton County,
    63 F.3d 110 (2d Cir. 1995)...............................................................................12

U.S. v. Nelson,
    500 Fed. App'x 90 (2d Cir. 2012)..............................................................15, 19

United States v. Martinez-Fuerte,
    428 U.S. 543 (1976).........................................................................................25

Washington v. Cnty. Of Rockland,
    373 F.3d 310 (2d. Cir. 2004)...........................................................................27

White v. Pauly,
    137 S. Ct. 548 (Jan. 9, 2017)...........................................................................18

Whren v. United States,
    517 U.S. 806 (1996).........................................................................................12

Wiles v. City of New York,
    2016 U.S. Dist. LEXIS 148024 (S.D.N.Y. Oct. 25, 2016)
    aff'd, 2018 U.S. App. LEXIS 5610 (2d Cir. 5610)..................................11, 15-16, 19, 23

Wood v. Moss,
    134 S. Ct. 2056 (2014).....................................................................................18

Zellner v. Summerlin,
    494 F.3d 344 (2d Cir. 2007).............................................................................12

**Statutes**

42 U.S.C. § 1983..........................................................................................1, 11, 27, 30

Fed. R. Civ. P. 8(a)(2).............................................................................................11

Fed. R. Civ. P. 12(b)...............................................................................................20

Fed. R. Civ. P. 12(b)(6)...........................................................................................30

**<u>Statutes</u>**                                                                                          **<u>Pages</u>**

Fed. R. Civ. P. 30(b)(6)....................................................................................................30

Fed. R. Civ. P. 56..............................................................................................................1

N.Y. Penal Law §195.05........................................................................................13, 16, 17

N.Y. Penal Law § 240.20(5)........................................................................................13, 15

N.Y. Penal Law §240.20(6)..........................................................13, 15, 16, 17, 21, 23

New York City Charter §435(a) ..............................................................................15

## PRELIMINARY STATEMENT

Plaintiffs Benjamin Case, Jennifer Klein and Mark Kushneir ("Plaintiffs") bring this action pursuant to 42 U.S.C. § 1983 against defendants the City of New York, Chief of Department Joseph Esposito, Lt. David Groht, Sgt. Lawrence Papola, Officer Benjamin Almonte, Officer Dmitry Tverdokhleb and Officer Michael Maldonado ("Defendants"), alleging that they were deprived of their constitutional rights as a result of their arrests on November 17, 2011, in the Wall Street area during Occupy Wall Street ("OWS") demonstrations. The claims remaining are: (1) deprivation of federal rights under §1983, (2) Kushneir's claim of false arrest, (3) violation of First Amendment time, place and manner; (4) excessive detention, (5) violation of fair trial rights, and (7) municipal liability.[1] Defendants, hereby submit this Memorandum of Law in support of their Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## STATEMENT OF FACTS

Thursday, November 17, 2011, was the two-month anniversary of Occupy Wall Street ("OWS"). Ex. C; 56.1 ¶¶1-2. Organizers of OWS put out a "Call to Action," calling upon the 99 percent to participate in a national day of direct action by gathering at 7:00 a.m., before the ring of the New York Stock Exchange bell, to confront Wall Street. Id. The highest ranking uniformed officer of the NYPD, Chief of Department Joseph Esposito, testified that the NYPD had information that demonstrators were planning to prevent the Stock Exchange from opening on November 17, 2011. Ex. K, 59:2-13, 59:24-60:10; 56.1 ¶3.

---

[1] Plaintiffs' claims of excessive force, abuse of process and failure to intervene/supervise were dismissed by this Court in a decision dated February 10, 2017. See Dkt. No. 72. Plaintiff Elizabeth Catlin was dismissed from this case together with defendants McCarthy and Conforti. See Dkt. No. 82. Plaintiffs have withdrawn their claim for First Amendment retaliation. See Dkt. No. 118.

On November 17, 2011, Benjamin Case, a resident of Providence, Rhode Island, was in New York City to participate in an OWS protest. Ex. D, 6:19-25, 15:22-24; 56.1 ¶4. Case described the events of November 17, 2011, as a planned action for the second month anniversary of OWS and a protest of the eviction of Zuccotti Park, which included a series of marches and demonstrations around the Wall Street area. Ex. D, 19:18-25; 56.1 ¶5. Case arrived at what is called the "Big Red Cube," in the Wall Street area on November 17, 2011, where groups of people had gathered at between 6:30—7:00 a.m., and plans were made for marches taking off in different directions. Ex. D, 25:3-10, 28:3-5; 56.1 ¶6. Case stated that on November 17, 2011, he was involved in shutting down Wall Street as a protest action. Ex. D, 22:6-15; 56.1 ¶7. Case understood "shutting down Wall Street" to mean clogging the streets and sidewalks in the Wall Street area. Ex. D, 21:22-22:1; 56.1 ¶8. Referring to November 17, 2011, Case blogged, "we clogged up Wall Street before the opening bell." Ex. D, 36:14-20, Ex. O, P533; 56.1 ¶9. Case arrived at the location of Beaver and William Streets in the Wall Street area at approximately 9:45—10:00 a.m. on November 17, 2011. Ex. D, 28:21-24' 56.1 ¶10. Case was in a group of protesters in the middle of the intersection of William and Beaver Streets. Ex. D, 34:4-10; 56.1 ¶11. At approximately 9:45 a.m., on November 17, 2011, Officer Benjamin Almonte walked up to the intersection of Williams and Beaver Streets in lower Manhattan. Ex. H, 90:16-19, 91:11-13; 56.1 ¶12. Almonte observed that vehicles could not get through the intersection; vehicles were at a standstill. Ex. H, 92:6-9; 56.1 ¶¶13-14. The vehicles were not able to proceed through the intersection at Williams and Beaver Streets, because there was a large crowd in the middle of the intersection including Case. Ex. H, 95:2-12, 109:25-110:3; 56.1 ¶15. Thereafter, Sgt. Lawrence Papola began to give orders to the crowd to disperse using a loudspeaker. Ex. H, 106:20-107:11; 56.1 ¶16. Prior to his arrest, Case heard police give these

orders to leave the area.  Ex. D, 32:13-15; 56.1 ¶17.. Video of the incident depicts Papola give

the following orders using a microphone:

> *My name is Sgt. Lawrence Papola.  You are unlawfully obstructing vehicular or pedestrian traffic.  I am ordering you to leave this roadway or sidewalk.  If you do so voluntarily, no charges will be placed against you.  If you refuse to leave, you will be arrested and charged with disorderly conduct or other pertinent traffic infractions*.  Ex. M, Rivera Video, 2 of 2, No. 340, 00:15-00:54; 56.1 ¶18.

Video of the incident depicts Papola repeat these orders with a final warning:

> *My name is Sgt. Lawrence Papola.  You are unlawfully obstructing vehicular or pedestrian traffic.  I am ordering you to leave this roadway or sidewalk.  If you do so voluntarily, no charges will be placed against you.  If you refuse to leave, you will be arrested and charged with disorderly conduct or other pertinent traffic infractions—this was your final warning*. Ex. M, Rivera Video, 2 of 2, No. 340, 01:11-01:34; 56.1 ¶19.

Video of the incident depicts Papola state the following:

> *Since you have refused to leave this roadway, I am ordering your arrest on the charge of disorderly conduct*. Ex. M, Rivera Video, 2 of 2, No. 340, 01:48-01:53; 56.1¶20.

After hearing the final arrest warning, the group of protesters, including Case, sat down in the

intersection.  Ex. M, Rivera Video, 2 of 2, No. 340, 02:03; 56.1 ¶21. Subsequently, Case laid

down in the intersection.  Ex. D, 33:10-13; Ex. M, Rivera Video, 2 of 2, No. 340, 02:03, 02:05;

56.1 ¶22. While at the location of his arrest in the middle of the intersection, and prior to his

arrest, Case locked arms with other protesters.  Ex. D, 33:16-18; Ex. H, 112:2-4; 56.1 ¶23.

When asked if he complied with police orders, Case stated that he discussed it

with a fellow protester, with whom he was sitting in the street.  Ex. D, 32:25-33:5; 56.1 ¶24.

Case was lying on his back when he was approached by officers and was arrested at

approximately 10:00 a.m. Ex. D, 30:21-31-16; 56.1 ¶25. While on his back, an officer rolled him

onto his stomach, cuffed him and instructed him to tuck his knees in and roll to get to his feet.

Ex. D, 31:15-22; 56.1 ¶26. Two days prior to the date of incident, Case stated in an internet chat

to a friend that "the likelihood that I will be arrested on Thursday is high."  Ex. D, 22:25-23:1;

Ex. P, P524; 56.1 ¶27. When asked if he got arrested on November 17, 2011, to send a message to Michael Bloomberg and the corporations; Case stated, "I would say that was one of the purposes to attending the protest." Ex. D, 36:14-18; Ex. O, P533; 56.1 ¶28.

Case blogged, "Wall Street brokers shouted at us on the 17th as we barred them from getting to work." Ex. D, 37:9-21; Ex. O, P535; 56.1 ¶29. Following Case's arrest, a white van, black SUV and another white van can be seen proceeding east on Beaver Street. Ex. M, Rivera Video, 2 of 2, No. 340, 06:16-06:19; 56.1 ¶30. Another white van followed by other vehicles, including a white box truck, can be seen being able to proceed north on Williams Street. Ex. M. Rivera Video, 2 of 2, No. 340, 06:19-06:22; 56.1 ¶31. Almonte was assigned Case's arrest. Ex. H, 120:2-24; 56.1 ¶32. Almonte processed Case's arrest and swore out the criminal court complaint. Ex. H, 153:23-154:1; 56.1 ¶34. Case was issued a Desk Appearance Ticket ("DAT") and released. Ex. A, ¶143; 56.1 ¶35. Case was in custody for approximately thirteen hours. Ex. X; 56.1 ¶120. Case suffered no physical or psychological injuries as a result of his arrest on November 17, 2011. Ex. D, 39:22-40:10; 56.1 ¶36. Case made one court appearance following his arraignment on March 12, 2012. Ex. Q; 56.1 ¶37. Case pled guilty to disorderly conduct pertaining to his arrest on November 17, 2011. Ex. D, 43:10-13; Ex. Q; 56.1 ¶38.

On November 17, 2011, Jennifer Klein, a resident of New Haven, Connecticut, came to New York City to protest in front of the New York Stock Exchange in connection with OWS. Ex. E, 6:23:25, 27:7:10' 56.1 ¶39. Klein arrived at the intersection of Pine and Nassau Streets in lower Manhattan at 8:30 a.m., on November 17, 2011. Ex. E, 20:13-21, 35:4-5; 56.1 ¶40. It was Klein's intention to march down the Pine Street to the Stock Exchange and to demonstrate in front of the Stock Exchange. Ex. E, 26:22-27:14; 56.1 ¶42. When asked if she

intended to shut down the Stock Exchange, Klein testified that she thought a rally in front of the stock exchange could temporarily block some access to it. Ex. E, 27:7:14; 56.1 ¶43. Klein wanted to make a right onto Nassau Street proceed to the Stock Exchange; however there were police barriers set up on Nassau Street preventing access. Ex. E, 20:13-18; 56.1 ¶44. Klein remained in the intersection of Pine and Nassau Streets in a crowd of over 200 people for nearly an hour. Ex. E, 20:2-4; 56.1 ¶45. Demonstrators, including Klein, then came to a standstill at that location and blocked the intersection. Ex. I, 34:25-35:6; 56.1 ¶46. Police officers formed a line across Nassau Street just south of Pine Street in the direction of the Stock Exchange to protect the area. Ex. J, 58:20-59:5; 56.1 ¶47. When Officer Dmitry Tverdokhleb arrived at the intersection of Nassau and Pine Streets, protesters were blocking the entire intersection. Ex. J, 63:19-25; 56.1 ¶48. Tverdokhleb first observed Klein at approximately 8:30 a.m., standing in the middle of the intersection of Pine and Nassau Streets. Ex. J, 68:16-70:1856.1 ¶49. When Tverdokhleb was ordered to begin extracting protesters from the crowd, he observed Klein sitting in the intersection. Ex. J, 91:21-23, 93:9-18; 56.1 ¶50. Klein saw Groht get up upon the barrier with a bullhorn instructing people that they were blocking the street, they were blocking traffic, and if they did not move, they would be arrested. Ex. E, 21:19-24; 56.1 ¶51. At approximately 8:45 a.m., Groht climbed up on top of a cement barrier and gave instructions using a bullhorn. Ex. I, 36:19:19-20, Ex. N, Kilcoyne Video, VTS.01_2, 05:10; 56.1 ¶52. Video of the incident depicts Groht giving the following orders using the bullhorn:

> *Be advised, you do not have a parade permit. You are blocking the street. Please get on the sidewalk and stop blocking the street or you are subject to arrest.\*\*\*Be advised you do not have a parade permit. Please return to the sidewalk, you are blocking the intersection.\*\*\* Be advised you do not have a parade permit. For your safety, you must leave the street. You are blocking traffic and cannot obstruct vehicular traffic. Failure to comply will result in your arrest.\*\*\*For your safety please exit the street. You do not have a parade permit Failure to comply will result in your arrest for obstructing vehicular traffic.\*\*\*Be advised, you do not currently*

> *have a parade permit. You are obstructing vehicular traffic. Please leave the street or you are subject to arrest.\*\*\*You do not have a parade permit. You are subject to arrest for obstructing the street.* Ex. M, Rivera Video, 1 of 2, No. 329, 00:15-02:28; 56.1 ¶53.

Fellow officers were placed at locations in the crowd to ensure that the instructions given by Groht could be heard by the crowd. Ex. I, 36:21-37:4; 56.1 ¶54. Klein admits to hearing Groht giving at least six orders before she was arrested but was not surprised to learn that he gave orders at least fifteen times using the bullhorn before she was arrested. Ex. E, 22:15-17, 44:17-20; 56.1 ¶55. Although Klein testified that she stood up when she heard the officer with the megaphone give the orders, video depicts Klein sitting down in the street disappearing from view a few seconds later. Ex. M, Rivera Video, 1 of 2, No. 329, 02:44; 56.1 ¶57. Groht got down from the cement block and moved into the crowd in the street and continued giving orders to leave the street. Ex. M, Rivera Video, No. 330, 00:47-01:04, 02:10-03:44, 04:24-05:57; 56.1 ¶58. People who worked in the area complained to Groht that they were trying to get through the crowd to get to work. Ex. I, 45:11-20; 56.1 ¶59. While Klein is still sitting in the middle of the intersection, Groht can be seen giving orders via bullhorn to leave the intersection within a few feet of Klein. Ex. N, Kilcoyne Video, VTS_01_3, 04:52; 56.1 ¶60. Klein testified that she sat down in the street because she was surrounded by police. Ex. E, 30:4-7; 56.1 ¶61. Video shows Klein five seconds prior to her sitting down in the intersection; there are no officers near her. Ex. M, Rivera Video, 1 of 2, No. 329, 02:39; 56.1 ¶62. Klein testified that the only way that she could express and defend her First Amendment rights was to sit down and that she was sitting in the intersection for only two minutes before she was arrested. Ex. E, 30:12-16; 56.1 ¶63. Video depicts Klein sitting in the intersection at 9:01 a.m.; she was arrested at approximately 9:25 a.m. Ex. N, Kilcoyne Video, VTS_01_3, 04:52; Ex. T; 56.1 ¶64. Klein observed an office supply truck and a van in the intersection. Ex. E, 31:12-14, 39:12-17; 56.1 ¶65. An entire line of traffic,

including the office supply truck and a van, were at a standstill and could not proceed at the intersection of Pine and Nassau Streets. Ex. N, Kilcoyne Video, VTS_01_2, 04:25; 56.1 ¶66. Klein defines "occupation" as a "space where people take collective action through physically occupying it in order to express grievances or assert rights." Ex. E, 24: 3-9; 56.1 ¶67. Klein testified, "we were occupying the street in the same sense that I was not leaving." Ex. E, 37:22-24. Klein stated in an e-mail, "we occupied at Nassau and Pine Street about a block from the New York Stock Exchange." Ex. S, P474; 56.1 ¶68. Klein stated in another e-mail, "I do feel we sort of made a collective decision to defend public streets and our rights to occupy them together." Ex. E, 41:3-6; Ex. S, P479; 56.1 ¶70. Klein also e-mailed, "we just rather calmly and determinably decided we should hold the line together." Ex. E, 42:4-11; Ex. S, P479; 56.1 ¶71. Klein testified that she occupied Pine and Nassau Streets. Ex. E, 41:21-42:3; 56.1 ¶72. Klein testified that she decided that she was going to stay at that intersection until she was allowed to proceed with the march. Ex. E, 30:5-11; 56.1 ¶73. While still in the middle of the intersection of Pine and Nassau Streets, Klein was arrested at approximately 9:25 a.m., and charged with disorderly conduct. Ex. T; 56.1 ¶74. Klein was handcuffed and handed over to Tverdokhleb at her arrest location; Tverdokhleb was assigned to process her arrest. Ex. J, 96:16-18, 97:18-23; 56.1 ¶75. Klein was issued a DAT and released. Ex. A, ¶143; 56.1 ¶76. After the arrests were made at the intersection of Pine and Nassau Streets, the intersection cleared, traffic started flowing and the protestors went to another location. Ex. I, 40:16:22, 44:19-23; 56.1 ¶77. Klein did not suffer any physical injuries as a result of her arrest. Ex. E, 50:7-11; 56.1 ¶78. Klein testified that the emotional injuries she sustained consisted of the stress of being in a cell and not being able to fulfill a professional commitment due to her arrest. Ex. E, 50:18-51:256.1 ¶79. Klein received no psychological treatment for these alleged injuries. Ex. E, 51:16-18; 56.1 ¶79.

7

Klein e-mailed a friend on November 18, 2011, "they kept us cuffed and penned for a couple of hours on the street and then in jail all day until 11:00 p.m. at night! Fortunately, where we were everyone was in high spirits and unhurt. (One of the officers who finally processed us said my grad students, who were with me, should all get A+'s for the semester!)." Ex. E, 53:17-23, Ex. T, P471; 56.1 ¶80. Klein was in custody for approximately thirteen hours. Ex. Y; 56.1 ¶121, Klein accepted an ACD to resolve the criminal charges against her. Ex. E, 54:16-55:4; 56.1 ¶81.

On November 17, 2011, Mark Kushneir,[2] went to the Wall Street area of Manhattan via the Brooklyn Bridge to march to the Stock Exchange in connection with OWS. Ex. F, 17:10-14, 28:2-8; 56.1 ¶82. Kushneir arrived in the Wall Street area at approximately 6:30 a.m. Ex. F, 17:14-18; 56.1 ¶83. Kushneir participated in an OWS demonstration on November 17, 2011, responding to a call put out via flyers, word of mouth and e-mail chains for a day of protest. Ex. F, 18:8-12, 22:9-1356.1 ¶84. Kushneir intended to participate in the process of shutting down Wall Street. Ex. F, 32:22-33:3; 56.1 ¶85. According to Kushneir, part of the protesting on November 17, 2011, included blocking streets or sidewalks. Ex. F, 33:4-7; 56.1 ¶86. Kushneir's intent was to put on many performances or skits depicting homes being foreclosed upon using painted cardboard houses as props. Ex. F, 18:12-23; 56.1 ¶87. Prior to the day's events, Kushneir attended an OWS organizational meeting with a large number of people in which what was going to happen on November 17, 2011, was laid out. Ex. F, 20:8-16; 56.1 ¶88. Shutting down Wall Street was discussed at the organizational meeting. Ex. F, 21:10-22:6; 56.1 ¶89. As he was marching toward the Stock Exchange with his cardboard house, Kushneir was in a group of anywhere from 50 to 200 people. Ex. F, 26:2:8; 56.1 ¶90. Kushneir was in the front of that group. Ex. F, 26:9-1156.1 ¶91. Other people who were not in the group were

---

[2] Plaintiff Kushneir was arrested under the name Steven Kushner.

standing around watching Kushneir and the group with their cardboard houses as they were demonstrating and chanting.  Ex. F, 27:8-15; 56.1 ¶92. According to Kushneir, these people looked like they were going to work, some were on their way to work, some cursed at the protesters, some responded positively.  Ex. F, 27:8-2256.1 ¶93. At various points along the march route, Kushneir heard officers ordering crowds of people to move or disperse.  Ex. F, 28:14-18; 56.1 ¶94. At some point, Kushneir arrived at the location of Broadway and Exchange Place—the location of his arrest, and at that location, there were approximately 20 police officers.  Ex. F, 26:12-27:4; 56.1 ¶95.  Kushneir and others formed a line, standing side by side, with their cardboard boxes fully blocking the sidewalk from building to curb. Ex. M, Rivera Video, 1 of 2, No. 332, 00:1056.1 ¶96. Chief of Department Joseph Esposito was present at the location of Broadway and Exchange Place.  Ex. K, 73:13-15; Ex. M, Rivera Video, 1 of 2, No. 332, 00:1056.1 ¶97. While at this location, Esposito observed Kushneir in a group of protesters lined up on the sidewalk from the building line to the curb blocking pedestrian traffic.  Ex. K, 75:10-24; 56.1 ¶98. Esposito observed an officer with a bullhorn give the group orders to disperse or be subject to arrest.  Ex. K, 13:9-14:5, 22:19-25, 86:8-12, 88:6-10; 56.1 ¶99. Esposito observed more than one pedestrian who tried to come through the protesters but was unable to do so.  Ex. K, 117:23-118:11; 56.1 ¶100. Esposito gave the final order for the crowd to disperse giving them one last chance to comply.  Ex. K, 85:24-86:17; 56.1 ¶101.  The crowd, including Kushneir, could have dispersed by simply turning around and walking in the opposite direction. Ex. K, 87:4-9, 140:12-13, 144:18-25; 56.1 ¶102. Officer Michael Maldonado observed a group of protesters blocking the sidewalk with houses; Kushneir was in the front. Ex. L, 15:23-24, 53: 8-10, 77:16-23; 56.1 ¶117. Officer Michael Maldonado observed Esposito give warnings to the crowd of protesters as they were blocking pedestrian traffic.  Ex. L, 16:20-24, 56:22-23; 56.1

¶118.  Maldonado observed the protesters fail to comply with Esposito's orders—"they wouldn't move."  Ex. L, 53:11-16; 56.1 ¶119.

Esposito shouted the orders standing within approximately three feet of Kushneir while Kushneir was looking directly at him.  Ex. M, Rivera Video, 1 of 2, No. 332, 00:10; 56.1 ¶106. "Chief Esposito was standing right in front of me."  Ex. F, 29:1; 56.1 ¶107. After Esposito gave his final order, the crowd did not disperse—they opened up their cardboard box houses forming a wedge or shield on the sidewalk from building to curb.  Ex. H, 76:7:15; 56.1 ¶108. Esposito then gave instructions to the officers to make arrests Ex. K, 91:23-92:4; Ex. H, 76:16-21, 77:15-21; 56.1 ¶109. Kushneir was arrested at approximately 9:00 a.m., when it seemed like people were all going to work according to him.  Ex. F, 30:19-21; 56.1 ¶110. Kushneir was charged with disorderly conduct and issued a DAT. Ex. U; Ex. A, ¶143; 56.1 ¶111. Kushneir's arrest was processed by Maldonado, who also swore out the criminal court complaint.  Ex. V; Ex. W, Ex. L, 75:9-76:12; Ex. U; 56.1 ¶112.  Kushneir was in custody for approximately twelve hours. Ex. Z; 56.1 ¶122. Kushneir accepted an ACD and made one court appearance.  Ex. F, 38:22-24; Ex. A, ¶148; 56.1 ¶114. Kushneir suffered no physical or emotional injuries as a result of his arrest.  Ex. F, 38:4-39:11; 56.1 ¶115.

## STANDARD OF REVIEW

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts…When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (U.S. 2007); see Marcavage v. City of New York, 689 F.3d 98, 110 (2d Cir. 2012); Garcia v. Doe, 779 F.3d 84 (2d Cir. 2015). A motion for summary judgment requires the party to "make a showing sufficient

to establish the existence of [each] element essential to that party's case…since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

### PLAINTIFFS' DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER §1983 CLAIM MUST BE DISMISSED

Plaintiffs bring a generic claim under §1983 alleging they were deprived of their constitutional rights. See Exhibit A, ¶¶91-97, attached to the Declaration of Amy Robinson, hereinafter "Ex. A." This cause of action must be dismissed as "plaintiff[s] fail to "allege how this claim is distinct from [their] other claims" See Wiles v. City of New York, 2016 U.S. Dist. LEXIS 148024, at *33 (S.D.N.Y. 2016) aff'd, 2018 U.S. App. LEXIS 5610.  See also Sforza v. City of New York, 2009 U.S. Dist. LEXIS 27358, at *37-38 (S.D.N.Y.2009) (dismissing a generic "Deprivation of Federal Civil Rights" claim where plaintiff only lists the constitutional amendments but failed to provide any information on the deprivation she allegedly experienced.) Based on the foregoing this cause of action must be dismissed.

### PROBABLE CAUSE EXISTED FOR KUSHNEIR'S ARREST AND DEFENDANTS ESPOSITO AND MALDONADO ARE ENTITLED TO QUALIFIED IMMUNITY

Plaintiff Kushneir's claim for false arrest fails as probable cause existed for his arrest and prosecution.  The existence of probable cause to arrest constitutes justification and is a complete defense. Covington v. City of New York, 171 F.3d 117 (2d Cir. 1999).  "There can be no federal civil rights claim for false arrest where the arresting officer had probable cause. Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Singer v. Fulton County, 63 F.3d 110, 118 (2d Cir. 1995)(internal quotations omitted); citing Bernard v. United States, 25 F.3d 98, 102 (2d Cir.

11

1994); O'Neill v. Town of Babylon, 986 F.2d 646, 650 (2d Cir. 1993). Where there is probable cause to arrest for any offense, a false arrest claim is subject to dismissal. Marcavage v. City of New York, 689 F.3d 98, 110 (2d Cir. 2012); citing Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006); see also Devenpeck v. Alford, 543 U.S. 146, 153-54 (2004); Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007) ("[A]n arrest is not unlawful so long as the officer has knowledge of, or reasonably trustworthy information as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed any crime."). Probable cause is an objective test, and any alleged alternative motives by defendants are irrelevant. "[M]otivation is not a consideration in assessing probable cause." Singer, 63 F.3d 118. "[W]e refuse to examine the motivation behind the decision by the sergeant to seek an arrest warrant." Mozzochi v. Borden, 959 F.2d 1174, 1179 (2d Cir. 1992); Whren v. United States, 517 U.S. 806, 812-13 (1996). "[R]educing sidewalk and street congestion in a city with eight million inhabitants[] constitutes[s] [a] significant governmental interest[]…"Mastrovincenzo v. City of New York, 435 F.3d 78, 100 (2d Cir. 2006) (internal quotation marks omitted; see also Concerned Jewish Youth v. McGuire, 621 F.2d 471, 478 (2d Cir. 1980) (where the Court found that the interests of residents, visitors and workers must be balanced with that of protestors). Due to the strong interest the City of New York has in maintaining order during mass demonstrations, officers should not be forced to wait for congestion to arise or for a demonstration to devolve into utter chaos before parameters are put in place to prevent it. In this case, Kushneir was charged with disorderly conduct for blocking pedestrian traffic under NY PL §240.20(5), however his admitted and observed actions are also sufficient to establish the existence of probable cause to

arrest him for disorderly conduct for failure to comply with a lawful order under PL §240.20(6) and obstructing governmental administration ("OGA") under §195.05.[3]

N.Y. Penal Law § 240.20(5) makes it a violation when someone "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof [she] obstructs pedestrian or vehicular traffic." There was probable cause for plaintiff's arrest under NY PL § 240.20(5). There is no dispute that Kushneir was arrested on the sidewalk. Prior to Kushneir's arrest, officers were attempting to clear the sidewalk. Ex. K; Ex. M; 56.1 ¶¶99, 101, 106. Though plaintiff has attempted to deny it, pedestrians attempting to pass were present on that sidewalk and unable to proceed because of the protestors who were remaining on the sidewalk, including Kushneir. Ex. K, 117:23-118:11; 56.1 ¶100. Here, evidence in the record establishes the following: officers were present during an OWS demonstration where unquestionably a large group of protestors, including Kushneir, had gathered on a sidewalk with large painted cardboard houses blocking all access to the sidewalk from building to curb during morning rush hour in the Wall Street area. Ex. F, 26:2:8; 56.1 ¶90. Kushneir admitted that he was in the front of that group. Ex. F, 26:9-11; 56.1 ¶91. Kushneir admits that at various points he heard officers ordering crowds of people to move or disperse. Ex. F, 28:14-18; 56.1 ¶94. Esposito observed Kushneir in a group of protesters lined up on the sidewalk from the building line to the curb blocking pedestrian traffic. Ex. K, 75:10-24; 56.1 ¶98. Esposito observed an officer with a bullhorn give the group orders to disperse or be subject to arrest. Ex. K, 13:9-14:5, 22:19-25, 86:8-12, 88:6-10; 56.1 ¶99. Esposito observed more than one pedestrian who tried to come through the protesters but was unable to do so. Ex. K, 117:23-118:11; 56.1 ¶100. Esposito

---

[3] Probable cause for any crime – not just the crime charged – will provide a "complete defense" to a false arrest claim. See Devenpeck v. Alford, 543 U.S. 146, 152-53 (2004); Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006).

shouted the orders to disperse standing right in front of Kushneir.  Ex. M, Rivera Video, 1 of 2, No. 332, 00:10; Ex. F, 29:1; 56.1 ¶106. After Esposito gave his final order, the crowd, including Kushneir, did not disperse—instead, they opened up their cardboard box houses forming a wedge or shield on the sidewalk from building to curb.  Ex. L, 76:7:15; 56.1 ¶108.   Any argument that Kushneir did not have an opportunity to comply with these orders is without merit.  Multiple orders were given by an officer and by Esposito.   Kushneir admits, and the video clearly shows, that Esposito was standing right in front of Kushneir. Ex. F; 56.1 ¶107. Ignoring multiple orders means that there was ample time to comply.   Kushneir, along with the entire crowd of cardboard house holders simply refused to comply.  Kushneir's refusal to comply with the lawful orders given, together with the entire blockage of the sidewalk during rush hour in downtown Manhattan while pedestrians were trying to pass through demonstrates that Kushneir intended to cause public inconvenience, annoyance or alarm. Moreover, Kushneir admits that he intended to participate in the process of shutting down Wall Street.  Ex. F, 32:22-33:3; 56.1 ¶85. According to Kushneir, part of the protesting on November 17, 2011, included blocking streets or sidewalks.  Ex. F, 33:4-7; 56.1 ¶86. These are statements of clear intent to cause public inconvenience, annoyance or alarm.   Accordingly, as Kushneir continued to refuse to comply with lawful police orders, was part of a protest that was obstructing a sidewalk during rush hour in downtown Manhattan where pedestrians tried to pass, and remained continuously blocking the sidewalk in defiance of police orders, he was lawfully subject to arrest under NY PL § 240.20(5), and any claims related to his arrest, must be dismissed.

Probable cause exists for a violation of NY PL § 240.20(6) when an individual "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof [] congregates with other person in a public place and refused to comply with a lawful

order of the police to disperse."  It cannot be disputed that plaintiff, along with a group of individuals, was present blocking a sidewalk from building to curb in downtown Manhattan. Lawful orders were given to the group; Kushneir remained continuously blocking the sidewalk in defiance of police orders. Accordingly, an objective officer could believe that he was disregarding lawful orders to clear the sidewalk and that probable cause existed for his arrest under NY PL § 240.20(6).  "Under New York's disorderly conduct statute, an order to disperse is lawful unless the order was purely arbitrary and not calculated in any way to promote the public order." U.S. v. Nelson, 500 Fed. Appx. 90, 93 (2d Cir. 2012)) (citing Crenshaw v. City of Mount Vernon, 372 Fed. Appx. 202, 206 (2d Cir. 2010)).  In this case, the orders were an attempt to clear a sidewalk which was blocked from building to curb during morning rush hour in downtown Manhattan.  This makes the orders anything but arbitrary, and in line with the Police Department's duties and responsibilities under inter alia, the New York City Charter §435(a).  See Marcavage v. City of New York, 689 F.3d 98, 109 (2d Cir. 2012); Wiles v. City of New York, 2016 U.S. Dist. LEXIS 148024, at *34 (S.D.N.Y. 2016) aff'd, 2018 U.S. App. LEXIS 5610.  As Kushneir ignored and refused to comply with lawful orders before his arrest on the sidewalk, his arrest is supported by probable cause under PL §240.20(6).  While facilitating crowd control, officers issued orders for the protestors, including Kushneir, to disperse. Kushneir cannot deny that he failed to comply with numerous orders to disperse by remaining in the exact location where the orders were issued. This refusal to disperse interfered with the officers' duties to maintain a congestion-free sidewalk and maintain order during a demonstration.  See Wiles v. City of New York, 2016 U.S. Dist. LEXIS 148024, at *34-35 (S.D.N.Y. 2016) (Directing pedestrian traffic to clear sidewalks of congestion pursuant to NYC Charter §435(a) is a duty that requires "instantaneous judgment calls, rather than a pre-programmed means of achieving a

15

compulsory result," citing Denis v. Town of Haverstraw, 852 F. Supp. 2d 405, 413 (S.D.N.Y. 2012) (holding that a police officer directing traffic is a discretionary action entitled to immunity from state causes of action). Accordingly, as Kushneir here continued to refuse to comply with lawful police orders, was part of a protest that was obstructing the sidewalk, and remained continuously in defiance of the lawful police orders he was lawfully subject to arrest under PL §240.20(6), and any claims related to his arrest must be dismissed.

Under N.Y. Penal Law §195.05 "A person is guilty of obstructing governmental administration when [s]he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act[.]"  In determining whether an individual's behavior rises to the level of interference, an officer may consider both the individual's actions and his words. Kass v. City of New York, 864 F.3d 200, 209 (2d Cir. 2017). This element is easily satisfied; an individual need only "intrude himself into, or get in the way of, an ongoing police activity." Id. at 210 (quoting In re Kendell R., 897 N.Y.S.2d 83, 84 (N.Y. Sup. Ct. 1st Dep't 2010).  Kushneir obstructed governmental administration by interfering with officers attempting to clear the sidewalk.  There is no dispute that Kushneir was ultimately arrested while still on the sidewalk.  Kushneir's assertion that he did not hear any orders to disperse is ridiculous.  Video clearly depicts Kushneir being ordered to disperse. Ex. M; 56.1 ¶¶99, 106. When he did not move, Chief Esposito ordered his arrest.  Kushneir cannot deny that his conduct interfered with the officers' attempts to maintain a congestion-free sidewalk as well as maintain order during a demonstration. Any argument that his physical actions were not enough to effectively interfere and hamper officers' efforts is without merit.  Kushneir's presence while declining defendants'

lawful orders provides probable cause to arrest under PL §195.05 and constitutes sufficient physical force or interference.  As noted in this Circuit, a plaintiff's mere refusal to comply with the dispersal order is enough to establish probable cause. See Brown v. City of New York, 2014 U.S. Dist. LEXIS 83513 at *21 (S.D.N.Y. 2014) (Refusing to obey orders to leave the area can be the basis for an arrest for obstructing governmental administration) citing C.G. v. City of New York, 2013 U.S. Dist. LEXIS 153020 (E.D.N.Y. 2013); Mediavilla v. City of New York, 2016 U.S. Dist. LEXIS 192198 (S.D.N.Y. 2016) (finding probable cause for NY PL § 195.05 and 240.20(6) based on plaintiff's refusal to comply with dispersal orders at an OWS event); Lennon v. Miller, 66 F.3d 416, 424 (2d Cir. 1995); Marcavage v. City of New York, 2010 U.S. Dist. LEXIS 107724 at *30 (S.D.N.Y. 2010) (finding probable cause for OGA where officers, carrying out a governmental function of regulating pedestrian traffic during a demonstration, ordered plaintiffs to leave the area numerous times before their arrest).

Even if the Court did not find probable cause on any offense, defendants Esposito and Maldonado are entitled to qualified immunity.  Defendants are entitled to qualified immunity if they can satisfy either part of a two-part test.  "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Garcia v. Doe, 779 F.3d 84, 92 (2d Cir. 2014); see also Wood v. Moss, 134 S. Ct. 2056, 2059 (2014); Bradway v. Gonzales, 26 F.3d 313, 317-18 (2d Cir. 1994) ("qualified immunity shields public officials performing discretionary functions from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known . . . or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights.")  The Court

must take care not to define the right at issue too broadly.  "[T]he clearly established law must be 'particularized' to the facts of the case."  White v. Pauly, 137 S. Ct. 548, 552 (Jan. 9, 2017) (quotations omitted) ("Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality.").  The requirement that a right be clearly defined requires a considerable showing keyed to the particular circumstances the individual defendants confronted. "[I]n the light of pre-existing law the unlawfulness must be apparent. In other words, existing precedent must have placed the statutory or constitutional question . . . beyond debate." Occupy Nashville v. Haslam, 769 F.3d 434, 442-43 (6th Cir. 2014) (quoting Plumhoff v. Rickard, 134 S. Ct. 2012, 2023, (2014); Anderson v. Creighton, 483 U.S. 635, 640 (1987)); See Crowell v. Kirkpatrick, 400 F. App'x 592, 594 (2d Cir. 2010) ("[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established.") (quotations omitted).  Viewing this requirement from the defendants' perspective, the courts have consistently affirmed that the defendants' actions must be so beyond the pale, and the right so distinctly defined, that not a single reasonable official could think that conduct lawful.  That requirement acknowledges the split-second decisions that officers must make during uncertain situations.  "The doctrine of qualified immunity serves to protect police from liability and suit when they are required to make on-the-spot judgments in tense circumstances." Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir. 1995) ("An officer's actions are objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances.").

Like probable cause, qualified immunity is an objective test based on the knowledge possessed at the time, but without considering the subjective intent or motivation of

the government official.  Garcia v. Doe, 779 F.3d 92 ("The relevant, dispositive inquiry in determining whether a right is clearly establishes is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.") (citations omitted).  The Second Circuit has repeatedly applied that standard to review police officers' actions during OWS on the issue of probable cause or qualified immunity.  See Berg v. City of New York, 2018 U.S. App. 20646 (2d Cir. 2018); Caravalho v. City of New York, 2018 U.S. App. 10785 (2d Cir. 2018) (summary order); Higginbotham v. City of New York, 2018 U.S. App. LEXIS 20637 (2d Cir. 2018) (summary order); Wiles v. City of New York, 2018 U.S. App. LEXIS 5610 (2d Cir. 5610); Kass v. City of New York, 2017 U.S. App. LEXIS 13259 (2d Cir. 2017); Pluma v. City of New York, 2017 U.S. App. LEXIS 6096 (2d Cir. 2017) (summary order); Brown v. City of New York, 2017 U.S. App. LEXIS 11937 (2d Cir. 2017); Shamir v. City of New York, 2015 U.S. App. LEXIS 18420 (2d Cir. 2017); Lebowitz v. City of New York, 2015 U.S. App. LEXIS 9106 (2d Cir. 2015) (summary order); Garcia v. City of New York, 2015 U.S. App. LEXIS 2762 (2d Cir. 2015).

        Here, under each of the penal law provisions above, defendants' arrest of Kushneir was justified and they are entitled to qualified immunity.  The orders directed to Kushneir were at least arguably lawful as defined by the Circuit Court in U.S. v. Nelson, 500 Fed. App'x 90, 93 (2d Cir. 2012).  Kushneir cannot pierce qualified immunity by claiming that he did not hear multiple orders both generally and directed at him while on the sidewalk. Kushneir ignored lawful orders, was arrested on the sidewalk and can provide no justification for refusing to comply.  An officer would be at least arguably reasonable to believe that he was breaking the law and probable cause existed for his arrest and prosecution.  Even if Kushneir disputes the "purely arbitrary" standard to determine whether an order is lawful, its unlawfulness is far from apparent, let alone clearly established.  Accordingly, if the Court finds probable cause lacking, it is was by no means clearly established that arresting Kushneir for refusing to disperse

from a sidewalk during a demonstration was unlawful or that the officer was "plainly incompetent" or "knowingly violating the law," as the Court would be required to find in denying qualified immunity.  Hunter v. Bryant, 502 U.S. 224, 229 (1991).

### PLAINTIFFS' FIRST AMENDMENT TIME, PLACE, MANNER CLAIM AGAINST DEFENDANTS ESPOSITO, PAPOLA AND GROHT MUST BE DISMISSED

Plaintiffs further allege that defendants violated their First Amendment-based rights under a time, place and manner analysis.  Time, place and manner restrictions are permissible if they (1) are justified without reference to the content of the regulated speech, (2) are narrowly tailored to serve a significant governmental interest and (3) leave open ample, alternative channels for communication of the information.  Marcavage v. City of New York, 689 F.3d 98, 104 (2d Cir. 2012).  First, as determined by the Court's in its decision on the Rule 12(b) motion in this case, the orders given to plaintiffs were content-neutral.  The restriction on expressive activity was not aimed at the content of any message—no pedestrian traffic is allowed in the roadway and pedestrian traffic must be able to move freely on sidewalks.  Second, the restrictions were narrowly tailored to serve a significant governmental interest.  As discussed above, states have a strong interest promoting the free flow of traffic on streets and sidewalks, and police orders to disperse from heavily-trafficked intersections and a dense sidewalk during morning rush hour in the Wall Street area promoted the free flow of traffic.  Chief Esposito, Sgt. Papola and Lt. Groht were executing lawful orders under §240.20(6)—which is a permissible time, place manner restriction on speech in a public area, and was thus narrowly tailored.  Third, plaintiffs had obvious alternative channels for communication. With respect to Case and Klein, the sidewalks where the protestors entered and exited the intersections provided ample channels for communication, and it was lawful and safe to be on the sidewalks.  Kushneir had ample alternative channels of communication in that he could have simply turned around and walked in

the opposite direction.  Ex. K, 87:4-9, 140:12-13, 144:18-25; 56.1 ¶102.  Kushneir could have also remained at the arrest location had he opened a space on the sidewalk he was blocking for pedestrians to pass.  While plaintiffs may have preferred to document the protest activities in the middle of heavily-trafficked intersections and dense sidewalk, the law does not require that alternative channels be "perfect substitutes."  Mastrovincenzo v. City of New York, 435 F.3d 78, 101 (2d Cir. 2006).  Moreover, video of each of the plaintiffs' arrest locations demonstrates that the turnout of people on November 17th was so large that it was unavoidable that substantial numbers of demonstrators would be unable to access the area surrounding the New York Stock Exchange. This is not tantamount to a denial of the First Amendment rights of these individuals. Courts have recognized that the City is not required to do all that it is physically capable of doing to promote First Amendment expression. "Rather, it is given the discretion to balance often-conflicting strands of public interest, including the need to ensure access to the streets by emergency vehicles, the ability of the police to deal with public disorders or crises, ensuring access by members of the public not participating in the event to their own homes, and more generally the preservation of public safety and order." Haus v. City of New York, 2011 U.S. Dist. LEXIS 155735, *44-45 (S.D.N.Y. 2011).

Moreover, it can hardly be said that the police-imposed restrictions in the instant case were so stringent as to suggest First Amendment bias. Video evidence shows Case and Klein literally sitting in the middle of heavily-trafficked intersections and Kushneir blocking a heavily-trafficked sidewalk during rush hour in the Wall Street area. Ex. M; Ex. N; 56.1 ¶¶ 21, 22, 56, 60, 62, 66, 96, 106.  In so doing, plaintiffs blocked vehicular and pedestrian traffic. Video and testimonial evidence demonstrate that multiple orders were given to disperse to each plaintiff.  Case and Klein admit that they heard these orders given by Papola and Groht, but they

21

simply refused to comply with them. Kushneir's denial that he heard orders given by Chief Esposito while standing directly in front of him belies common sense.  The First Amendment does not insulate individuals from criminal sanction merely because they are simultaneously engaged in expressive activity.  Papineau v. Parmley, 465 F.3d 46, 58 (2d Cir. 2006).  "One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest."  Id., citing Cox v. Louisiana, 379 U.S. 536, 554 (1965).  Accordingly, defendants Esposito, Groht and Papola did not violate the First Amendment, because the orders they gave were permissible time, place, and manner restrictions on speech as they were neutral, narrowly tailored to maintain crowd control and security and did not foreclose ample, alternative channels of communication.

        Qualified immunity "operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Saucier v. Katz, 533 U.S. 194, 206 (2001)). The defense is available to public officials "if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Id. (emphasis added) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, (1982)). A right is "clearly established" if the contours of the right are sufficiently clear in the context of the alleged violation. Johnson v. Newburgh Enlarged School District, 239 F.3d 246, 250 (2d Cir. 2001).  "[C]ourts in this Circuit have recognized that 'spontaneous police order[s] to demonstrators to relocate can be viewed through the lens of time, place, and manner doctrine'" pertaining to the First Amendment. Wiles v. City of New York, 2016 U.S. Dist. LEXIS 148024, at *5 n.1 (S.D.N.Y. 2016) aff'd, 2018 U.S. App. LEXIS 5610 (2d Cir. 2018) (quoting  Akinnagbe v. City of New York, 128 F. Supp. 3d 539, 548 (E.D.N.Y. 2015)). Defendants are entitled to qualified immunity, because it was not clearly established that orders

temporarily preventing demonstrators from heavily-trafficked streets and a densely crowded sidewalk violated the First Amendment.

Given the facts in which plaintiffs repeatedly refused to comply with the officers' orders—on heavily-trafficked public streets where vehicular traffic was trying to pass and a public sidewalk where pedestrians were trying to pass, at a time of day when the street and sidewalks in the Wall Street area would become more and more congested, and in close proximity to a public protest— it was objectively reasonable for the officers to infer that plaintiffs' continued defiance of their orders recklessly created a risk that they would "cause public inconvenience, annoyance or alarm," including a public disturbance under PL §240.20(6). At the very least, competent police officers could reasonably disagree as to whether, by remaining in the middle of intersections and on the sidewalk despite numerous requests to disperse, plaintiffs recklessly created such a risk.  Accordingly, Esposito, Groht and Papola are entitled to qualified immunity, because any other conclusion would not appropriately confine the denial of qualified immunity to officers who are "plainly incompetent" or "knowingly violate the law." See Zalaski, 723 F.3d at 389.

### PLAINTIFFS' EXCESSIVE DETENTION THEORY FAILS AS A MATTER OF LAW, AND UNDER THE FACTS OF THIS CASE

A claim for excessive detention is governed by the Fourth Amendment, which "requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention" following a warrantless arrest. Bryant v. City of New York., 404 F.3d 128, 136 (2d Cir. 2005). Under the Supreme Court's precedent, "judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement . . . ." Id. at 137 (quoting Cty. of Riverside v. McLaughlin, 500 U.S. 44, 56, (1991)). An arrestee can rebut the presumption of constitutionality by showing that the probable cause

determination was "delayed unreasonably," such as "for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." McLaughlin, 500 U.S. at 56.

Plaintiffs Case and Klein were detained for approximately 13 hours; Kushneir was detained for approximately 12 hours.  Exs. X, Y, Z; 56.1 ¶¶120-122.  Their detention of less than 48 hours was presumptively reasonable. See Bryant, 404 F.3d at 137; see also Caravalho v. City of New York, 2018 U.S. App. LEXIS 10785 (2d Cir. 2018) (summary order) (in an OWS case, Court concluded that, "no reasonable jury could find that the detention of plaintiffs for 24 to 30 hours, in the circumstances here, was excessive."); Lebowitz v. City of New York, 606 Fed. Appx. 17, 18 (2d Cir. 2015) (in another OWS case, the Court stated, "[b]ecause the plaintiffs were arraigned within 48 hours, any pre-arraignment delay the plaintiffs experienced was presumptively reasonable.") (citing Bryant v. City of New York, 404 F.3d 128, 137-38 (2d Cir. 2005)).  Similarly here, plaintiffs have failed to put forth any evidence to show that their release was unreasonably delayed because of "ill will," "delay for delay's sake," or officers' attempts to gather additional evidence to justify their arrests, rather than because of the "practical realities" of transporting busloads of arrestees and processing their arrests. See McLaughlin, 500 U.S. at 56-57.  Plaintiffs' claim that their release was delayed to prevent them from participating in another OWS demonstration later in the evening on November 17, 2011, is entirely unsubstantiated.

Furthermore, plaintiffs' assertion that their detentions were excessive based upon the theory that they believe that they could have been released sooner if they had been given what they consider to be a lesser form of process, such as a summons instead of DATs, is without merit.  See Dkt. No. 118.  Even if there had been a decision to pursue an in-custody

24

arrest of any of the plaintiffs through to arraignment, as opposed to receiving DATs, this would not have amounted to a Constitutional violation.  "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. Lago Vista, 532 U.S. 318, 354 (2001) (finding no Constitutional violation where a motorist was arrested for a seatbelt infraction).  When an arrest is pursued even where a ticket, summons, or even a monetary fine, would be more common or typical is flatly not a constitutional violation.  Id. at 323 (the constitution allows "a warrantless arrest for a minor criminal offense, such as a misdemeanor seatbelt violation punishable only by a fine."); see also United States v. Martinez-Fuerte, 428 U.S. 543, 557-558, n. 12, (1976) ("The logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers").  This is no less true even, assuming arguendo, that plaintiffs received DATs based on a City policy pertaining to protests.  See Dinler v. City of New York, 2012 U.S. Dist. LEXIS 141851, *65-66 (S.D.N.Y. 2012) ("Plaintiffs' attempt to distinguish these cases on the grounds that they addressed discretionary decisions by officers, whereas here there was a citywide policy, is thoroughly unconvincing."); see also Bryant v. City of New York, 404 F.3d 128, 138-39 (2d Cir. 2005) (holding that the City's decision to keep arrested protestors in custody until they could be arraigned, rather than issue them desk appearance tickets, was not objectively unreasonable); see also Haus v. City of New York, 2011 U.S. Dist. LEXIS 155735, *222 (S.D.N.Y.) ("[A] claim of excessive detention cannot be based on the contention that plaintiffs should have been immediately issued a DAT.").  Simply put, plaintiffs have no Constitutional right to a summons.

 Plaintiffs' excessive detention claim is presumptively reasonable as a matter of law, because they were released well within the 48 hours prescribed by the Second Circuit.  Their attempt to

overcome that fact with an argument that they could have been given a summons is meritless; the law is unequivocal that the process issued does not give rise to a constitutional claim, even if lesser process was available. Moreover, the NYPD's use of a special, centralized Mass Arrest Processing Center equipped to accommodate a large number of arrests with the assistance of the NYPD Legal Bureau and Criminal Justice Bureau agents clearly facilitates arrest processing. Accordingly, this claim against Esposito, Almonte, Tverdokhleb and Maldonado must be dismissed.

Finally, in the alternative, defendants are entitled to qualified immunity on any excessive detention claim, as plaintiffs are unable to make a showing sufficient to overcome the presumption their detention was proper of any improper motivations by any defendant. Moreover, defendants are entitled to qualified immunity as the law indicates that they have significant leeway regarding what form of process can issue, and declining to issue a summons cannot give rise to a constitutional violation.

## **PLAINTIFFS' FAIR TRIAL CLAIM MUST BE DISMISSED**

Similarly, plaintiffs' claim that their right to a fair trial was violated must also be dismissed. A plaintiff may sue for denial of the right to a fair trial where an officer creates false information likely to influence a jury's decision and forwards that information to prosecutors. Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997). Claims based on fabrication of evidence are restricted to those cases "in which an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." Garnett v. Undercover Officer C0039, 838, F.3d 265, 279 (2d Cir. 2016). Any alleged fabrication must be material—that is, of such a character that it would likely influence a jury's decision if a

jury were to consider it.  Id.; Marom v. City of New York, 2016 U.S. Dist. LEXIS 140720, at *7-8 (S.D.N.Y. 2016).  Here, there is no evidence to support the allegation that officers "created false information" against plaintiffs and then forwarded it to the District Attorney's Office. This allegation is nothing more than conclusory and unsupported by the record. See Abdul-Rahman v. City of New York, 2012 U.S. Dist. LEXIS 45653, *34 (E.D.N.Y. 2012).  Additionally, within the context of plaintiffs' §1983 claim, plaintiffs are unable to show that they were subject to a "deprivation of liberty consistent with the concept of seizure", Faruki v. City of New York, 517 Fed. Appx. 1, 2 (2d. Cir. 2013) (citing Washington v. Cnty. Of Rockland, 373 F.3d 310, 316 (2d. Cir. 2004)) "that resulted from the initiation or pendency of judicial proceedings." Id. (citing Murphy v. Lynn, 118 F.3d 938, 944 (2d Cir. 1997).  Merely having to respond to orders of the court and attend court hearings is insufficient to allege a deprivation of liberty. Plaintiffs do not allege that they were detained during the legal proceedings, thus their arrests cannot serve as the predicate deprivation of liberty as they occurred prior to their arraignments, without a warrant and therefore not pursuant to legal process.  See Mesa v. City of New York, 2013 Dist. Ct. LEXIS 1097, 2016 WL 5900217 at *46-47 (S.D.N.Y. 2013).

Officer Almonte swore out a criminal court complaint stating that he observed plaintiff Case: (1) standing in a group of approximately 70 individuals in the middle of the roadway, (2) refuse to comply with repeated lawful orders to disperse from the intersection given by Sgt. Papola, (3) sit on the ground after the orders were given with his arms interlocked with other individuals and (4) obstruct vehicular traffic from flowing.  Ex. R; 56.1 ¶34.  Almonte testified that he observed the group of protesters standing in the intersection, including Case (Ex. H, 95:2-12, 109:25-110:3; 56.1 ¶15), he observed and heard the orders given by Papola using the loudspeaker (Ex. H, 106:20-107:11; 56.1 ¶16), he observed Case subsequent to these orders sit

down in the intersection (Ex. H, 121:22-122:9; 56.1 ¶23), he observed Case lock arms with other protesters (Ex. H, 112:2-4, 113:8-10; 56.1 ¶23), he observed that traffic was blocked by the presence of the protesters, including Case in the intersection (Ex. H, 92:6-9; 56.1 ¶¶13, 14). Thus, it is clear from the record that any argument asserting that Almonte falsified any statement in the criminal complaint or did not witness Case's conduct prior to his arrest is therefore without merit. Accordingly, Case's claim as it relates to a denial of rights to a fair trial must be dismissed as implausible and without merit.

Officer Tverdokhleb swore out a criminal court complaint stating that he observed plaintiff Klein: (1) standing in a group of over 200 individuals in the middle of the street, (2) obstructing all vehicular traffic and (3) refuse to leave the roadway after receiving multiple orders to do so by Lt. Groht. Ex. T; 56.1 ¶¶64, 74. Officer Tverdokhleb testified that when he arrived at the intersection of Nassau and Pine Streets, protesters were blocking the entire intersection. Ex. J, 63:19-25; 56.1 ¶48. Tverdokhleb first observed Klein at approximately 8:30 a.m., standing in the middle of the intersection of Pine and Nassau Streets. Ex. J, 68:16-70:18; 56.1 ¶49. Tverdokhleb saw Lt. Groht stand up on a concrete block. Ex. J, 54:19-23; 56.1 ¶51. Tverdokhleb heard Groht giving orders to the crowd to disperse, because they were blocking traffic; Ex. I, 122:14-123:4; 56.1 ¶51. Tverdokhleb heard these orders so many times, he lost count of how many times Groht repeated these orders. Ex. J. 71:11-72:20. When Tverdokhleb was ordered to begin extracting protesters from the crowd, he observed Klein sitting in the intersection. Ex. J, 91:21-23, 93:9-18. Thus, it is clear from the record that any argument asserting that Tverdokhleb falsified any statement in the criminal complaint or did not witness Klein's conduct prior to his arrest is therefore without merit. Accordingly, Klein's claim as it relates to a denial of rights to a fair trial must be dismissed as implausible and without merit.

Officer Maldonado swore out a criminal court complaint stating that he observed plaintiff Kushneir: (1) standing in the middle of the sidewalk at Broadway and Exchange Place with approximately 100 individuals and (2) completely block the sidewalk forcing pedestrians to walk in the street to pass.  Ex. U; 56.1 ¶¶111, 112. Maldonado observed a group of protesters blocking the sidewalk with houses; Kushneir was in the front. Ex. L, 15:23-24, 53: 8-10, 77:16-23; 56.1 ¶117. Maldonado observed Esposito give warnings to the crowd of protesters as they were blocking pedestrian traffic. Ex. L, 16:20-24, 56:22-23; 56.1 ¶118. Maldonado observed the protesters fail to comply with Esposito's orders—"they wouldn't move."  Ex. L, 53:11-16; 56.1 ¶119. Thus, it is clear from the record that any argument asserting that Maldonado falsified any statement in the criminal complaint or did not witness Kushneir's conduct prior to his arrest is therefore without merit. Based on the foregoing, plaintiffs' claims as they relate to a denial of rights to a fair trial must be dismissed as the evidence shows that the officers witnessed plaintiffs' conduct prior to their arrests and recorded their observations accurately in the criminal court complaints.  This claim must be dismissed and the defendants are entitled to qualified immunity.

### PLAINTIFFS' MONELL CLAIM MUST BE DISMISSED

Plaintiffs' remaining Monell claim based upon a theory of failure to train fails as their Constitutional claims must be dismissed. As this Court is aware, where there is no underlying constitutional violation, there can be no municipal liability. See Caravalho v. City of New York, 2016 U.S. Dist. LEXIS 44280, at *67 (S.D.N.Y. Mar. 31, 2016) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)).  While municipalities may be sued under 42 U.S.C. § 1983, they are not liable under the theory of respondeat superior.  Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978).  In this case, plaintiffs' Monell claim must be dismissed as they suffered no constitutional violation.  "[N]either Monell[], nor

29

any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."  Los Angeles v. Heller, 47 U.S. 796, 799 (S. Ct. 1986).  See Patterson v. Westchester County, 2014 U.S. Dist. LEXIS 50763, 42-43 (S.D.N.Y. 2014).

Furthermore, as stated in their opposition to defendants' pre-motion letter in this matter, plaintiffs are now pursuing what they refer to as, "First Amendment-based and excessive detention-based Monell claims challenging defendants' DAT/No Prints policy as applied to OWS." See Dkt. No. 118. The Court determined in its decision on the Rule 12(b)(6) motion to dismiss that plaintiffs' remaining Monell claim is one based upon a failure to train. See Dkt. No. 72. Discovery in this case was conducted on the basis of plaintiffs' failure to train claim, including voluminous training documents and the 30(b)(6) testimony of Inspector Anthony Raganella of the NYPD Disorder Control Unit, Officer Shurland Marshall of the NYPD Police Academy and Lt. Christopher Czark of the NYPD Criminal Justice Bureau.  As plaintiffs appear to be asserting a new Monell theory, defendants respectfully reserve the right to respond to plaintiffs' new arguments pertaining to Monell that will presumably be presented in their opposition to the instant motion.[4]

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant summary judgment on all causes of action, dismiss plaintiffs' complaint with prejudice, and grant such other and further relief as the Court deems just and proper.

---

[4] Defendants respectfully note that plaintiffs cannot set forth a new theory of liability in an opposition to a summary judgment motion.

Dated:      New York, New York
            January 11, 2019

                              ZACHARY CARTER
                              Corporation Counsel - City of New York
                              *Attorney for Defendants*
                              100 Church Street
                              New York, New York 10007
                              (212) 356-3518


                  By:    /s/
                         _____
                         Amy Robinson
                         New York City Law Department
                         Special Federal Litigation Division