**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**BENJAMIN CASE, JENNIFER KLEIN, and**
**MARK KUSHNEIR,**

                         **Plaintiffs,**

    **-v-**

**THE CITY OF NEW YORK, et al.,**

                        **Defendants.**

---

**MEMORANDUM OF LAW IN**
**OPPOSITION TO**
**DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

**Index No.  14-cv-9148 (AT)(BCM)**


**MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Gideon Orion Oliver**
***Attorney for Plaintiffs***
**277 Broadway, Suite 1501**
**New York, NY  10007**
**646-263-3495**

TABLE OF CONTENTS…………………………………………………..…………….i

TABLE OF AUTHORITIES………………………………………………….……..ii

PRELIMINARY STATEMENT………………………………………………….1

FACTS……………………………………………………………………………....1

ARGUMENT………………………………………………………………………15

I.     ESPOSITO AND MALDONADO ARE NOT ENTITLED TO
     SUMMARY JUDGMENT ON KUSHNEIR'S FALSE ARREST CLAIM………14

II.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
    PLAINTIFFS' FIRST AMENDMENT – TIME/PLACE/MANNER-BASED
    CLAIMS………………………………………………………………………..22

III.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT
    ON PLAINTIFFS' FAIR TRIAL RIGHTS CLAIMS…………………..…26

    A.  EACH PLAINTIFF HAS SUFFICIENTLY SHOWN A COGNIZABLE
    DEPRIVATION OF LIBERTY FOR FAIR TRIAL RIGHTS PURPOSES…..31

IV.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT
  AS A MATTER OF LAW AS TO PLAINTIFFS' *MONELL* CLAIMS AGAINST
  DEFENDANT CITY OF NEW YORK…………………………………………32

    A.  THERE IS AMPLE RECORD EVIDENCE BASED ON WHICH A
    REASONABLE JURY COULD FIND FOR PLAINTIFFS AS TO THEIR
    FAILURE TO TRAIN-BASED *MONELL*
    CLAIMS………………………………………………………………..…32

    B.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS A
    MATTER OF LAW AS TO PLAINTIFFS' "NO SUMMONS" *MONELL* -
    POLICY-BASED CLAIMS……………………………………………37

CONCLUSION…………………………………………………………………39

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. City of New York*,
No. 15CV6741 (DLC), 2016 WL 1169520 (S.D.N.Y. Mar. 22, 2016) ............................16, 17

*Akinnagbe v. City of New York*,
128 F. Supp. 3d 539 (E.D.N.Y. 2015) ....................................................................16, 17, 21, 22

*Amnesty Am. V. Town of W. Hartford*,
361 F.3d 113 (2d Cir 2004)................................................................................................33

*Arbuckle v. City of New York*,
14 Civ. 10248 (ER), 2016 WL 5793741 (SDNY Sept. 30, 2016) ..........................................19

*Barham v. Ramsey*,
434 F.3d 565 (DC Cir. 2006).........................................................................................19, 20

*Bryant v. City of New York*,
2003 WL 22861926 (SDNY 2003), *aff'd*, 404 F.3d 128 (2nd Cir.) ......................................37

*Case v. City of NY*,
233 F.Supp. 3d 372 (SDNY 2017)................................................................................ *passim*

*Charles v City of NY*,
12-CV-6180 (SLT)(SMG), 2017 U.S. Dist. LEXIS 17943 (EDNY 2017) ...........................21

*Christina Gonzalez* v. NYC, 14 Civ. 7721,
2016 WL 5477774 (SDNY Sept. 29, 2016).........................................................................23

*City of Chicago v. Morales*,
527 U.S. 41 (1999)...........................................................................................................16

*City of Los Angeles v. Preferred Communications, Inc.*,
476 U.S. 488 (1986).........................................................................................................25

*Coggins v. Buonaro*,
776 F.3d 108 (2nd Cir. 2015)............................................................................................26

*Collins et al. v. City of New York*,
295 F. Supp. 3d 350 (SDNY Mar. 29, 2018)......................................................................32

*Deegan v. City of Ithaca*,
444 F.3d 135 (2nd Cir. 2006).............................................................................................24

*Dellums v. Powell*,
    566 F.2d 167 (D.C. Cir. 197) ........................................................................20

*Devenpeck v. Alford*,
    543 U.S. 146 (2004) .....................................................................................15

*Dinler v. City of New York*,
    No. 04 Civ. 7921, 2012 U.S. Dist. LEXIS 141851, 2012 WL 4513352
    (S.D.N.Y. Sept. 30, 2012) ...............................................................19, 20, 37

*DiSorbo v Hoy*,
    74 F App'x 101 (2d Cir 2003) ......................................................................33

*Dowling v. City of N.Y.*,
    No-11-CV4954(NGG), 2013 US Dist LEXIS 142108 (EDNY Sept. 30, 2013) ...................32

*Dowling v. City of New York*,
    No. 11 CV 4954 (NGG)(RML), 2013 WL 5502867 (E.D.N.Y. Sept. 30, 2013) ...................21

*Edenfield v. Fane*,
    507 U.S. 761 (1993) .....................................................................................24

*Evans v. City of N.Y.*,
    12-CV-5341 (MKB), 2015 U.S. Dist. LEXIS 37781 (E.D.N.Y. Mar. 25, 2015) ...................32

*Frisby v. Schultz*,
    487 U.S. 474 (1988) .....................................................................................24

*Garnett v. City of New York*,
    2014 WL 395094 ..........................................................................................26

*Garnett v. Undercover Officer C0039*,
    838 F.3d 265 (2nd Cir. 2016) ("*Garnett III*") .........................................26, 27

*Garnett v. Undercover Officer CO309*,
    2015 WL 1539044 (SDNY April 6, 2015) ("*Garnett II*") .............................26, 27

*Gogol v. City of N.Y.*,
    15-CV-5703 (ER), 2017 U.S. Dist. LEXIS 127187 (SDNY Aug. 10, 2017) ...................32

*Greater New Orleans Broad. Assoc., Inc., v. U.S.*,
    527 U.S. 173 (1999) .....................................................................................24

*Harris v. City of New York*,
    222 F. Supp. 3d 341 (SDNY 2016) ................................................................32

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981) .....................................................................................22

*Jackson v. City of NY*,
939 F.Supp.2d 219 (E.D.N.Y. 2013) .......................................................................21

*Jocks v. Tavernier*,
316 F.3d 128 (2d Cir.2003)......................................................................................26

*Matter of Kendall R.*,
71 A.D.3d 553 (1st Dept. 2010)...............................................................................21

*Lennon v. Miller*,
66 F.3d 416 (2nd Cir. 1995).....................................................................................21

*MacNamara v. City of N.Y.*,
No. 04 CIV. 9216 (RJS)(JCF), 2007 WL 3196295 (S.D.N.Y. Oct. 30, 2007) ........27

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994)..................................................................................................22

*Marcavage v. City of NY*,
689 F.3d 98 (2nd Cir. 2012)...............................................................................21, 26

*Marom v. City of New York*,
No. 15 Civ. 2017 (PKC), 2016 WL 5900217 (SDNY July 29, 2016) ...............26, 27

*McCullen v. Coakley*,
134 S.Ct. 2518 (2014)...............................................................................................24

*Morse v. Fusto*,
804 F.3d 538 (2nd Cir. 2015)...................................................................................26

*NAACP v. Clairborne Hardware*,
458 U.S. 886 (1982)..................................................................................................20

*Norton v. Town of Islip*,
No 12-CV-4463 (PKC), 2016 US Dist LEXIS 7004 (EDNY Jan. 21, 2016),
*aff'd* 678 F. App'x 17 (2d Cir. 2017)........................................................................32

*Olivieri v. Ward*,
801 F.2d 602 (2nd Cir. 1986)...................................................................................25

*Outlaw v City of Hartford*,
884 F3d 351 (2d Cir 2018)........................................................................................33

*Papineau v. Parmley*,
465 F.3d 46 (2nd Cir. 2006)...............................................................15, 16, 17, 20

*People v. Arbeiter*,
169 Misc.2d 771 (N.Y.Sup.App.Term 1st Dept. 1996), *app. den'd* 89 NY2d
918 (1996) ................................................................................................................21

*People v. Baker*,
20 NY3d 354 (2013) ...........................................................................................16, 17

*People v. Barrett*,
13 Misc.3d 929 (NY Crim. Ct. 2006) ......................................................................18

*People v. Benjamin*,
185 Misc.2d 466 (N.Y. Crim. Ct. 2000) ..................................................................19

*People v. Carcel*,
165 N.Y.S.2d 113 (1957) ........................................................................................16

*People v. Galpern*,
259 N.Y. 279 (1932) ...............................................................................................16

*People v. Gonzalez*,
25 N.Y.3d 1100 (2015) ...........................................................................................17

*People v. Griswald*,
170 Misc.2d 38 (Yates County Court 1996) ...........................................................18

*People v. Johnson*,
22 NY3d 1162 (2014) .........................................................................................16, 17

*People v. Jones*,
9 N.Y.3d 259 (2007) .....................................................................................16, 33, 35

*People v. Kauff, et al.*,
34 Misc.3d 137(A), (Appellate Term, 9th and 10th Dists., Dec. 27, 2011) ............16

*People v. Losinger*,
313 N.Y.S2d 60, 62 (Rochester City Crim. Ct. 1970) ............................................17

*People v. Munafo*,
50 N.Y.2d 326 (1980) ..............................................................................................18

*People v. Nixon*,
248 N.Y. 182 (1928) ................................................................................................15

*People v. Pritchard*,
27 N.Y.2d 246 (1970) ..............................................................................................17

*People v. Reed*,
19 Misc. 3d 217 (NY Crim. Ct. 2008) .....................................................................16

*People v. Taylor*,
   19 Misc. 3d 1114(A), 859 N.Y.S.2d 906 (Crim. Ct. 2008) ...................................16

*People v. Todaro*,
   26 NY2d 325 (1970) ...........................................................................................16

*People v. Vargas*,
   179 Misc.2d 236 (Crim. Ct., N.Y. Co. 1998) ......................................................21

*People v. Weaver*,
   16 N.Y.2d 123 (2011) .........................................................................................17

*Perez v Duran*,
   962 F. Supp 2d 533 (SDNY July 3, 2013) ...........................................................32

*Peterec v. Hilliard*,
   12-CV-3944 (CS), 2013 US Dist. LEXIS 132118 (SDNY Sept. 16, 2013) ..........................32

*Poventud v City of NY*,
   2015 US Dist LEXIS 29949 (SDNY Mar. 9, 2015) ...............................................33

*Ricciuiti v. NY City Transit Authority*,
   124 F.3d 123 (2nd Cir. 1997).........................................................................26, 27

*Robison v. Via*,
   821 F.2d 913 (2d Cir. 1987)................................................................................22

*Rohman v NY City Tr. Auth.*,
   215 F.3d 208 (2d Cir. 2000).................................................................................32

*Schiller v. City of New York*,
   04 Civ. 7922 (RJC)(JCF), 2008 WL 200021 (SDNY, January 23, 2008),
   *reconsideration den'd, Abdell v. City of New York*, 2008 WL 2540813 (SDNY
   June 25, 2008), *aff'd, Schiller v. City of New York*, 2009 WL 497580 (SDNY,
   Feb. 27, 2009) ............................................................................................16, 27

*Schiller v City of NY*,
   04 Civ. 7922 (KMK) (JCF), 2006 US Dist LEXIS 67907 (SDNY Sep. 20,
   2006) ................................................................................................................39

*Schiller v City of NY*,
   2007 US Dist LEXIS 36058 (SDNY May 18, 2007).............................................39

*Shamir v. City of NY*,
   804 F.3d 555 (2nd Cir. 2015)..............................................................................15

*Swartz v. Insogna*,
   704 F.3d 105 (2nd Cir. 2013)..............................................................................32

*Vann v City of NY,*
   72 F3d 1040 (2d Cir 1995)...............................................................................33

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989)........................................................................................25

*Washington Mobilization Comm. V. Cullinane,*
   566 F.2d 107 (D.C. Cir. 1977).......................................................................20

*Wiles v. City of New York,*
   13-cv-2898 (TPG) 2016 WL 6238609 (SDNY Oct. 25, 2016) ...........................23

*Zahrey v. Coffey,*
   221 F.3d 342 (2nd Cir. 2000)..........................................................................26

*Zalaski v. City of Hartford,*
   723 F.3d 382 (2nd Cir. 2013)..........................................................................22

*Zellner v. Summerlin,*
   494 F.3d 344 (2nd Cir. 2007)..........................................................................15

**Statutes**

CPL § 510.40 .......................................................................................................32

New York Criminal Procedure Law § 170.55 .....................................................10

New York Penal Law Sections 195.05 ............................................................5, 31

NY Criminal Procedure Law Section 510.40 .................................................5, 14

PL § 15.05(3) .......................................................................................................18

PL § 15.15(1) .......................................................................................................18

PL §  240.20 ..........................................................................................16, 17, 18, 37

PL §§ 240.20(5) ......................................................................................... *passim*

PL § 240.20(6) ........................................................................................... *passim*

**Other Authorities**

First Amendment ......................................................................................... *passim*

Fourth Amendment ...........................................................................................19, 22

Fourteenth Amendment ......................................................................................40

Fed. R. Civ. P. 56(a) ...................................................................................................15

Local Civil Rule 56.1 ...................................................................................................1

**PRELIMINARY STATEMENT.** Plaintiffs submit this Memorandum of Law and accompanying opposition to Defendants' motion for summary judgment, including the May 8, 2019 Declaration of Gideon Orion Oliver (the "Oliver Decl."); Plaintiffs' Response to Defendants' Local Civil Rule 56.1 Statement ("Resp. 56.1"); and Plaintiffs' Affirmative Statement of Facts Pursuant to Local Civil Rule 56.1 ("56.1"). Throughout, Plaintiffs adopt the styles of referring to documents in the record used in the Oliver Decl. Deposition transcripts are referred to by the deponent's last name.

**FACTS.** Other relevant facts are also included in the ARGUMENT sections below. November 17, 2011 was the two-month anniversary of Occupy Wall Street ("OWS") in New York City ("N17"). Resp. 56.1 ¶ 1 (D1347). OWS organizers put out a call to action for protest actions around the Wall Street area. Resp. 56.1 ¶ 2 (D1347). Around a week or so before N17, the NYPD learned that OWS organizers were planning demonstrations in the Wall Street area. 56.1 ¶ 259 (Esposito 25:10-23). Specifically, Esposito testified that "there was some information about preventing Wall Street from opening up, blocking traffic" including "the Stock Exchange." 56.1 ¶ 260 (Esposito 48:16-49:11, 58:9-14, 59:2-60:14, 98:13-18). Esposito could say nothing more about those plans, 56.1 ¶ 261 (Esposito 28:14-19, 49:11-18), and Defendants produced no further evidence about them, 56.1 ¶¶ 262 (29:2-31:3); 254 (Dkt. 106). 78 (Esposito 104:16-105:18). In part of planning for policing an event where protesters might block traffic, the NYPD comes up with plans for preventing them from doing so, which include the placement of NYPD barricades and other resources, including NYPD vehicles and officers, to stop them. 56.1 ¶¶ 264 (53:20-25); 265 (53:20-54:7); 266 (54:4-21, 58:15-25). On the morning of N17, the NYPD so deployed NYPD barricades and other resources, including NYPD vehicles and officers. 56.1 ¶ 267 (AR5).

Plaintiffs Benjamin Case, Jennifer Klein, and Mark Kushneir each intended to and did participate in N17-related protests. Resp. 56.1 ¶¶ 4 (Case 6:19-25, 15:22-24); 5 (19:18-25); 6 (25:3-10,

28:3-5); 39 (Klein 6:23:25, 27:7:10.); 42 (27:7:14); 56.1 ¶¶ 64 (25:14-16, 26:22-27:3, 27:9-10, 27:21-22, 41:8-12);  66 (29:1-6); 67 (20:13-18); 147 (Kushnier 18:8-17, 19:14-20:4);  149 (18:17-18), 152 (25:11-14, 31:13-17).

**PLAINTIFF BENJAMIN CASE (DEFENDANTS LAWRENCE PAPOLA AND BENJAMIN ALMONTE):** Benjamin Case was arrested near Beaver and William Streets at between 9:40 and 10:00am. P's 56.1 ¶¶ 3 (Case 30:21-31:4); 12 (Rivera 2 of 2, No. 340 ("Rivera 340") 01:08-1:10, 1:55-2:10); Resp. 56.1 ¶ 11 (Case 34:4-10). When Case arrived at the intersection, he stood in the pedestrian crosswalk on William St., out of the roadway on Beaver St., *not* in the middle of the intersection. 56.1 ¶ 4 (Rivera 340, 01:08-1:10); Resp. 56.1 ¶ 11 (Case 34:4-10). There Case briefly locked his arms with a person next to him. 56.1 ¶ 5 (33:16-21). Case then heard one police order to leave the area, then he and others sat down briefly to discuss their response. 56.1 ¶¶ 9 (32:13-18; 33:22-24; 44:2-4; Rivera 340, 01:09-01:34); 10 (Case 33:10-13; Rivera 340, 01:47-01:55). He was then immediately knocked over onto his back (with others) as people in front of them fell on top of them. 56.1 ¶¶ 11 (Case 33:13-15; Rivera 340, 01:56-02:08); 15 (Case 32:25-33:15); Resp. 56.1 ¶¶ 22 (33:10-15; Rivera 340, 01:56-2:15); 23 (Case 33:16-21, Rivera 340, 02:04-2:15); 24 (Case 32:25-15); 25 (Rivera 340, 02:00-02:08).

As Almonte approached the intersection soon before Case's arrest, when he saw 25-50 protestors and journalists with cameras, with at least 15-20 officers who stood "scattered" among them, from around 25' away. 56.1 ¶¶ 21 (Almonte 91:2-13, 92:11-15, 93:25-94:10); 22 (95:3-4, 13-17); 23 (95:25-96:12); 24 (105:2-8); 25 (96:13-97:4). Between Almonte and the protesters in the Beaver St. roadway were numerous cars followed by a group of police officers standing in the street between the cars and the protesters "facing the protesters." 56.1 ¶ 26 (97:5-16, 98:10-23). Officers in the intersection between Almonte and the protesters had ordered the cars "stop at that intersection so that nobody would get through"; gave the cars that Almonte was walking next to signs to "stop"

2

with their raised hands; and prevented cars from moving forward using their physical presence. 56.1 ¶¶ 27 (101:3-7); 28 (101:18-102:10); 29 (102:12-103:11); Resp. 56.1 ¶ ¶ 11 (Case 34:4-10, Almonte 95:25-96:12, 105:2-8, 96:13-97:4, Rivera 340, 0:00-0:15); 13 (Almonte 102:12-103:11); 14 (93:18-24, 94:17-20). Almonte did not hear any police orders as he approached the police line. 56.1 ¶ 30 (103:17-22).

When Almonte arrived at the police line, facing the protesters from around 15' away, he saw and heard Papola give dispersal orders as Papola stood in the roadway with a number of fellow officers behind him. 56.1 ¶¶ 31 (104:2-18); 32 (108:13-109:2); 33 (109:19-23). NYPD video shows Papola giving only two sets of police orders total at the location, given around 15 seconds apart. 56.1 ¶¶ 6 (Rivera 340, 00:15-01:34); 7 (00:54-01:11); Resp. 56.1 ¶¶ 18 (00:15-00:54); 19 (01:11-01:34). Around 15 seconds after the second order, the video shows Papola ordering that arrests be made. 56.1 ¶ 8 (01:34-01:53); Resp. 56.1 ¶ 20 (01:48-01:53). Almonte "went in to arrest" people "immediately" after Papola's second order, and within seconds he physically arrested one person, who went limp. 56.1 ¶ 35 (Almonte 112:13-14, 116:10-17); 36 (114:6-7, 18-21, 116:18-25).

Almonte testified he observed Case sit down and interlock arms with others for "a couple of seconds" after Papola's final order and before he physically arrested the person who went limp at the intersection. 56.1 ¶ 34 (111:18-112:13, 112:23-113:4); 38 (122:20-24, 123:21-23, 124:2-4). When Almonte next saw Case, it was a block away from where other officers had arrested him. 56.1 ¶ 45 (117:21-119:3, 126:20-23). It took Almonte at least 3 minutes to arrest, cuff, and carry the person he arrested who went limp at least a block away.  56.1 ¶¶ 39 (116:2-9); 40 (114:6-10, 14-17). Almonte did not see Case being placed under arrest; did not see Case being placed in handcuffs; was not involved in prying Case's arms apart from other people's arms; did was not informed by any fellow officer that they had to pry Case's arms apart from others' arms; and did not recall seeing Case tighten his arms while being arrested. 56.1 ¶¶ 37 (128:4-7); 41 (125:23-25); 42 (126:2-6, 13-15); 43

(139:21-24); 44 (140:5-8); 47 (128:8-12).

All told, Case was only briefly in the crosswalk on William St. -not in the roadway on Beaver St. - before he sat down and was almost immediately knocked over. 56.1 ¶¶ 10 (Case 33:10-13, Rivera 340, 01:47-01:55); 11 (Case 33:13-15, Rivera 340, 01:56-02:08); 12 (01:08-1:10, 1:55-2:10). Case did not interlock his arms with other protesters after he sat down. 56.1 ¶¶ 13 (Case 33:16-21, Rivera 340, 02:04-2:15); 14 (02:04-2:15).  Case did not tighten his arms or interfere with his arrest in any way. 56.1 ¶¶ 16 (Case 44:8-10); 17 (44:5-7). The officers who arrested Case- not Almonte- rolled him onto his stomach, cuffed him, then stood him up and walked him away from the intersection and to the next intersection down Beaver St., placing him in the street next to other people who were arrested. 56.1 ¶¶ 18 (38:4-6); 19 (38:6-9); Resp. 56.1 ¶ 26 (31:15-22). At that second location, Almonte was assigned Case's arrest. 56.1 ¶ 20 (38:12-15, 42:13-14); Resp. 56.1 ¶ 32 (Almonte 120:2-24).

In addition to processing the arrest of the person Almonte physically arrested (not Case), a supervisor assigned Almonte to process the arrests of Case and three other people at that location. 56.1 ¶ 48 (110:18-20, 120:11-24). The supervisor did not ask Almonte whether he had seen any of those four people do anything before they were arrested, and Almonte claimed it was a coincidence that he had seen all those arrestees that were later randomly assigned to him engage in specific unlawful conduct at the intersection prior to their arrests. 56.1 ¶¶ 49 (121:4-7); 50 (121:8-12). Almonte did not recall any fellow officer giving him information about Case's alleged pre-arrest conduct. 56.1 ¶ 46 (127:8-18).

Case was in police custody for over 13 hours before he was released with a Desk Appearance Ticket ("DAT") requiring him to appear for arraignment in NYC Criminal Court on January 26, 2012. 56.1 ¶ 57 (Case 39:18-21; Case DAT; Case OLPA). Almonte created NYPD arrest processing paperwork (56.1 ¶¶ 53 Almonte 136:24-137:8, Case Scratch OLBS; 54 (Almonte 144:22-

145:2, Case OLBS); 56 (Case OLBS Report), provided that and other evidence to a prosecutor from the Office of the District Attorney of New York County ("DANY") (56.1 ¶¶ 51 (Almonte 154:6-9); 52 (154:6-22-156:15-18); 58 (Case Datasheet), and ultimately swore out an accusatory instrument (56.1 ¶¶ 59 (Case Complaint); 60 (Case Complaint; Case Court Action Sheet ("CAS")) stating and/or swearing that he had observed Case engage in specific unlawful conduct, some of which he later admitted was not true, and some of which a reasonable jury could find, based on the record evidence, was not true. *See* Point III below.

Based on Almonte's sworn allegations, Case was charged with violating New York Penal Law ("PL") Sections 195.05 (Obstruction of Governmental Administration or "OGA"); and 240.20(5) and 240.20(6) (Disorderly Conduct). 56.1 ¶ 60 (Case Complaint; Case CAS). Case was required to appear in court on or about January 26, 2012 for his arraignment, after which he was released on his own recognizance pursuant to NY Criminal Procedure Law ("CPL") Section 510.40 ("ROR"). 56.1 ¶¶ 60 (Case Complaint; Case CAS); 61 (Case Datasheet). Case was further required to appear on March 12, 2012 and May 7, 2012. 56.1 ¶¶ 61 (Case Datasheet); 62 (Case CAS). On May 7, 2012, Case pleaded guilty to a Disorderly Conduct violation. 56.1 ¶ 63 (Case Certificate of Disposition ("COD")).

**PLAINTIFF JENNIFER KLEIN (DEFENDANTS DAVID GROHT AND DMITRY TVERDOKHLEB):** Jennifer Klein, a History Professor at Yale University, went to New York City on the morning of November 17, 2011 with several of her graduate students to demonstrate in front of the NY Stock Exchange. 56.1 ¶¶ 64 (Klein 7:22-8:3); 65 (25:14-16, 26:22-27:3, 27:9-10, 27:21-22, 41:8-12). She planned to take a 2:00 p.m. train to Boston to appear on a scholarly panel. 56.1 ¶¶ 66 (29:1-3); 67 (29:1-6); Resp. 56.1 ¶ 43 (27:11-14, 27:20-22).

Klein marched on the Pine St. sidewalk and attempted to turn south onto the Nassau St. sidewalk. 56.1 ¶¶ 68 (20:13-18); 69 (27:25-28:8); 71 (20:21). By 8:30 a.m., at the Pine and Nassau

intersection, Klein encountered a police blockade, including barricades and a heavy police presence, that funneled the march off the sidewalk and into the intersection. 56.1 ¶¶ 70 (20:13-21, 21:10-13, 30:23-31:11, 37:17-19); 71 (20:21); Resp. 56.1 ¶¶ 40 (20:13-21, 35:4-5), 44 (20:13-21, 21:10-13, 30:23-31:11, 37:17-19). A permanent installation of concrete blocks on the South end of Nassau St. blocked off the area preventing cars and protesters alike from passing. 56.1 ¶ 99 (Tverdokhleb 52:53-55:10, 55:18-56:25, 64:2-14). Police officers also physically blocked protesters from walking South on Nassau St., creating a secure police staging area to the South of the intersection. 56.1 ¶¶ 75 (Klein 21:19-20); 100 (Tverdokhleb 60:17-61:12); 101 (64:18-23). Having been funneled into the street at the Pine and Nassau intersection by barricades and the heavy police presence, Klein waited there with other protesters in hopes of continuing the march. 56.1 ¶ 73 (Klein 37:7-10, 37:17-21).

When Tverdokhleb arrived in the area, he saw police and protesters from between half a block and a block or "a couple of car lengths" south of the intersection in the police staging area. 56.1 ¶¶ 102 (Tverdokhleb 58:16-59:24, 62:18-25); 103 (54:19-23, 73:18-74:9); 104 (59:10-11; 59:21-24; 62:16-17). As he approached, Tverdoklheb saw and heard a police supervisor giving orders by loudspeaker from atop the permanently installed concrete blocks. 56.1 ¶ 103 (54:19-23, 73:18-74:9). Tverdokhleb testified that he saw Klein for the first time from that vantage point at around 8:30 a.m., and that Klein was "moving." 56.1 ¶¶ 104 (59:10-11; 59:21-24; 62:16-17); 105 (68:16-20, 69:17-23). While Tverdokhleb waited for orders, he saw pedestrians cross through the protesters. 56.1 ¶ 107 (84:13-86:16). Tverdoklheb did not recall hearing any instructions that protesters could remain in the area if they got on the sidewalk. 56.1 ¶ 106 (88:6-11).

Around 3 minutes before Tverdokhleb was ordered to move in and make arrests, he moved closer to Nassau St., until he was around a car length away from the protesters, and during those 3 minutes he testified that he saw Klein standing, talking to others standing. 56.1 ¶¶ 108 (81:17-82:21); 109 (87:10-12). A supervisor then pointed out certain individual protesters and instructed

Tverdokhleb and other officers to move in, extract them, and remove them to the police staging area to the South. 56.1 ¶¶ 110 (74:21 -76:16); 111 (77:20-24). Tverdokhleb then left the police staging area and physically extracted one apparently male protester- not Klein. 56.1 ¶¶ 112 (54:19-55:13); 113 (76:17-21, 80:18-81:16, 89:10-12, 90:15-25, 93:23-94:19.).  After he personally extracted that person, Tverdokhleb remained in the staging area to the South assisting other officers with arrest processing. 56.1 ¶ 114 (76:20-77:4, 79:13-18, 93:13-95:19). Tverdokhleb testified that he briefly saw Klein sitting down on the ground before she was arrested, around ten minutes after he extracted the male person. 56.1 ¶ 115 (91:6-92:17, 93:7-19).

Klein stood with the crowd beginning by around 8:30 a.m. and at around 8:39 a.m. briefly sat down to try to hear what was being said. 56.1 ¶ 74 (Klein 21:14-18). By around 8:45 a.m., there were almost three rows of officers blocking Nassau St., and an officer with a megaphone climbed on top of a concrete barrier. 56.1 ¶¶ 75 (21:19-20); 76 (21:19-21, Rivera 329, 00:15-02:28). Police video depicts Groht on top of a concrete barrier giving orders to the protesters gathered at the intersection over a bullhorn in sum and substance to "get on the sidewalk and stop blocking the street" and stating "you do not have a parade permit." Resp. 56.1. ¶ 53 (00:15-02:28). Klein heard an officer announce twice in quick succession that people were blocking traffic and if they did not move they would be arrested. 56.1 ¶ 77 (Klein 21:22-22:3). The officer immediately made a third announcement. 56.1 ¶ 78 (22:3). Klein then stood up, but when she did so she saw there was nowhere for her to go. 56.1 ¶¶ 79(22:3-5, 38:12-17, 40:18-20, 44:6-12, 45:14-15); 80 (22:3-8, 30:17-18, 44:6-12, 45:14-46:2). The officer then immediately made a fourth announcement, and a mass of police began to push into the intersection. 56.1 ¶ 81 (22:8-10, 44:6-12). Other officers simultaneously formed a line across Pine St. and began arresting people. 56.1 ¶ 82 (22:11-16, 44:10-12). The police activity tightened the already-packed crowd around Klein. 56.1 ¶ 83 (29:16-17, 45:20-46:1).

At around 8:58am, Klein was still standing in the intersection with nowhere to go, surrounded by police who had lined both sides of Pine St. and who were pushing into the protesters from Nassau St. 56.1 ¶¶ 84 (22:18-20); 85 (22:22, 38:16-21, 46:7-8); 86 (22:21-25, 38:22-23). By 8:59 am, Klein believed police were trying to end any type of demonstration in the Wall Street area. 56.1 ¶ 87 (23:1-6, 41:13-20). Around 2-3 minutes before she was arrested, recognizing that the surrounding police had made it impossible to continue the demonstration, Klein sat on the street. 56.1 ¶ 88 (29:24-30:6, 30:12-16, 46:1-2).  Tverdokhleb did not see Klein in the process of sitting down because he was some distance away, in the staging area. 56.1 ¶ 116 (Tverdokhleb 93:7-18, 96:4-9). Klein was arrested around at 9:01 a.m, not 9:25 a.m.- approximately thirty minutes (not one hour) after she arrived at the intersection, and approximately two minutes (not thirty minutes) after she sat down. 56.1 ¶ 89 (Klein 46:19-20, Kilcoyne 1_3, 05:54-05:59); Resp. 56.1 ¶ 64 (05:42, Klein 46:19-20).

An officer (not Tverdokhleb) picked Klein up from her seated position and then handed her to an apparently African-American woman officer. 56.1 ¶¶ 90 (39:2-3, Kilcoyne 1_3, 05:50-05:59); 91 (Klein 46:21-24; 47:16-22, Rivera 330, 6:30-6:34). That officer put Klein in handcuffs and led her to the police staging area to the South with other arrested people. 56.1 ¶¶ 92 (Klein 46:22-47:2); 93 (37:18-19, 48:9-12, Rivera 330, 6:30-6:34). She left Klein left cuffed at the sidewalk staging area for 1.5-2 hours. 56.1 ¶ 94 (Klein 48:14-15). Tverdokhleb did not see any officers give any instructions specifically to Klein, as opposed to the perceived crowd or group. 56.1 ¶ 116 (Tverdokhleb 93:7-18); 117 (96:4-9). Tverdokhleb "assumed" that Klein had heard instructions given by Groht to leave the area, "guessed" that she did not comply with the instructions, and "assumed" that she sat down in response to those instructions – but did not see her do so. 56.1 ¶¶ 116 (93:7-18, 96:4-9); 133 (121:3-24); 134 (121:25-122:9); 135 (120:15, 121:3).

Tverdokhleb did not place Klein under arrest; did not see Klein being placed under arrest;

8

and does not know who placed Klein under arrest. 56.1 ¶¶ 118 (102:14-20); 119 (95:22-24); 120 95:25-96:3). Tverdokhleb did not put handcuffs on Klein, and does know who did. 56.1 ¶¶ 121 (89:8-9); 122 (96:10-12); 123 (97:6-13 ,). Tverdokhleb first touched Klein at the arrest holding area South of Nassau and Pine. 56.1 ¶ 124 (96:16-22). Tverdokleb was assigned to process the arrests of five people that morning (the male he extracted, Klein, and three others) when a supervisor told him, "These five are yours" and then pointed out five specific arrestees who were sitting next to each other on the sidewalk. 56.1 ¶¶ 128 (98:20-25, 103:6-10); 129 (103:14-104:4). Aside from the person Tverdokhleb extracted, he did not know who arrested the others. 56.1 ¶ 130 (101:23-102:8, 102:14-20). Tverdokhleb did not recall the supervisor asking if he had seen each of the five people before. 56.1 ¶ 131 (104:24-105:5). Tverdokhleb testified he was "lucky enough to see or remember" those specific people among the 200 or more protesters from before they were arrested. 56.1 ¶ 132 (105:13-18). Tverdokhleb did not know how the protesters arrived at the intersection. 56.1 ¶ 97 (44:9-13, 45:4-8, 68:13-15). Tverdokhleb never saw Klein marching. 56.1 ¶ 125 (118:10-12, 119:10-11). No one told Tverdokhleb anything about Klein's alleged pre-arrest conduct. 56.1 ¶ 126 (97:2-5).

Klein was in police custody for between 13-14 hours before she was released with a DAT requiring her to appear for arraignment in NYC Criminal Court on January 26, 2012. 56.1 ¶ 142 (Klein DAT, Klein OLPA); 143 (Klein DAT, Klein OLPA).

Tverdokhleb created NYPD arrest processing paperwork (56.1 ¶¶ 136 (Tverdokhleb 125:24-126:3, Scratch Klein OLBS); 139 (Tverdokhleb 21:24-22:14, 113:19-114:14, Klein Scratch OLBS (D32-33)); 140 (Tverdokhleb 22:9-23:3. Klein OLBS Report); 141 (Klein OLBS), provided that and other evidence to DANY (56.1 ¶¶ 144 (Klein Datasheet)), and ultimately swore out an accusatory instrument (56.1 ¶¶ 146 (Klein Complaint, Klein CAS) stating and/or swearing that he had observed Klein engage in specific unlawful conduct, some of which he later admitted was not true, and some of which a reasonable jury could find, based on the record evidence, was not true. *See*

Point III below. Based on Tverdokhleb's sworn allegations, Klein was charged with violating PL §§ 240.2(5) and 240.20(6) (Disorderly Conduct). 56.1 ¶ 146 (Klein Complaint, Klein CAS). Klein arraigned on January 26, 2012, after which she was ROR'd and had to return to NYC Criminal Court to appear on four other dates (3/12/12, 5/7/12, 5/23/12, and 10/15/2012) before she ultimately accepted an Adjournment in Contemplation of Dismissal ("ACD") under New York Criminal Procedure Law ("CPL") § 170.55 on October 15, 2012. 56.1 ¶¶ 96 (Klein 51:5-8), 147 (Klein DA Datasheet); 148 (Klein 54:21-23, Klein CAS); 145 (Klein 54:21-55:4, Klein CAS, Klein COD).

**PLAINTIFF MARK KUSHNEIR (DEFENDANTS JOSEPH ESPOSITO AND X MALDONADO):** Plaintiff Mark Kushneir meant to put on political performances related to home foreclosures along with a Graduate School friend who had made cardboard images of foreclosed homes as props. 56.1 ¶¶ 151 (Kushneir 18:8-17, 19:14-20:4); 152 (18:17-23, 19:4-6.); 149 (18:17-18); 181 (29:25- 30:3). Kushneir was ultimately arrested around 9:00 a.m. near Broadway at around Exchange Place. 56.1 ¶¶ 154 (25:6-10); 155 (30:18-21). Around 10-15 minutes before prior to his arrest, Kushneir participated in a foreclosure-related political performance South of Exchange Place. 56.1 ¶¶ 156 (25:11-14, 31:13-17); 157 (25:14-19, 27:8-20, 31:4-8);. Kushneir then walked along with other protesters toward Broad St. 56.1 ¶¶ 158 (25:19-20); 159 (27:23-24). Broad St. was blocked off with metal NYPD barricades, so Kushneir and the others made a right turn to walk North onto Broadway. 56.1 ¶¶ 160 (25:10-22); 161 (25:22-24, 27:20-22).

On Broadway, Kushneir walked at the head of between 50-200 protesters. 56.1 ¶ 162 (25:25-26:11). There were interlocked metal NYPD barricades between the sidewalk on which Kushneir was walking and the roadway. 56.1 ¶¶ 163 (26:17-21, 31:8-12); 225 (Maldonado 43:11-13, 43:24-7). The metal barricades funneled Kushneir and the other protesters on the Broadway sidewalk toward a line of police that waited at Broadway near Exchange Place. 56.1 ¶¶ 166 (Kushneir 27:20-22; 31:8-

12); 165 (26:12-19). The metal NYPD barricades were interlocked together and prevented passage from the Broadway sidewalk (on which Kushneir was arrested) into the street. 56.1 ¶¶ 218 (Rivera Video, 1 of 2, No. 332 ("Rivera 332") 0:17-0:38); 219(Rivera 332, 0:17-0:38).

Kushneir then came face to face with a wall of 20-30 police officers standing in a line across the sidewalk from the building to the curb, and "there was no going through them" – the police line itself would have blocked any pedestrian who wanted to move farther on Broadway. 56.1 ¶¶ 166 (Kushneir 25:22-24, 26:22-27:4); 167 (Almonte 72:4-8) 223 (Maldonado 41:7-17); 224 (41:18-42:2, 43:8-10). Kushneir was on Broadway near Exchange Place for only between 15-40 seconds total before he was arrested. 56.1 ¶ 168 (Kushneir 34:8-14).  NYPD video shows Esposito standing in front of Kushneir for approximately 15 seconds total before Kushneir was placed under arrest. 56.1 ¶ 169 (33:24-25, Rivera 332, 0:00-0:38). During a few of those seconds, Kushneir briefly stood in a line on the sidewalk with others, holding up his cardboard prop, before his arrest, but did not form any line, wedge, or shield blocking the sidewalk. Resp. 56.1 ¶¶ 96 (Kushneir 32:9-32-19); 108 (Rivera 332, 0:08-0:09, 0:09-0:15, 00:11-00:15, Esposito 91:12-92:4, 138:22-139:17, 141:14-142:2).

Just prior to Kushneir's arrest, Kushneir saw and heard Esposito in front of him yelling something that was unintelligible to Kushneir for approximately 5 seconds. 56.1 ¶ 170 (Kushneir 28: 19-29:2; 29:8-24, Rivera 332, 0:03-0:08).  Kushneir was then immediately arrested. 56.1 ¶ 171 (Kushneir 29:21-24, Rivera 332, 0:10-0:15).

NYPD video captures Esposito standing on the sidewalk in front of and facing Kushneir and other protesters giving one order[1] over the course of around 9 seconds, speaking into his

---

[1]     Esposito testified that, in addition to his order captured on NYPD video, another NYPD order gave orders via bullhorn at that location (56.1 ¶¶ 182 (Esposito 12:20-13:13); 183 (13:21-14:5, 22:19-23:17, Esposito Exh. 2, D645); 185 (Esposito 131:9-17)), but he could not say anything about that officer's identity (56.1 ¶. 184 (13:9-20)) or how much time elapsed between then and the order that Esposito gave that was captured on video (56.1 ¶ 203 (89:14-23)). Had NYPD videographers been present, they would have been expected to record any such order. 56.1 ¶ 184 (13:9-20); 189

cupped hands: "You're all blocking the sidewalk. You're not – you – remove yourself immediately or be arrested for disorderly conduct for blocking the sidewalk. Now. Go. They're under arrest, let's go." 56.1 ¶¶ 196 (Esposito 85:24-86:17); 197 (88:17-89:13); 201 (Rivera 332, 0:00-0:12); 202 (Esposito 122:25-123:14; Rivera 332, 0:00-0:16).

Esposito did not announce a time within which to comply with his order. 56.1 ¶ 193 (Rivera 332, 0:00-0:15); 208 (Esposito 131:18-21; Rivera 332, 0:00-0:09). Esposito gave people only around one second after completing his order to comply before he verbally ordered arrests, stating: "They're under arrest, let's go." 56.1 ¶¶ 209 (Esposito 91:12-92:4; Rivera 332, 0:08-0:09); 210 (Esposito 138:22-139:17; Rivera 332, 0:08-0:09).

Approximately three seconds after ordering arrests, Esposito physically attempted to place someone under arrest. 56.1 ¶ 211 (Esposito 141:14-142:2; Rivera 332, 0:00-0:15). Maldonado moved in and grabbed the protester closest to him when he saw that. 56.1 ¶ 226 (Maldonado 57:15-22, 59:16-23, 60:3-9). Maldonado physically arrested just that one person, who was not Kushneir.  56.1 ¶ 227 (59:16-60:7). Maldonado then lined that person up on the wall and eventually loaded them into a police wagon. 56.1 ¶¶ 229 (61:2-15); 230 (61:16-17).

Esposito testified that he expected protesters to "back…away from" the police and "disperse in the opposite direction" by turning around and walking the other way in response to his order. 56.1 ¶¶ 204 (Esposito 87:4-13); 205 (139:25-140:13). However, Esposito gave no order for people to turn around and go backwards. 56.1 ¶¶ 206 (87:10-21); 207 (Rivera 332, 0:00-0:15).  And in fact, NYPD video shows at least nine interlocked metal barricades extending from a newsstand toward the middle of the block all the way to the police line. 56.1 ¶ 218 (0:17-0:38). Those barriers were interlocked together and prevented passage from the Broadway sidewalk where Kushneir was

---

(52:16-20; 190 (Esposito 126:9-15). Yet the only order recorded by the NYPD videographer present was Esposito's. 56.1 ¶¶ 191 (Rivera 332, 0:00-0:12); 192 (0:00-0:15).

arrested into the street. 56.1 ¶¶ 216 (Esposito 136:22-137:9; 137:15-18); 219 (Rivera 332, 0:17-0:38).

Esposito did not remember them (56.1 ¶¶ 212 (Esposito 84:7-9); 213 (84:10-13); 214 (86:18-21)),but

acknowledged seeing those barriers on NYPD video during his deposition (56.1 ¶ 215 (136:22-

137:9)).

Although part of NYPD videographers' intended role at demonstrations is to capture illegal

activity that gives rise to police orders, NYPD video from the location does not do that – instead, it

begins with Esposito's order. 56.1 ¶¶ 188 (51:19-52:15); 200 (84:23-85:20, 125:6-14, 138:9-13); 201

(Rivera 332, 0:00-0:12). There were no pedestrians where Kushneir was arrested on Broadway. 56.1

¶ 173 (Kushneir 30:22-31:3; 32:14-18). Pedestrians could have gotten past Kushneir had there been

any. 56.1 ¶ 176 (32:9-14). Almonte could not recall seeing any pedestrians trying to walk through the

group of protesters. 56.1 ¶ 177 (Almonte 71:6-25). Maldonado had "no idea" how many pedestrians

Kushneir did or did not block before he was arrested. 56.1 ¶ 240 (Maldonado 78:3-7).

Esposito did not know if police took any steps to permit demonstrators to remain in the

area, taking up less space on the sidewalk, or directing demonstrators to move to another designated

location nearby, before an order to disperse was given.  56.1 ¶¶ 187 (Esposito 94:14-18); 194 (Rivera

332, 0:00-0:15). Esposito did not direct demonstrators to move to another location nearby. 56.1 ¶

195 (0:00-0:18).

Maldonado arrived at the intersection around 8:45 a.m., and did not then see vehicular

traffic.  56.1 ¶¶ 220 (Maldonado 35:16-20); 221 (47:2-5). Maldonado did not place Kushneir under

arrest. 56.1 ¶¶ 227 (59:16-60:7); 228 (14:8-19, 32:18-33:20, 33:21-34:9, 32:15-20). Maldonado did not

see Kushneir's arrest. 56.1 ¶ 231 (33:18-20, 34:10-13). Maldonado did not see Kushneir's pre-arrest

conduct. 56.1 ¶ 232 (77:16-19; 77:24-78:2).

Kushneir was arrested by an apparently Caucasian NYPD officer who handcuffed him and

who was not assisted in that arrest by any other officer. 56.1 ¶¶ 174 (Kushneir 34:18-35:11); 175

(36:2-5); 178 (35:12-13). Later, during arrest processing, Kushneir's photograph was taken with a different officer. 56.1 ¶ 179 (36:14-37:11). The first time that Maldonado saw Kushneir, he was in the custody of another NYPD officer.  56.1 ¶ 233 (Maldonado 64:23- 65:2.). A supervisor assigned Maldonado to process 5 arrests, including Kushneir. 56.1 ¶ 234 (59:2-4, 63:2-5, 63:25- 64:3). They did not ask if Maldonado had seen any of them before. 56.1 ¶ 235 (64:7-10). No other officer told Maldonado anything about their alleged pre-arrest conduct. 56.1 ¶ 236 (64:11-22).

Kushneir was in NYPD custody for approximately 12 to 13 hours  before being released with a DAT requiring him to appear for arraignment in NYC Criminal Court on January 26, 2012. 56.1 ¶ 180 (Kushneir OLPA; Kushneir DAT); 241 (Kushneir OLPA; Kushneir DAT); 242 (Kushneir DAT; Kushneir DA Datasheet). Maldonado created NYPD arrest processing paperwork (56.1 ¶¶ 237 (Maldonado 73:8-18, Kushneir Scratch OLBS Report); 238 (Maldonado 73:19-22, 74:5-9; Kushneir OLBS Report); 239 (Kushneir OLBS Report), provided that and other evidence to DANY (56.1 ¶¶ 243 (Maldonado 85:20-22, 86:9-23); 244 (Kushneir DA Datasheet); 245(Maldonado 86:21-87:5)), and ultimately swore out an accusatory instrument (56.1 ¶¶ 246 (Kushneir Complaint)), stating and/or swearing that he had observed Kushneir engage in specific unlawful conduct, some of which he later admitted was not true, and some of which a reasonable jury could find, based on the record evidence, was not true. *See* Point III below. Based on Maldonado's sworn allegations, Kushneir was charged with violating PL §§ 240.20(5) (Disorderly Conduct). 56.1 ¶ 247 (Kushneir Complaint). Kushneir was arraigned on January 25, 2012, after which he was ROR'd. 56.1 ¶ 248 (New York Criminal Procedure Law § 510.40); 249 (Kushneir DA Datasheet; Kushneir COD). At Kushneir's second court appearance on March 12, 2012, DANY moved to dismiss the charge. 56.1 ¶¶ 249 (Kushneir DA Datasheet; Kushneir COD); 250 (Kushneir COD).

14

**ARGUMENT:** Summary judgment is not appropriate where, as here, the record demonstrates disputes as to material facts precluding summary judgment for Defendants as a matter of law under Fed. R. Civ. P. 56(a).

## I.   ESPOSITO AND MALDONADO ARE NOT ENTITLED TO SUMMARY JUDGMENT ON KUSHNEIR'S FALSE ARREST CLAIM

This Court must analyze probable cause based only on "the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *Shamir v. City of NY*, 804 F.3d 555, 557 (2ⁿᵈ Cir. 2015). Disputed facts related to probable cause are for a jury to decide. *See, e.g., Zellner v. Summerlin*, 494 F.3d 344, 368 (2ⁿᵈ Cir. 2007) (citing cases).

This Court should reject Defendants' main related argument - that Kushneir's arrest was justified by at least arguable probable cause – because it relies on interpreting material, disputed facts in Defendants' favor, when a jury could find for Plaintiffs as to those facts based on the record; and it fails on the law, as there was not even arguable probable cause to arrest Kushneir.

**A reasonable jury could find tht Esposito and Maldonado lacked even arguable probable cause to arrest Kushneir for violating PL §§ 240.20(5) or 240.20(6).**

"New York courts have interpreted [PL § 240.20(5)] to permit punishment only where the conduct at issue does more than merely inconvenience pedestrian or vehicular traffic." *Papineau v. Parmley*, 465 F.3d 46, 59 (2ⁿᵈ Cir. 2006) (cited in *Case v. City of NY*, 233 F.Supp. 3d 372, 383 (SDNY 2017) (with *Papineau* citing *People v. Pearl*, 66 Misc.2d 502 (1ˢᵗ Dept. 1971) ("Something more … the demonstrators' blocking of the west crosswalk, requiring [pedestrians] to enter the roadway to get to the other side, was required to sustain a conviction for obstructing pedestrian traffic"); and *People v. Nixon*, 248 N.Y. 182, 185, 187 (1928) (reversing convictions of labor picketers, whom a police officer had observed marching 4 abreast along a sidewalk only 12' feet wide with 100 others for 10 minutes, causing some pedestrians to walk around them into the roadway and otherwise behaving such that the "regular amount of traffic was just barely getting through")), providing a "limiting

construction." *Schiller v. City of New York*, 04 Civ. 7922 (RJC)(JCF), 2008 WL 200021, *7 (SDNY,

January 23, 2008), *reconsideration den'd, Abdell v. City of New York*, 2008 WL 2540813, *1 (SDNY June

25, 2008), *aff'd, Schiller v. City of New York*, 2009 WL 497580, *4, *9 (SDNY, Feb. 27, 2009); *see also,*

*e.g., People v. Jones,* 9 N.Y.3d 259 (2007) (dismissing charges that Jones stood "along with a number of

other individuals standing around [on a] public sidewalk, not moving, and that as a result, . . .

numerous pedestrians in the area had to walk around"); *People v. Carcel*, 165 N.Y.S.2d 113 (1957).

The NY Court of Appeals' 2007 *People v. Jones* decision not only re-affirmed the key holdings of

*Nixo, Carcel,* and their progeny that only real and substantial blockages of traffic fall within the

legitimate sweep of PL § 240.20, but also set the stage for subsequent Court of Appeals decisions,

discussed below, emphasizing the critical importance that the "public harm requirement" – which

stems from the statute's *mens rea* component. *See, e.g., People v. Baker*, 20 NY3d 354, 359-60 (2013).[2]

Additionally, "[t]he Second Circuit has required a showing that the putative offender was 'actually

and immediately blocking' the pedestrian or vehicular traffic in question." *Case,* 233 F Supp. 3d at

383, *citing Zellner v. Summerlin*, 494 F.3d 344, 372 (2nd Cir. 2007). Only an actual blockage of a real and

substantial nature can support a PL § 240.20(5) arrest or conviction. *See, e.g., People v. Kauff, et al.,* 34

Misc.3d 137(A), (Appellate Term, 9th and 10th Dists., Dec. 27, 2011).

Moreover, beyond that,

[w]here, as here, a disorderly conduct statute is applied in the context of 'political
demonstrations and protests—activities at the heart of what the Bill of Rights was designed
to safeguard,' First Amendment considerations come into play. *[Papineau v. Parmley*, 465 F.3d]

---

[2] Relatedly, *People v. Jones* substantially overruled New York cases saying that "an order to disperse is
lawful unless the order was purely arbitrary and not calculated in any way to promote the public
order, such as *People v. Galpern,* 259 N.Y. 279 (1932) and *People v. Todaro,* 26 NY2d 325 (1970) (both
decided before *City of Chicago v. Morales,* 527 U.S. 41, 58 (1999), both involving fact patterns almost
identical to *Jones*). *See, e.g., People v. Reed,* 19 Misc. 3d 217, 219 n. 1 (NY Crim. Ct. 2008); *People v.
Taylor,* 19 Misc. 3d 1114(A), 859 N.Y.S.2d 906 (Crim. Ct. 2008); *see also People v. Johnson,* 22 NY3d
1162, 1164 (2014); *Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 547-8 (E.D.N.Y. 2015); *Adams
v. City of New York*, No. 15CV6741 (DLC), 2016 WL 1169520, at *3 (S.D.N.Y. Mar. 22, 2016).

> at 56. 'Indeed, the [Supreme] Court has repeatedly held that police may not interfere with
> orderly, nonviolent protests merely because they . . . simply fear possible disorder.' *Id*."

*Case,* 233 F.Supp.3d at 383; *see also, e.g., Akinnagbe,* 128 F. Supp. 3d at 548. For example, in the

protest context, the Supreme Court has "long applied the 'clear and present danger' test to protest

cases to determine when police interference is constitutional" under which, "unless there is a 'clear

and present danger' of riot, imminent violence, interference with traffic or other immediate threat to

public safety" police interference to end or substantially limit a peaceful First Amendment assembly

may not withstand review. *Papineau,* 465 F.3d at 56-57. Under that test, "[n]either energetic, even

raucous, protesters who annoy or anger audiences, *nor demonstrations that slow traffic or inconvenience*

*pedestrians*, justify police stopping or interrupting a public protest." *Id.* at 57-58 (emphasis added).

Finally in this connection, all PL § 240.20 violations "require[] that the [underlying] conduct

be intentional or reckless" – providing a further "limiting construction." *Abdell,* 2008 WL 2540813,

at *1; *see also People v. Baker*, 20 NY3d at 359-60. The statute thus only ever sweeps in conduct that

creates or recklessly threatens a real "breach of the peace." *People v. Weaver*, 16 N.Y.2d 123, 127-28

(2011); *see also Adams,* 2016 WL 1169520, at *3 (discussing *People v. Johnson*, 22 N.Y.3d at 1164; *People*

*v. Gonzalez*, 25 N.Y.3d 1100, 1101 (2015), and other New York cases). Thus, "the validity of

disorderly conduct charges" turns "on the presence or absence of adequate proof of public harm."

*People v. Baker*, 20 NY3d. at 360. The "first and primary test" in considering whether particular

conduct is criminally disorderly is whether or not there is evidence of violence or a threat of violence

or criminally tumultuous conduct – that is, a real breach of the peace. *See, e.g., People v. Losinger*, 313

N.Y.S2d 60, 62 (Rochester City Crim. Ct. 1970). "A secondary test is that of interference with

vehicular and/or pedestrian traffic" and the like. *Id.* at 63. An arrestee must demonstrate a

"conscious disruptive intent" and their conduct must have caused "disturbance or disorder among

others present," *People v. Pritchard*, 27 N.Y.2d 246, 248-249 (1970) – that is, it "must cause

inconvenience, annoyance or alarm to a substantial segment of the public or be of such nature and

character that it would appear beyond a reasonable doubt that the conduct created a risk that a breach of the peace was imminent" (*People v. Griswald*, 170 Misc.2d 38, 41 (Yates County Court 1996)). With respect to the *mens rea* element, in order to be guilty of PL §§ 240.20(5) or 240.20(6) violations with an intentional state of mind, a person must have consciously meant to cause a significant blockage of traffic or to refuse to comply with a lawful and clearly communicated dispersal order. *See* PL § 15.15(1). And, in order to be guilty of such violations with a reckless state of mind, a person must have been aware of a specific public harm that their conduct created the risk of creating and persisted in that conduct after awareness of the risk was "a gross deviation from" the standard of conduct a reasonable person would observe. *See* PL § 15.05(3). A PL 240.20 prosecution or conviction must thus be based on credible "facts, either about the defendant's conduct or about the surrounding circumstances, to support an inference that defendant possessed the requisite intent or recklessness." *People v. Barrett*, 13 Misc.3d 929, 944-946 (NY Crim. Ct. 2006); *see also People v. Munafo*, 50 N.Y.2d 326, 331 (1980).

Against that backdrop, the record in this case shows that Kushneir did not cause any significant blockage of traffic as a matter of law, let alone with the requisite *mens rea*; or, alternately, at worst, presents questions of fact for a jury to determine precluding summary judgment related to whether he did so. For example: For example: By all accounts, Kushneir was on the Broadway sidewalk just before and during his arrest. 56.1 ¶¶ 158 (Kushneir 25:25-26:11); 159 (26:17-21; 31:8-12); 160 (27:20-22; 31:8-12); 161 (26:12-19); 168 (30:22-23, Rivera 332, 0:00-0:16); 199 (Esposito 122:25-123:14; Rivera 332, 0:00-0:16). There is no evidence that Kushneir blocked any vehicular traffic - he was not even allegedly in the roadway. Kushneir's testimony and video evidence show that neither he nor anyone else could have walked into the roadway, because interlocked NYPD barricades extended from the point Kushneir and others entered Broadway to the police line at which NYPD officers waited near Exchange Place, which would have prevented protesters or

pedestrians alike from passing from the sidewalk into the roadway. 56.1 ¶¶159 (Kushneir 26:17-21; 31:8-12); 160 (27:20-22; 31:8-12); 163 (Almonte 72:4-8); 215 (Rivera 332, 0:17-0:38); 216 (Rivera 332, 0:17-0:38); 221 (Maldonado 41:18-42:2; 43:8-10); 222 (43:11-13; 43:24-7). Additionally, the police line itself would have blocked any pedestrians who would have wanted to travel North on Broadway, past the protestors. 56.1 ¶¶ 162 (Kushneir 25:22-24, 26:22-27:4); 163 (Almonte 72:4-8); 221 (Maldonado 41:18-42:2; 43:8-10); 222 (43:11-13; 43:24-7). Other record evidence shows that there were not pedestrians, or other non-protesters, present to be blocked or inconvenienced, annoyed, or alarmed. 56.1 ¶¶ 169 (Kushneir 30:22-31:3, 32:14-18); 172 (32:9-14); 173 (Almonte 71:6-25); 237 (Maldonado 78:3-7).

**Moreover, as seen below, the record shows that Kushneir was not given a lawful dispersal order, nor meaningful opportunity to comply, with respect to the PL § 240.20(6) charge.** "Not every police instruction constitutes a 'lawful' order to leave, and the circumstances surrounding such an order must be examined." *People v. Benjamin*, 185 Misc.2d 466, 468-69 (N.Y. Crim. Ct. 2000).

> "[W]hether the police had probable cause to arrest [Plaintiff] for defying a police order turns on two factors. The first is whether, and to what extent, the police communicated their orders to the entire crowd." *Dinler v. City of New York*, No. 04 Civ. 7921, 2012 U.S. Dist. LEXIS 141851, 2012 WL 4513352, at *10 (S.D.N.Y. Sept. 30, 2012) (citing *Vodak v. City of Chicago*, 639 F.3d 738, 745 (7th Cir. 2011) ("[B]efore the police could start arresting peaceable demonstrators for defying their orders they had to communicate the orders to the demonstrators.")). "The second is whether the demonstrators were given an opportunity to comply with those orders—that is, whether they indeed refused to do so." *Id*; *see also Adams v. City of New York*, No. 15 Civ. 6741, 2016 U.S. Dist. LEXIS 37330, 2016 WL 1169520, at *3 (S.D.N.Y. Mar. 22, 2016) ("Section 240.20(6) requires that, in addition to the requisite intent, an arrestee must refuse to comply with a lawful dispersal order." (emphasis omitted)).

*Case*, 233 F.Supp.3d at 384. In this connection, under the Fourth Amendment, there is no such thing as "group" probable cause. *See Dinler v. City of New York*, 04 Civ. 7921 (RJS)(JCF), 2012 WL 4513352, at *3-6 (SDNY Sept. 30, 2012) (citing and discussing cases); *see also Barham v. Ramsey*, 434 F.3d 565, 573 (DC Cir. 2006); *Arbuckle v. City of New York,* 14 Civ. 10248 (ER), 2016 WL 5793741, at *5

(SDNY Sept. 30, 2016). In some cases, the First Amendment requires that a dispersal order be given before arrests may be made. *See, e.g., Papineau,* 465 F.3d at 60-61; *Dinler,* 2012 WL 4513352, at *6. And even where some perceived participants in a First Amendment assembly transgress the law, police do not have authority to treat the perceived "group" as a "unit"– at least not without first providing fair notice and an opportunity to disperse. *See Papineau*, 465 F.3d at 60-61; *NAACP v. Clairborne Hardware*, 458 U.S. 886, 908 (1982); *Dellums v. Powell*, 566 F.2d 167, 181-82, n. 31 (D.C. Cir. 197) ("notice and an opportunity to disperse [required] before arrests of the crowd 'as a unit' would be constitutionally permissible"); *Barham*, 434 F.3d at 576 (police "could not 'deal with the crowd as a unit' unless [they] first issued an order to disperse and then provided a reasonable period of time to comply with that order"); *Washington Mobilization Comm. V. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977) (same).

There is ample record evidence based on which a reasonable jury could determine there was not even arguable probable cause to arrest Kushneir for refusing a lawful dispersal order, let alone with the requisite *mens rea*. For example, a jury could credit record evidence that circumstances (such as the fact that police barricades funneled protesters to police without giving them an opportunity to leave, and the lack of pedestrians blocked) did not justify Esposito's dispersal order and/or that it was not a lawful order because it lacked narrow tailoring and/or failed to provide ample alternatives. A jury could also find that Kushneir did not refuse any lawful order, or have a meaningful order to comply with one. For example, on Kushneir's account and the version of events captured on video, only seconds passed between Esposito's order and Kushneir's arrest so Esposito did not give Kushneir an opportunity to disperse, (56.1  ¶¶. 167 (Almonte 72:4-8); 168 (Kushneir 34:8-14); 169 (Kushneir 33:24-25; Rivera 332, 0:00-0:38); 170 (Kushneir 28:19-29:2, 29:8-24, Rivera 332, 0:03-0:08); 201 (0:00-0:12); 202 (Esposito 122:25-123:14; Rivera 332, 0:00-0:16) 209 (Esposito 91:12-92:4, Rivera 332, 0:08-0:09); 210 (Esposito 138:22-139:17; Rivera 332, 0:08-0:09)), and there was nowhere

for Kushneir to disperse in light of the presence of other protesters, and barricades 56.1 ¶¶. (218
(Rivera 332, 0:17-0:38); 219 (0:17-0:38).

**A reasonable jury could find that Esposito and Maldonado lacked even arguable
probable cause to arrest Kushneir for OGA.** In order to be guilty of OGA, a person must act
with the intent, *see Akinnagbe,* 2015 WL 5124456, at *5, to prevent an authorized, official function,
*see, e.g., Lennon v. Miller,* 66 F.3d 416, 424 (2nd Cir. 1995); *Charles v City of NY*, 12-CV-6180
(SLT)(SMG), 2017 U.S. Dist. LEXIS 17943, at *46 (EDNY 2017). "The word "prevent" implies
"'an insurmountable obstacle or impediment.'" *People v. Arbeiter*, 169 Misc.2d 771, 773-4
(N.Y.Sup.App.Term 1st Dept. 1996), *app. den'd* 89 NY2d 918 (1996) and *cert den'd,* 520 US 1213
(1997). Interference that violates the prohibition on OGA must be physical. *Uzoukwu v. City of New*
York, 805 F.3d 409, 414 (2nd Cir. 2015); *People v. Case*, 42. N.Y.2d 98, 100 (1977); *People v. Vargas*, 179
Misc.2d 236, 237-38 (Crim. Ct., N.Y. Co. 1998).  Significantly, "'[f]ailing to obey a police order, in
and of itself, does not'" give rise to probable cause to arrest for OGA. *Akinnagbe*, 2015 WL 5124456,
at *4; *see also Matter of Kendall R.*, 71 A.D.3d 553, 554 (1st Dept. 2010). "[A]n order must be lawful
before failure to obey it gives rise to liability." *Akinnagbe*, 2015 WL 5124456, at *5. Beyond that,
"[c]ases in which disobeying a police order was sufficient to support an arrest for obstructing
governmental administration tend to involve some sort of physical action along with noncompliance
with a direct police order." *Dowling v. City of New York,* No. 11 CV 4954 (NGG)(RML), 2013 WL
5502867, at *4-6 (E.D.N.Y. Sept. 30, 2013); *see also Jackson v. City of NY,* 939 F.Supp.2d 219, 229-30
(E.D.N.Y. 2013). And even where the predicate for an OGA arrest is a purportedly intentional
refusal to comply with a lawful order, courts have required persistent, physical refusal that goes well
beyond passive remaining before an OGA charge will lie. *See, e.g., Marcavage v. City of NY*, 689 F.3d
98, 110 (2nd Cir. 2012) ("Plaintiffs rejected 17 directives (by three officers) to leave [a] no-
demonstration zone [that the Court found was a lawfully imposed time/place/manner regulation],

insisting on a constitutional right to demonstrate where they stood" and where they were "hostile and non-compliant" and "in effect, they courted arrest"). Against that backdrop, the same questions of fact that require jury decisions, which preclude summary judgment for Defendants as to probable cause to arrest for PL 240.20(6), and related jury determinations on whether Kushneir intentionally engaged in physical resistance of a lawful, authorized function, preclude judgment as a matter of law for Defendants based on probable cause to arrest Kushneir for OGA.

Finally in this connection, it was clearly established that an arrest without probable cause violated the Fourth Amendment in 2011, *see, e.g., Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987), and Esposito and Maldonado are not entitled to qualified immunity as a matter of law on Kushneir's false arrest claim.

## II.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AMENDMENT – TIME/PLACE/MANNER-BASED CLAIMS

It is beyond doubt that the government has strong interests in public safety and order, including in promoting pedestrian and traffic flow, *see, e.g., Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 768 (1994); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 650 (1981), and that police have general authority to regulate traffic in New York City, *see* NYC Charter §435(a). However, the record in this case demonstrates material factual disputes, which preclude granting summary judgment to Defendants, on whether the restrictions Defendants imposed on Plaintiffs' protected conduct – that is, police orders actually or allegedly given before each Plaintiff's arrest - were narrowly tailored, or whether they were overbroad to serve the asserted governmental interests. *See, e.g., Case*, 233 F.Supp.3d at 391-394 (reading *Madsen* to require a "heightened review requiring that the restriction burden no more speech than necessary"); *see also Akinnagbe,* 128 F.Supp.3d at 548-49 ("The Second Circuit has recognized that a spontaneous police order to demonstrators to relocate can be viewed through the lens of time, place, and manner doctrine"), discussing *Zalaski v.*

*City of Hartford*, 723 F.3d 382, 388 (2nd Cir. 2013)); *see also Christina Gonzalez* v. NYC, 14 Civ. 7721 (LTS), 2016 WL 5477774, *5-6 (SDNY Sept. 29, 2016) (same); *Wiles v. City of New York*, 13-cv-2898 (TPG) 2016 WL 6238609, *5 n. 1 (SDNY Oct. 25, 2016) (same).

Overbroad police orders, such as those at issue in this case, can lack narrow tailoring and fail to provide ample alternatives. For example, in the Mandelbaum Decision (Oliver Exh. 62), the Court found that the defendants – who had been protesting climate change by occupying the roadway in an active street – had acted recklessly in refusing to comply with a police order, but that the order itself was not lawful. Recognizing the government's significant interests in keeping open public spaces and defendants' actions, which "clos[ed] … Lower Broadway at rush hour", the Court found that because the police order was to leave "the area" – rather than to leave the roadway and continue their demonstration on the sidewalk, subject to the restrictions of PL 240.20(5) – the order was not narrowly tailored and did not afford defendants ample alternative channels for communication." Mandelbaum Decision (Oliver Exh. 62).

The record shows that Papola gave two orders to "leave this roadway or sidewalk" near the intersection where Case was arrested, around 15 seconds apart, only one of which Case heard, before ordering arrests 15 seconds later, 56.1 ¶¶ 6 (Rivera 340, 00:15-01:34); 7 (00:54-01:11); 8 (01:34-01:53); 9 (Case 32:13-18, 33:22-24, 44:2-4, Rivera 340, 01:09-01:34), while police blocked the roadway, 56.1 ¶¶. 26 (Almonte 97:5-16, 98:10-23); 27 (101:3-7); 28 (101:18-102:10); 29 (102:12-103:11); and Case stood in a pedestrian walkway, 56.1 ¶¶. 4 (Rivera 340, 01:08-1:10); 11(Case 33:13-15; Rivera 340, 01:56-02:08); 12 (01:08-1:10, 1:55-2:10).

The record shows that, after NYPD barricades and other resources funneled Klein into the intersection at Pine and Nassau, 56.1 ¶¶. 70 (Klein 20:13-21, 21:10-13, 30:23-31:11, 37:17-19); Groht gave orders in sum and substance to "return to the sidewalk" and "leave the street", Response 56.1 ¶¶. 53 (Rivera 329, 00:15-02:28), as she was effectively surrounded, 56.1 ¶¶. 80 (Klein 22:3-8, 30:17-

18, 44:6-12, 45:14-46:2); 81 (22:8-10, 44:6-12); 82 (22:11-16, 44:10-12); 83 (29:16-17, 45:20-46:1); 85 (38:16-21, 46:7-8); 86 (22:21-25; 38:22-23).

The record shows that Kushneir had been marching on Broadway for less than a minute before running into a police line at which Esposito gave one order near Kushneir, saying "remove yourself immediately" around one second before ordering arrests, 56.1 ¶¶. 167 (Almonte 72:4-8); 168 (Kushneir 34:8-14); 169 (Kushneir 33:24-25, Rivera 332, 0:00-0:38); 170 (Kushneir 28:19-29:2, 29:8-24, Rivera 332, 0:03-0:08); 201(0:00-0:12); 209 (Esposito 91:12-92:4, Rivera 332, 0:08-0:09); 210 (Esposito 138:22-139:17, Rivera 332, 0:08-0:09).

With the possible exception of the latter, none of the orders included a time within which to comply; an actually accessible dispersal route; or an offer of an ample alternative channel through which to continue engaging in protected conduct.

**A reasonable jury could find that the restrictions Defendants imposed on Plaintiffs'** **First Amendment-protected conduct lacked narrow tailoring.** The sidewalks and streets at issue are traditional public fora in which the "government's ability to restrict speech … is 'very limited.'" *McCullen v. Coakley*, 134 S.Ct. 2518, 2529 (2014). It is the government's burden to justify its restrictions on protected speech and conduct under the "narrow tailoring" test. *Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2nd Cir. 2006).  (internal citation omitted). It must identify the significant interest(s) served by the restrictions, and justify them. *See, e.g., Greater New Orleans Broad. Assoc., Inc., v. U.S.*, 527 U.S. 173, 183 (1999). It must also demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree. *See Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). A restriction is narrowly tailored "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  A narrowly tailored regulation cannot "burden substantially more speech than necessary to achieve its goal." *Deegan*, 444 F.3d at 144. Instead, it must "'focus[] on the source of the evils the [government] seeks to eliminate .

. . and eliminate[] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). In this connection, "a court 'may not simply assume that [a decision by local officials] will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity.' *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 496 (1986) (internal citation omitted). "Because the excuses offered for refusing to permit the fullest scope of free speech are often disguised, [Courts] must independently determine the rationality of the government's interest implicated and whether the restrictions are narrowly drawn *to further that interest*." *Olivieri v. Ward*, 801 F.2d 602, 606 (2nd Cir. 1986) (internal quotations omitted) (emphasis added).

Relatedly, the record demonstrates that at no time did Defendants make any effort to impose regulations on Plaintiffs' (and other demonstrators' conduct) *short of* in sum and substance banning demonstrators from the Wall Street area (the intended target of their protests). When a plausible, less restrictive alternative is offered to a speech restriction, it is the government's obligation to prove that the alternative will be ineffective to achieve its goals. *See, e.g., United States v. Playboy Entertainment* Group, 529 U.S. 803, 816 (2000). There were clearly plausible, less restrictive alternatives available to the police. For example, police could have blocked off part of the sidewalk and/or roadway at a location for continuing protest while allowing pedestrian and vehicular traffic to flow on the rest of the sidewalk and/or roadway, or offering an alternate location within sight and sound of the demonstrators' targets.

Against that backdrop, the record demonstrates material factual disputes for a jury to determine about the extent to which the restrictions imposed were reasonable in light of the asserted governmental interests and/or whether they burdened substantially more speech than was necessary to achieve them.

**A reasonable jury could find that the restrictions Defendants imposed failed to provide ample alternatives for expression.** An alternative channel for communication is "adequate and therefore ample" in the Second Circuit "if it is within close proximity to the intended audience." *Marcavage v. City of New York*, 689 F.3d 98, 107 (2nd Cir. 2012). As seen above, there is record evidence based on which a reasonable jury could find that Defendants' restrictions on Plaintiffs' expressive conduct – forcing them to leave the target of their demonstration, without imposing less restrictive alternatives, or providing another location within sight and sound or nearby - did not leave Plaintiffs with ample alternatives to demonstrate and/or communicate their message on N17 in the vicinity of the intended target of their demonstration activities.

Finally, Defendants are not entitled to qualified immunity as a matter of law on Plaintiffs' First Amendment claims. *See, e.g., Case*, 233 F.Supp.3d at 394 ("it was clearly established .... That, absent … a valid [time, place, and manner] restriction, arresting Plaintiffs for participating in the OWS demonstration was a First Amendment violation").

## III.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FAIR TRIAL RIGHTS CLAIMS

Police can violate a person's fair trial rights by forwarding false information to prosecutors that result in liberty deprivations. *Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2nd Cir. 2016) ("*Garnett III*"), *affirming Garnett v. Undercover Officer CO309,* 2015 WL 1539044 (SDNY April 6, 2015) ("*Garnett II*"); *Morse v. Fusto*, 804 F.3d 538 (2nd Cir. 2015); *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir.2003); *Zahrey v. Coffey*, 221 F.3d 342, 355 (2nd Cir. 2000); *Ricciuti v. NY City Transit Authority*, 124 F.3d 123, 130 (2nd Cir. 1997). Forwarding police records and/or making statements to prosecutors with false information about their observations of the conduct leading up to a person's arrest can amount to a violation. *Garnett v. City of New York*, 2014 WL 395094, at *12 (SDNY Aug. 13, 2014 ("*Garnett I*"); *see also Coggins v. Buonaro*, 776 F.3d 108, 113 (2nd Cir. 2015); *Marom v. City of New York*, No. 15 Civ. 2017 (PKC), 2016 WL 5900217, at *3 (SDNY July 29, 2016); *Case,* 233 F.Supp.3d at

388; *see also MacNamara v. City of N.Y.,* No. 04 CIV. 9216 (RJS)(JCF), 2007 WL 3196295, at *2 (S.D.N.Y. Oct. 30, 2007). The false information must be likely to influence a jury's decision *if* it arrived at a jury.  *Case,* 233 F.Supp.3d at 388; *see, e.g., Marom,* 2016 WL 5900217, at  *2; *see also Garnett II,* 2015 WL 1539044, at *8. A trial is not a "prerequisite to such a claim." *Schiller, et al. v. City of New York, et al.* 2008 WL 200021 at *9 (January 23, 2008); *accord, Garnett II* at *4. Probable cause is not a defense. *Ricciuti,* 124 F.3d at 130; *see also Garnett III,* 2016 WL 5496761, at *10. "The claim accrues when the officer forwards the false information to the prosecutors." *Ricciuti,* 134 F.3d at 130. "The limiting factor appears to be…whether the falsification caused material harm," *Schiller,* 2008 WL 200021 at *10, such as liberty deprivation, *see Garnett III,* 2016 WL 5496761, at *11 (citing *Riccitui,* 134 F.3d at 130, and *Jocks,* 316 F.3d at 138).

**ALMONTE/CASE:** Almonte informed prosecutors that: (1) he observed Case standing in the intersection blocking vehicular traffic. P's 56.1 ¶¶ 55 (Case OLBS); 57 (Case Datasheet); 58 (Case Complaint); (2) he observed Case sit in the street and then link arms with others; P's 56.1 ¶¶ 57 (Case Datasheet); 58 (Case Complaint); (3) he observed Case refuse to unlink arms to be arrested. P's 56.1 ¶ 55 (Case OLBS); 57 (Case Datasheet); (4) he observed that when police officers attempted to separate Mr. Case from said other persons, Case tightened his arms to prevent Almonte from removing Case from said persons; P's 56.1 ¶ 58 (Case Complaint); and (5) he and other officers had to pry Case's arms apart from others. P's 56.1 ¶ 55 (Case OLBS).

Almonte has admitted that statements 3, 4 and 5 are false: he did not physically place Case under arrest nor was he present at the time of Case's arrest. Almonte did not see Mr. Case being placed under arrest and was not involved in prying Mr. Case's arms apart from other people's arms. P's 56.1 ¶¶ 41 (Almonte 125:23-25); 42 (126:2-6, 13-15); 43 (139:21-24). Almonte was not informed by any fellow officer that they had to pry Mr. Case's arms apart from others' arms. P's 56.1 ¶ 44 (140:5-8).

27

In addition to Almonte not observing the conduct that he swore to prosecutors he saw, the evidence here shows that Case did not engage in any of the above conduct at all: (1) Case stood in a crosswalk to the side of the intersection, not in the intersection. P's 56.1 ¶ 4 (Rivera 340, 01:08-1:10); 12 (01:08-1:10, 1:55-2:10). Vehicular traffic at had been blocked by the police- **not** by Mr. Case, or any other non-police person at the intersection. P's 56.1 ¶¶ 27 (Almonte 101:3-7); 28 (101:18-102:10); 29 (102:12-103:11); P's Resp. 56.1 ¶ ¶ 11 (Case 33:13-15; Rivera 340, 01:56-02:08) 13 (Case 33:16-21; Rivera 340, 02:04-2:15); 14 (02:04-2:15). (2)- (5): Case did not link arms after sitting, and therefore did not refuse to release them to be arrested, did not tighten his arms, and no officer had to pry his arms apart. Police video taken between the time that Mr. Case sat down and the time he was arrested clearly shows both of Mr. Case's arms in the air, not interlocked with other protesters' arms. P's 56.1 ¶¶ 13 (Case 33:16-21; Rivera 340, 02:04-2:15); 14 (02:04-2:15); 16 (Case 44:8-10); 17 (44:5-7).

A reasonable jury could determine that Almonte did not see any of Case's pre-arrest conduct. A supervisor assigned Almonte to process Case's arrest, along with three others. 56.1 ¶ 48 (Almonte 110:18-20; 120:11-24). According to Almonte it just so happened that he had seen all four of those arrestees that were subsequently assigned to him at random at the intersection. P's 56.1 ¶¶ 49 (121:4-7); 50 (121:8-12).

**TVERDOKHLEB/KLEIN:** Tverdokhleb informed prosecutors that: (1) he observed Klein standing in the middle of the street blocking motor vehicle traffic. P's 56.1 ¶¶ 134 (Tverdokhleb 129:3-8; Klein Datasheet; Klein Complaint); 137 (Klein OLBS); 140 (Klein Datasheet) 141 (Klein Complaint); (2) he observed Klein blocking the intersection for approximately one hour; P's 56.1, ¶134 (Tverdokhleb 129:3-8; Klein Datasheet; Klein Complaint); 140 (Klein Datasheet); (3) he observed Lieutenant David Grout of the 17th precinct tell Klein and others multiple times that they were obstructing all vehicular traffic and were ordered to leave the roadway; P's 56.1 ¶ 141

(Klein Complaint); and (4) he observed Klein refuse to leave the roadway after being told multiple times to move. P's 56.1, ¶¶ 134 (Tverdokhleb 129:3-8; Klein Datasheet; Klein Complaint); 137 (Klein OLBS); 140 (Klein Datasheet); 141 (Klein Complaint).

Tverdokhleb has admitted that statements 3 and 4 are false. He did not see any officers give any instructions specifically to Prof. Klein, as opposed to the perceived crowd or group. P's 56.1 ¶ 115. Tverdokhleb "assumed" that Prof. Klein had heard the instructions given by Grout to leave the area and "guessed" that she did not comply with the instructions – but did not see her do so. P's 56.1 ¶¶ 115 (Tverdokhleb 96:4-9), 129 (121:3-24); 130 (121:25-122:9); 131 (120:15, 121:3). Statement 2 is also false: Tverdokhleb first saw Klein at approximately 8:30 a.m.- thirty minutes (not one hour) prior to her arrest, at which point she was <u>moving</u> (not standing). P's 56.1 ¶ 104 (68:16-20, 69:17-23).

A reasonable jury could determine that Tverdokhleb did not see any of Klein's pre-arrest conduct, and that statement 1 is false. For the majority of his time near Klein's arrest location, Tverdokhleb was stationed between half a block and a block south of an intersection with 200 people in it. 56.1 ¶¶ 101 (58:16-59:24, 62:18-25); 102 (54:19-23, 73:18-74:9); 103 (59:10-11; 59:21-24; 62:16-17). Tverdokhleb personally extracted one male person from the intersection, after which he remained in the staging area to the South assisting other officers for arrest processing. P's 56.1 ¶¶ 112 (76:17-21, 80:18-81:16, 89:10-12, 90:15-25, 93:23-94:19) 113 (76:20-77:4, 79:13-18, 93:13-95:19). Tverdokleb was assigned to process the arrests of five people that morning, including Ms. Klein- by a supervisor who did not ask if he had seen each of the five people before they were placed under arrest. P's 56.1 ¶ 123 (97:18-98:19; 102:24-103:10); 127 (104:24-105:5).  A reasonable jury could also determine that Klein and other protesters did not block motor vehicle traffic in the intersection at all, but that the police themselves blocked the intersection. P's 56.1 ¶¶ 69 (Klein 20:13-21, 21:10-13, 30:23-31:11, 37:17-19); 74 (21:19-20); 98 (Tverdokhleb 52:53-55:10, 55:18-56:25, 64:2-14); 99 (60:17-

29

61:12); 100 (64:18-23).  It was also the police who forced Klein into the intersection- before being funneled into the street by the police, Klein had marched on sidewalks, and was attempting to continue onto the Nassau Street sidewalk when she encountered the police blockade.  P's 56.1 ¶¶ 67 (Klein 20:13-18); 68 (27:25-28:8); 69 (20:13-21, 21:10-13, 30:23-31:11, 37:17-19); 70 (20:21).  Further, Klein did not refuse to leave the roadway: she was surrounded by police who had lined both sides of the intersection of Pine Street, and who were pushing into the protesters from Nassau Street. P's 56.1 ¶¶83 (22:18-20); 84 (22:22, 38:16-21, 46:7-8); 85 (22:21-25, 38:22-23).

**Maldonado** testified that he did not see **Kushneir's** pre-arrest conduct, nor did he see Kushneir's arrest. P's 56.1 ¶¶ 228 (Maldonado 33:18-20, 34:10-13); 229 (77:16-19, 77:24-78:2). The first time that Maldonado saw Kushneir, he was already in the custody of another NYPD officer. P's 56.1 ¶ 230 (64:23- 65:2). A supervisor assigned Maldonado to process the arrests of five people, including  Kushneir. P's 56.1 ¶ 231 (59:2-4, 63:2-5, 63:25-64:3.). The supervisor did not ask if Maldonado had seen any of the five people whose arrests he assigned Maldonado to process, including  Kushneir, before they were placed under arrest. P's 56.1 ¶ 232 (64:7-10). No other officer told Maldonado anything about what those five people, including Mr. Kushneir, did before they were placed under arrest. P's 56.1 ¶ 233 (64:11-22).

Despite not having seen Kushneir's pre-arrest conduct or arrest, Maldonado informed prosecutors that: (1) he observed Mr. Kushneir and others completely blocking a sidewalk and preventing the use of the sidewalk by pedestrians. P's 56.1 ¶¶ 236 (Kushneir OLBS); 242 (Maldonado 86:21-87:5); 243 (Kushneir Complaint); (2) he observed that pedestrians had to walk in the street to pass through the area. P's 56.1 ¶¶ 241 (Kushneir Datasheet); 242 (Maldonado 86:21-87:5); 243 (Kushneir Complaint); (3) he observed Kushneir told numerous times to leave. P's 56.1 ¶ 236 (Kushneir OLBS); (4) he observed Kushneir be given a final warning or be subject to arrest. P's

56.1 ¶ 236 (*id*); and (5) he observed Kushneir not obeying the lawful order to leave. P's 56.1 ¶ 236 (*id*).

In addition to Maldonado's false statements that he observed conduct he did not in fact observe:  Kushneir did not block the sidewalk- the police did. 56.1 ¶¶ 162 (Kushneir 25:22-24, 26:22-27:4); 163 (Almonte 72:4-8) 220 (Maldonado41:7-17); 221 (41:18-42:2, 43:8-10); P's Resp. 56.1 ¶ 96.  There were no pedestrians where Kushneir was arrested and pedestrians could have gotten past Kushneir had there been any. 56.1 ¶ ¶ 169 (Kushneir 30:22-31:3; 32:14-18); 172 (32:9-14); 173 (Almonte 71:6-25). And Kushneir was not given numerous warnings that he disobeyed: Esposito gave one order, one second after which Esposito ordered arrests, including Kushneir's. 56.1 ¶ 166 (Kushneir 28: 19-29:2; 29:8-24, Rivera 332, 0:03-0:08); 56.1 ¶ 167 (Kushneir 29:21-24, Rivera 332, 0:10-0:15).

## A.  EACH PLAINTIFF HAS SUFFICIENTLY SHOWN A COGNIZABLE DEPRIVATION OF LIBERTY FOR FAIR TRIAL RIGHTS PURPOSES

As a result of Almonte's false statements, Case was detained for approximately thirteen hours; charged with violating PL §§ 195.05 (which is a Class A Misdemeanor), 240.20(5), and 240.20(6); was ROR'd at arraignment; and was required to appear in court twice after arraignment (3 total appearances). P's 56.1 ¶¶ 59 (Case Complaint, Case CAS); 60 (Case Datasheet). As a result of Tverdokhleb's false statements, Klein was detained for around thirteen hours; charged with violating PL §§ 240.20(5) and 240.20(6); was ROR'd at arraignment; and was required to appear in court on four other dates (5 total appearances). P's 56.1 ¶¶ 142 (Klein CAS); 143 (Klein Datasheet); 144 (Klein CAS).  As a result of Maldonado's false statements, Kushneir was detained for approximately twelve hours; charged with violating PL §§ 240.20(5) and 240.20(6); and ROR'd at arraignment. Then, on the second court appearance, DANY moved to dismiss the charge. P's 56.1 ¶¶ 244 (Kushneir Complaint); 247 (Kushneir COD).

Being ROR'd pursuant to CPL § 510.40 alone is a sufficient liberty deprivation for both malicious prosecution and fair trial rights purposes, as is the requirement to attend one or more post-arraignment appearances, whether or not combined with other deprivations. *See, e.g., Swartz v. Insogna,* 704 F.3d 105, 112 (2nd Cir. 2013) (ROR and 3 appearances); *Rohman v NY City Tr. Auth.*, 215 F.3d 208, 216 (2d Cir. 2000) (ROR and 5 appearances); *Gogol v. City of N.Y.*, 15-CV-5703 (ER), 2017 U.S. Dist. LEXIS 127187, at *34 (SDNY Aug. 10, 2017) (ROR and 1 appearance); *Harris v. City of New York*,, 222 F. Supp. 3d 341, 351-352 (SDNY 2016) (2-hour detention followed by DAT); *Evans v. City of N.Y.,* 12-CV-5341 (MKB), 2015 U.S. Dist. LEXIS 37781, at *18 (E.D.N.Y. Mar. 25, 2015); *Dowling v. City of N.Y.*, No-11-CV4954(NGG) (RMI), 2013 US Dist LEXIS 142108, at *19 (EDNY Sept. 30, 2013) ("twenty-four hours in jail" and ACD); *Perez v Duran*, 962 F. Supp 2d 533, 543 (SDNY July 3, 2013) (ROR and two post-arraignment hearings); *Norton v. Town of Islip*, No 12-CV-4463 (PKC), 2016 US Dist LEXIS 7004, at *13 (EDNY Jan. 21, 2016), *aff'd* 678 F. App'x 17 (2d Cir. 2017) ("at least one" post-arraignment appearance); *Collins et al. v. City of New York*, 295 F. Supp. 3d 350, 371 (SDNY Mar. 29, 2018); *Peterec v. Hilliard*, 12-CV-3944 (CS), 2013 US Dist LEXIS 132118, at *33 (SDNY Sept. 16, 2013) (one appearance, no bail, and no travel restrictions).

## IV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFFS' *MONELL* CLAIMS AGAINST DEFENDANT CITY OF NEW YORK

Because Defendants did not make any substantive arguments regarding Plaintiffs' *Monell* claims in their opening papers based on any evidentiary record, Defendants have waived their opportunity to do so.

### A. THERE IS AMPLE RECORD EVIDENCE BASED ON WHICH A REASONABLE JURY COULD FIND FOR PLAINTIFFS AS TO THEIR FAILURE TO TRAIN-BASED *MONELL* CLAIMS

After this Court's ruling that Plaintiffs had adequately pleaded certain *Monell*-based claims on a failure-to-train theory, *Case*, 233 F.Supp.3d at 403-408, Plaintiffs took discovery on some of them

32

(*see* Oliver Decl. ¶ 3). The required proof of notice for deliberate indifference "will vary given the facts of the case and need not rely on any particular factual showing." *Amnesty Am. V. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir 2004). At summary judgment, other lawsuits can raise a factual issue as to *Monell's notice* prong (rather than to prove the facts underlying claims), as "deliberate indifference may be inferred if [legal] complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v City of NY*, 72 F3d 1040, 1049 (2d Cir 1995); *DiSorbo v Hoy*, 74 F App'x 101, 103-104 (2d Cir 2003); *Outlaw v City of Hartford*, 884 F3d 351, 381 (2d Cir 2018). Thus, the mere fact of complaints of similar past conduct has been held to provide the required notice. *Poventud v City of NY*, 2015 US Dist LEXIS 29949, at *48 (SDNY Mar. 9, 2015).

Constitutional violations such as those Plaintiffs suffered are the inevitable result of pitting police against demonstrators, particularly when police are trained as the NYPD trained its officers. Here, the City has acknowledged that it has been sued a number of times since the year 2000 over police response to large scale protests, for example the Republican National Convention in 2004 and Critical Mass bicycle rides- and that the litigation had on NYPD policies, practices, and training in effect in November 2011. P's 56.1 ¶ 254 (Raganella 201:24 – 202:20); SAC ¶ 26 (listing cases); *Case*, 233 F Supp 3d 372 at 405-406. *People v. Jones*, 9 N.Y.3d 259 (2007) also put Defendant City on notice that authority to arrest for a PL 240.20(5) violation exists only when a real and substantial obstruction of traffic (going beyond causing some pedestrians to walk around protesters into the roadway) has occurred. And a number of Court of Appeals cases cited in Point I above put Defendant City notice of the *mens rea* required to support a Disorderly Conduct arrest or conviction. However, the NYPD continued training on for authority to arrest on Disorderly Conduct almost exclusively with a Legal Bureau Bulletin from 1971. The Legal Bureau did not issue any bulletin

updating the constitutional law regarding authority to arrest for Disorderly Conduct until a decade later, in 2017. P's 56.1 ¶ 300 (Packard 56.1 ¶ 68).

In response to developments in case law, as well as judgments and settlements in civil rights lawsuits, the City chose not to update its relevant training, adhering to an approach that had and would in the future lead to constitutional violations. The City chose to remove Lesson Plans that included First Amendment training. P's 56.1 ¶ 337-338 (Perkins *Packard* 37:4-24; Marshall 34). The City chose to refrain from training on the First Amendment and policing in advance of OWS (as it did in advance of the Republican National Convention (RNC)), and chose not to use in 2011 the documents that it had prepared for the RNC. P's 56.1 ¶ 336 (Raganella 59:15-19, 242:2-6, 242:16-19; Exhibit AR39).

As seen below, based on the record, a jury could find that Defendant City disregarded a known or obvious consequence of its failures to train properly in light of notice that its program will cause constitutional violations.

**The City failed to train regarding constitutionally adequate dispersal orders and opportunities to disperse prior to arrest at First Amendment assemblies and applying PL § 240.20(6).** Nearly all testimony on pre-arrest warnings or dispersal orders was based on unwritten policies and practices. P's 56.1 ¶ 287-88 (Esposito 130:16- 131:8; 133:18-134:8); ¶ 345 (Raganella 88:16-90:3; 90:9-19). There is almost no record evidence of training as to proposed or sample contents of pre-arrest warnings or dispersal orders. The NYPD's "Form Disorder Warning" was not part of NYPD Academy or DCU training. P's 56.1 ¶ 314 (Marshall 115:22-116:9; 119:4-8; Raganella 185:3-10; Exh. AR27).

There is no record evidence that the NYPD trains in informing demonstrators that they must move or why (P's 56.1 ¶ 312 (Marshall 146:5-11)); how many warnings to give before taking enforcement action (P's 56.1 ¶ 286 (Esposito 127:21-128:3); what constitutes a meaningful time

within which to comply with a dispersal order or the length of time to give people to comply (P's 56.1 ¶ 287 (Esposito 130:16-24; 133:18-134:8); ¶ 313 (Marshall Dep. 146:14-21); ¶ 340 (Raganella 249:2-12); 347 (Raganella 94:12-18) or the need to give a meaningful opportunity to comply (i.e., a route through which to disperse). P's 56.1 ¶ 340  (Raganella Dep. 249:2-12). Although Defendants cite to a 1971 Legal Bureau Bulletin as their training on the application of PL §240.20(6), the only time the topic of opportunity to disperse comes up is in the factual summary of the case – not in any legal analysis or guidance. P's 56.1 ¶¶ 315-16 (Marshall 119:11-120:4, 158:25-159:19; 160:6-161:7). And again- despite the NY Court of Appeals 2007 decision in *People v. Jones*, the Legal Bureau did not issue an updated bulletin on Disorderly Conduct until 2017.  P's 56.1 ¶ 300 (Packard 56.1 ¶ 68).

The only training materials produced that mention "Time, Place, and Manner" restrictions are one Lesson Plan and accompanying Powerpoint (that recite the principles generally and do not offer guidance on applying those concepts in practice) and Legal Guidelines from the RNC (P's 56.1 ¶ 335 (Raganella Dep. 145:21-146:13; 147:18-148:4; AR10, AR11, and AR39). The City removed this Lesson Plan on the First Amendment from its curriculum and did not use the RNC Guidelines for training in 2011. P's 56.1 ¶¶ 336-338 (Raganella 59:15-19, 242:2-6, 242:16-19; Perkins *Packard* 37:4-24; Marshall 34). There is no record evidence of training regarding narrow tailoring or ample alternatives.

Although Esposito testified that the NYPD had a policy of allowing demonstrators to remain at a particular location, cordoned off by barricades so they would not block traffic (P's 56.1 ¶ 323 (Esposito 93:22-94:10)), no witness testified about any codification of or training about any such policy. The only record evidence witnesses identified regarding allowing demonstrators to be within proximity to an intended target was a Maintaining Public Order Lesson Plan, which says that demonstrators should be permitted as near to the target as is "consistent with safety

35

and…reasonable requirements of unobstructed passage" but there is no training as to the meaning

of this phrase. P's 56.1 ¶ 358 (Marshall Dep. 77:21-78:3; 83:12-14; 145:19-23).

> **The City failed to train on treating perceived groups of people as units for probable**
>
> **cause determinations.**  There is no record evidence of training regarding the need for meaningful

dispersal orders before treating a crowd as a unit.  There is no written or unwritten policy to prevent

a perceived crowd from being treated as a "unit" unless and until the perceived "members" have

been given a lawful order and meaningful opportunity to comply, and refused. Although Raganella

testified that "individualized probable cause" was necessary before enforcement action is taken

against any person (P's 56.1 ¶ 331 (**Raganella Dep. 260:20-261:3)),** he also testified that an Incident

Commander could take action against a perceived group if the perceived group caused just one

person to walk around them into the roadway and could identify no written guidelines limiting or

describing NYPD discretion to take such action against a perceived group. P's 56.1 ¶ 348-49

(Raganella 204:2-205:3, 205:4-206:4, 207:6-9, 207:12-208:6).  The City has no training regarding

how to distinguish between people in a perceived group are law-abiding or law-breaking or passers-

by. P's 56.1 ¶ 351-52 (Raganella 208:25-209:9; 238:19-25; 240:5-13; Exh. AR12, D125); ¶ 353-

355 (Raganella 209:10-20; 209:21-210:21; 212:11-213:2).

> **The City failed to train in applying NYPL § 240.20 (5) to protest activity where the**
>
> **arrestee did not create or recklessly risk substantial disruption of vehicular or pedestrian**
>
> **traffic or other criminally significant public ramifications.** The record evidence reveals virtually

no training regarding what constitutes a "real and substantial" blockage of traffic. P's 56.1 ¶ 367

(Marshall 60:15-23; 81:19-24; 120:5-12; 121:17-123:3). The only document used in training in

November of 2011 that discussed what degree of obstruction of traffic was "substantial" so as to

trigger probable cause to arrest for NYPL § 240.20 (5) was a 2007 Memo, which was not part of the

Academy curriculum, was not circulated to recruits, and there is no record evidence that the Memo

was used in in-service training. P's 56.1 ¶ 362 (Marshall 110:23-111:11; Marshall Exh. 10). Esposito

testified that even one person having to go around other people into the street would provide

sufficient cause to make a Disorderly Conduct arrest.  P's 56.1 ¶ 370 (Esposito Dep. 120:10-16). The

record evidence reveals almost no training regarding what state of mind is required to justify a PL

240.20 arrest (including for either PL 240.20(5) or 240.20(6)).  There are no training documents in

evidence that explain the concepts of "public inconvenience, annoyance, or alarm." P's 56.1 ¶¶ 360

(Marshall Exh. 34, D3466; Marshall 78:12-79:7); 361 (Marshall 78:4-11; 79:8-80:19; 81:3-8; 111:18-

112:12)

### B. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFFS' "NO SUMMONS" *MONELL* POLICY-BASED CLAIMS

Based on the record, a jury could determine that Defendants' refusal to consider Plaintiffs

for Summons eligibility, solely because they were arrested in connection with an OWS protest,

violated their Fourteenth Amendment-based Equal Protection rights and/or their First Amendment

rights. *See, e.g., Case*, 233 F.Supp.3d 381-82, 391-92, 394-95; *Dinler v City of NY*, No. 04 Civ. 7921

(RJS) (JCF), 2012 US Dist. LEXIS 141851, at *68-88 (SDNY Sep. 30, 2012); *Bryant v. City of New*

*York*, 2003 WL 22861926, at *12 (SDNY 2003), *aff'd*, 404 F.3d 128 (2nd Cir.)

The Patrol Guide sets out the NYPD's policies regarding eligibility for and processing

arrestees who charged with some offenses for release with a Summons (56.1 ¶¶ 270-271 (Esposito

95:9-20; Czark 65:21-25)) or Desk Appearance Tickets ("DAT") (56.1 ¶¶ 275 (Esposito 95:21-96:2)).

PG 209-01 governs Summons eligibility. 56.1 ¶ 273 (Czark Dep. 64:18-65:2; PG 209-01).

Disorderly Conduct is a summons-eligible offense. 56.1 ¶¶ 266, 285 (Czark 58:14-22, 61:6-15; PG

209-01, D728). Under PG 209-09, which governs Summons procedures, a person would have their

identification verified, go through a warrant check, then be subject to release with a Summons. 56.1

¶¶ 272, 274, 288 (Czark 62:22-64:2; 81:13-82:6, 82:17-83:6; PG 209-09, D730-731). In a normal,

non-mass arrest situation, an individual officer has discretion, within the limitations of the relevant
NYPD Patrol Guide provisions, whether to Summons on the street or hold someone for further
processing. 56.1 ¶ 266 (Czark 58:14-22). In contrast, while Summonses are sometimes utilized in a
mass arrest situation, 56.1 ¶ 267 (Czark 41:19-20), it is only at a supervisors' – not an individual
officer's – discretion, 56.1 ¶¶ 266-269 (Czark 58:23-59:13). On average, issuing a Summons takes
between around a half hour and an hour. 56.1 ¶¶ 305-307 (Czark 62:22-63:12; Esposito 114:20-
115:11).

PG 208-27 governs DAT eligibility and procedures. 56.1 ¶ 276 (Czark 70:12-19; PG 208-27).
A person arrested for Disorderly Conduct is eligible for DAT release. (PG 208-27, D712). A person
arrested for OGA is eligible for DAT release unless a supervisor determines they engaged in
"uncooperative actions" such as locking arms together with PVC pipe. 56.1 ¶ 287 (Czark 69:5-70:11;
PG 208-27, D712, D714(t)). PG 208-28 governs DAT identification standards. 56.1 ¶ 277 (Czark
68:4-11; PG 208-28). It was NYPD policy to fingerprint every arrestee considered for a DAT. 56.1 ¶
279 (Czark 96:23-25, 97:5-20, 99:15-16). On average, issuing a DAT takes between around 4 and 10
hours. 56.1 ¶¶ 308-309 (Czark 99:7-19; Esposito 115:19-21).

Around when OWS started in September of 2011, then-NYPD Commissioner Raymond
Kelly and/or Esposito's office, acting on Defendant Esposito's recommendation, adopted a
"DAT/No Prints" policy to be applied to OWS "for the most part." 56.1 ¶¶ 284 (Czark 122:17-22);
290 (Esposito 68:4-12, 69:11-70:17); 291 (96:15-97:8, 97:21-98:21); 292 (Czark 122:23-123:10); 293
(Esposito 104:16-105:18); 294 (98:22-99:2, 101:11-102:2); 295 (99:3-6, 105:19-24, 106:3-8); 301
(101:3-102:12) Kelly would decide whether to enact the policy on an event-by-event basis based on
briefings and recommendations from Esposito and others. 56.1 ¶ 300 (Esposito 99:17-101:2).
Processing prisoners with "DAT's – No Prints" is a "special circumstance" under which arrestees

are not considered for Summons release. 56.1 ¶¶ 281-283, 296 (Czark 97:24-98:2, 111:12-16, 124:5-8; Esposito 97:9-20).

On N17, the NYPD put such a policy in place, so that normal NYPD Summons eligibility and processing procedures were bypassed and all arrestees – even those who are Summons-eligible, but for their arrest related to an OWS protest – were considered for DAT eligibility only (without fingerprinting them). 56.1 ¶ 302 (Esposito 108:15-109:15). The policy was informed by the NYPD's past experience with large-scale demonstrations, including awareness of prior complaints in lawsuits and at least one liability determination after trial around the length of time demonstrators had been held in custody. 56.1 ¶¶ 303-304 (Esposito 110:19-25, 113:16-114:11); *see also* 56.1 ¶¶ 313-320 (citing cases, including *Mandal,* 02 Civ. 1234 (SDN)(WHP)(FM), 2007 WL 3376897, at *2 (SDNY Nov. 13, 2007)). Whether people would be deterred from protesting as a result of increased arrest processing time was not a concern in enacting the policy. 56.1 ¶¶ 311-312 (Esposito 149:25-150:16).

Although Esposito said that the purpose of enacting the policy was to collect "better" and "more accurate" information, 56.1 ¶¶ 295 (Esposito 99:3-6, 105:19-24, 106:3-8); 296 (97:9-20); 297 (103:13-18); 298 (103:18-20); 299 (106:21-107:24), he did not explain how, or provide evidence about why that was necessary. The NYPD's written DAT procedures do not establish as a matter of law that the policy would have resulted in collecting "better" or "more accurate" information; or that it was otherwise justified. And Defendants did not produce documents to support the justifications they claimed for adopting the policy. *See, e.g., Schiller v City of NY*, 2007 US Dist LEXIS 36058, at *9 (SDNY May 18, 2007).

Finally, the record establishes that either the NYPD Commissioner or Esposito or both decided to enact the challenged policy on behalf of Defendant City. *See, e.g., Schiller v City of NY*, 04 Civ. 7922 (KMK) (JCF), 2006 US Dist LEXIS 67907, at *6-8 (SDNY Sep. 20, 2006). They were final policymakers and liability can spread to Defendant City for their decision.

Therefore, a reasonable jury could find that Defendants' application of the "DAT – No Prints" policy to Plaintiffs, who were otherwise eligible to be released with a Summons, as a result of which they were each detained for hours, was not justified, and violated Plaintiffs' First and/or Fourteenth Amendment (Equal Protection) rights.

**CONCLUSION:** WHEREFORE, this Court should deny Defendants' motion for summary judgment.

DATED:      May 8, 2019
            Brooklyn, NY

                                          /S/
                                          Gideon Orion Oliver
                                          277 Broadway, Suite 1501
                                          New York, NY 10007
                                          646-263-3495