UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BENJAMIN CASE, et al.,** | **PLAINTIFFS' AFFIRMATIVE STATEMENT OF FACTS PURSUANT TO LOCAL CIVIL RULE 56.1** |
| **Plaintiffs,** | |
| **-v-** | |
| **THE CITY OF NEW YORK, et al.,** | **14-CV-9148 (AT) (BM)** |
| **Defendants.** | |

## PLAINTIFFS' AFFIRMATIVE STATEMENT OF FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Plaintiffs submit this statement pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York.

### Plaintiff Benjamin Case

1.  Mr. Case had no specific plan or intention of going to the New York Stock Exchange on November 17, 2011.  Case Dep. 28:14-20.

2.  Mr. Case did not intend to get arrested on November 17, 2011. Case Dep. 35:19-21.

3.  Mr. Case was arrested near Beaver and William Streets at around 10:00am. Case Dep. 30:21-31:4.

4.  When Mr. Case arrived near Beaver and William Streets, he stood in the pedestrian crosswalk on William Street, out of the roadway on Beaver Street. Rivera 2 of 2, No. 340, 01:08-1:10.

5.  Mr. Case briefly locked his arms with a person next to him while standing at that crosswalk. Case Dep. 33:16-21.

6.  Police video shot near the intersection of William and Beaver Streets captures two sets of police orders. Rivera Video, 2 of 2, No. 340, 00:15-01:34.

7.    The first and second police orders came only around 15 seconds apart. Rivera Video, 2 of 2, No. 340, 00:54-01:11.

8.    Around 15 seconds after the second order, Defendant Papola ordered that arrests be made. Rivera Video, 2 of 2, No. 340, . 01:34-01:53.

9.    After Mr. Case arrived, he heard police give only one order to leave the area over a loudspeaker. Case Dep. 32:13-18; 33:22-24; 44:2-4; Rivera 2 of 2, No. 340, 01:09-01:34.

10.   Mr. Case and others then briefly sat down to discuss what they wanted to do in response to that order. Case Dep. 33:10-13; Rivera 2 of 2, No. 340, 01:47-01:55.

11.   Mr. Case was then immediately knocked over by people in front of them who fell on top of them. Case Dep. 33:13-15; Rivera 2 of 2, No. 340, 01:56-02:08.

12.   Mr. Case was not in the roadway on Beaver Street prior to the time he was knocked over. Rivera 2 of 2, No. 340, 01:08-1:10, 1:55-2:10.

13.   Mr. Case did not interlock his arms with other protesters after he sat down. Case Dep. 33:16-21; Rivera Video, 2 of 2, No. 340, 02:04-2:15.

14.   Police video taken between the time that Mr. Case sat down and the time he was arrested clearly shows both of Mr. Case's arms in the air, not interlocked with other protesters' arms. Rivera Video, 2 of 2, No. 340, 02:04-2:15.

15.   Mr. Case did not have "an opportunity to discuss it" with the people next to him before the police began arresting demonstrators. Case Dep. 32:25-33:15.

16.   Mr. Case did interfere with his arrest in any way.  Case Dep. 44:8-10.

17.   Mr. Case did not ever tighten his arms.  Case Dep. 44:5-7.

18.   The officer who arrested Mr. Case walked him away from the intersection, down Beaver Street toward Broad Street. Case Dep. 38:4-6.

19.    At the next intersection, he was placed in the street next to some other people who were arrested. Case Dep. 38:6-9.

20.    At the street corner, Mr. Case was then assigned to Defendant Almonte. Case Dep. 38:12-15; 42:13-14.

## Defendant Almonte

21.    Defendant Almonte and other officers approached the intersection of Beaver and William Streets on foot from some distance away. Almonte Dep. 91:2-13; 92:11-15; 93:25-94:10.

22.    When he was around 25 feet away from the intersection of Beaver and William Streets, Defendant Almonte saw a "large crowd" at the intersection ahead. Almonte Dep. 95:3-4, 13-17.

23.    That "crowd" included between 25 and 50 protestors. Almonte Dep 95:25-96:12.

24.    That "crowd" also included journalists with cameras. Almonte Dep. 105:2-8.

25.    In addition to the "crowd" of protesters and journalists, there were also "at least maybe 15 or twenty officers," who were standing "sort of kind of scattered" around the intersection. Almonte Dep.  96:13-97:4.

26.    Between Defendant Almonte and the "group" of protesters and journalists, there were numerous cars followed by a group of police officers standing in the street "facing the protesters". Almonte Dep. 97:5-16; 98:10-23.

27.    Officers at the intersection between the protesters and Defendant Almonte "had to make sure the vehicles had to halt or stop at that intersection so that nobody would get through." Almonte Dep., 101:3-7.

28.    Officers at the intersection between the protesters and Defendant Almonte had given the cars that Defendant Almonte was walking next to signs to "stop" with their raised hands. Almonte Dep. 101:18-102:10.

3

29.     The physical presence of the officers prevented the cars from moving forward because had they moved forward so they would have run those officers over. Almonte Dep. 102:12-103:11.

30.     At that point, Defendant Almonte did not hear any police orders. Almonte Dep. 103:17-22.

31.     Defendant Almonte then arrived at the police line, facing the protesters around 15 feet away from the protesters. Almonte Dep. 104:2-18.

32.     Defendant Almonte then saw and heard Defendant Papola give dispersal orders. Almonte Dep. 108:13-109:2.

33.     When Defendant Papola gave those orders, he was standing in the roadway with a number of fellow officers behind him. Almonte Dep. 109:19-23.

34.     Defendant Almonte testified that he saw Mr. Case sit down and interlock arms with others for "a couple of seconds" after "the final order was given" by Defendant Papola. Almonte Dep. 111:18-112:13; 112:23-113:4.

35.     Defendant Almonte "went in to arrest" people "immediately" after Defendant Papola's final order. Almonte Dep. 112:13-14; 116:10-17.

36.     Within seconds, Defendant Almonte physically arrested one person, who went limp. Almonte Dep. 114:6-7, 18-21; 116:18-25.

37.     Defendant Almonte did not recall seeing Mr. Case tighten his arms while being arrested. Almonte Dep. 128:4-7.

38.     Defendant Almonte testified that, in the seconds between Defendant Papola's last order and the moment he physically arrested someone, he observed Mr. Case sit down. Almonte Dep. 122:20-24; 123:21-23; 124:2-4.

39.     It took Defendant Almonte at least 3 minutes to place that person under arrest, cuff them, and carry them a block or a block and a half away. Almonte Dep. 116:2-9.

4

40. Defendant Almonte carried that person a block or a block and a half away from the location where Mr. Case was arrested. Almonte Dep. 114:6-10, 14-17.

41. Defendant Almonte did not see Mr. Case being placed under arrest. Almonte Dep. 125:23-25.

42. Defendant Almonte did not see Mr. Case being placed in handcuffs. Almonte Dep. 126:2-6, 13-15.

43. Defendant Almonte was not involved in prying Mr. Case's arms apart from other people's arms. Almonte Dep.139:21-24.

44. Defendant Almonte was not informed by any fellow officer that they had to pry Mr. Case's arms apart from others' arms. Almonte Dep. 140:5-8.

45. When Defendant Almonte next saw Mr. Case, it was a block away from the location at which Mr. Case had been arrested by another officer. Almonte Dep. 117:21-119:3; 126:20-23.

46. Defendant Almonte did not recall any fellow officer giving him information about what they (the fellow officer) had observed Mr. Case do prior to his arrest. Almonte Dep. 127:8-18.

47. Defendant Almonte did not recall any fellow officer telling him that Mr. Case had tightened his arms while being arrested. Almonte Dep. 128:8-12.

48. In addition to processing the arrest of the person Defendant Almonte physically arrested, a supervisor assigned Defendant Almonte to process the arrests of four people at that location.  Almonte Dep. 110:18-20; 120:11-24.

49. The supervisor did not ask Defendant Almonte whether Defendant Almonte saw any of those four people do anything before they were arrested when he assigned Defendant Almonte to process those arrests. Almonte Dep. 121:4-7.

50. According to Defendant Almonte, it just so happened that Defendant Almonte had seen all four of those arrestees that were subsequently assigned to him at random at the intersection. Almonte Dep. 121:8-12.

51. Defendant Almonte met with a prosecutor regarding Mr. Case's arrest. Almonte Dep. 154:6-9.

52. Defendant Almonte could not recall what he told the prosecutor. Almonte Dep. 154:6-22-156:15-18.

53. As part of processing Mr. Case's arrest, Defendant Almonte created a handwritten or "scratch" Online Booking Sheet ("OLBS") Report. Almonte Dep. 136:24-137:8; Case Scratch OLBS Report.

54. A digital version of that OLBS was then created based on the handwritten OLBS. Almonte Dep. 144:22-145:2; Case OLBS Report.

55. NYPD OLBS Reports are routinely forwarded to prosecutors prior to the first time an NYPD officer meets with a prosecutor regarding a potential prosecution. *See* Oliver Declaration.

56. THE OLBS Report states that Defendant Almonte "OBSVD DEFT ALONG WITH NUMEROUS OTHERS SITTING IN THE INTERSECTION BLOCKING VEH TRAFFIC AND REFUSING TO DISPERSE AFTER GIVEN A LAWFUL ORDER TO DO SO. DEFT AND OTHERS LINKED ARMS AND REFUSED TO RELEASE THEM TO BE ARRESTED. A/O AND OTHER UMOS HAD TO PRY THEIR ARMS APART." Case OLBS Report.

57. Plaintiff Case was released with a DAT after 13 hours in custody. Case Dep. 39:18-21; Case DAT; CASE OLPA.

58. According to the DA Datasheet created by DANY in connection with Mr. Case's prosecutor, Defendant Almonte informed prosecutors that Plaintiff Case "was in a group of approx 70 individuals standing in the middle of the street, blocking vehicular traffic," "Sgt. Papola gave

repeated orders to disperse from the street" and that Mr. Case and "approx. 20 others then sat on street and interlocked arms and refused to leave the area, refused to unlock arms." Case DA Datasheet.

59.   On December 2, 2011, Defendant Almonte swore out a criminal court accusatory instrument alleging that on November 17, 2011 at about 10:15 hours on the corner of William and Beaver Streets, he observed Mr. Case

> . . . standing in a group of approximately 70 individuals, in the middle of the roadway at the above location.
>
> Deponent [Almonte]. . . observed the defendant refuse to comply with repeated lawful orders to disperse from the intersection given by Sergeant Lawrence Papola, shield# 03646, a uniformed member of the New York City Police Department.
>
> Deponent states that after the above orders were given, deponent observed the defendant seated on the ground at the above location and the defendant had both of defendant's arms interlocked with the arms of two other individuals.  Deponent further states that when police officers attempted to separate the defendant from said other persons, the defendant tightened defendant's arms to prevent the deponent from removing the defendant from said other persons.
>
> Deponent further states that the defendant's above stated conduct prevented the deponent from conducting a lawful duty and lawful function, specifically a police operation and to disperse persons from the above location.
>
> Deponent further states that the above-described conduct caused a public inconvenience and disturbance in that the defendant and other individuals were obstructing vehicular traffic and preventing any vehicles from being able to drive on the road at the above location.

Case Criminal Court Complaint.


60.   Based on that accusatory instrument, on or about January 26, 2012, Plaintiff Case was charged with violating PL §§ 195.05 (Obstructing Governmental Administration), 240.2(5) and 240.20(6) (Disorderly Conduct). Case Criminal Court Complaint; Case Court Action Sheet.

61.   Plaintiff Case was released on his own recognizance at his arraignment pursuant to New York Criminal Procedure Law § 510.40. Case DA Datasheet.

62.   Mr. Case appeared on or about January 26, 2012, March 12, 2012 and May 7, 2012. Case Court Action Sheet.

63.   On May 7, 2012, Mr. Case pled guilty to PL § 240.20. Case Certificate of Disposition.

**Plaintiff Jennifer Klein**

64.   On November 17, 2011, Jennifer Klein was a Professor of History at Yale University. Klein Dep. 7:22-8:3.

65.   On November 17, 2011, Professor Klein went to New York City with some of her Graduate students to demonstrate in front of the New York Stock Exchange, protesting policies favoring the financial sector. Klein Dep. 25:14-16; 26:22-27:3; 27:9-10; 27:21-22; 41:8-12.

66.   On November 17, 2011, Professor Klein had a obligation to be in Boston at 2:00pm, to be part of a scholarly panel. Klein Dep. 29:1-3.

67.   She intended to participate in a march and rally and then take a train to Boston to comply with her professional commitments. Klein Dep. 29:1-6.

68.   On the morning of November 17, 2011, Professor Klein participated in a march that went east on Pine Street and attempted to turn right onto Nassau Street and continue on the sidewalk. Klein Dep., 20:13-18.

69.   Professor Klein marched on the sidewalk. Klein Dep., 27:25-28:8.

70.   At Pine and Nassau Streets, she encountered a police blockade, a double line of police officers, a barricade, and police vehicles that funneled the march off the sidewalk and into the intersection. Klein Dep: 20:13-21; 21:10-13; 30:23-31:11; 37:17-19.

71.   Professor Klein arrived at the intersection of Pine and Nassau streets by 8:30 a.m.. Klein Dep., 20:21.

72.   Professor Klein had not heard any police instructions or orders before arriving at the intersection. Klein Dep. 36:11-14, 36:24-37:1.

8

73.    After being funneled into the intersection by barricades and a heavy police presence, Professor Klein waited in hopes of continuing the march. Klein Dep. 37:7-10, 37:17-21.

74.    Professor Klein stood with the crowd and at around 8:39 a.m. briefly sat down to try to hear what was being said. Klein Dep. 21:14-18.

75.    By around 8:45 a.m., there were almost three rows of officers blocking Nassau Street. Klein Dep., 21:19-20.

76.    At around 8:45 a.m., an officer with a megaphone climbed on top of a concrete barrier. Klein Dep., 21:19-21; Rivera Video, 1 of 2, No. 329, 00:15-02:28.

77.    Professor Klein heard the officer announce twice in quick succession that people were blocking traffic and if they did not move they would be arrested.  Klein Dep. 21:22-22:3.

78.    The officer immediately made a third announcement. Klein Dep. 22:3.

79.    After that third announcement, Professor Klein stood up. Klein Dep. 22:3-5; 38:12-17; 40:18-20; 44:6-12; 45:14-15.

80.    After Professor Klein stood up, she saw that there was nowhere for her to go. Klein Dep. 22:3-8; 30:17-18; 44:6-12; 45:14-46:2.

81.    The officer then immediately made a fourth announcement and a mass of police began to push into the intersection. Klein Dep. 22:8-10; 44:6-12.

82.    At the same time, police formed a line across Pine Street and began arresting people. Klein Dep. 22:11-16; 44:10-12.

83.    The police activity tightened the already packed crowd around Professor Klein. Klein Dep. 29:16-17; 45:20-46:1.

84.    By around 8:55am, police lined both sides of the intersection of Pine Street and were pushing into the protesters from Nassau Street. Klein Dep. 22:18-20.

85.    At around 8:58am, Professor Klein was still standing. Klein Dep., 22:22; 38:16-21; 46:7-

8.

86.   At around 8:58am, there was nowhere for Professor Klein to go because she was surrounded. Klein Dep. 22:21-25; 38:22-23.

87.   By around 8:59am, Professor Klein understood that police were simply trying to eject her from the Wall Street area and shut down any type of demonstration. Klein Dep. 23:1-6; 41:13-20.

88.   Around two to three minutes before she was arrested, recognizing she would be prevented from demonstrating and surrounded by police, Professor Klein sat on the street. Klein 29:24-30:6; 30:12-16; 46:1-2.

89.   Professor Klein was arrested at around 9:01am. Klein Dep., 46:19-20; Kilcoyne Video, VTS_01_3, 05:54-05:59.

90.   Professor Klein was seated when she was arrested. Klein Dep. 39:2-3; Kilcoyne Video, VTS_01_3, 05:50-05:59.

91.   Professor Klein was picked up by an officer – a white man wearing a zipper jacket – and then handed to another officer – an African-American woman. Klein Dep. 46:21-24; 47:16-22; Rivera Video, No. 330, 6:30-6:34.

92.   Professor Klein was placed in handcuffs by the African-American woman officer. Klein Dep. 46:22-47:2.

93.   The African-American woman officer led Professor Klein off the street and put Professor Klein on a sidewalk with other arrested people. Klein Dep. 37:18-19; 48:9-12; Rivera Video, No. 330, 6:30-6:34.

94.   Professor Klein was left cuffed on that sidewalk for between an hour and a half and two hours. Klein Dep. 48:14-15.

95.   Professor Klein's detention on November 17, 2011 between her arrest and release with a

DAT caused her to miss her train and her professional commitment to be on a panel in Boston at 2 p.m. that afternoon. Klein Dep. 29:1-3, 51:3-8.

96.   Professor Klein had to return to New York repeatedly to appear in court, breaking her obligations to her students by missing classes and advisee meetings. Klein Dep. 51:5-8.

### Defendant Tverdokhleb

97.   At around 8:00am, Defendant Tverdokhleb was assigned to the area near Nassau and Pine Streets to clear an intersection" of protesters. Tverdokhleb Dep. 44:9-13; Tverdokhleb Dep. 45:4-8; 68:13-15.

98.   Defendant Tverdokhleb did not know how the around 200 protesters had gotten there. Tverdokhleb Dep. 64:24-65:12.

99.   There was a "permanent installation" of concrete blocks on the South end of Nassau Street at the intersection of Nassau and Pine Streets that "blocked off" the "area" so that "protesters c[ould not] pass" and "that prevented cars going in." Tverdokhleb Dep. 52:53-55:10; 55:18-56:25; 64:2-14.

100.   That area on Nassau Street to the South of the intersection with Pine Street formed a police staging area that was devoid of protesters. Tverdokhleb Dep. 60:17-61:12.

101.   At that location, police blocked protesters from walking South on Nassau Street. Tverdokhleb Dep. 64:18-23.

102.   When Defendant Tverdokhleb arrived in the area he first observed the crowd of police and protesters from between half a block and a block or "a couple of car lengths" South of the intersection. Tverdokhleb Dep., 58:16-59:24; 62:18-25.

103.   When Defendant Tverdoklheb approached the intersection, he saw and heard a police supervisor giving orders via loudspeaker from on top of the permanently installed concrete blocks. Tverdokhleb Dep. 54:19-23; 73:18-74:9.

104.   From that vantage point several car lengths South of Pine Street, Defendant Tverdokhleb observed the crowd while he waited for orders. Tverdokhleb Dep. 59:10-11; 59:21-24; 62:16-17.

105.   Defendant Tverdokhleb testified that he saw Professor Klein for the first time around 8:30 a.m. while still standing at that location two to three car lengths South of Pine Street. Tverdokhleb Dep. 68:16-20; Tverdokhleb Dep. 69:17-23.

106.   Defendant Tverdokhleb did not recall hearing any instructions that protesters could remain in the area if they got on the sidewalk. Tverdokhleb Dep. 88:6-11.

107.   During the time period Defendant Tverdokhleb observed the crowd of protesters, he observed pedestrians who were able to cross through the crowd. Tverdokhleb Dep. 84:13-86:16.

108.   Defendant Tverdokhleb testified that for around three minutes just before he was ordered to move in to extract people, he moved closer to Nassau Street, until he was around a car length away from the crowd. Tverdokhleb Dep. 81:17-82:21.

109.   Defendant Tverdokhleb testified that during that time he saw Professor Klein standing in the crowd, talking to other people standing in the crowd. Tverdokhleb Dep. 87:10-12.

110.   A supervisor then instructed Defendant Tverdokhleb and other officers to move into the crowd and extract certain individuals. Tverdokhleb Dep. 74:21 -76:16.

111.   The extraction process involved grabbing the people who were pointed out by the supervisors and placing them in the staging area to the South. Tverdokhleb Dep. 77:20-24.

112.   Defendant Tverdokhleb moved through the permanent installation of concrete blocks on the South end of Nassau Street at the intersection of Nassau and Pine Streets in order to "get to the crowd" of protesters. Tverdokhleb Dep. 54:19-55:13.

113.   Defendant Tverdokhleb then personally extracted one male person, who was not Professor Klein. Tverdokhleb Dep. 76:17-21; 80:18-81:16; 89:10-12; 90:15-25; 93:23-94:19.

114.   After Defendant Tverdokhleb personally extracted one male person, he remained in the staging area to the South assisting other officers for arrest processing. Tverdokhleb Dep. 76:20-77:4; 79:13-18; 93:13-95:19.

115.   Defendant Tverdokhleb claimed that he briefly saw Professor Klein sitting down on the ground before she was arrested, around ten minutes after he extracted the male person and had moved to the police staging area to the South. Tverdokhleb Dep. 91:6-92:17; 93:7-19.

116.   Defendant Tverdokhleb did not see Professor Klein in the act of sitting down because he "was dealing with the people who were arrested and brought to the staging area, which is a little bit like a car length away from Nassau and Pine." Tverdokhleb Dep. 93:7-18.

117.   Defendant Tverdokhlen did not see any officers give any instructions specifically to Professor Klein, as opposed to the perceived crowd or group. Tverdokhleb Dep. 96:4-9.

118.   Defendant Tverdokhleb did not place Ms. Klein under arrest in the first instance. Tverdokhleb Dep. 102:14-20.

119.   Defendant Tverdokhleb did not see Professor Klein being placed under arrest. Tverdokhleb Dep. 95:22-24.

120.   Defendant Tverdokhleb does not know who placed Professor Klein under arrest. Tverdokhleb Dep. 95:25-96:3.

121.   Defendant Tverdokhleb did not put handcuffs on Professor Klein. Tverdokhleb Dep. 89:8-9.

122.   Defendant Tverdokhleb does not know who put handcuffs on Professor Klein. Tverdokhleb Dep. 96:10-12.

123.   Professor Klein was wearing flex-cuffs with her arms behind her back when Defendant Tverdokhleb accepted her. Tverdohkleb Dep. 97:6-13.

124.   Defendant Tverdokhleb first touched Professor Klein at the arrest holding area South of

Nassau and Pine. Tverdokhleb Dep. 96:16-22.

125.   Defendant Tverdokhleb never saw Prof. Klein marching. Tverdokhleb Dep. 118:10-12; 119:10-11.

126.   No one told Defendant Tverdokhleb anything about Professor Klein's conduct prior to her arrest. Tverdokhleb Dep. 97:2-5.

127.   Defendant Tverdokleb was assigned to process the arrests of five people that morning: the male he extracted, Professor Klein, and three others. Tverdokhleb Dep. 97:18-98:19; 102:24-103:10.

128.   Defendant Tverdokhleb was assigned those five arrests when a supervisor told him, "These five are yours". Tverdokhleb Dep. 98:20-25; 103:6-10.

129.   The supervisor then pointed out five specific arrestees who were sitting next to each other on the sidewalk. Tverdokhleb Dep. 103:14-104:4.

130.   Aside from the person Defendant Tverdokhleb extracted, Defendant Tverdokhleb did not know who arrested the other four people whose arrests he processed. Tverdokhleb Dep. 101:23-102:8; 102:14-20.

131.   Defendant Tverdokhleb did not recall the supervisor who assigned him to process the five arrests asking him if he had seen each of the five people before they were placed under arrest. Tverdokhleb Dep. 104:24-105:5.

132.   Defendant Tverdokhleb testified that he was "lucky enough to see or remember those people" of the 200 or more protesters from before they were arrested. Tverdokhleb Dep. 105:13-18.

133.   Defendant Tverdokhleb "assumed" that Professor Klein had heard the instructions given by the Lieutenant "to leave the area". Tverdokhleb Dep. 121:3-24.

134.   Defendant Tverdokhleb "assumed" that Professor Klein had sat down in response to those instructions. Tverdohkleb Dep. 121:25-122:9.

135.   Defendant Tverdokhleb "guessed" that Professor Klein did not react to the instructions given by the Lieutenant over the bullhorn. Tverdokhleb Dep. 120:15, 121:3.

136.   When Defendant Tverdokhleb processed Plaintiff Klein's arrest, he wrote up three violation-level charges, including Parading without a Permit. Tverdokhleb Dep. 125:24-126:3; Scratch Klein OLBS.

137.   Defendant Tverdokhleb was ordered that arrestees would not be issued Summonses, but rather issued DAT's and put through the system. Tverdokhleb Dep. 126:4-128:10.

138.   Defendannt Tverdokhleb subsequently met with prosecutors from the Office of the District Attorney of New York County regarding Professor Klein's prosecution. Tverdokhleb Dep. 129:3-8; Klein DA Datasheet; Klein Criminal Court Complaint.

139.   As part of processing Professor Klein's arrest, Defendant Tverdokhleb created a handwritten or "scratch" Online Booking Sheet ("OLBS") Report. Tverdokhleb Dep. 21:24-22:14, 113:19-114:14; Klein Scratch OLBS Report (D32-33).

140.   A digital version of that OLBS was then created based on the handwritten OLBS. Tverdokhleb Dep. 22:9-23:3. Klein OLBS Report.

141.   The "details section" of the OLBS Report states:

> AT T/P/O AO DID OBSERVED DEFT. STANDING IN THE MIDDLE OF
> THE STREET BLOCKING M/V TRAFFIC AND DISOBEYING LAWFUL
> ORDER TO LEAVE AREA DUE TO NON-PERMIT PROTESTING. ORDER
> WAS GIVEN MULTIPLE TIMES BY LT DAVID GROHT TAX # 879044 OF
> THE 17TH PCT.

Klein OLBS Report.

142.   Plaintiff Klein was released with a DAT at around 11:00 p.m. Klein DAT; Klein OLPA.

143.   Plaintiff Klein had been in custody for 13-14 hours before she was released with a DAT. Klein DAT; Klein OLPA.

15

144.   According to the DA Datasheet created by DANY in connection with Professor Klein's prosecutor, Defendant Tverdokhleb informed prosecutors that he observed her "in intersection with approximately 200 people," "Blocking intersection for ~ 1 hour," "Lt gave multiple orders to disperse," and Ms. Klein "refuses to leave." Klein DA Datasheet.

145.   On December 2, 2011, Defendant Tverdokhleb swore out a criminal court accusatory instrument alleging that on November 17, 2011 at about 09:25 hours on the corner of Pine and Nassau Streets, he observed Ms. Klein

> . . . standing amongst a group of over two-hundred (200) individuals in the middle of the street at the above-listed location. Deponent further states that the actions of the defendant and others obstructed all vehicular traffic in that no cars could drive through the intersection.
>
> Deponent further states that deponent observed Lieutenant David Grout of the 17th precinct tell the defendant and others multiple times that they were obstructing all vehicular traffic and were ordered to leave the roadway. Deponent further states that deponent observed defendant refuse to leave the roadway after being told multiple times to move. Deponent further states that defendant's actions caused public inconvenience, annoyance and alarm.

Klein Criminal Court Complaint.

146.   Based on that accusatory instrument, at her arraignment on January 26, 2012, Plaintiff Klein was charged with violating PL §§ 240.2(5) and 240.20(6) (Disorderly Conduct); Klein Criminal Court Complaint;  Klein Court Action Sheet.

147.   Plaintiff Klein was released on her own recognizance pursuant to New York Criminal Procedure Law § 510.40. Klein DA Datasheet.

148.   Ms. Klein appeared in New York City Criminal Court in connection with the charges against her on January 26, 2012; March 12, 2012; May 7, 2012; May 23, 2012; and October 15, 2012. Klein Dep. 54:21-23; Klein Court Action Sheet.

149.   After the Judge who was presiding over Occupy Wall Street cases started handing out significant jail sentences, Professor Klein accepted an Adjournment in Contemplation of Dismissal

pursuant to CPL § 170.55 on October 15, 2012. Klein Dep. 54:21-55:4; Klein Court Action Sheet; Klein Certificate of Disposition.

150.   The criminal case against Mr. Klein was dismissed and sealed on April 12, 2013. Klein Court Action Sheet; Klein Certificate of Disposition.

**Plaintiff Mark Kushneir**

151.   Mr. Kushneir went to the Wall Street area on November 17, 2011 to put on political performances related to foreclosures of people's homes in the Wall Street area along with a friend from Graduate School. Kushneir Dep. 18:8-17; 19:14-20:4

152.   Mr. Kushneir's friend made cardboard images of foreclosed homes as props for the performances. Kushneir Dep. 18:17-23; 19:4-6.

153.   Mr. Kushneir and his friend intended to "kind of bounce around the area" putting on the performances. Kushneir Dep. 18:17-18.

154.   Mr. Kushneir was ultimately arrested on Broadway at around Exchange Place. Kushneir Dep. 25:6-10.

155.   Mr. Kushneir was arrested at around 9:00 a.m. Kushneir Dep. 30:18-21.

156.   Around 10-15 minutes prior to his arrest, Mr. Kushneir participated in a foreclosure-related political performance South of Exchange Place. Kushneir Dep. 25:11-14; 31:13-17.

157.   At that location, Mr. Kushneir saw other people walking around, including people he perceived to be protesters and people "on their way to work." Kushneir Dep. 25:14-19; 27:8-20; 31:4-8.

158.   Mr. Kushneir then walked along with other protesters toward Broad Street. Kushneir Dep. 25:19-20.

159.   Mr. Kushneir had his cardboard home prop with him while he walked. Kushneir Dep. 27:23-24.

160.   When Mr. Kushneir arrived at Broad Street, Broad Street was blocked off with metal barricades. Kushneir Dep. 25:10-22.

161.   Because they could not proceed on Broad Street, Mr. Kushneir and the other protesters made a right turn to walk North onto Broadway. Kushneir Dep. 25:22-24; 27:20-22.

162.   On Broadway, Mr. Kushneir walked at the head of a group of between 50-200 protesters.  Kushneir Dep. 25:25-26:11.

163.   There were interlocked metal barricades between the sidewalk on Broadway where Mr. Kushneir was walking and the roadway. Kushneir Dep. 26:17-21; 31:8-12.

164.   The metal barricades funneled the protesters on the sidewalk toward a line of police that waited at Broadway near Exchange Place. Kushneir Dep. 27:20-22; 31:8-12.

165.   Just prior to his arrest, Mr. Kushneir had been walking on the sidewalk on Broadway. Kushneir Dep. 26:12-19.

166.   Mr. Kushneir then came face to face with "a wall of" around 20 or so police officers and "there was no going through them." Kushneir Dep. 25:22-24; 26:22-27:4.

167.   No pedestrians could have passed the police line. Almonte Dep. 72:4-8.

168.   Mr. Kushneir was on Broadway near Exchange Place at the location of his arrest for between fifteen to forty seconds total before he was arrested. Kushneir Dep. 34:8-14.

169.   Defendant Esposito was in front of Mr. Kushneir for approximately 15 seconds total before Mr. Kushneir was placed under arrest. Kushneir Dep. 33:24-25; Rivera Video, 1 of 2, No. 332, 0:00-0:38.

170.   Just prior to Mr. Kushneir's arrest, Mr. Kushneir saw and heard Defendant Esposito in front of him yelling something that was unintelligible to Mr. Kushneir for approximately five seconds. Kushneir Dep. 28:19-29:2; 29:8-24; Rivera Video, 1 of 2, No. 332, 0:03-0:08.

171.   Mr. Kushneir was then immediately arrested. Kushneir Dep. 29:21-24; Rivera Video, 1

of 2, No. 332, 0:10-0:15.

172.   Mr. Kushneir was standing on the sidewalk when he was arrested. Kushneir Dep. 30:22-23; Rivera Video, 1 of 2, No. 332, 0:00-0:16.

173.   There were no pedestrians where Mr. Kushneir was arrested on Broadway. Kushneir Dep. 30:22-31:3; 32:14-18.

174.   Mr. Kushneir was arrested by an apparently Caucasian male NYPD officer with dirty brown hair who was around 25 years old and around 5'9" tall. Kushneir Dep. 34:18-35:11.

175.   That officer was not assisted in Mr. Kushneir's arrest by any other officer. Kushneir Dep. 36:2-5.

176.   At the location where Mr. Kusnheir was arrested, pedestrians would have been able to get past him on the sidewalk. Kushneir Dep. 32:9-14.

177.   Defendant Almonte testified that he could not recall seeing any pedestrians trying to walk through the group of protesters containing Mr. Kushneir. Almonte Dep. 71:6-25.

178.   The apparently Caucasian male NYPD officer who arrested Mr. Kushneir then handcuffed Mr. Kushneir. Kushneir Dep. 35:12-13.

179.   Later, during arrest processing, Mr. Kushneir's photograph was taken with a different officer than the officer who had arrested him. Kushneir 36:14-37:11.

180.   Mr. Kushneir was in NYPD custody for approximately 12 to 13 hours. Kushneir Dep. 38:1-3; Kushneir OLPA; Kushneir DAT.

181.   Had Mr. Kushneir not been arrested, he intended to continue protesting for the rest of the day. Kushneir Dep. 29:25- 30:3.

**Defendant Esposito**

182.   Defendant Esposito testified that prior to Defendant Esposito's giving orders at Broadway and Exchange Place on November 17, 2011, another NYPD officer gave orders via

19

bullhorn at that location. Esposito Dep. 12:20-13:13.

183.   Defendant Esposito testified that the officer's orders used "standard verbiage" to communicate in sum and substance that "the group" was" blocking the sidewalk" and "[t]hey would have to disperse or be subject to an arrest." Esposito Dep. 13:21-14:5; 22:19-23:17.

184.   Defendant Esposito did not recall anything at all about the identity of that officer Defendant Esposito says gave those orders. Esposito Dep. 13:9-20.

185.   Defendant Esposito did not hear the officer announce that demonstrators would have a certain amount of time to comply with the orders. Esposito Dep. 131:9-17.

186.   Defendant Esposito did not know if the police took any steps to permit demonstrators to remain in the area, taking up less space on the sidewalk, before the first order to disperse that he claimed to have heard. Esposito Dep. 93:15-21; 94:11-13; 133:9-17.

187.   Defendant Esposito did not know if there were any orders given at that location by him or anyone else directing demonstrators to move to another designated location nearby. Esposito Dep. 94:14-18.

188.   Part of TARU's intended role at demonstrations is to videotape illegal activity that gives rise to police orders or warnings. Esposito Dep. 51:19-52:15.

189.   Part of TARU's function would also be to record the warnings themselves. Esposito Dep. 52:16-20.

190.   If there were a TARU videographer present, they would have been expected to videotape police warnings. Esposito Dep. 126:9-15.

191.   The only police orders or warning that the TARU video shows consists of approximately nine seconds of Defendant Esposito speaking into his cupped hands before Esposito says to other police, "they're under arrest, let's go."  Rivera Video, 1 of 2, No. 332, 0:00-0:12.

192.   The TARU video does not show another NYPD officer give orders at Broadway and

Exchange Place prior to Defendant Esposito giving orders. Rivera Video, 1 of 2, No. 332, 0:00-0:15.

193.   The TARU video does not show any announcement by Defendant Esposito or anyone else that demonstrators would have a certain amount of time to comply with any police order. Rivera Video, 1 of 2, No. 332, 0:00-0:15

194.   The TARU video does not show police taking any steps to permit demonstrators to remain in the area or take up less space on the sidewalk before an order to disperse was given. Rivera Video, 1 of 2, No. 332, 0:00-0:15

195.   The TARU video does not show any orders given at that location by Defendant Esposito or anyone else directing demonstrators to move to another designated location nearby. Rivera Video, 1 of 2, No. 332, 0:00-0:18

196.   Defendant Esposito testified that he himself then gave "a final order for the crowd to disperse or that'd be arrested and then giving the order to have them arrested." Esposito Dep. 85:24-86:17.

197.   Defendant Esposito did not use a bullhorn to communicate the order. Esposito Dep. 88:17-89:13.

198.   Defendant Esposito did not know how many orders he himself gave at the location. Esposito Dep. 84:14-16.

199.   Defendant Esposito could have given as a few as one order. Esposito Dep. 84:17-20.

200.   Defendant Esposito testified that his order to disperse and the order to have the protesters arrested were on a video clip that was a fair and accurate representation of the events. Esposito Dep. 84:23-85:20; 125:6-14; 138:9-13.

201.   That video clip shows Defendant Esposito give one order, in which Defendant Esposito says in total:

> "You're all blocking the sidewalk.  You're not – you – remove yourself immediately or be arrested for disorderly conduct for blocking the sidewalk. Now. Go. They're under arrest,

let's go."

Rivera Video, 1 of 2, No. 332, 0:00-0:12.

202.   During the time period depicted in the video clip of Mr. Kushneir's arrest location prior to Mr. Kushneir's arrest, Defendant Esposito can be seen standing on the sidewalk. Esposito Dep. 122:25-123:14; Rivera Video, 1 of 2, No. 332, 0:00-0:16.

203.   Defendant Esposito did not recall how much time elapsed between the first order that the other officer allegedly gave and the order that Defendant Esposito gave. Esposito Dep. 89:14-23.

204.   Defendant Esposito expected protesters to "back…away from" the police and "disperse in the opposite direction" by turning around and going backwards. Esposito Dep. 87:4-13.

205.   Defendant Esposito theorized that Kushnier could have "le[ft] the scene" by "turn[ing] around and walk[ing] the other way." Esposito Dep. 139:25-140:13.

206.   Defendant Esposito did not recall giving directions for people to turn around and go backwards. Esposito Dep. 87:10-21.

207.   The TARU video does not show Defendant Esposito giving orders for people to turn around and go backwards. Rivera Video, 1 of 2, No. 332, 0:00-0:15

208.   Defendant Esposito did not announce a certain amount of time within which demonstrators were to comply with his order to disperse. Esposito Dep. 131:18-21; Rivera Video, 1 of 2, No. 332, 0:00-0:09.

209.   After Defendant Esposito gave his order to disperse, he gave people approximately one second to comply before he verbally ordered arrests. Esposito Dep. 91:12-92:4; Rivera Video, 1 of 2, No. 332, 0:08-0:09.

210.   Approximately one second from the moment Defendant Esposito's final order ended, Esposito said, "They're under arrest, let's go" as a direction to fellow officers to make arrests.

Esposito Dep. 138:22-139:17; Rivera Video, 1 of 2, No. 332, 0:08-0:09.

211.   Between 12 seconds and 15 seconds into the TARU video clip depicting Mr. Kushneir's arrest, Defendant Esposito saw himself touch someone and attempt to place them under arrest. Esposito Dep. 141:14-142:2; Rivera Video, 1 of 2, No. 332, 0:00-0:15.

212.   Defendant Esposito did not know whether there were barriers placed along Broadway. Esposito Dep.  84:7-9.

213.   Defendant Esposito did not recall observing barriers placed along Broadway. Esposito Dep. 84:10-13.

214.   Defendant Esposito did not recall seeing metal barricades along the side of the crowd of protesters when Esposito gave that final order. Esposito Dep. 86:18-21.

215.   On viewing the video, Defendant Esposito saw that there were barriers at Mr. Kushneir's arrest location. Esposito Dep. 136:22-137:9.

216.   When barriers are deployed in the manner depicted at the beginning of the Rivera video clip on which Mr. Kushneir's arrest is depicted, they are meant to be locked together. Esposito Dep. 136:22-137:9; 137:15-18.

217.      Esposito theorized that the metal barricades depicted in the first twelve seconds of the police video could not have prevented Mr. Kushnier from exiting to the right (i.e., toward the street) because he believed that he viewed the last barrier on that video. Esposito Dep. 140:14-141:13; Rivera Video, 1 of 2, No. 332, 0:00-0:12.

218.   TARU video taken over the following 20 seconds shows at least nine interlocked metal barricades extending from a newsstand located toward the middle of the block all the way to the police line.  Rivera Video, 1 of 2, No. 332, 0:17-0:38 (numbers 1-9 indicating each barricade added).

23



219.   The metal police barricades were interlocked together and prevented passage from the Broadway sidewalk where Mr. Kushneir was arrested into the street. Rivera Video, 1 of 2, No. 332, 0:17-0:38.

**Defendant Maldonado**

220.   Defendant Maldonado arrived at the area of Broadway and Exchange on November 13, 2011 at around 8:45 a.m. Maldonado Dep. 35:16-20.

221.   Defendant Maldonado did not recall seeing vehicular traffic when he arrived at the location. Maldonado Dep. 47:2-5.

222.   The first thing Defendant Maldonado remembers after arriving at the location was standing behind Defendant Esposito, waiting for his instructions. Maldonado Dep. 40:14-20.

223.   At that time, Defendant Maldonado was standing with perhaps thirty or more other NYPD officers. Maldonado Dep. 41:7-17.

224.   The officers stood in a police line on the sidewalk from curb to building. Maldonado

Dep. 41:18-42:2; 43:8-10.

225.   At that location, there were metal barricades in the street parallel to the curbline. Maldonado Dep. 43:11-13; 43:24-7.

226.   Defendant Maldonado moved in and grabbed the protester closest to him as he saw Defendant Esposito move in an attempt to make an arrest. Maldonado Dep. 57:15-22; 59:16-23; 60:3-9.

227.   Defendant Maldonado physically arrested just that one person on November 17, 2011- who was not Mr. Kushneir. Maldonado Dep. 59:16-60:7.

228.   Defendant Maldonado did not place Mr. Kushneir under arrest. Maldonado Dep. 14:8-19; 32:18-33:20; 33:21-34:9; 32:15-20.

229.   Defendant Maldonado then brought the person who he had arrested over to a wall where prisoners were lined up. Maldonado Dep. 61:2-15.

230.   Defendant Maldonado then remained with that person until he brought them to the prisoner wagon. Maldonado Dep. 61:16-17.

231.   Defendant Maldonado did not see Mr. Kushneir's arrest. Maldonado Dep. 33:18-20; 34:10-13.

232.   Defendant Maldonado did not see Mr. Kushneir's pre-arrest conduct. Maldonado Dep. 77:16-19; 77:24- 78:2.

233.   The first time Defendant Maldonado saw Mr. Kushneir was after he was already in the custody of another NYPD officer. Maldonado Dep. 64:23- 65:2.

234.   A supervisor assigned Defendant Maldonado to process the arrests of five people, including Mr. Kushneir. Maldonado Dep. 59:2-4; 63:2-5; 63:25- 64:3.

235.   The supervisor did not ask if Defendant Maldonado had seen any of the five people whose arrests he assigned Defendant Maldonado to process, including Mr. Kushneir, before they

were placed under arrest. Maldonado Dep. 64:7-10.

236.   No other officer told Defendant Maldonado anything about what those five people, including Mr. Kushneir, did before they were placed under arrest. Maldonado Dep. 64:11-22.

237.   As part of processing Mr. Kushneir's arrest, Defendant Maldonado created handwritten or "scratch" Online Booking Sheet ("OLBS") Report. Maldonado Dep. 73:8-18; Kushneir Scratch OLBS Report.

238.   A digital version of that OLBS was then created based on the handwritten OLBS. Maldonado Dep. 73:19-22; 74:5-9; Kushneir OLBS Report.

239.   The details sections of the OLBS Report states:

> AT T/P/O DEFT WAS OBSERVED NUMEROUS TIMES TO LEAVE ABOVE STATED LOCATION FINAL WARNING WAS GIVEN OR BE SUBJECT TO ARREST DEFT WAS ARRESTED FOR NOT OBEYING A LAWFUL ORDER TO LEAVE LOCATION WHERE HE WAS BLOCKING PEDESTRIAN TRAFFIC.

Kushneir OLBS Report.

240.   Defendant Maldonado had "no idea" how many pedestrians Mr. Kushneir did or did not block before he was arrested. Maldonado Dep. 78:3-7.

241.   Plaintiff Kushneir was released with a DAT at around 9:40pm. Kushneir DAT; Kushneir OLPA.

242.   The DAT required Mr. Kushneir to appear in New York City Criminal Court on January 25, 2012 for arraignment. Kushneir DAT; DA Datasheet.

243.   Defendant Maldonado met with a prosecutor regarding Mr. Kushneir's case. Maldonado Dep. 85:20-22; 86:9-23.

244.   Defendant Maldonado informed the Office of the District Attorney of New York County that he observed Mr. Kushneir as part of "a group of approximately 100 people standing in the sidewalk on Broadway and Exchange," the "entire sidewalk was blocked and pedestrians could

not use it" and "pedestrians had to walk in the street to pass through the area." Kushneir DA Datasheet.

245.   On December 2, 2011, Defendant Maldonado told a prosecutor that Mr. Kushneir "was blocking a sidewalk. From building to curb, no one was able to get through. No pedestrians were able to walk through that crowd." Maldonado Dep. 86:21-87:5.

246.   On December 2, 2011, Defendant Maldonado swore out a criminal court accusatory instrument alleging that on

> November 17, 2011 at about 9:15 hours on the corner of Broadway and Exchange Place, he observed Mr. Kushneir  . . . standing in the middle of the sidewalk at the above-mentioned location with approximately one-hundred others. Deponent further states that the actions of the defendant and the above-mentioned others caused public inconvenience and annoyance, in that the defendant and others completely blocked the sidewalk and prevented use of the sidewalk by pedestrians, and that said pedestrians were forced to walk in the street to pass through the area.

Kushneir Criminal Court Complaint.

247.   Based on that accusatory instrument, Plaintiff Kushneir was charged with violating New York Penal Law § 240.20(5) (Disorderly Conduct). Kushneir Criminal Court Complaint.

248.   Plaintiff Kushneir was released on his own recognizance at his arraignment pursuant to New York Criminal Procedure Law § 510.40. Kushneir DA Datasheet.

249.   Mr. Kushneir appeared in New York City Criminal Court on January 25, 2012 and March 12, 2012. Kushneir DA Datasheet; Kushneir Certificate of Disposition.

250.   On March 12, 2012, the Office of the District Attorney of New York County moved to dismiss the charge against Mr. Kushneir. Kushneir Certificate of Disposition.

251.   As a result of his arrest and prosecution, Plaintiff Kushneir was confronted by a director at his workplace, who questioned him about what happened in New York, which made Mr. Kushneir apprehensive and nervous in the workplace. Kushneir Dep. 39:3-7; 39:14-21.

### _Monell_ Claims Against Defendant City

27

252.   NYPD Disorder Control Unit Commanding Officer Anthony Raganella testified as a 30(b)(6) witness regarding the NYPD's policies, practices, and training in effect in November of 2011 related to (1) (a) Policing First Amendment assemblies; (b) Crowd/disorder control (related to policing First Amendment assemblies); and (c) The role of "arrest teams" in disorder control and policing First Amendment assemblies (hereinafter, the "Raganella Topics"); and the extent, location and custodians of documents related to those topics.  Raganella Dep. 53:21-54:14; AR2.

253.   Raganella's testimony was limited to post-NYPD Academy, in-service Disorder Control Unit (the "DCU") training on those topics. Raganella Dep. 257:23-258:8.

254.   The NYPD has been sued a number of times since the year 2000 over police response to large scale protests, for example the Republican National Convention in 2004 and Critical Mass bicycle rides. Raganella Dep. 201:24 – 202:9.

255.   Raganella could identify no impact that litigation had on NYPD policies, practices, and training in effect in November 2011 regarding the the Raganella Topics. Raganella Dep. 202:10-20.

256.   NYPD Officer Shurland Marshall testified as Defendant City's 30(b)(6) witness regarding the NYPD's policies, practices, and training in effect in November of 2011 related to: 1(d) authority to and/or grounds to arrest for, or NYPD practices regarding arrests for (i) Disorderly Conduct- New York State Penal Law ("PL") Section 240.20 (5); (ii) Disordely Conduct- PL Section 240.20 (6); (iii) Obstruction of Governmental Administration- PL Section 195.05, including in connection with First Amendment assemblies; (e) The blockage of traffic necessary to trigger a PL 240.20(5) arrest; (f) Ensuring that lawfully authorized and constitutionally significant notice, and a meaningful opportunity to disperse, were given and disregarded prior to a PL 240.20(6) arrest; (g) The public inconvenience, annoyance, or alarm required to arrest for a PL240.20 violation and the state of mind required to arrest for a PL 240.20 violation and (h) Ensuring that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to effecting

arrests in connection with First Amendment assemblies for purported "group" conduct (hereinafter, the "Marshall Topics"); and the extent, location and custodians of documents related to those topics.  Marshall Dep. 25:25-26:24; AR2.

257.   Marshall's testimony was limited to recruit training at the NYPD Academy and did not cover DCU training or related documents on those topics. Marshall Dep. 44:7-23; 118:16-23.

258.   Esposito testified as Defendant City's 30(b)(6) witness regarding the NYPD's policies, practices, and training in effect in November of 2011 related to (l) Discretion to release detainees with a summons or Desk Appearance Ticket after detention in lieu of arrest; (m) Procedures to be followed in determining whether to release a detainee with a summons or Desk Appearance Ticket; and (n) The use of arrests in lieu of issuing summonses for summons-eligible offenses; and the extent, location and custodians of documents related to those topics.  10/10/17 Letter from NYC (Oliver Ex. 63).

### November 17, 2011 Planning

259.   Defendant Esposito testified that a few days or a week before November 17, 2011, the NYPD learned that OWS demonstrators were planning November 17, 2011 OWS demonstrations through an intelligence briefing. Esposito Dep. 25:10-23.

260.   Esposito "believe[d] there was some information about preventing Wall Street from opening up, blocking traffic. Shutting down to speak, the area but I believe it was focused on Wall Street. Meaning the Stock Exchange." Esposito Dep. 48:16-49:11; 58:9-14; 59:2-60:14; 98:13-18.

261.   Aside from that, Esposito had no specific recollection of any information that he received from the Intelligence Division prior to November 17, 2011 about demonstrators' plans. Esposito Dep. 28:14-19; 49:11-18

262.   Plaintiffs requested copies of any briefing documents that the Intelligence Division gave to the Chief of Department regarding the November 17, 2011 OWS demonstrations. Esposito Dep.

29:2-31:3; March 23, 2018 Joint Letter, Dkt. 106 (Oliver Ex. 64).

263.   Despite requests during discovery for the intelligence NYPD relied on in formulating the DAT/No Prints policy, Defendants never turned over any records regarding any of the grounds Defendant Esposito cited as leading to or justifying the NYPD's decision to adopt the DAT/No Prints policy. *See* Oliver Ex. 64.

264.   As part of planning for a detail where it is anticipated that protesters might block traffic, the NYPD takes steps to plan for possible blockages of traffic. Esposito Dep. 53:20-25.

265.   As part of planning to prevent demonstrators from blocking vehicular traffic as part of planning for a detail where it is anticipated that protesters might block traffic, the NYPD would come up with a plan to try to stop them from doing so. Esposito Dep. 53:20-54:7.

266.   Those steps could include barrier placement and could employ offers at certain intersections. Esposito Dep. 54:4-21; 58:15-25.

267.   As a result of the NYPD's planning for policing the November 17, 2011 Occupy Wall Street protests, the NYPD deployed hundreds of NYPD officers, and other NYPD resources. *See* AR5  (Oliver Ex. 65).

### Basics of NYPD's Training

268.   NYPD Officers receive training at the NYPD Academy as recruits and "in-service" training after they graduate. Raganella Dep. 103:16-20.

269.   Instructors utilize Lesson Plans in NYPD Academy training. Marshall Dep. 36:13-14.

270.   The Lesson Plans reflect the NYPD's practices and training in the topics they cover. Marshall Dep. 36:15-17.

271.   Additional materials such as NYPD Patrol Guide provisions related to a particular topic are listed in the relevant Lesson Plans or Student Guide provisions. Marshall Dep. 41:15-42:17; 103:3-20.

272.   The NYPD Academy also utilizes PowerPoint presentations related to the topics in the relevant Student Guide provisions, but those PowerPoints merely repackage the same content that was in the Lesson Plans and NYPD Student Guide provision. Marshall Dep. 37:5-14; 48:7-14.

273.   Command-level training is post-NYPD Academy training provided at local commands on certain topics. Raganella Dep.125:16-21.

274.   Disorder Control Training is in-service training provided by the DCU that consists of disorder control formations, high profile vehicle rescues, counter-alluding operations, and mass arrests. Raganella Dep. 166:4-12.

275.   The mass arrest portion of Disorder Control Training would have included some discussion of "legal issues," but Raganella did not point to any written documents including such "legal issues". Raganella Dep. 166:10-12.

276.   Officers who receive Disorder Control Training are not graded or tested. Raganella Dep. 109:2-7, 109:15-18.

277.   Officers who receive Disorder Control Training are observed for proficiency, but those observations are not recorded anywhere. Raganella Dep. 109:9-14.

278.   A DCU training slide states that "Disorders are by nature military engagements" and that "Tactics to control disorders are copied from the military." Packard 56.1 ¶ 134.

279.   For policing large groups, DCU teaches a "Disperse & Demoralize" strategy. Raganella Dep. 132: 13-18; AR14, D1183 (Oliver Ex. 39).

280.   AR 12, "Disorder Control Guidelines," was created in October of 1997 and formed the "foundation" for DCU Lesson Plans. Raganella Dep. 130:13-131:9; AR12 (Oliver Ex. 37).

281.   Raganella testified that the Disorder Control Guidelines are "not meant to be a guideline for the policing of lawful First Amendment assemblies or lawful demonstrations or protests." Raganella Dep. 133:2-6.

282.   Rather, Raganella testified, the Disorder Control Guidelines were created "for disorder – meaning civil unrest and riots." Raganella Dep. 133:7-8.

283.   Ragnella could not provide a NYPD definition of "civil unrest" or "riots" as used in training or in written policies and practices regarding the Raganella Topics. Raganella Dep. 134:15-23.

284.   According to Raganella, groups that engage in civil disobedience, groups that cause blockage of traffic or some other public ramifications do not rise to the level of riot or civil unrest. Raganella Dep. 135:7-15.

285.   Raganella admitted that NYPD training instructs that the same crowd management and disorder control tactics be used in managing both First Amendment assemblies and riots. Raganella Dep. 232:18-233:18.

**Policies, Practices and Training Regarding Group Probable Cause and Dispersal Orders at First Amendment Assemblies; and Applying PL § 240.20(6)**

286.   Esposito did not know if the NYPD had policies in place on November 17, 2011 regarding how many warnings or orders to give before taking enforcement or arrest action. Esposito Dep. 127:21-128:3.

287.   Esposito did not know if the NYPD had policies in place on November 17, 2011 regarding the length of time to be given or what constituted meaningful opportunity to comply with police orders given to demonstrators before taking enforcement or arrest action, except that it had to be "reasonable." Esposito Dep. 130:16-24; 133:18-134:8.

288.   Esposito did not know if the NYPD had policies in place on November 17, 2011 regarding the need to include a length of time within which to comply with police orders given to demonstrators before taking enforcement or arrest action. Esposito Dep. 130:25-131:8.

289. In November of 2011, training in the Marshall Topics was provided through only two separate NYPD sources: The NYPD Academy and the DCU. Marshall Dep. 43:2-44:23; 44:20-23; 50:13-16; 50:17-51:6.

290. The DCU was the only command or unit that provided in-service training in the Marshall Topics in November 2011. Marshall Dep. 44:20-23; 50:13-16; 50:20-51:6.

291. In November of 2011, there was no other command-level training in place that Marshall was aware of regarding the Marshall Topics. Marshall Dep., 30:17-21.

292. In November of 2011, the only written training materials the NYPD Academy used to train NYPD officers in the Marshall Topics were: Sections of the NYPD Student's Guide, PowerPoints, Lesson Plans, the NYPD Patrol Guide, and a NYPD Legal Bulletin. Marshall Dep. 25:17-26:24; 38:6-10; 44:22-43:10; 49:6-9.In November of 2011, training at the NYPD Academy regarding authority to arrest for Disorderly Conduct was covered only in Lesson Plans and Student Guide provisions on the topics "Authority to Arrest", "Custodial Offenses", and "Maintaining Public Order". Marshall Dep., 34:16-21; 36:22-37:4; Marshall 33, D3449-3457 (Oliver Ex. 52); Marshall 99, D3191-32304 (Oliver Ex. 56); Marshall 34, D3458-3474 (Oliver Ex. 53); Marshall 25 (Oliver Ex. 51); AR23, D-408-439 (Oliver Ex. 45).

293. In November of 2011, no part of the Authority to Arrest Lesson Plan, NYPD Student Guide, or the related PowerPoint covered probable cause or authority to arrest for Disorderly Conduct in the context of First Amendment assemblies. Marshall Dep. 74:7-75:17; 123:20-124:8; Marshall 99 (Oliver Ex. 56); AR23 (Oliver Ex. 45).

294. Marshall could not identify any NYPD Patrol Guide provisions related to authority to arrest for Disorderly Conduct. Marshall Dep. 35:22-25.

295. Aside from those NYPD Student's Guide provisions, Lesson Plans, and PowerPoints, the only documents Marshall identified regarding NYPD Academy training in authority to arrest for

Disorderly Conduct were (1) a NYPD Police Academy Training Memo from 2007 and (2) a NYPD Legal Bureau Memo from 1971.  Marshall Dep. 37:15-38:19; 41:10-14; Marshall 10 (the "2007 Training Memo," Oliver Ex. 50); Marshall 95 (the "1971 Legal Bureau Bulletin," Oliver Ex. 55).

296.   The 1971 Legal Bureau Bulletin was given to NYPD recruits as part of their NYPD Academy Training in November of 2011. Marshall Dep. 58:24-25; 59:12-16; 81:16-18.

297.   Aside from the 1971 Legal Bureau Bulletin, no other Legal Bureau Bulletins were given to recruits regarding the Marshall Topics. Marshall Dep. 59:25-60:12.

298.   Between April 15, 1971 and February 2017, the NYPD did not issue any Legal Division or Legal Bureau Bulletins to members of service regarding the conduct for which an arrest for obstruction of vehicular or pedestrian traffic is justified. Packard 56.1 ¶ 66.

299.   The NYPD issued an updated Legal Bureau Bulletin dated February 2017 that "specifically explains the circumstances under which an officer can charge a person with . . . 'obstruction of vehicular or pedestrian traffic." Packard 56.1 ¶ 67.

300.   The NYPD did not create a Legal Bureau Bulletin on disorderly conduct that included *People v. Jones* until February 2017. Packard 56.1 ¶ 68.

301.   Marshall testified that the 2007 Memo was used in command-level training in November of 2011. Marshall Dep. 106:6-107:8.

302.   Raganalla did not know what role the 2007 Memo played in in-service training, and did not know if any changes were made to the DCU lesson plans as a result of the Memo. Raganella Dep. 253:18- 254:9.

303.   The 2007 Memo was not provided to NYPD recruits as part of their NYPD Academy training in November of 2011. Marshall Dep. 60:15-23; 81:19-24.

304.   Training Memos like the 2007 Memo are sent to instructors, who might choose to include the content in their lessons, but are not formally incorporated into training. Marshall Dep. 61:2-63:10.

305.   Changes made in Lesson Plans over time can be gleaned from comparing the text of the different versions. Marshall Dep. 52:19-25.

306.   If the 2007 Memo were formally incorporated into NYPD Police Academy training, that would be reflected in an update to the Lesson Plan or the NYPD Student's Guide. Marshall Dep. 61:11-15; 62:16-18.

307.   The text of the January 2007 Lesson Plan on Maintaining Public Order (Marshall 51, Oliver Ex. 54) covering Disorderly Conduct (D3868-D3869) is identical to the text of the August 2011 revision covering Disorderly Conduct (Marshall 34, D3470-3471). *Compare* Marshall 51 (Oliver Ex. 54) *with* Marshall 34 (Oliver Ex. 53).

308.   Aside from defining "public place" and "transportation facility," the NYPD's only training regarding Disorderly Conduct in both the January 2007 Lesson Plan and the August 2011 revision merely quotes the text of the Disorderly Conduct statute. *Compare* Marshall 51 (Oliver Ex. 54), D3868-D3869 and Marshall 34 (Oliver Ex. 53), D3470-3471 *with* NYPL § 240.20.

309.   The NYPD's Lesson Plan on Maintaining Public Order (Marshall 34, Oliver 53) at pp. 7-13 (D3465-D3471) covered the NYPD's policies, practices, and training regarding probable cause to arrest for Disorderly Conduct and ensuring that lawfully authorized and constitutionally significant notice, and a meaningful opportunity to disperse, were given and disregarded prior to a Disorderly Conduct 240.20(6) arrest in November of 2011. Marshall Dep. 75:21-76:11; Marshall 34, D3465-D3471 (Oliver Ex. 53).

310.   Marshall could identify nothing in Marshall 34 (Oliver Ex. 53) that related to dispersal orders. Marshall Dep. 76:12-77:3.

311.   The only portion of Marshall Exhibit 34 that Marshall could identify relating to probable cause to arrest for Disorderly Conduct was Section 4(f) of D3471, which only quotes the text of NYPL Section 240.20(6). Marshall Dep. 77:5-11; 82:20-83:7; compare Marshall Exhibit 34, D3471, with NYPL § 240.20(6); *see also* Marshall Exhibit 34, D3470.

312.   Aside from Marshall Exhibit 34, Marshall could identify no NYPD training materials utilized by the NYPD Academy in November of 2011 regarding informing demonstrators that they must move and why. Marshall Dep. 146:5-11.

313.   Marshall could identify no NYPD training materials utilized by the NYPD Academy in November of 2011 regarding what length of time to give demonstrators who are told to move an opportunity to comply with the direction. Marshall Dep. 146:14-21.

314.   The form Disorderly Conduct Warning in AR27 includes the words "(GIVE OPPORTUNITY TO LEAVE)", but this played no role in Academy training or DCU training. Marshall Dep. 115:22-116:9; 119:4-8; Raganella Dep. 185:3-10; AR27 (Oliver Ex. 47).

315.   The other document that reflected the NYPD's training, policies, or practices that were in effect in November of 2011 regarding giving a person an opportunity to leave an area after a warning was the 1971 Legal Bureau Bulletin. Marshall Dep. 119:11-120:4; 1971 Legal Bureau Bulletin.

316.   The only time the topic of giving a person an opportunity to leave an area after a warning appears in the 1971 Legal Bureau Bulletin is on the first page, which talks about the factual summary in the case- not in any legal analysis or guidance. Marshall Dep. 158:25-159:19; 160:6-10; 160:20-161:7; 1971 Legal Division Bulletin.

317.   It was not the NYPD's policy in November of 2011 to provide a warning accompanied by a specific explanation of how a person's behavior is violating the law before making an arrest for a PL 240.20(5) violation. Marshall Dep. 113:21-114:2.

36

318.   Aside from the language "You are blocking pedestrian traffic and forcing individuals to walk into the street. If you do not move, you will be subject to arrest" contained in the 2007 Memo (which was not formally included in Academy training and was not given to recruits, *see* ¶¶ 303-307 above), Marshall could identify no other documents utilized in NYPD Academy training reflecting the NYPD's policies, training, or practices in November of 2011 that included sample language to be used in connection with a Disorderly Conduct arrest. Marshall Dep. 114:3-14.

319.   Aside from Marshall 34 (Oliver Ex. 53) at D3466, which states only that "demonstrators should be permitted as near to the target it [sic] is criticizing as long as it is consistent … [w]ith safety and … [r]easonable requirements of unobstructed passage," Marshall was aware of no documents relating to what factors should be taken into account to determine whether demonstrators being near their intended target was consistent with safety. Marshall Dep. 129:17-130:6; Marshall 34, D3466 (Oliver 53).

320.   According to Marshall, Marshall 25 (Oliver Ex. 51), the Police Student's Guide regarding Maintaining Public Order, at D3300-3302 and D3306 accurately reflected the NYPD's policies, practices, and training regarding maintaining public order at a demonstration in November of 2011. Marshall Dep. 146:22-24; 150:3-152:23.

321.   Marshall 25 lists events that historically have led to civil disorder in which the NYPD's response to those events is depicted as positive and to be emulated. Marshall 25, D3309-3310 (Oliver Ex. 51).

322.   The Lesson Plan on Custodial Offenses (Marshall 33) merely recites the Obstructing Governmental Administration statute and provides examples, and there is no other training or written materials that reflect the department's training or practices regarding probable cause to arrest for OGA. Marshall Dep. 73:2-15; Marshall 33, 3452 (Oliver Ex. 52).

37

323.   The NYPD had an unwritten policy regarding policing demonstrators to try to allow demonstrators to demonstrate in a particular location, cordoned off by barricades or some other means, so that they were not blocking pedestrian or vehicular traffic. Esposito Dep. 93:22-94:10.

324.   The only written documents reflecting NYPD policies, practices, and in-service DCU training that were in effect or existed in November 2011 regarding the Raganella Topics, including the NYPD's policies, practices, and training in effect in November of 2011 related to (a) Policing First Amendment assemblies, and (b) Crowd/disorder control (related to policing First Amendment assemblies), were: Raganella AR6; AR9-15; AR17-20; and AR25-26 (Oliver Ex. 40, 41-44, 46, and 47). Raganella Dep. 14:8-10; 15:7-23; 54:15-21; 55:16-56:7; 92:11-15.

325.   Raganella testified that AR6 did not in fact relate to (a) Policing First Amendment assemblies or (b) Crowd/disorder control (related to policing First Amendment assemblies). Ragnella Dep. 41:9-12.

326.   Raganella testified that AR9 did not in fact relate to (a) Policing First Amendment assemblies or (b) Crowd/disorder control (related to policing First Amendment assemblies). Ragnella Dep. 52:11-12.

327.   Ragenella did not know if AR18 was used in training in November 2011, and did not testify as to it. Raganella Dep. 158:12-24.

328.   AR 19, 20 and 25 relate to training for newly promoted lieutenants, sergeants and other executives only, and were not prepared, approved, or used by the DCU in any of its training. Raganella Dep. 127:2-130:12; 162:23-163:7; AR 25 (Oliver 46).

329.   Raganella was not aware of any unwritten policies, practices, or training in November of 2011 regarding the Raganella Topics. Raganella Dep. 98:3-8.

330.   The first bullet point in Exhibit AR19, which was not part of Academy or DCU training, instructs that it is NYPD policy to protect the rights of peaceful assembly and free speech as well as

the right to safe and *unhindered passage* for all people. Raganella Dep. 260:4-10 (emphasis added); AR19, D546 (Oliver 43).

331.   Raganella testified that, if a demonstration does hinder the passage of people who are not demonstrators, the NYPD will accommodate such hindrance as long as it is consistent with public safety. Raganella Dep. 260:20-261:3.

332.   Raganella testified that Exhibit AR10, a lesson in Disorder Control Training Lesson Cover Sheet regarding Legalities of Protests/Demonstrations, reflected the NYPD's DCU training in legalities of protests/demonstrations that was in effect in November of 2011. Raganella Dep. 139:2-7.

333.   Exhibit AR11, the Legalities at Demonstrations Instructor Guide, was a PowerPoint meant to accompany and mirror the Raganella AR10 lesson plan. Raganella 145:9-20; Raganella AR10-11 (Oliver 35-36).

334.   Raganella testified that AR10 and A11 reflect the only DCU training in November of 2011 that related to "Clear and Present Danger" rule. Raganella Dep. 147:11-17.

335.   Raganella testified that Exhibits AR10, AR11, and AR39 reflect all NYPD DCU training in November of 2011 that relates to the "Time, Place, Manner" rule. Raganella Dep. 145:21-146:13; 147:18-148:4; AR10, AR11, and AR39 (Oliver 35, 36, and 48).

336.   AR39, the "NYPD Legal Guidelines for the Republican National Convention" document, was not used in NYPD training in November of 2011. Raganella Dep. 59:15-19, 242:2-6, 242:16-19.

337.   Deposition testimony subsequent to Raganella's revealed that Exhibits 10 and 11 were removed from DCU training in 2004, and incorporated into the "Maintaining Public Order" curriculum (Marshall 34). Perkins *Packard* Dep. 37:4-24.

338.   The Maintaining Public Order Lesson Plan does not include information on the "Clear

and Present Danger" rule or the "Time, Place, and Manner" rule. Marshall 34 (Oliver 53).

339.   AR13 covers the disorderly conduct context where someone has refused to leave the roadway instructs the officer to, after identifying themselves and providing a warning, "Give people the opportunity to leave." Raganella Dep. 248:18-25; AR13, D1227 (Oliver 38).

340.   Raganella is not aware of any documents reflecting the department's policies, practices or training regarding what kind or how much of an opportunity should be given for protesters to leave after the warning in AR13 (Oliver 38) at D1227. Raganella Dep. 249:2-12.

341.   Raganella explained his understanding based on the department's training that was in effect in November 2011 regarding the requirements of the Time, Place, and Manner rule as it relates to policing First Amendment assemblies as follows: "[T]he government or municipality concerned is allowed to place restrictions on First Amendment assemblies and free speech so long as it's not based on the actual content of the speech itself."  Raganella Dep. 194:23-195:17.

342.   Raganella testified that, regarding the requirement of "narrow tailoring," the governmental restriction "needs to be specifically related to a governmental interest." Raganella Dep. 195:18-17:19.

343.   Raganella testified that, regarding the requirement to provide "ample alternatives," if the government is going to restrict protest activity that would otherwise be constitutionally protected, the government must give the protesters an alternative manner of expressing themselves or give an alternative means to accomplish what the protesters are looking to do, such as the opportunity to protest within "sight and sound" of the object of their protest. Raganella Dep. 196:10-19; 197:20-198-15.

344.   There were no written guidelines or training regarding narrow tailoring or ample alternatives for expression utilized in NYPD DCU training in November of 2011. Raganella Dep. 198:23-199:7.

345.   Raganella testified that the NYPD's unwritten practices to ensure protesters receive lawfully authorized and constitutionally significant notice and a meaningful opportunity to disperse are as follows: reading "the appropriate arrest warnings" to the group through an amplification device; giving protesters an opportunity to comply or disperse; reading the warnings again; and perhaps, when tactically and safely feasible, placing an officer at the back of the group to make sure the back of the group is able to hear the instructions. Raganella Dep. 88:16-90:3; 90:9-19.

346.   Raganella could not identify and written guidelines, policies, practices, or training regarding communicating a dispersal order and giving a person an opportunity to comply with it. Raganella Dep. 91:7-18; 95:21-24.

347.   Raganella testified that the communicating an order and giving a person an opportunity to comply with it was "just something that we did as far as I can recall in regard to our Legal Bureau wanting that to be done." Raganella Dep. 94:12-18.

### Group Probable Cause

348.   Raganella testified that, from a discretion standpoint, whether one person having to go into the roadway to get around a perceived group is a substantial enough obstruction of traffic to warrant taking law enforcement action against the perceived group, would be at the discretion of the Incident Commander and subject to different factors. Raganella Dep. 204:2-205:3.

349.   Raganella could identify no written guidelines limiting or describing the discretion an Incident Commander has to treat a perceived group as a unit, for example in circumstances where a group of people is in the street blocking traffic and fails to comply with arrest warnings by dispersing or leaving the roadway. Raganella Dep. 205:4-206:4, 207:6-9, 207:12-208:6.

350.   According to Raganella, NYPD training requires that if enforcement action is taken against any one person, whether by themselves or in a group, individualized probable cause is required for every person enforcement action is taken against. Raganella Dep. 208:6-17.

351.   Raganella testified that the NYPD is "pretty emphatic" about training people to distinguish between lawbreakers and law-abiding citizens. Raganella Dep. 208:25-209:9; 238:19-25.

352.   The third bullet point on D125 in the Disorder Control Guidelines instructs officers to distinguish between bystanders and participants, but Raganella could identify nothing in writing that instructs officers how to make the distinction or how to do so. Raganella Dep. 240:5-13; AR12 (Oliver 37), D125.

353.   Raganella testified that distinctions between law-abiding and law-breaking are made in the street by looking at people to see if the officer has probable cause to believe the person is committing a crime or offense at the time as an individual. Raganella Dep. 209:10-20.

354.   Raganella could not identify any written documents that train officers to distinguish between a law-abiding person, like a photojournalist, and a law-breaking person, because the DCU assumes that is something they learned at the NYPD Academy Raganella Dep. 209:21-210:21.

355.   Raganella could identify no written guidelines or training regarding how to distinguish law-breaking people from passersby. Raganella Dep. 212:11-213:2.

356.   In *R.J. Osterhoudt v. City of New York, et al.*, NO. 10 CV 3173 (EDNY) (RJC)(RML), the Court denied defendants' bid to dismiss his *Monell* claims, which Osterhoudt supported "by citing other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 Republican National Convention, and the World Economic Forum" including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis . . . [that] Osterhoudt alleges . . . caused his own arrest on November 5, 2008" and that "the NYPD failure to train officers how to determine individual probable cause, instead of sweeping up arrestees *en masse*, is the same failure that led to his own unlawful arrest." 2012 WL 4481927, at *1-2 (E.D.N.Y. Sept.

27, 2012); SAC, ¶ 26 (j).

### Creating or recklessly risking substantial disruption of vehicular or pedestrian traffic or other criminally significant public ramifications

357.   Marshall testified that a group of people who stop traffic by stopping themselves across a public highway must create an actual and substantial obstruction of vehicular traffic before they can be subject to arrest. Marshall Dep. 154:16-155:10; 156:16-21.

358.   Marshall could identify no NYPD training materials utilized by the NYPD Academy in November of 2011 defining the concepts of "obstruction", "incidental blockage" of traffic, "dangerous", or "inconvenient". Marshall Dep. 77:21-78:3; 83:12-14; 145:19-23.

359.   Marshall identified Marshall 34 at D3466 as covering the topic of "public inconvenience, annoyance, and alarm." Marshall Dep. 78:4-5, 10-11.

360.   Marshall 34 at D3466, Section B(2) states that "Arrests may be made if … [u]nreasonable noise is intended to cause … [p]ublic inconvenience … [a]nnoyance or alarm is a direct result (Disorderly Conduct)" and says nothing else about the topics of public inconvenience, annoyance, or alarm. Marshall 34, D3466 (Oliver 53); Marshall Dep. 78:12-79:7.

361.   Marshall testified that, aside from Marshall 34, D3466, D3470-3471 and the 1971 Legal Bureau Bulletin, there were no other training materials utilized by the NYPD Academy in November of 2011 where the concepts of "public inconvenience, annoyance, or alarm" were either discussed or explained. Marshall Dep. 78:4-11; 79:8-80:19; 81:3-8; 111:18-112:12.

362.   In November of 2011, Marshall testified that the 2007 Memo, which was not part of formal Academy training or given to recruits, was the only document reflecting NYPD Academy training regarding what degree of obstruction of vehicular or pedestrian traffic was "substantial" so as to trigger probable cause to arrest for Disorderly Conduct – PL 240.20(5). Marshall Dep. 110:23-111:11; Marshall 10 (Oliver 50).

363.   Marshall testified that Marshall Exhibit 34 at D3466 covered the topic of the blockage of traffic necessary to trigger an arrest for Disorderly Conduct. Marshall Dep. 77:12-21.

364.   Marshall Exhibit 34 at D3466, Section 3(c) states that, in the context of a demonstration, with respect to "[o]bstruction of a street, sidewalk or building entrance…[i]f incidental blockage of such is dangerous as well as inconvenient" police should "[i]nform demonstrators they must move and why" and that "[i]f demonstrators refuse to move, arrests may be made." Marshall 34, D3466 (Oliver 53).

365.   In November of 2011, the only language in the 2007 Memo Marshall could identify as defining a substantial obstruction of vehicular or pedestrian traffic read: "To issue a summons for violations of Penal Law 240.20(5), the narrative portion of the summons must clearly articulate that the defendant's actions caused a substantial obstruction of vehicular or pedestrian movement." Marshall Dep. 110:23-111:11; Marshall 10 (Oliver 50).

366.   The NYPD Academy training in November of 2011 did not cover factors to consider in determining if an obstruction of traffic were "substantial" within the meaning of the Disorderly Conduct statute. Marshall Dep. 120:5-12; 122:19-123:3.

367.   The NYPD Academy training in November of 2011 contained no standards, rules, or factors to consider in determining what constitutes a "substantial" obstruction of traffic, triggering probable cause to arrest for 240.20(5). Marshall 60:15-23; 81:19-24; 120:5-12; 121:17-123:3; Marshall 34 (Oliver 53).

368.   Aside from Marshall 34 at D3466, which states only that "demonstrators should be permitted near the target it [sic] is criticizing as along as it is consistent" with "reasonable requirements of unobstructed passage," Marshall could identify no other documents reflecting the NYPD's policies, practices, or NYPD Academy training in November of 2011 with respect to defining "obstructed passage." Marshall Dep. 130:7-131:2; Marshall 34, D3466 (Oliver 53).

369.   Esposito testified that, if people had to go around other people into the street, that constitutes enough of a blockage of traffic to trigger probable cause to arrest for Disorderly Conduct. Esposito Dep. 119:20-120:9.

370.   Esposito testified that even one person having to go around other people into the street would provide sufficient cause to make a Disorderly Conduct arrest.  Esposito Dep. 120:10-16.

371.   Esposito testified that there must be an actual obstruction of pedestrian or vehicular traffic, rather than a threatened or risked obstruction, in order to trigger probable cause to arrest for Disorderly Conduct. Esposito Dep. 121:4-14.

372.   Esposito testified that if a person wants to walk on the sidewalk and cannot because they are physically being blocked by the subjects that are blocking the sidewalk, that provides probable cause to arrest for Disorderly Conduct. Esposito Dep. 122:7-20.

### City of New York's  "No-Summons" Policy ("DAT's - No Prints" Policy)

373.   When a person is detained by the NYPD, they can be released without charges, released with a Summons, released with a Desk Appearance Ticket ("DAT"), or fully booked and processed online. Czark Dep. 42:4-43:3.

374.   In a non-large scale arrest situation, when an officer makes an arrest for a Disorderly Conduct violation, that officer has discretion whether to issue the arrestee a Summons on the street, or bring them to the Precinct. Czark Dep. 58:14-22.

375.   Summonses are sometimes issued in mass arrest situations. Czark Dep. 42:19-20.

376.   In a large-scale arrest situation, an individual does not typically have discretion whether to issue the arrestee a Summons on the street, or bring them to the Precinct. Czark Dep.  58:23-59:4.

377.   Rather, in a large-scale arrest situation, the discretion to determine whether to release an arrestee with a Summons or not lies with a supervisor. Czark Dep. 58:23-59:13.

378.   In November of 2011, the NYPD had policies in place regarding a person's eligibility for

release with a Summons. Esposito Dep. 95:9-20.

379.   There were only two NYPD Patrol Guide ("PG") procedures in effect regarding Summons eligibility and summons processing procedures in November of 2011. Czark Dep. 65:21-25.

380.     The NYPD's standards for identification related to Summonses that were in effect in November of 2011 were found in PG 209-09 (D730). Czark Dep. 63:13-64:2.

381.     The NYPD Patrol Guide procedure governing Summons eligibility in November of 2011 was PG 209-01 (D727 and 728). Czark Dep. 64:18-65:2.

382.   Pursuant to PG 209-09, for a person released with a Summons for Disorderly Conduct in November of 2011, they would typically be brought to the station house for identification to be verified, for a background check, and for a warrant check.  Czark Dep. 62:22- 63:12.

383.   In November of 2011, the NYPD had policies in place regarding a person's eligibility for release with a DAT. Esposito Dep. 95:21-96:2.

384.   The NYPD Patrol Guide procedure governing DAT general procedure, including eligibility, in November of 2011 was PG 208-27. Czark Dep. 70:12-19.

385.   The NYPD's standards for identification related to DATs that were in effect in November of 2011 were found in PG 208-28. Czark Dep.  68:4-11.

386.   In November of 2011, it was the NYPD's policy to take fingerprints from every arrestee being considered for DAT release. Czark Dep. 96:23-25; 97:5-20; 99:15-16.

387.   In November of 2011, after a prisoner were fingerprinted and photographed, they would be lodged and wait while a DAT Investigation form and related checks were completed. Czark Dep. 109:13-110:21.

388.   Processing prisoners with "DAT's - No Prints" means they are not eligible for release with a Summons. Czark Dep. 142:14-142:25.

389.   Processing prisoners with "DAT's - No Prints" is a "special circumstance." Czark Dep. 97:24-98:2.

390.   The "DAT's - No Prints" policy was applied to mass arrests and demonstrations in November of 2011. Czark Dep. 122:17-22.

391.   In November of 2011, disorderly conduct was a Summons-eligible offense. Czark Dep. 61:6-15.

392.   In November of 2011, a person arrested for Resisting Arrest was not eligible for release with a DAT. Czark Dep. 69:2-4.

393.   In November of 2011, a person arrested for Obstruction of Governmental Administration could receive a DAT unless a supervisor determines that they engaged in "uncooperative actions" such as locking arms together with PVC piping. Czark Dep. 69:5-70:11; PG 208-27, fD714.

394.   According to NYPD policy that was in effect in November of 2011, a person who was arrested and released with a Summons is released after warrant checks are performed. Czark Dep. 81:13-82:6, 82:17-83:6.

395.   According to NYPD policy that was in effect in November of 2011, a person who was and released with a DAT is subjected to warrant checks and then further arrest processing. Czark Dep. 81:13-82:6; 83:-15.

396.   Discussions of plans for policing OWS events between September and November of 2011 occurred during meetings that Defendant Esposito called or during staff meetings that then-NYPD Commissioner Raymond Kelly held. Esposito Dep. 68:4-12; 69:11-70:17.

397.   At one of those meetings, in departures from normal NYPD procedures regarding determinations as to eligibility regarding release with Summonses or Desk Appearance Tickets, then-NYPD Commissioner Kelly decided "to have desk appearance tickets with no fingerprint" as

"the order of the day." Esposito Dep. 96:15-97:8; 97:21-98:21.

398.   The decision to process arrests pursuant to a "DAT's - No Prints" came from the Chief of Department's Office. Czark Dep. 122:23-123:10.

399.   Esposito testified that "part of the information we had during Occupy Wall Street is that they were going to come with false identification and try to deceive the police department." Esposito Dep. 104:16-105:18.

400.   Commissioner Kelly determined around "[w]hen Occupy Wall Street start[ed]" that DAT's with no prints would be given "for the most part".  Esposito Dep. 98:22-99:2.; 101:11-102:2.

401.   Esposito himself made a recommendation to the Commissioner regarding that "DAT's – No Prints" policy. Esposito Dep. 99:3-6; 105:19-24; 106:3-8.

402.   That decision was out of the ordinary order of NYPD policies regarding Summons and DAT eligibility. Esposito Dep. 97:9-20.

403.   Esposito testified that the reason for "DAT's – No Prints" was to collect "as much information as possible to ensure the proper processing and follow through on people that [NYPD] took into custody." Esposito Dep. 103:13-18.

404.   Esposito testified that among the reasons for "DAT's – No Prints" was that with "a desk appearance ticket you get better information, more accurate information." Esposito Dep. 103:18-20.

405.   Esposito testified that among the reasons for "DAT's – No Prints" was that with a DAT there is "a lot [more] information" the NYPD requires to be collected and that the information collected is more accurate. Esposito Dep. 106:21-107:24.

406.   Commissioner Kelly would then make the decision regarding whether to do "DAT's - No Prints" for an event on an "event by event" based on briefings and recommendations from Esposito and others. Esposito Dep. 99:17-101:2.

407.  With respect to the November 17, 2011 OWS demonstrations, Esposito explained that "when Occupy Wall Street first started that determination was made earlier…[s]o we continued it during the November event." Esposito Dep. 101:3-102:12.

408.  On November 17, 2011, the NYPD determined that people would be released with DAT's, No Prints if otherwise eligible, rather than summonses. Esposito Dep. 108:15-109:15.

409.  The "DAT's – No Prints" decision was informed by the NYPD's past experience with large- scale demonstrations. Esposito Dep. 110:19-25; 113:16-114:3.

410.  Esposito was aware of complaints regarding the length of time that demonstrators had been in police custody in prior large-scale arrests. Esposito Dep. 144:4-11.

411.  On average, it takes approximately a half hour for an NYPD officer to issue a summons on the street. Esposito Dep. 114:20-115:4.

412.  On average, it would take around an hour or two hours to issue a person a summons at a Precinct. Esposito Dep. 115:5-11.

413.  The typical arrest to release time for issuing a Summons in November of 2011 was between 30 minutes and an hour. Czark Dep. 62:22-63:12.

414.  On average, the arrest to release time with a DAT is around eight to ten hours. Esposito Dep. 115:19-21.

415.  The typical arrest to release time for issuing a DAT in November of 2011 was between four to five hours. Czark Dep. 99:17-19.

416.  Esposito doubted that people who had been detained by the police for long periods of time would be deterred from protesting. Esposito Dep. 149:25-150:10.

417.  Whether people would be deterred from continuing to protest was not a concern of the NYPD planners as a result of the increased arrest processing time that resulted from the NYPD's "DAT's – No Prints" decision. Esposito Dep. 150:11-16.

Dated: New York, New York
        May 8, 2019

                                        Gideon Oliver, Esq.
                                        277 Broadway, Suite 1501
                                        New York, NY 10007


                                        By:    /s/
                                               _____

                                               Gideon Orion Oliver