UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

BENJAMIN CASE, et al.,

                              Plaintiffs,

              -against-

THE CITY OF NEW YORK et al.,

                              Defendants.

------------------------------------------------------------------------------x

**PLAINTIFFS' RESPONSE
TO DEFENDANTS'
LOCAL CIVIL RULE 56.1
STATEMENT**

14-CV-9148 (AT) (BM)

       Plaintiffs Benjamin Case, Jennifer Klein, and Mark Kushneir, by their attorney Gideon

Orion Oliver, submit this statement pursuant to Rule 56.1 of the Local Civil Rules of the United

States District Court for the Southern District of New York, responding to Defendants'

Affirmative Statement of Material Facts about which they contend there is no genuine issue to be

tried.

       Plaintiffs generally object to the purported assertions of fact to the extent they are not

material facts and to the extent they are not supported by admissible evidence in contravention of

Local Rule 56.1(d).

**November 17, 2011—Shut Down Wall Street**

       1. November 17, 2011, was the two month anniversary of Occupy Wall Street ("OWS").

OccupyWallSt.org., D1347.

       **Response 1: Admit.**

       2. Organizers of OWS put out a "Call to Action," calling upon the 99 percent to

participate in a national day of direct action by gathering at 7:00 a.m., before the ring of the New

York Stock Exchange bell, to confront Wall Street.  Id.

       **Response 2: Admit.**

3. The highest ranking uniformed officer of the NYPD, Chief of Department Joseph Esposito, testified that the NYPD had information that demonstrators were planning to prevent the Stock Exchange from opening on November 17, 2011. Esposito Dep., 59:2-13, 59:24-60:10.

**Response 3: Admit** that Defendant Esposito so testified. **Dispute** that the NYPD had such information. *See* Plaintiffs' Affirmative 56.1, Paragraphs 259-264.

## Benjamin Case

4. On November 17, 2011, Benjamin Case a resident of Providence, Rhode Island, was in New York City participating in an OWS protest. Case Dep., 6:19-25, 15:22-24.

**Response 4: Admit**.

5. Case described the events of November 17, 2011, as a planned action for the second month anniversary of OWS and a protest of the eviction of Zuccotti Park, which included a series of marches and demonstrations around the Wall Street area. Case Dep., 19:18-25.

**Response 5: Admit**.

6. Case arrived at what is called the "Big Red Cube," in the Wall Street area on November 17, 2011, where groups of people had gathered at between 6:30—7:00 a.m., and plans were made for marches taking off in different directions. Case Dep. 25:3-10, 28:3-5.

**Response 6: Admit.**

7. Case stated that on November 17, 2011, he was involved in shutting down Wall Street as a protest action. Case Dep., 22:6-15.

**Response 7: Dispute**. Mr. Case testified that he was involved in "the protest action that day along with a lot of other people." Case Dep., 22:6-15. He also answered affirmatively that "shutting down Wall Street on that day was a protest action." Case Dep., 22:6-15. Mr. Case did not testify that he was involved in shutting down Wall Street.

8. Case understood "shutting down Wall Street" to mean clogging the streets and sidewalks in the Wall Street area. Case Dep., 21:22-22:1.

**Response 8: Dispute**. Mr. Case understood the phrase "shutting down Wall Street" to be symbolic. When first asked about his understanding, Mr. Case testified that he "saw the idea of shutting down Wall Street as a familiar phrase that could be used in reference to" the need to restructure the system. Case Dep. 21:3-22:1. When asked "what specifically would occur" in shutting down Wall Street, Mr. Case testified that to him "*that phrase is -- largely symbolic….*" *Id*. (emphasis added). Only when defense counsel framed the question as: "Did you understand 'shutting down Wall Street' *as ever to mean* clogging the streets and sidewalks in the Wall Street area?" did Mr. Case answer that "Yes. I think that was connected to protests." *Id*. (emphasis added).

9. Referring to November 17, 2011, Case blogged, "we clogged up Wall Street before the opening bell." Case Dep., 36:14-20, Case Blog, P533.

**Response 9: Admit** to the extent that Mr. Case blogged this statement. **Dispute** that Mr. Case "clogged up Wall Street before the opening bell" on November 17, 2011. As Mr. Case testified, the use of "we" in the blog entry, which also states that "we" had been involved in protests in Oakland and at Sotheby's, was a reference to Occupy Wall Street, and not to his own personal actions on November 17, 2011: "I personally had not been in Oakland or at Sotheby's, but I remember writing something about that using 'we' to characterize Occupy Wall Street." Case Dep., 36:22-37:4.

10. Case arrived at the location of Beaver and William Streets in the Wall Street area at approximately 9:45 - 10:00 a.m. on November 17, 2011. Case Dep., 28:21-24.

**Response 10: Admit**.

11. Case was in a group of protesters in the middle of the intersection of William and Beaver Streets. Case Dep., 34:4-10.

**Response 11: Dispute** to the extent that Mr. Case was in the pedestrian crosswalk on William Street, out of the roadway on Beaver Street, not "in the middle of the intersection of William and Beaver Streets." Rivera Video, 2 of 2, No. 340, 1:08, 1:10. **Dispute** to the extent that Defendants characterize the "group" as being composed solely of protesters. The "group" at the intersection included at least protesters, journalists, and police officers. Case Dep. 34:4-10; Almonte Dep. 95:25-96:12; 105:2-8; 96:13-97:4; Rivera Video, 2 of 2, No. 340, 0:00-0:15.

12. At approximately 9:45 a.m., on November 17, 2011, Officer Benjamin Almonte walked up to the intersection of Williams and Beaver Streets in lower Manhattan. Almonte Dep., 90:16-19, 91:11-13.

**Response 12:  Admit**.

13. While proceeding to the intersection, Almonte observed that vehicles could not get through the intersection. Almonte Dep., 92:6-9.

**Response 13: Admit** to the extent that officers in the intersection had ordered the cars "to halt or stop at that intersection so that nobody would get through," Almonte Dep., 101:3-7; 101:8-102:10, and that the physical presence of a line of police officers in the intersection prevented the cars from moving forward. Almonte Dep. 102:12-103:11.

14. As he proceeded to the intersection, cars were forced at a stop; Almonte and the officers with him walked between the parked cars on the street to his left and the vehicles that were trying to get through on his right. Almonte Dep., 93:18-24, 94:17-20.

**Response 14: Dispute** that cars were stopped for any other reasons aside from that they were blocked by police who had ordered them to stop. *See* Response 13. Otherwise, **admit**.

15. The vehicles were not able to proceed through the intersection at Williams and Beaver Streets, because there was a large crowd in the middle of the intersection; Case was in the crowd. Almonte Dep., 95:2-12, 109:25-110:3.

**Response 15: Dispute.** *See* Responses 11, 13, and 14.

16. Thereafter, Sgt. Lawrence Papola began to give orders to the crowd to disperse. Almonte Dep., 106:20-107:11.

**Response 16: Dispute** that Papola gave multiple orders to a "crowd" that Mr. Case was part of. While police video captures two orders, *see* Rivera 2 of 2, No. 340, 0:15-01:34, Mr. Case only heard the one. Case Dep. 32:13-18; 33:22-24; 44:2-4; Rivera 2 of 2, No. 340, 01:09-01:34.

17. Prior to his arrest, Case heard police give orders over a loudspeaker to leave the area. Case Dep., 32:13-15.

**Response 17: Admit** only to the extent that that Mr. Case heard one order. *See* Response 16.

18. Video of the incident depicts Papola give the following orders using a microphone:

*My name is Sgt. Lawrence Papola. You are unlawfully obstructing vehicular or pedestrian traffic. I am ordering you to leave this roadway or sidewalk. If you do so voluntarily, no charges will be placed against you. If you refuse to leave, you will be arrested and charged with disorderly conduct or other pertinent traffic infractions.*

Rivera Video, 2 of 2, No. 340, 00:15-00:54:

- 5 -



**Response 18: Admit**.

19. Video of the incident depicts Papola repeat the orders given in ¶14 with a final

warning:

> *My name is Sgt. Lawrence Papola. You are unlawfully obstructing vehicular or pedestrian traffic. I am ordering you to leave this roadway or sidewalk. If you do so voluntarily, no charges will be placed against you. If you refuse to leave, you will be arrested and charged with disorderly conduct or other pertinent traffic infractions—this was your final warning.*

Rivera Video, 2 of 2, No. 340, 01:11-01:34.

**Response 19:** ¶14 does not allege orders. Assuming that Defendants are citing to the

orders from ¶18, **admit**.

20. Video of the incident depicts Papola state the following:

> *Since you have refused to leave this roadway, I am ordering your arrest on the charge of disorderly conduct.*

Rivera Video, 2 of 2, No. 340, 01:48-01:53.

**Response 20:  Admit**.

21. After hearing the final arrest warning, the group of protesters, including Case, sat

down in the intersection. Rivera Video, 2 of 2, No. 340, 02:03.



**Response 21: Admit** only to the extent that after Mr. Case heard one order to disperse, he and others briefly sat down to discuss what they wanted to do in response to that order. Case Dep. 33:10-13.

22. Subsequently, Case laid down in the intersection. Case Dep., 33:10-13, Rivera Video, 2 of 2, No. 340, 02:03, 02:05:



**Response 22: Dispute**. After briefly sitting down to discuss what they wanted to do, Mr. Case and others were immediately knocked over by people in front of them, who fell on top of them. Case Dep. 33:10-15; Rivera Video, 2 of 2, No. 340, 01:56-2:15.

23. While at the location of his arrest in the middle of the intersection, and prior to his arrest, Case locked arms with other protesters. Case Dep., 33:16-18; Almonte Dep., 112:2-4.

**Response 23: Admit** only that Mr. Case had briefly locked his arms with a person next to him while standing in the crosswalk, before sitting down. Case Dep., 33:16-21.

However, Mr. Case did not interlock his arms with any other protesters after he sat down. Rivera Video, 2 of 2, No. 340, 02:04-2:15.

24.  When asked if he complied with police orders, Case stated that he discussed it with a fellow protester, whom he was sitting with in the street. Case Dep. 32:25-33:5.

**Response 24: Dispute.** Mr. Case did not have an opportunity to discuss what to do with regards to the police orders because he and the protester with whom we he wanted to have that discussion were immediately knocked over by people in front of them who fell on top of them, and then he was then arrested. Case Dep. 32:25-15.

25.  Case was lying on his back when he was approached by officers and was arrested at approximately 10:00 a.m. Case Dep., 30:21-31-16.

**Response 25: Admit** to the extent that Mr. Case was arrested after he had been knocked over and was therefore on his back. *See* Rivera Video, 2 of 2, No. 340, 02:00-02:08.

26.  While on his back, an officer rolled him onto his stomach, cuffed him and instructed him to tuck his knees in and roll to get to his feet. Case Dep., 31:15-22.

**Response 26:  Admit.**

27.  Two days prior to the date of incident, Case stated in a chat to a friend that "the likelihood that I will be arrested on Thursday is high." Case Dep., 22:25-23:1, Case Chat Transcript, P524.

**Response 27:  Admit.**

28.  When asked if he got arrested on November 17, 2011, to send a message to Michael Bloomberg and the corporations; Case stated, "I would say that was one of the purposes to attending the protest." Case Dep., 36:14-18, Case Blog, P533.

**Response 28: Dispute**. Case did not testify that he got arrested to send a message to Michael Bloomberg or corporations. **Admit** that Case testified that "to send a message to Michael Bloomberg and the corporations" was "one of the purposes to *attending the protest*." Case Dep., 36:14-18 (emphasis added); Case Blog, P533.

29. Case blogged "Wall Street brokers shouted at us on the 17th as we barred them from getting to work." Case Dep., 37:9-21, Case Blog, P535.

**Response 29: Admit** only to the extent that Mr. Cases use of "us" and "we" in his blog posts referred to Occupy Wall Street protesters generally, and not his personal actions. *See* Response 9. Mr. Case testified that there were no Wall Street workers that shouted at protesters at the location where he was arrested and that, to his knowledge, he did not block any Wall Street brokers from getting to work. Case Dep., 43:16-44:1.

30. Following Case's arrest, a white van, black SUV and another white van can be seen proceeding east on Beaver Street. Rivera Video, 2 of 2, No. 340, 06:16-06:19.

**Response 30: Admit** that some vehicular traffic can be seen flowing in the background of the cited video, but otherwise **dispute**, including the alleged direction of the traffic and the street cited. The video does not clearly support Defendants' description.

31. Another white van followed by other vehicles, including a white box truck, can be seen being able to proceed north on Williams Street. Rivera Video, 2 of 2, No. 340, 06:19-06:22.

**Response 31:** *See* Response 30.

32. Almonte was assigned Case's arrest. Almonte Dep., 120:2-24.

**Response 32: Admit**.

33. Almonte's function on November 17, 2011, was to keep free moving traffic. Almonte Dep., 22:18-24.

**Response 33: Dispute** to the extent that was a general function that the police unit Almonte was assigned to would perform, and that it was only one function Almonte described. Almonte also testified that he was individually assigned as part of an "arrest team" whose purpose was to make and process arrests. Almonte Dep. 56:5-22; 57:17-18.

34. Almonte processed Case's arrest and swore out the criminal court complaint. Almonte Dep., 153:23-154:1.

**Response 34: Admit**.

35. Case was issued a Desk Appearance Ticket ("DAT") and released. Amended Complaint ¶143.

**Response 35:  Admit**.

36. Case suffered no physical or psychological injuries as a result of his arrest on November 17, 2011. Case Dep., 39:22-40:10.

**Response 36: Dispute**. Among other things, Mr. Case testified that his arrest and its aftermath "was uncomfortable and painful both physically and emotionally," Case Dep., 39:22-40:10, that he was in police custody for over 13 hours, Case Dep. 39:18-21, and Mr. Case returned to court repeatedly as a result of the resulting criminal charges.

37. Case made one court appearance following his arraignment on March 12, 2012. Record of Court Action.

**Response 37: Dispute.** Mr. Case appeared in court on or about January 26, 2012, March 12, 2012 and May 7, 2012. Case Court Action Sheet.

38. Case pled guilty to disorderly conduct pertaining to his arrest on November 17, 2011. Case Dep., 43:10-13. Case Court Action Sheet.

**Response 38**: **Admit.**

## Jennifer Klein

39. On November 17, 2011, Jennifer Klein, a resident of New Haven, Connecticut, came to New York City to protest in front of the New York Stock Exchange in connection with OWS. Klein Dep., 6:23:25, 27:7:10.

**Response 39**: **Admit.**

40. Klein arrived at the intersection of Pine and Nassau Streets in lower Manhattan at 8:30 a.m., on November 17, 2011. Klein Dep., 20:13-21, 35:4-5.

**Response 40**: **Admit** to the extent that Prof. Klein arrived in the intersection "by 8:30." Klein Dep., 20:13-21, 35:4-5.

41. When Lt. David Groht arrived at the intersection of Pine and Nassau Streets, traffic was flowing east to west on Pine Street. Groht Dep., 34:17-24.

**Response 41**: **Admit** to the extent that Defendant Groht so testified. However, **dispute** to the extent that Groht also testified that, when he arrived at the intersection, traffic "came to a standstill." Groht Dep. 34:25-35:4.

42. It was Klein's intention to march down the Pine Street to the Stock Exchange and to demonstrate in front of the Stock Exchange. Klein Dep., 26:22-27:14.

**Response 42**: **Admit** to the extent that was one of Professor Klein's stated intentions.

43. When asked if she intended to shut down the Stock Exchange, Klein testified that she thought a rally in front of the stock exchange could temporarily block some access to it. Klein Dep., 27:7:14.

- 11 -

**Response 43**: **Admit** to the extent that Prof. Klein testified that a rally in front of the Stock Exchange "*could* temporarily block some access to it *perhaps*." Klein Dep. 27:11-14 (emphasis added). **Dispute** that the cited testimony reflects that Professor Klein intended to "shut down" the Stock Exchange. Professor Klein testified that her purpose for rallying in front of the Stock Exchange was to "visually demonstrate disagreement with policies that favored the financial sector." Klein Dep. 27:20-22.

44. Klein wanted to make a right onto Nassau Street proceed to the Stock Exchange; however there were police barriers set up on Nassau Street preventing access. Klein Dep., 20:13-18.

**Response 44**: **Admit** to the extent that Prof. Klein's access to Nassau Street was blocked by a "police blockade and a double line of police officers and a barricade," which "create[d] a funnel that forced people into the intersection." Klein Dep. 20:13-21; 21:10-13; 30:23-31:11; 37:17-19.

45. Klein remained in the intersection of Pine and Nassau Streets in a crowd of over 200 people for nearly an hour. Klein Dep., 20:2-4.

**Response 45**: **Dispute.** The portion of testimony cited makes no comment on duration. *See* Response 64, in which NYPD video fixes the time of Professor Klein's arrest at around 9:02 a.m. Kilcoyne Video, VTS_01_3, 05:42; Klein Dep. 46:19-20.

46. Demonstrators, including Prof. Klein, then came to a standstill at that location and blocked the intersection. Groht Dep., 34:25-35:6.

**Response 46**: **Dispute.** Defendant Groht did not see Professor Klein in the intersection at all, and did not see Klein block any traffic at the intersection. Groht Dep., 35:7-12. Professor Klein was marching on the sidewalk, and continued to continue marching on the sidewalk, until

she was forced into the intersection by a police blockade, lines of police officers, a barricade, and police vehicles. *See* Response 44.

47. Police officers formed a line across Nassau Street just south of Pine Street in the direction of the Stock Exchange to protect the area. Tverdokhleb Dep., 58:20-59:5.

**Response 47**: **Admit** to the extent that other portions of Defendant Tverdokhleb's testimony so states.

48. When Officer Dmitry Tverdokhleb arrived at the intersection of Nassau and Pine Streets, protesters were blocking the entire intersection. Tverdokhleb Dep., 63:19-25.

**Response 48**: **Dispute.** Defendant Tverdokhleb testified that Nassau Street south of Pine Street was blocked off by concrete barricades and NYPD officers when he arrived. *See* Plaintiffs' Affirmative 56.1, Paragraphs 100-102. It was this blockage by police, combined with the presence of protesters, that caused the intersection to be "all blocked off." Tverdokhleb Dep., 63:22-64:23.

49. Tverdokhleb first observed Klein at approximately 8:30 a.m., standing in the middle of the intersection of Pine and Nassau Streets. Tverdokhleb Dep., 68:16-70:18.

**Response 49**: **Dispute** to the extent that that Defendant Tverdokhleb testified she was "moving" when he first saw her. Tverdokhleb Dep., 70:9-22.

50. When Tverdokhleb was ordered to begin extracting protesters from the crowd, he observed Klein sitting in the intersection. Tverdokhleb Dep., 91:21-23, 93:9-18.

**Response 50**: **Admit** that Defendant Tverdokhleb testified that he briefly saw Professor Klein sitting down on the ground before she was arrested from a distance of around a car length away while he was assisting other officers with arrest processing in the staging area. *See* Plaintiffs' Affirmative 56.1, Paragraphs 115-117.

51. Klein saw Groht get up upon the barrier with a bullhorn instructing people that they were blocking the street, they were blocking traffic, and if they did not move, they would be arrested. Klein Dep., 21:19-24

    **Response 51**: **Admit**.

52. At approximately 8:45 a.m., Groht climbed up on top of a cement barrier and gave instructions using a bullhorn. Groht Dep., 36:19:19-20, Kilcoyne Video, VTS.01_2, 05:10:



    **Response 52**: **Admit.**

53. Video of the incident depicts Groht giving the following orders using the bullhorn:

> *Be advised, you do not have a parade permit. You are blocking the street. Please get on the sidewalk and stop blocking the street or you are subject to arrest.\*\*\*Be advised you do not have a parade permit. Please return to the sidewalk, you are blocking the intersection.\*\*\* Be advised you do not have a parade permit. For your safety, you must leave the street. You are blocking traffic and cannot obstruct vehicular traffic. Failure to comply will result in your arrest.\*\*\*For your safety please exit the street. You do not have a parade permit Failure to comply will result in your arrest for obstructing vehicular traffic.\*\*\*Be advised, you do not currently have a parade permit. You are obstructing vehicular traffic. Please leave the street or you are subject to arrest.\*\*\*You do not have a parade permit. You are subject to arrest for obstructing the street.*

Rivera Video, 1 of 2, No. 329, 00:15-02:28.

- 14 -

**Response 53**: **Admit** to the extent that Defendant Groht gave orders through a bullhorn.

Portions of the cited order are unintelligible and portions are not transcribed correctly. The cited

order is revised below with additions in bold and deletions struck through.

> *Be advised, you do not have a parade permit. You are **currently** blocking the street. Please get ~~on~~ **[indistinguishable]** the sidewalk and stop blocking the street or you are subject to arrest.\*\*\*Be advised you do not have a parade permit. **Unless[?] all[?]-- [indistinguishable]**. Please return to the sidewalk— **currently**—you are **currently** blocking the intersection.\*\*\* Be advised you do not have a parade permit. For your safety, you must leave the street. You are **currently** blocking traffic and cannot obstruct vehicular traffic. **[Indistinguishable sentence].** Failure to comply will result in ~~your~~ arrest.\*\*\*For your safety please exit the street. You do not have a parade permit. Failure to comply will result in ~~your~~ arrest for obstructing vehicular traffic.\*\*\*Be advised, you do not currently have a parade permit. You are obstructing vehicular traffic. Please **return to**—leave the street or you are subject to arrest.\*\*\*You do not have a parade permit. You are subject to arrest for obstructing the street.*

Rivera Video, 1 of 2, No. 329, 00:15-02:28.

54.  Fellow officers were placed a locations in the crowd to ensure that the instructions given by

Groht could be heard by the crowd. Groht Dep., 36:21-37:4.

**Response 54**: **Admit** to the extent that Groht so testified.

55. Klein admits to hearing Groht giving at least six orders before she was arrested but was not

surprised to learn that he gave orders at least fifteen times with the bullhorn before she was

arrested. Klein Dep., 22:15-17, 44:17-20.

**Response 55**: **Dispute** that Professor Klein admitted to hearing Defendant Groht give

around six orders. She testified that she heard around four announcements and knew of five to

six announcements made by police. Klein Dep., 22:15-17; *see* Plaintiffs' Affirmative 56.1,

Paragraphs 77-81. Further, Professor Klein testified that she would not be surprised to learn that

an officer had given orders at least fifteen times before she was arrested at her deposition, after

she had viewed police video. Klein Dep., 18:15-19; 44:17-20. Professor Klein was not testifying about her knowledge on November 17, 2011.

56. After giving these orders, the video pans over the crowd, and Klein can be seen in the upper right hand corner of the screen standing in the intersection:



Rivera Video, 1 of 2, No. 329, 02:29.

**Response 56**: **Admit**.

57. Although Klein testified that she stood up when she heard the officer with the megaphone give the orders, video depicts Klein sitting down in the street disappearing from view a few seconds later. Rivera Video, 1 of 2, No. 329, 02:44.

**Response 57**: **Dispute**. **Admit** only that at 02:44, Professor Klein's head disappears behind a person between her and the camera. The footage does not show Professor Klein sitting down at or around the timestamp cited here by Defendants. Professor Klein stood up after the third announcement she heard. Klein Dep. 22:3-5; 38:12-17; 40:18-20; 44:6-12; 45:14-15. Then, around two to three minutes before she was arrested, recognizing she would be prevented from demonstrating and, surrounded by police, Professor Klein sat on the street. Klein 29:24-30:6; 30:12-16; 46:1-2.

58. Groht got down from the cement block and moved into the crowd in the street and continued giving orders to leave the street. Rivera Video, No. 330, 00:47-01:04, 02:10-03:44, 04:24-05:57.

**Response 58**: **Admit**, except to the extent that the cited video does not clearly show Groht giving orders in all of the cited instances. For example, a brass band begins playing at approximately 4:05, obscuring the following audio.

59. People who worked in the area complained to Groht that they were trying to get through the crowd to get to work. Groht Dep., 45:11-20.

**Response 59**: **Admit** that Groht so testified.

60. While still sitting in the middle of the intersection, Groht can be seen giving orders via bullhorn to leave the intersection within a few feet of Klein. Kilcoyne Video, VTS_01_3, 04:52:



**Response 60: Admit** that Professor Klein is seen sitting in the intersection surrounded by police, but **dispute** the implication that she was "still" sitting in the intersection. Plaintiff Klein had been standing, then sat down two to three mninutes before she was arrested. *See* Plaintiffs' Affirmative 56.1, Paragraphs 73-88.

61. Klein testified that she sat down in the street because she was surrounded by police. Klein Dep., 30:4-7.

**Response 61**: **Admit** to the extent that around two to three minutes before she was arrested, recognizing she would be prevented from demonstrating and surrounded by police, Professor Klein sat on the street. Klein 29:24-30:6; 30:12-16; 46:1-2

62. The still below shows Klein five seconds prior to her sitting down in the intersection; there are no officers near her:



Rivera Video, 1 of 2, No. 329, 02:39.

**Response 62: Dispute**. At 02:44, Professor Klein's head disappears behind a person between her and the camera. The footage does not show Professor Klein sitting down at or around the timestamp cited here by Defendants. Further dispute because the cited still shows at least ten officers near Professor Klein.

63. Klein testified that the only way that she could express and defend her First Amendment rights was to sit down and that she was sitting in the intersection for only two minutes before she was arrested. Klein Dep., 30:12-16.

**Response 63**: **Admit** to the extent that Klein testified that the only way she could defend her First Amendment rights in that moment was to sit down because she had been prevented from continuing the march as she had intended, then surrounded by police. *See* Plaintiffs' Affirmative 56.1, Paragraphs 87-88.

64. Video depicts Klein sitting in the intersection at 9:01 a.m.; she was arrested at approximately 9:25 a.m. Kilcoyne Video, VTS_01_3, 04:52, Klein Criminal Complaint.

   **Response 64**: **Dispute**. The timestamp on the NYPD video cited clearly shows Ms. Klein being arrested at around 9:01 a.m. Kilcoyne Video, VTS_01_3, 05:42. Additionally, Ms. Klein testified that she was arrested at around 9:01 a.m. Klein Dep., 46:19-20.

65. Klein observed an office supply truck and a van in the intersection. Klein Dep., 31:12-14, 39:12-17.

   **Response 65**: **Admit** to the extent that Prof. Klein observed an office supply truck on the opposite side of the intersection from her, after "the police had already created a situation by pushing over 200 people into the street," Klein Dep., 31:12-16, 39:19. Klein testified that she saw a police van in the intersection. Klein Dep. 39:20-21.

66. An entire line of traffic, including the office supply truck and a van, were at a standstill and could not proceed at the intersection of Pine and Nassau Streets:



Kilcoyne Video, VTS_01_2, 04:25.

**Response 66**: **Admit**. Police had funneled protesters into the intersection and had themselves blocked the intersection. *See* Plaintiffs' Affirmative 56.1, Paragraphs 70, 75, 99-101.

67. Klein defines "occupation" as a "space where people take collective action through physically occupying it in order to express grievances or assert rights." Klein Dep., 24: 3-9.

**Response 67**: **Dispute.** In the cited testimony Professor Klein is defining "occupation" in the context of the specific, physical "occupation" of Zuccotti Park, not a general definition of "occupation." Klein Dep. 23:17-24:9.

68. Klein testified, "we were occupying the street in the same sense that I was not leaving." Klein Dep., 37:22-24.

**Response 68**: **Dispute**. Prof. Klein testified "we were occupying the street in the sense that I was not leaving"- *not* the "same" sense as the occupation of Zuccotti Park. Immediately before this incorrectly cited testimony, Klein testified that she was using the word "occupy" "in a *different* way [t]han the people who were actually camped out and saw themselves as having taken over Zuccotti Park." Klein Dep. 37:11-16 (emphasis added).

69. Klein stated in an e-mail, "we occupied at Nassau and Pine Street about a block from the New York Stock Exchange." Klein E-mail, P474.

**Response 69**: **Admit** that Professor Klein so stated. Professor Klein testified that according to her use of "occupy," she "occupied" Nassau and Pine Streets in the sense that "[w]hen the police blocked [her] from continuing in the march and blocked the other people using barricades and extremely heavy police presence" she "wait[ed] there hoping to continue with the march." Klein Dep., 37:2-10.

70. Klein stated in another e-mail, "I do feel we sort of made a collective decision to defend public streets and our rights to occupy them together." Klein Dep., 41:3-6, Klein E-mail, P479.

**Response 70**: **Admit** that Professor Klein so stated. *See* Response 69.

71. Klein also e-mailed, "we just rather calmly and determinably decided we should hold the line together." Klein Dep., 42:4-11, Klein E-mail, P479.

**Response 71**: **Admit** that Professor Klein so stated. Professor Klein explained she meant she "felt that the police were simply going to push everyone out of there and not allow any kind of rally to take place. I was literally being pushed by a line of police with nowhere to go. I was now there and what was kind of left to try to hold the line in the hopes that some kind of march or rally could somehow be realized." Klein Dep. 42:4-15.

72. Klein testified that she occupied Pine and Nassau Streets. Klein Dep., 41:21-42:3.

**Response 72**: **Dispute** except to the extent that Profesor Klein "remained" there.

73. Klein testified that she decided that she was going to stay at that intersection until she was allowed to proceed with the march. Klein Dep., 30:5-11.

**Response 73**: **Admit** based on Klein Dep. 38:9-11.

74. While still in the middle of the intersection of Pine and Nassau Streets, Klein was arrested at approximately 9:25 a.m., and charged with disorderly conduct. Klein Criminal Complaint.

**Response 74: Dispute** that Prof. Klein was arrested at 9:25 a.m. Professor Klein was arrested at approximately 9:02 a.m. *See* Response 64. **Dispute** the characterization that Professor Klein was "still" in the intersection. *See* Responses 60. **Admit** that Professor Klein was with arrested in the middle of the intersection and charged with Disorderly Conduct.

75. Klein was handcuffed and handed over to Tverdokhleb at her arrest location; he was assigned to process her arrest. Tverdokhleb Dep., 96:16-18, 97:18-23.

**Response 75**: **Dispute.** Professor Klein was handcuffed at her arrest location and then moved to the police staging area to the South by other officers, then handed over to Tverdokhleb at that second location. *See* Plaintiffs' Affirmative 56.1, Paragraphs 91-94, 124.

76. Klein was issued a DAT and released. Amended Complaint ¶143.

**Response 76**: **Admit**.

77. After the arrests were made at the intersection of Pine and Nassau Streets, the intersection cleared, traffic started flowing and the protestors went to another location. Groht Dep., 40:16:22, 44:19-23.

**Response 77**: **Admit** to the extent that "eventually the street cleared, traffic started flowing, and the group went to another location." Groht Dep., 40:18-22.

78. Klein did not suffer any physical injuries as a result of her arrest. Klein Dep., 50:7-11.

**Response 78**: **Admit.**

79. Klein testified that the emotional injuries she sustained consisted of the stress of being in a cell and not being able to fulfill a professional commitment due to her arrest. Klein Dep., 50:18-51:2. Klein received no psychological treatment for these alleged injuries. Klein Dep., 51:16-18.

**Response 79**: **Dispute** to the extent that Professor Klein testified that, in addition to "being in a cell for an open[] ended amount of time," during which she "didn't know when [she] was being released," and indeed "wasn't released from the cell until 10 or 11 hours later," Klein Dep., 50:22-25, Professor Klein was not able to fulfill her professional commitment on November 17, 2011 day because of her arrest, and had to miss teaching classes and advising students when she had to return to New York to appear in court as a result of the criminal prosecution. Klein Dep., 51-1:10.

80. Klein e-mailed a friend on November 18, 2011, "they kept us cuffed and penned for a couple of hours on the street and then in jail all day until 11:00 p.m. at night! Fortunately, where we were everyone was in high spirits and unhurt. (One of the officers who finally processed us said my grad students, who were with me, should all get A+'s for the semester!)." Klein Dep., 53:17-23, Klein E-Mail, P471.

**Response 80**: **Admit** that Professor Klein so stated. Regarding the cited portion of Professor Klein's e-mail, Professor Klein explained: "I don't think that precludes not knowing what is going to happen. Especially as the hours wore on in which I was in a cell. I had no idea that I would be kept in a cell until very late at night." Klein Dep. 53:23-54:2.

81. Klein accepted an ACD, because the criminal court judge was handing out significant jail time to other people. Klein Dep., 54:16-55:4.

**Response 81**: **Admit.**

**Mark Kushneir**

82. On November 17, 2011, Mark Kushneir, went to the Wall Street area of Manhattan via the Brooklyn Bridge to march to the Stock Exchange in connection with OWS. Kushneir Dep., 17:10-14, 28:2-8.

**Response 82**: **Admit** based on the cited testimony that Mr. Kushneir went to the Wall Street area of Manhattan via the Brooklyn Bridge on November 17, 2011, and eventually marched with cardboard props in the vicinity of the Brown Brothers building. **Dispute** the assertion that Mr. Kushneir's intent was "to march to the Stock Exchange" as unsupported by the cited testimony or the record. Mr. Kushneir and a friend from Graduate School attended the protests intending "to put on many performances of homes being foreclosed upon" along with

- 23 -

"reading off statistics" so they "had props" in the form of "cardboard houses" and were going to kind of bounce around the area." Kushneir Dep., 18:10-23.

83. Kushneir arrived in the Wall Street area at approximately 6:30 a.m. Kushneir Dep., 17:14-18.

**Response 83**: **Admit.**

84. Kushneir participated in OWS on November 17, 2011, responding to a call put out via flyers, word of mouth and e-mail chains for a day of protest. Kushneir Dep., 18:8-12, 22:9-13.

**Response 84**: **Admit.**

85. Kushneir intended to participate in the process of shutting down Wall Street. Kushneir Dep., 32:22-33:3.

**Response 85**: **Dispute**. In the cited testimony Mr. Kushneir answered "no" to the question: "Did you intend to shut down Wall Street?" and commented that "it would be impossible to shut down Wall Street." Kushneir Dep., 32:22-33:3. Mr. Kushneir's stated intent for the day was to "kind of bounce around area" using cardboard houses as props in "performances of houses being foreclosed upon" and describing exploitative predatory lending. Kushneir Dep., 18:12-23. Additionally, the word "process" is mistakenly transcribed. The next question – "Did part of that *protesting* include blocking streets or sidewalks" – makes that clear. Kushnier Dep., 33:3-7 (emphasis added).

86. According to Kushneir, part of the protesting on November 17, 2011, included blocking streets or sidewalks. Kushneir Dep., 33:4-7.

**Response 86**: **Admit** only to the extent that Mr. Kushneir assumed that was true for some others in the cited testimony. Mr. Kushneir never testified that part of *his* protesting involved blocking streets or sidewalks.

- 24 -

87. Kushneir's intent was to put on many performances or skits depicting homes being foreclosed upon with cardboard houses as props. Kushneir Dep., 18:12-23.

   **Response 87**: **Admit**.

88. Prior to the day's events, Kushneir attended an OWS organizational meeting with a large number of people in which what should be going happening on November 17, 2011, was laid out. Kushneir Dep., 20:8-16.

   **Response 88**: **Dispute** that the meeting laid out "what should be happening on November 17, 2011." Mr. Kushneir testified that the meeting was a "cacophony of opinions" and was not coherent about what people were going to do or be responsible for. Kushneir Dep., 20:8-22. Otherwise, **admit**.

89. Shutting down Wall Street was discussed at the organizational meeting.   Kushneir Dep., 21:10-22:6.

   **Response 89**: **Admit** to the extent that there were "rhetoric[al]" discussions about "shutting down Wall Street" throughout the day, meaning "theoretical discussions about shutting down Wall Street in the sense of what Wall Street represents, like finance and all that stuff and the stock market." Kushnier Dep., 21:10-22:2.

90. As he was marching toward the Stock Exchange with his cardboard house, Kushneir was in a group of anywhere from 50 to 200 people. Kushneir Dep., 26:2:8.

   **Response 90**: **Admit**.

91. Kushneir was in the front of that group. Kushneir Dep., 26:9-11.

   **Response 91**: **Admit**.

92. Other people who were not in the group were standing around watching Kushneir and the group with their cardboard houses as they were demonstrating and chanting. Kushneir Dep., 27:8-15.

      **Response 92**: **Admit**.

93. These people looked like they were going to work, some were on their way to work, some cursed at the protesters, some responded positively. Kushneir Dep., 27:8-22.

      **Response 93**:  **Admit.**

94. At various points along the march route, Kushneir heard officers ordering crowds of people to move or disperse. Kushneir Dep., 28:14-18.

      **Response 94**: **Admit** to the extent that Mr. Kushneir heard "police officers telling *other* people to move." Kushneir Dep., 28:14-18 (emphasis added).

95. At some point, Kushneir arrived at the location of Broadway and Exchange Place—the location of his arrest, and at that location, there were approximately 20 police officers. Kushneir Dep., 26:12-27:4.

      **Response 95**: **Admit** that**,** at some point, Mr. Kushnier arrived at the location of Broadway and Exchange Place – the location of his arrest. **Dispute** that there were approximately 20 police officers at the location of his arrest; the cited testimony is in response to a question regarding the number of officers Mr. Kushneir's group "*came up against*" on the sidewalk, not the total police presence at the location of Mr. Kushneir's arrest. Rivera Video, 1 of 2, No. 332, 0:45-1:05.

96. Kushneir and others formed a line, standing side by side, with their cardboard boxes fully blocking the sidewalk from building to curb. Rivera Video, 1 of 2, No. 332, 00:10:



**Response 96**: **Admit** only to the extent that Mr. Kushneir briefly stood in a line with others, holding up his cardboard box, before he was arrested. Otherwise, **dispute**. Pedestrians could have gotten through the boxes, and it was the combination of police barricades, officers, and vehicles at that location that blocked pedestrian access to the sidewalk. Kushneir Dep., 32:9-32-19.

97. Chief of Department Joseph Esposito was present at the location of Broadway and Exchange Place when the photo in the preceding paragraph was taken. Esposito Dep., 73:13-15; Rivera Video, 1 of 2, No. 332, 00:10.

**Response 97:  Admit**.

98. While at this location, Esposito observed Kushneir in a group of protesters lined up on the sidewalk from the building line to the curb blocking pedestrian traffic. Esposito Dep. 75:10-24.

**Response 98**: **Admit** to the extent that Esposito so testified. Otherwise, **dispute**. *See* Response 96; Rivera Video, 1 of 2, No. 332, 00:00-00:15

- 27 -

99. Esposito observed an officer with a bullhorn give the group orders to disperse or be subject to arrest. Esposito Dep., 13:9-14:5, 22:19-25, 86:8-12, 88:6-10.

**Response 99**: **Admit** only to the extent that Esposito so testified. **Dispute** that any orders other than Esposito's order that is captured on video and about which Mr. Kushneir testified were given. Esposito could not identify the officer who allegedly gave the orders or say anything about their content. Although a TARU videographer was present, they did not record any such orders. And Mr. Kushneir testified that there was only the one order Defendant Esposito gave that is captured on the TARU video before he was arrested. *See* Plaintiffs' Affirmative 56.1, Paragraphs 173-175.

100. Esposito observed more than one pedestrian who tried to come through the protesters but were unable to do so. Esposito Dep., 117:23-118:11.

**Response 100**: **Admit** only to the extent that Esposito so testified.

101. Esposito gave the final order for the crowd to disperse giving them one last chance to comply. Esposito Dep., 85:24-86:17.

**Response 101**: **Admit** only to the extent that Esposito so testified. **Dispute** that the order was a "final" order or that they were given a "last" chance. *See* Response 99. Further dispute that they were given a "chance to comply." After Defendant Esposito's order to disperse, he gave people approximately one second to comply before he ordered arrests. Esposito Dep. 91:12-92:4; Rivera Video, 1 of 2, No. 332, 0:08-0:09. Approximately one second from the moment Defendant Esposito's final order ended, Esposito said, "They're under arrest, let's go" as a direction to fellow officers to make arrests. Esposito Dep. 138:22-139:17; Rivera Video, 1 of 2, No. 332, 0:08-0:09.

102. The crowd, including Kushneir, could have dispersed by turning around and walking in the opposite direction. Esposito Dep., 87:4-9, 140:12-13, 144:18-25.

**Response 102**: **Admit** only to the extent that Defendant Esposito so theorized. Otherwise, **dispute**. Defendant Esposito did not give any meaningful opportunity to comply with his orders. *See* Response 101; *see* Plaintiffs' Affirmative 56.1 at 208-210. Defendant Esposito did not give directions for people to turn around and go backwards. Esposito Dep. 87:10-21 *see* Plaintiffs' Affirmative 56.1 at 203-204. Defendant Esposito mistakenly believed that the people he had ordered to disperse could have dispersed by going around the metal barricades that were directly adjacent to the location at which he gave his orders. However, TARU video shows at least nine interlocked metal barricades extending from a newsstand lock toward the middle of the block all the way to the police line. Rivera Video, 1 of 2, No. 332, 0:17-0:38. The metal police barricades were interlocked together and prevented passage from the Broadway sidewalk where Mr. Kushneir was arrested into the street. Rivera Video, 1 of 2, No. 332, 0:17-0:38; *see* Plaintiffs' Affirmative 56.1 at 218-219.

103. Officer Benjamin Almonte arrived at the location of Broadway and Exchange Place and witnessed the group, including Kushneir, standing side by side on the sidewalk. Almonte Dep., 70:7-20.

**Response 103**: **Admit** that Defendant Almonte so testified.

104. Almonte and other officers were instructed to form a line approximately fifteen feet in front of the protesters. Almonte Dep., 68:9:12-15.

**Response 104**: **Admit** that Defendant Almonte so testified. Defendant Almonte testified that no pedestrians could have passed that line once it was formed. Almonte Dep., 72:4-8.

105. After the line was formed, Almonte observed Esposito give orders to the crowd, including Kushneir. Almonte Dep., 73:13-24.

**Response 105**: **Admit** that Defendant Almonte testified that he observed Esposito give orders to demonstrators. **Dispute** that the cited testimony supports that the demonstrators included Kushneir.

106. Esposito shouted the orders standing within approximately three feet of Kushneir while Kushneir was looking directly at him. Rivera Video, 1 of 2, No. 332, 00:10:



**Response 106**: **Admit** to the extent that just prior to Mr. Kushneir's arrest, Mr. Kushneir saw and heard Defendant Esposito in front of him yelling something that was unintelligible to Mr. Kushneir for approximately five seconds before he was arrested. Kushneir Dep. 28: 19-29:2; 29:8-24; Rivera Video, 1 of 2, No. 332, 0:00-0:16.

107.  "Chief Esposito was standing right in front of me." Kushneir Dep., 29:1.

**Response 107**. Defendants misquote the cited testimony. **Admit** to the extent that Mr. Kushneir testified that "Chief Esposito was right in front of" him for approximately 15

- 30 -

seconds total before Mr. Kushneir was placed under arrest. Kushneir Dep., 33:24-25; Rivera Video, 1 of 2. No. 332, 0:00-0:38.

108. After Esposito gave his final order, the crowd did not disperse—they formed a wedge or shield with their cardboard boxes. Almonte Dep., 76:7:15.

**Response 108**: **Dispute.** Esposito's order was not a "final" order – it was the only order. *See* Responses 99, 101. The police video does not show that the protesters were forming a "wedge" or "shield." Rivera Video, 1 of 2, No. 332, 00:11-00:15. After Defendant Esposito gave his order to disperse, he only gave people approximately one second to comply before he verbally ordered arrests. Esposito Dep. 91:12-92:4; Rivera Video, 1 of 2, No. 332, 0:08-0:09; *see* Response 101; *see* Plaintiffs' Affirmative 56.1 at 208-210. Approximately one second from the moment Defendant Esposito's final order ended, Esposito said, "They're under arrest, let's go" as a direction to fellow officers to make arrests. Esposito Dep. 138:22-139:17; Rivera Video, 1 of 2, No. 332, 0:08-0:09 *see* Response 101; *see* Plaintiffs' Affirmative 56.1 at 209. Around 3-5 seconds later, Defendant Esposito was himself attempting to arrest someone. Esposito Dep. 141:14-142:2; Rivera Video, 1 of 2, No. 332, 0:09-0:15; *see* Plaintiffs' Affirmative 56.1 at 211.

109. Esposito then gave instructions to the officers to make arrests. Esposito Dep., 91:23-92:4, Almonte Dep., 76:16-21, 77:15-21.

**Response 109**: **Admit** to the extent that after Defendant Esposito gave his order to disperse, he gave people approximately one second to comply before he verbally ordered arrests. *See* Response 101.

110. Kushneir was arrested at approximately 9:00 a.m., when it seemed like people were all going to work. Kushneir Dep., 30:19-21.

**Response 110**: **Admit**.

111. Kushneir was charged with disorderly conduct and obstructing governmental administration and issued a DAT. Kushneir Criminal Complaint, Amended Complaint ¶143.

**Response 111**: **Dispute** that Mr. Kushneir was charged with obstructing governmental administration. Kushneir Criminal Court Complaint. **Admit** that Mr. Kushneir was issued a DAT. **Admit** that Mr. Kushneir was charged with Disorderly Conduct.

112. Kushneir's arrest was processed by Officer Michael Maldonado, who also swore out the criminal court complaint. Maldonado Memo Book Entries, D21-24, Maldonado Scratch OLBS, Maldonado Dep., 75:9-76:12, Kushneir Criminal Complaint.

**Response 112:** **Admit**.

113. While Maldonado did not recall Kushneir at his deposition some six years after the date of incident, he knows that he would not have sworn out the criminal court complaint if he had not seen Kushneir's conduct before his arrest. Maldonado Dep., 86:21-87:11.

**Response 113**: **Admit** only to the extent that Defendant Maldonado so testified.

**Dispute** that Defendant Maldonado saw Mr. Kushneir's conduct before his arrest.

Defendant Maldonado did not see Mr. Kushneir's pre-arrest conduct. Maldonado Dep.

77:16-19; 77:24- 78:2. Defendant Maldonado did not see Mr. Kushneir's arrest.

Maldonado Dep. 33:18-20; 34:10-13. The first time Defendant Maldonado saw Mr.

Kushneir was after he was already in the custody of another NYPD officer. Maldonado

Dep. 64:23- 65:2.

114. Kushneir accepted an ACD and made one court appearance.   Kushneir Dep., 38:22-24, Amended Complaint ¶148.

**Response 114**: **Dispute**. In response to a deposition question about whether he

made one court appearance, he responded "As best as I can remember, yeah." Kushneir

Dep., 38:22-24. Mr. Kushneir's court paperwork shows that Mr. Kushneir appeared in

New York City Criminal Court on January 25, 2012 and March 12, 2012, when the Office

of the District Attorney of New York County moved to dismiss the charge against Mr.

Kushneir. Kushneir DA Datasheet; Kushneir Certificate of Disposition.

115. Kushneir suffered no physical or emotional injuries as a result of his arrest. Kushneir Dep.,

38:4-39:11.

      **Response 115: Dispute**. Mr. Kushneir testified that he felt "embarrassment and fear in

the workplace" because of the incident. Kushneir Dep., 39:14-22.

116. Kushneir continued to participate in demonstrations after November 17, 2011. Kushneir

Dep., 40:9-14.

      **Response 116**: **Admit**.

117. Maldonado observed a group of protesters blocking the sidewalk with houses; Kushneir was in the

front. Ex. L, Maldonado Dep., 15:23-24, 53: 8-10, 77:16-23.2

      **Response 117:** **Dispute** that protesters were blocking pedestrian traffic. *See* Response 96.

Otherwise, **Admit** to the extent that the cited testimony does not indicate that Maldonado saw Kushneir

before his arrest. Maldonado did not see Kushneir's pre-arrest conduct. *See* Response 113.

118. Maldonado observed Esposito give warnings to the crowd of protesters as they were blocking

pedestrian traffic. Ex. L, Maldonado Dep., 16:20-24, 56:22-23.

      **Response 118**: **Admit** to the extent that Maldonado so testified. **Dispute** that protesters were

blocking pedestrian traffic. *See* Response 96.

119. Maldonado observed the protesters fail to comply with Esposito's orders—"they wouldn't move."

Ex. L, Maldonado Dep., 53:11-16.

      **Response 119**: **Admit** to the extent that Maldonado so testified. **Dispute** that

protesters were given an opportunity to comply. *See* Response 101.

120. Case was in custody for approximately thirteen hours. Ex. X, NYPD OLPA form.

    **Response 120**: **Admit**.

121. Klein was in custody for approximately thirteen hours. Ex. Y, NYPD OLPA form.

    **Response 121: Admit.**

122. Kushneir was in custody for approximately twelve hours. Ex. Z, NYPD OLPA form.

    **Response 122: Admit.**

123.  The record evidence shows that the NYPD thoroughly trained police officers on policing

demonstrations and on the application of the disorderly conduct statute in policing demonstrations.

Exhibits AA—NN.

    **Response 123**: **Dispute**. *See* Oliver Decln, ¶¶ 74-86.

124. The record evidence shows the role of the Criminal Justice Bureau and the Mass Arrest Processing

Center in arrest processing. Exhibit MM.

    **Response 124**: **Dispute**. Another witness – not Raganella, but Lt. Christopher Czark – testified

on behalf of Defendant City about the role of the CJB and the Mass Arrest Processing center in arrest

processing. *See, e.g.,* Exhibit AR2; Czark Dep. 13-14.

Dated: New York, New York
      May 8, 2019

                                    Gideon Oliver, Esq.
                                    277 Broadway, Suite 1501
                                    New York, NY 10007

                                By:     /s/_____
                                      Gideon Orion Oliver, Esq.