UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___9/30/2019____

BENJAMIN CASE, JENNIFER KLEIN, and MARK KUSHNEIR,

                    Plaintiffs,

        -against-

THE CITY OF NEW YORK, CHIEF OF DEPARTMENT JOSEPH ESPOSITO, LIEUTENANT DAVID GROHT, SERGEANT LAWRENCE PAPOLA, OFFICER BENJAMIN ALMONTE, OFFICER DMITRY TVERDOKHLEB, and OFFICER MICHAEL MALDONADO,

                    Defendants.

14 Civ. 9148 (AT)

**OPINION
AND ORDER**

ANALISA TORRES, District Judge:

       Plaintiffs, Benjamin Case, Jennifer Klein, and Mark Kushneir, bring this action pursuant to 42 U.S.C. § 1983 against the City of New York (the "City"), and Chief of Department Joseph Esposito, Lieutenant David Groht, Sergeant Lawrence Papola, Officer Benjamin Almonte, Officer Dmitry Tverdokhleb, and Officer Michael Maldonado (collectively, the "Individual Defendants"), who are employed by the New York City Police Department (the "NYPD"), alleging that Plaintiffs' constitutional rights were violated in connection with their participation in an Occupy Wall Street demonstration in Manhattan. In a memorandum and order dated February 10, 2017 (the "February 2017 Order"), the Court granted in part and denied in part Defendants' motion to dismiss the first amended complaint. Before the Court now is Defendants' motion for summary judgment on the remaining claims in the second amended complaint (the "complaint"). For the reasons stated below, Defendants' motion is GRANTED in part and DENIED in part.[1]

---

[1] Benjamin Case, Elizabeth Catlin, Jennifer Klein, and Mark Kushneir originally brought this action pursuant to 42 U.S.C. § 1983 against the City and nine individual defendants employed by the NYPD, asserting malicious abuse of process and violations of the First Amendment (retaliation and time, place, and manner), the Fourth Amendment

The facts discussed in this opinion are undisputed except where otherwise noted. The Court has drawn all reasonable inferences in favor of Plaintiffs, as the nonmovants. *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

I.    Events of November 17, 2011

The first Occupy Wall Street ("OWS") protest occurred on September 17, 2011. *Cf.* Def. 56.1 ¶ 1, ECF No. 138. OWS organizers then called for "a national day of direct action," to be held before the ring of the New York Stock Exchange bell, on November 17, 2011 (the "protest"), the two-month anniversary of the first demonstration. *Id.* ¶ 2. Facts specific to each Plaintiff are set forth below.

*Benjamin Case.* At about 9:45 a.m. on November 17, 2011, Defendant Officer Benjamin Almonte walked up to the intersection of William and Beaver Streets in the Wall Street area. *Id.* ¶ 12. Case, a participant in the protest, *id.* ¶ 4, arrived there at approximately 9:45–10:00 a.m., *id.* ¶ 10. Vehicles were unable to get through the intersection. *Id.* ¶ 13. At his deposition, Almonte testified that it was blocked by a crowd of protesters. Almonte Dep. 95:2–12, ECF No. 140-4. Defendant Sergeant Lawrence Papola gave orders to disperse over a loudspeaker. Def. 56.1 ¶¶ 16, 18–20. Case heard at least one such directive. *Id.* ¶ 17. After Papola's orders, Case and some other individuals briefly locked arms while standing, *id.* ¶ 23,

---

[2] The following facts are drawn from the parties' pleadings and submissions, including the complaint, the Rule 56.1 statement of undisputed fact and the response thereto and the parties' declarations. Facts in dispute are so noted. Citations to a paragraph in Defendants' Rule 56.1 statement also include Plaintiffs' response.

(excessive force, false arrest, and excessive detention), the Sixth Amendment (fair trial), and the Fourteenth Amendment (equal protection and due process) to the U.S. Constitution. ECF No. 1. Over the course of the litigation, Plaintiffs withdrew certain claims, *see* Gideon Oliver Decl. in Opp. to Mot. to Dismiss ¶¶ 6–10, ECF No. 63; Gideon Oliver Decl. in Opp. to Def. Mot. for Summary Judgment ¶ 3, ECF No. 140 ("Oliver Decl."); and the Court dismissed certain claims in the February 2017 Order, *see Case v. City of New York*, 233 F. Supp. 3d 372, 408 (S.D.N.Y. 2017). The parties have also stipulated to dismissal of all claims brought by Elizabeth Catlin. ECF No. 82. Case, Klein, and Kushneir proceed as the remaining plaintiffs. *Id.*

and then Case sat down on the roadway, *id.* ¶ 21. Subsequently, he had his back briefly on the ground. *Id.* ¶¶ 22, 25. A police officer rolled Case onto his stomach, handcuffed him, and instructed him to reposition to his feet. *Id.* ¶ 26. Following Case's arrest, some vehicular traffic began proceeding. *Id.* ¶¶ 30–31. Almonte was assigned to Case's arrest and swore out Case's criminal court complaint. *Id.* ¶¶ 32, 34. Case was charged with disorderly conduct in violation of New York Penal Law §§ 240.20(5) (obstruction of pedestrian or vehicular traffic), 240.20(6) (failure to obey lawful dispersal order), and 195.05 (obstruction of governmental administration in the second degree). Pl. Opp. 56.1 ¶ 62, ECF No. 145. Case was issued a Desk Appearance Ticket ("DAT") and later released. Def. 56.1 ¶ 35. Case made three court appearances, Pl. Opp. 56.1 ¶ 64, and pleaded guilty to disorderly conduct, Def. 56.1 ¶ 38.

*Jennifer Klein.* Klein was another participant in the protest. *Id.* ¶ 39. She arrived at the intersection of Pine and Nassau Streets by 8:30 a.m. *Id.* ¶ 40. Klein wanted to continue walking onto Nassau to proceed to the Stock Exchange, but police barriers on Nassau blocked access. *Id.* ¶ 44. Defendant Officer Dmitry Tverdokhleb arrived at the intersection. *Id.* ¶ 48. Vehicular traffic could not move through. Tverdokhleb Dep. 63:22–64:23, ECF No. 140-5; Def. 56.1 ¶ 66. As Tverdokhleb was ordered to begin arrests, he observed Klein sitting down in the intersection. *Id.* ¶ 50. Video of the scene shows Klein seated at certain moments. Def. Ex. M, Rivera Video, 1 of 2, No. 329, 02:44, ECF No. 123-13; Def. Ex. N, Kilcoyne Video, VTS_01_3, 04:52, ECF No. 123-14. At around 8:45 a.m., Klein saw Defendant Lieutenant David Groht climb on top of a cement barrier with a bullhorn and instruct people that they "were blocking the street, they were blocking traffic[, and i]f they did not move, they would be arrested." Klein Dep. 21:19–24, ECF No. 140-2; Def. 56.1 ¶¶ 51–52. Klein heard at least four of the dispersal orders. Def. 56.1 ¶ 55. Groht moved from the cement block to the street and continued giving

orders to leave the street. *Id.* ¶ 58. Video of the protest depicts Groht giving orders over a bullhorn to leave the intersection while standing a few feet from Klein, who is shown sitting in the street. *Id.* ¶ 60. Klein was arrested at the intersection sometime after 9 a.m. and charged with disorderly conduct in violation of New York Penal Law §§ 240.20(5) (obstruction of pedestrian or vehicular traffic) and 240.20(6) (failure to obey lawful dispersal order). Def. 56.1 ¶ 74; Pl. Opp. ¶ 148. Tverdokhleb was assigned to process Klein's arrest. Def. 56.1 ¶ 75. She was issued a DAT and later released. *Id.* ¶ 76. Klein accepted an Adjournment in Contemplation of Dismissal ("ACD") to resolve the charges. Pl. Opp. 56.1 ¶ 151.

*Mark Kushneir.* Kushneir also participated in the protest. Def. 56.1 ¶ 82. He arrived in the Wall Street area at approximately 6:30 a.m. *Id.* ¶¶ 83, 84. Kushneir marched toward the Stock Exchange at the front of a group of about 50 to 200 individuals. *Id.* ¶¶ 90–91. As he marched, Kushneir heard police officers telling people to move. *Id.* ¶ 94. Kushneir arrived at the intersection of Broadway and Exchange Place, *id.* ¶ 95, and stood side by side with others holding cardboard signs, *id.* ¶ 96. Defendant Chief of Department Joseph Esposito also stood at that intersection. *Id.* ¶ 97. Esposito gave at least one order for the crowd to disperse. *Id.* ¶ 101. Video footage of the scene begins with Esposito shouting an order through cupped hands while standing in front of Kushneir, directing individuals on the sidewalk to remove themselves "immediately," and "now," or be arrested for disorderly conduct for blocking the sidewalk. Def. Ex. M, Rivera Video, 1 of 2, No. 332, 0:00–0:08; Def. 56.1 ¶ 106. The parties dispute whether Esposito gave additional orders of dispersal prior to the start of filming. Def. 56.1 ¶ 108. About two seconds after the order shown in the video, Esposito instructed officers to make arrests. Def. Ex. M., Rivera Video, 1 of 2, No. 332, 0:08–0:11; Def. 56.1 ¶ 109. Kushneir was arrested at approximately 9:00 a.m., Def. 56.1 ¶ 110, charged with disorderly conduct in violation of New

York Penal Law § 240.20(5) (obstruction of pedestrian or vehicular traffic), *id.* ¶ 111; Pl. Opp. ¶ 249, and issued a DAT, Def. 56.1 ¶ 111. Defendant Officer Michael Maldonado processed Kushneir's arrest and swore out Kushneir's criminal court complaint. *Id.* ¶ 112. Kushneir ultimately accepted an ACD to resolve the charges. *Id.* ¶ 114.

## DISCUSSION

I.  Legal Standard

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party initially bears the burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). If the nonmoving party has the ultimate burden of proof on specific issues at trial, the movant may also satisfy its own summary-judgment burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact. *Celotex*, 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*, 315 F.3d at 105. In deciding the motion, the Court views the record in the light most favorable to the nonmoving party. *Koch*, 287 F.3d at 165.

II.      <u>Analysis</u>

      A.  Fourth Amendment False Arrest

Kushneir alone asserts a false arrest claim.  "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, . . . is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted).  "Under New York law, a plaintiff claiming false arrest must show, *inter alia*, that the defendant intentionally confined him without his consent and without justification." *Id.*  "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." *Id.* (internal quotation marks and citation omitted).  "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.*  "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Id.* (internal citations omitted).

Defendants assert the existence of probable cause for arresting Kushneir under either New York Penal Law §§ 240.20(5) or 240.20(6).  Viewing the record in the light most favorable to Plaintiffs, the Court concludes that triable issues of material fact remain as to whether Esposito had probable cause to arrest Kushneir for violations of either offense.  The Court addresses each offense in turn.

Section 240.20(5) provides that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e obstructs vehicular or pedestrian traffic." N.Y. Penal Law § 240.20(5).  The

Second Circuit requires a showing that the putative offender was "actually and immediately blocking" the pedestrian or vehicular traffic in question. *Zellner v. Summerlin*, 494 F.3d 344, 372 (2d Cir. 2007). Further, "New York courts have interpreted this statute to permit punishment only where the conduct at issue does more than merely inconvenience pedestrian or vehicular traffic." *Jones v. Parmley*, 465 F.3d 46, 59 (2d Cir. 2006). Where, as here, a disorderly conduct statute is applied in the context of "political demonstrations and protests— activities at the heart of what the Bill of Rights was designed to safeguard," First Amendment considerations come into play. *Id.* at 56. "Indeed, the [Supreme] Court has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they . . . simply fear possible disorder." *Papineau v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006).

The testimonial evidence does not establish that Kushneir was blocking pedestrian traffic at the time of arrest.[3] Esposito testified that Kushneir was part of a group of individuals preventing others from walking on the street, Esposito Dep. 75:4–76:17, ECF No. 140-8, and Maldonado testified that people remained in the street where Kushneir was later arrested despite police warnings to move, Maldonado Dep. 48:6–7, ECF No. 140-7. In contrast, Kushneir testified that there were no pedestrians on the sidewalk where he was arrested. Kushneir Dep. 30:24–31:3, ECF No. 140-3.

Nor does the video footage resolve the disputes. Although the video depicts individuals gathered on a sidewalk, Kushneir among them, it does not show any pedestrians attempting to pass at any moment prior to Kushneir's arrest. Def. Ex. M, Video No. 332, 0:00–0:10. The video footage is also inconclusive as to whether Kushneir, when he was arrested, was merely

---

[3] Kushneir was not in the roadway, and as such was not blocking vehicular traffic. Def. Ex. M, Video No. 332, 0:00–0:10.

pausing during the procession of protestors as he testified, or standing and impeding pedestrian traffic as alleged in the criminal complaint. *See* Kushneir Dep. 34:11 (testifying that he was only at the location of arrest for approximately twenty to forty seconds prior to arrest); 27:14–28:5 (testifying that he had been walking prior to the arrest); 29:25–30:3 (testifying that he had intended to keep marching had he not been arrested). Therefore, the issue of whether Kushneir was "actually and immediately blocking" pedestrian traffic is a matter to be determined by a jury. *Zellner*, 494 F.3d at 372.

The same is true of Defendants' assertion of a probable cause defense under § 240.20(6). Section 240.20(6) states that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [he] congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse."[4] N.Y. Penal Law § 240.20(6). "[W]hether the police had probable cause to arrest [the plaintiff] for defying a police order turns on two factors. The first is whether, and to what extent, the police communicated their orders to the entire crowd." *Dinler v. City of New York*, No. 04 Civ. 7921, 2012 WL 4513352, at *10 (S.D.N.Y. Sept. 30, 2012) (citing *Vodak v. City of Chicago*, 639 F.3d 738, 745 (7th Cir. 2011) ("[B]efore the police could start arresting peaceable demonstrators for defying their orders they had to communicate the orders to the demonstrators.")). "The second is whether the demonstrators were given an opportunity to comply with those orders—that is, whether they indeed refused to do so." *Id.*; *see also Adams v. City of New York*, No. 15 Civ. 6741, 2016 WL 1169520, at *3 (S.D.N.Y. Mar. 22, 2016) ("Section 240.20(6) requires that, in addition to the requisite intent, an arrestee must refuse to

---

[4] Although Kushneir was charged only under § 240.20(5), the offense for which a plaintiff was arrested "need not be the same as" the offense later cited as providing probable cause for the arrest. *Garcia v. Does*, 779 F.3d 84, 90 n.7 (2d Cir. 2014).

comply with a lawful dispersal order.").

Here, Kushneir and Esposito dispute whether the dispersal orders were sufficiently communicated to Kushneir and whether he was given an adequate opportunity to comply. *See* Kushneir Dep. 33:23–25 (testifying that Esposito was in front of Kushneir for about fifteen seconds prior to Kushneir's arrest), 34:8–11 (testifying that Kushneir was only at the location of arrest for approximately twenty to forty seconds prior to his arrest), 28:19–29:2 (testifying that Kushneir did not hear any "intelligible" order to disperse immediately prior to his arrest), 29:8–24 (testifying that Kushneir heard Esposito yelling and that then Kushneir was arrested "next thing I know"); Esposito Dep. 86:4–17 (testifying that another officer gave a pre-scripted order to disperse prior to Esposito's own "final" order, but that Esposito could not recall who that officer was), 88:17–89:4 (testifying that it was not Esposito's "general practice" to use a police bullhorn to communicate his orders, and, when asked why it was not his practice, responding, it was "[s]omeone else's job. I'm the chief of department."), 89:5–13 (testifying that Esposito did not remember why he chose not to use a bullhorn), 91:12–19 (testifying that Esposito provided "[n]ot much time at all" for people to comply with his order to disperse, and that only "seconds" elapsed between his own order of dispersal and his order of arrest).[5]  Again, the video footage is inconclusive on these competing accounts, and resolving the conflicting versions of events is for the jury, not the Court.  *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  Because these disputed facts are material to Esposito's probable cause defense, summary judgment is inappropriate as to Kushneir's false arrest claim.

Defendants argue that, even if the officers lacked probable cause to arrest Kushneir, they

---

[5]  *Cf. Dinler*, 2012 WL 4513352, at *11 ("Because the marchers had no opportunity to comply with [the officer's] so-called dispersal order, the Court finds that there was no probable cause to arrest even protesters at the *front* of the march who might have been able to hear the order." (granting plaintiffs' motion for summary judgment on their false arrest claim)).

are entitled to qualified immunity. Def. Mem. at 17–20, ECF No. 125. A qualified immunity

defense against a false arrest claim requires a showing of "arguable probable cause." *Zalaski v.*

*City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013). "Arguable probable cause exists if either

(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b)

officers of reasonable competence could disagree on whether the probable cause test was met."

*Id.* at 390. The Court cannot conclude, based on this record, that either factor is met. Testimony

regarding whether Kushneir was actually blocking pedestrian traffic is sharply disputed, as is

whether orders to disperse were adequately communicated before Esposito ordered Kushneir's

arrest. Because the facts underlying arguable probable cause are contested, and because such

factual disputes prevent evaluation of the reasonableness of the officer's actions, *McKelvie v.*

*Cooper*, 190 F.3d 58, 63 (2d Cir. 1999), summary judgment on qualified immunity grounds is

not appropriate.

    Accordingly, Defendants' motion for summary judgment on Kushneir's false arrest claim

against Esposito and Maldonado is DENIED.

### B. Sixth Amendment Fair Trial

    To prevail on a claim for denial of the constitutional right to a fair trial, a plaintiff must

demonstrate that "(1) an investigating official (2) fabricates information (3) that is likely to

influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff

suffers a deprivation of life, liberty, or property as a result." *Caravalho v. City of New York*, 732

F. App'x 18, 24 (2d Cir. 2018) (internal quotation marks, citation, and alterations omitted). The

information must be "both false *and* likely to influence a jury's decision." *Garnett v.*

*Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016) (emphasis added). Statements

made in charging instruments, such as a criminal complaint, can be actionable. *Marom v. City of*

*New York*, No. 15 Civ. 2017, 2016 WL 5900217, at \*1–3 (S.D.N.Y. July 29, 2016). A trial is not a prerequisite for such a claim. *Schiller v. City of New York*, No. 04 Civ. 10178, 2008 WL 200021, at \*10 (S.D.N.Y. Jan. 23, 2008), *aff'd*, No. 04 Civ. 7922, 2009 WL 497580 (S.D.N.Y. Feb. 27, 2009) (collecting cases). Instead, where plaintiff never proceeded to trial, the question is if the allegedly false information is material such that it would "likely influence the jury *if* it arrived at a jury." *Garnett v. Undercover Officer C0039*, No. 13 Civ. 7083, 2015 WL 1539044, at \*8 (S.D.N.Y. Apr. 6, 2015).[6] Moreover, courts in this District have held that "spending a number of hours in jail constitutes a sufficient deprivation of liberty, as has the obligation to attend numerous follow-up court appearances." *Marom v. Blanco*, No. 15 Civ. 2017, 2019 WL 3338141, at \*7 (S.D.N.Y. July 25, 2019) (internal quotation marks, citation, and alterations omitted).

Defendants argue that the record does not support Plaintiffs' allegation that officers created false information or that Plaintiffs suffered liberty deprivations as a result of such allegedly false information. Def. Mem. at 27. The Court agrees in part. Case, Klein, and Kushneir's fair trial claims are addressed in turn.

### 1. Case

Almonte swore out a criminal court complaint stating that he observed Case failing to comply with repeated lawful orders to disperse from the intersection, sitting on the roadway after dispersal orders were given, and obstructing vehicular traffic. Def. Ex. R, ECF No. 123-18; Def. 56.1 ¶ 34. Specifically, the complaint alleges that Case was "seated on the ground," with "both of defendant's arms interlocked" with others, and that "when police officers attempted to

---

[6] As noted in the February 2017 Order, a plaintiff's guilty plea in the prior proceeding does not preclude her from pursuing a § 1983 claim based on the right to a fair trial. *Case*, 233 F. Supp. 3d at 388 n.10 (citing *Powers v. Coe*, 728 F.2d 97, 102 (2d Cir. 1984)).

separate [Case] from said other persons, [Case] tightened [his] arms to prevent [Almonte] from removing [Case] from said other persons." Def. Ex. R. Case, however, disputes that he blocked vehicular traffic or refused to leave, and argues that, although the video footage shows that he interlocked arms with others while standing, he did not interlock arms while seated, and, therefore, was not tightening his arms when arrests began. Pl. Mem. at 27–28, ECF No. 136. Case claims, moreover, that Almonte did not actually observe or arrest him. Pl. Mem. at 27.

Despite conflicting accounts of the events leading to the arrest, the Court concludes that Case did not experience a liberty deprivation due to an allegedly false statement. Video footage depicts Case seated on the ground after officers issued repeated orders of dispersal over a bullhorn. Ex. M, Rivera Video, 2 of 2, No. 340, 1:10–2:15. Case testified to hearing dispersal orders and then sitting down in the intersection. Case Dep. 33:10–13 ("I remember showing up at that corner, and then I remember hearing those orders. A number of people around us sat down, and we sat down . . . ."), ECF No. 140-1; *see also id.* 33:16–18 (Case testifying that, while standing, he had locked arms with other protestors at the intersection prior to arrest). Moreover, Almonte merely testified that he could not "recall" his observations, Almonte Dep. 125:10–17, not that he did not in fact observe Case's pre-arrest conduct, as Plaintiffs assert, Pl. Mem. at 27. The record, therefore, bears out the substance of the charges in Case's criminal court complaint.

As such, although Case experienced a liberty deprivation, *see* Def. 56.1 ¶ 120 (13 hours of post-arrest detention); Pl. Opp. 56.1 ¶ 64 (three court appearances in connection with his charges), the Court concludes that such deprivation did not stem from a false statement that would have influenced a jury. The "material substance" of Case's criminal complaint "can be proven by other, more persuasive evidence," namely, the record evidence noted above. *Marom*, 2019 WL 3338141, at *9 (dismissing fair trial claim).

Accordingly, Defendants' motion for summary judgment on Case's fair trial claim against Papola and Almonte is GRANTED.

### 2. Klein

Klein was handcuffed by one officer, and then handed over to Tverdokhleb, who was assigned to process her arrest. Def. 56.1 ¶ 74. Tverdokhleb testified that, as he was ordered to begin arrests, he observed Klein sitting down at the intersection. *Id.* ¶ 50. Klein does not dispute that she was seated and heard at least four orders to disperse. *Id.* ¶¶ 55, 60. Tverdokhleb swore out a criminal court complaint charging Klein with disorderly conduct in violation of §§ 240.20(5) and 240.20(6). Pl. Opp. 56.1 ¶¶ 147–48.

The Court cannot conclude that there is a genuine issue of material fact as to whether the allegations were false in substance. The record shows that Klein was among a large group of individuals in the roadway and remained there after hearing orders to leave. Klein Dep. 21:19–24; Def. 56.1 ¶¶ 51–52, 55, 60. Although Klein insists that a reasonable jury could find that Tverdokhleb did not see any of Klein's pre-arrest conduct, Pl. Mem. at 29, the evidence—Tverdokhleb's testimony, video footage depicting Klein's location and seated position, Def. Ex. M, Rivera Video, 1 of 2, No. 329, 02:44; Def. Ex. N, Kilcoyne Video, VTS_01_3, 04:52, and Klein's testimony that she was seated in the roadway at times and heard at least four orders to disperse but remained, Klein Dep. 21:19–24; Def. 56.1 ¶¶ 51–52, 55, 60—supports the allegations in the criminal complaint. Klein experienced a liberty deprivation, *see* Def. 56.1 ¶ 121 (13 hours of post-arrest detention); Pl. Opp. 56.1 ¶ 148 (five court appearances in connection with her charges), but the Court concludes that such deprivation did not arise from a false statement that would have influenced a jury. *See Marom*, 2019 WL 3338141, at *8–9.

In sum, viewing the evidence in the light most favorable to Klein, the Court concludes

that the record demonstrates that the allegations in Klein's criminal court complaint, as with Case, are in substance "true and accurate, even though," or if, "they were based on information given to them by other officers." *Marom*, 2016 WL 5900217, at *1–3.

Accordingly, Defendants' motion for summary judgment on Klein's fair trial claim against Groht and Tverdokhleb is GRANTED.

### 3. Kushneir

Turning to Kushneir, the parties agree that Esposito gave at least one dispersal order, Def. 56.1 ¶ 101, and that video footage depicts Esposito shouting such an order through cupped hands while standing in front of Kushneir, *id.* ¶ 106. But, the parties dispute whether Kushneir understood Esposito, *see id.* ¶ 106; Pl. Opp. 56.1 ¶ 170, and, whether Kushneir heard any orders directing him to disperse immediately prior to his arrest. *Compare* Def. 56.1 ¶¶ 99, 105, 106 (parties disputing whether Kushneir heard Esposito's orders to disperse before he was arrested), *with id.* ¶ 94 (Kushneir admitting that he heard officers telling "other people to move" at various points along the march route). Kushneir disputes Maldonado's statement in the criminal complaint that Maldonado witnessed Kushneir's pre-arrest conduct, *id.* ¶ 113, claiming that he was arrested by an unidentified police officer, Pl. Opp. 56.1 ¶ 174. Given that Kushneir was detained for 12 hours, Def. 56.1 ¶ 122, and appeared twice in court, *id.* ¶ 114, he experienced an actionable liberty deprivation.

In considering Kushneir's false arrest claim, the Court holds that triable facts remain as to whether probable cause existed for his arrest. Those disputed facts are also material to Kushneir's fair trial claim. Whether the substance of the allegations in his criminal court complaint is true and accurate, and whether Maldonado saw Kushneir's pre-arrest conduct, are unresolved factual questions that have direct bearing on the lawfulness of Kushneir's liberty

deprivation.

"Qualified immunity is unavailable on a claim for denial of the right to a fair trial where that claim is premised on proof that a defendant knowingly fabricated evidence and where a reasonable jury could so find." *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015); *see also Jovanovic v. City of New York*, No. 04 Civ. 8437, 2006 WL 2411541, at *13 (S.D.N.Y. Aug. 17, 2006) ("The right to a fair trial free of fabricated evidence is basic to our Constitution and was clearly established at the time that [the Defendant] allegedly acted. Any reasonable officer would have known that [p]laintiff's rights would be violated by . . . making false statements to prosecutors." (citation omitted)). Here, because of material factual disputes, the reasonableness of Esposito and Maldonado's actions cannot be evaluated, making a finding of qualified immunity inappropriate. *McKelvie*, 190 F.3d at 63; *see also Knox v. Cnty. of Putnam*, No. 10 Civ. 1671, 2012 WL 4462011, at *4 n.13 (S.D.N.Y. Sept. 27, 2012) (citation omitted) ("[W]here . . . there is a triable question of fact as to whether [the] [d]efendant knowingly misrepresented the evidence to prosecutors in relation to the issue of probable cause, the Court cannot make a determination as to qualified immunity on a motion for summary judgment."). The Court cannot conclude that Esposito and Maldonado are entitled to qualified immunity.

Accordingly, Defendants' motion for summary judgment on Kushneir's fair trial claim against Esposito and Maldonado is DENIED.

### C. First Amendment Time, Place, and Manner

Plaintiffs have withdrawn their First Amendment retaliation claim, Oliver Decl. ¶ 3, but continue to pursue their time, place, and manner claim. Plaintiffs challenge the time, place, and manner restrictions imposed by "police orders actually or allegedly given before each Plaintiff's arrest." Pl. Mem. at 22. Plaintiffs argue that those restrictions were "overbroad to serve the

asserted governmental interests." *Id.*

"Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). The government may impose such restrictions in public forums such as streets, sidewalks, and parks, *see Snyder v. Phelps*, 562 U.S. 443, 456 (2011); *Hotel Emps. & Rest. Emps. Union v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 544–45 (2d Cir. 2002), if they (1) are content-neutral, or "justified without reference to the content of the regulated speech," (2) "are narrowly tailored to serve a significant governmental interest," and (3) "leave open ample alternative channels for communication of the information," *Clark*, 468 U.S. at 293. "[T]he Second Circuit has recognized that a spontaneous police order to demonstrators to relocate can be viewed through the lens of time, place, and manner doctrine." *Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 548 (E.D.N.Y. 2015) (citing *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013)).

In the February 2017 Order, the Court held that qualified immunity was inappropriate at the motion to dismiss stage because further factual development was required. *Case*, 233 F. Supp. 3d at 394 (citing *Occupy Columbia v. Haley*, 738 F.3d 107, 124–25 (4th Cir. 2013)). Defendants now renew their claim of qualified immunity. Def. Mem. at 22–23. With the benefit of additional factual development, the Court again considers this argument. *See McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 277 (2d Cir. 1999) ("[I]t is not necessary for a district court to determine whether in fact the First Amendment was violated before deciding whether a defendant is entitled to qualified immunity.").

To begin, there are no material disputes as to the facts underlying the question of qualified immunity. The parties agree that the congregation of protestors on the morning of

November 17, 2011 was sizable, and that the crowd was, at times, at a standstill in the middle of sidewalks and roadways. *See* Case Dep. 34:7–8 (testifying that "[t]here were a lot of people there" at the protest); *id.* at 33:10–15 (testifying that "[a] number of people around us sat down, and we sat down" in the intersection of Williams and Beaver Streets); Klein Dep. 20:2–4 (testifying that Klein was in a crowd of "[o]ver 200" individuals); *id.* 38:6–11 (testifying that Klein decided to remain standing in the intersection of Pine and Nassau Streets in hopes that the march would proceed); Kushneir Dep. 26:5–8 (testifying that Kushneir was at the front of a crowd "anywhere from 50 to 200 people"). In addition to the large crowds, video footage shows pedestrians and vehicles attempting, unsuccessfully, to access the sidewalks and roadways at certain moments, individuals standing or sitting in the roadway for stretches of minutes, and a sometimes-chaotic atmosphere. *See* Def. Exs. M & N.

The Court is mindful that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). Given the totality of the circumstances, the Court cannot say that the Individual Defendants' "judgment was so flawed that no reasonable officer would have made a similar choice" when deciding whether and how to regulate the public's movements at the protest. *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001) (internal quotation marks omitted). The Court, therefore, holds that, "for qualified immunity purposes, the officers" did not "invad[e] Plaintiffs' clearly established rights of association, assembly, and free exercise, as they were executing . . . order[s] to disperse—a permissible time, place, and manner restriction on speech in a public area." *Mesa v. City of New York*, No. 09 Civ. 10464, 2013 WL 31002, at *23 (S.D.N.Y. Jan. 3, 2013); *see also Collins v. City of New York*, 295 F. Supp. 3d 350, 363 (S.D.N.Y. 2018), *reconsideration denied*, No. 14 Civ. 08815, 2019 WL 1413999 (S.D.N.Y. Mar.

29, 2019) ("Defendants are entitled to qualified immunity because it was not clearly established that an order temporarily banning demonstrators from a densely crowded sidewalk violated the First Amendment."). The substantial crowd presence at Plaintiffs' arrest locations justified Defendants' asserted need to regulate the demonstrators' movement (or, at times, their refusal to leave).

Accordingly, Defendants' motion for summary judgment on the First Amendment time, place, and manner claim against the Individual Defendants is GRANTED. Below the Court addresses the City's liability for the same.

### D. *Monell* Liability

Municipalities can be held liable under § 1983 for constitutional violations caused by "action[s] pursuant to official municipal policy of some nature." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). "Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom or policy of the municipality." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013).

In the February 2017 Order, the Court denied Defendants' motion to dismiss Plaintiffs' claims against the City as to Fourth Amendment false arrest, Sixth Amendment fair trial, and First Amendment time, place, and manner. *Case*, 233 F. Supp. 3d at 408.[7] Plaintiffs continue to pursue causes of action against the City for (1) failure-to-train under policies 2–5 listed in the Court's February 2017 Order, and (2) the No-Summons Policy. Oliver Decl. at 1–2 (citing *Case*, 233 F. Supp. 3d at 407). The Court addresses municipal liability for each in turn.

---

[7] The Court also denied Defendants' motion to dismiss Plaintiffs' Fourth Amendment excessive detention and First Amendment retaliation claims against the City, *Case*, 233 F. Supp. 3d at 408, but Plaintiffs have withdrawn those claims, *see* Oliver Decl. ¶ 3.

1. Failure to Train

A failure to train or supervise employees about citizens' constitutional rights can constitute an official government policy, but only if it amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact. *Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018*)* (internal quotation marks and citation omitted). To demonstrate that a failure to train constitutes "deliberate indifference," a plaintiff must satisfy three elements: (1) that a policymaker knows to a "moral certainty" that employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights. *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d. Cir. 2007) (internal quotation marks and citation omitted). "In addition, at the summary judgment stage, plaintiffs must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006) (internal quotation marks and citation omitted). The Court addresses each of the three elements required for a failure-to-train theory in turn.

First, Defendants argue that Plaintiffs' citation to various lawsuits brought against the City does not establish proof of notice for deliberate indifference purposes. Def. Reply at 17–18. In the February 2017 Order, the Court concluded that Plaintiffs' reference to these lawsuits was sufficient to establish proof of notice for deliberate indifference to withstand a 12(b)(6) motion. *Case*, 233 F. Supp. 3d at 405–06. And at summary judgment, the existence of other lawsuits can raise at least a factual issue as to the notice prong, because "deliberate indifference may be

inferred if [legal] complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall other incidents." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *see also Outlaw*, 884 F.3d 351, 380 (2d Cir. 2018) ("*Monell* liability, by its nature, will often turn on evidence concerning victims other than the plaintiffs and alleged misfeasors other than the individual defendants"). Here, the Court holds that the number and persistence of legal challenges brought, sometimes resulting in plaintiffs' verdicts and other times in settlements, is sufficient to create a jury question on the issue of notice. *See Case*, 233 F. Supp. 3d at 405–06 (collecting cases); *id.* (citing Compl. ¶ 26).

The second element of a failure-to-train theory requires that Plaintiffs "show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." *Jenkins*, 478 F.3d at 94. Policing demonstrators presents hard questions. A jury could conclude that the substance of Plaintiffs' complaint describes the kind of situation where training or supervision will make addressing the "difficult choice[s]" inherent in policing large demonstrations "less difficult." *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992); *see also Vasconcelloes v. City of New York*, No. 12 Civ. 8445, 2016 WL 403474, at *3 (S.D.N.Y. Jan. 28, 2016) ("A choice might also be difficult where, although the proper course is clear, the employee has powerful incentives to make the wrong choice." (quoting *Walker*, 974 F.2d at 297) (internal quotation marks omitted)). Further, whether there has been a "history of employees mishandling the situation," *Walker*, 974 F.2d at 297, is an issue contested by the parties. The Court concludes, therefore, that disputed questions of material fact remain as to the second element.

The third element is causation. "[I]t is not enough for a § 1983 plaintiff merely to

identify conduct properly attributable to the municipality." *Bd. of Cty. Comm'rs of Bryan Cty., Okl.*, 520 U.S. at 404. "The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the '*moving force*' behind the injury alleged." *Id.* (emphasis added). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

To establish causation, Plaintiffs claim that the City's training of police officers was constitutionally deficient because of the following four policies and practices:

(1) "The policy and practice of failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to effecting arrests in connection with First Amendment assemblies" (the "Dispersal Orders Policy");

(2) "The policy and practice of treating perceived 'groups' of people as a 'unit' for 'mass arrest' probable cause determination purposes without ensuring that lawfully authorized and constitutionally significant notice, and a meaningful opportunity to disperse, were given and disregarded prior to treating the perceived 'group' as a 'unit'" (the "Group Probable Cause Policy");

(3) "The policy and practice of applying New York Penal Law § 240.20(5) (Disorderly Conduct—Blocking Pedestrian or Vehicular Traffic) in connection with actual or perceived protest activity in circumstances where the person arrested neither created nor recklessly risked substantial disruption of vehicular or pedestrian traffic or other criminally significant public ramifications" (the "§ 240.20(5) Policy");

(4) "The policy and practice of applying New York Penal Law § 240.20(6) (Disorderly

Conduct—Failure to Obey Lawful Dispersal Order) in connection with actual or

perceived protest activity in circumstances where neither lawful dispersal orders, nor

meaningful opportunities to disperse, were in fact given" (the "§ 240.20(6) Policy").

*Case*, 233 F. Supp. 3d at 406–07 (quoting Compl. ¶ 361 (internal quotation marks omitted)).

Defendants argue that the allegedly deficient policies were not the "moving force," or

cause, behind Plaintiffs' injuries. Def. Reply at 18–19 (internal quotation marks and citation

omitted). The Court agrees in part, and shall address the surviving constitutional claims in turn.

a. Kushneir's False Arrest Claim

Plaintiffs argue that a jury could find that the City disregarded the obvious consequences

of failing to train officers on disorderly conduct arrests. Pl. Mem. at 34. Viewing the record in

the light most favorable to Plaintiffs, the Court agrees. The record—including the deposition

testimony of Federal Rule of Civil Procedure 30(b)(6) witnesses Officer Shurland Marshall, ECF

No. 140-10, and Deputy Inspector Anthony Raganella, ECF No. 140-9, and training materials,

*e.g.*, Marshall Dep. Ex. 34, ECF No. 140-53—leaves unresolved the material question of whether

a direct causal link exists between a City policy and Kushneir's false arrest claim. *See also, e.g.*,

Pl. Opp. 56.1 ¶ 314 (noting lack of evidence that the NYPD trains officers in the manner in

which to inform demonstrators they must move or disperse), ¶ 288 (lack of evidence with respect

to how many warnings to give before taking enforcement action), ¶¶ 289, 315, 342 (same with

length of time for providing meaningful opportunity for compliance). The Court concludes,

therefore, that Plaintiffs have made the requisite showing of specific training deficiencies, and

that the Dispersal Orders Policy's causal relationship to Kushneir's false arrest claim is a triable

question for the jury.

The Court also concludes that a triable question remains as to whether the §§ 240.20(5) and 240.20(6) Policies are the moving force behind Kushneir's false arrest. The question of whether the City failed to train officers with respect to providing (1) adequate dispersal notice and (2) a meaningful opportunity to comply with such notice goes to the heart of the elements of New York Penal Law §§ 240.20(5) and 240.20(6). *See, e.g.*, A.R. 27, ECF No. 140-47 (December 7, 2012 NYPD lesson plan on disorder control training); A.R. 50, ECF No. 140-50 (May 14, 2011 NYPD lesson plan on disorder control guidelines). Plaintiffs have met their burden of identifying specific training deficiencies, *see* Pl. Mem. at 34–37, and a jury may conclude that the adequacy of such training has a direct causal link to Kushneir's false arrest. The Court will, therefore, allow the question of causation on Kushneir's false arrest claim for municipal liability to proceed under the §§ 240.20(5) and 240.20(6) Policies as well.

The Group Probable Cause Policy, however, is different.[8] Testimony indicates that the NYPD trains its officers on the need for individualized suspicion. *E.g.*, Raganella Dep. 204:2–206:4, 207:6–9, 207:12–208:6, ECF No. 140-9. Plaintiffs find fault in the fact that no *written* guidelines could be identified, even though training is provided through other means. Pl. Mem. at 36. But "failure-to-train liability is concerned with the substance of the training, not the particular instructional format," *Connick v. Thompson*, 563 U.S. 51, 68 (2011), and Plaintiffs do not indicate how unwritten guidelines fail to pass constitutional muster, *see Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 255 (E.D.N.Y. 2014) ("Although plaintiff takes issue with the amount or format of the training provided[,] that cannot establish deliberate indifference as a matter of

---

[8] As defined above, the Group Probable Cause Policy refers to "the policy and practice of treating perceived 'groups' of people as a 'unit' for 'mass arrest' probable cause determination purposes without ensuring that lawfully authorized and constitutionally significant notice, and a meaningful opportunity to disperse, were given and disregarded prior to treating the perceived 'group' as a 'unit.'"

law.").  Nor have Plaintiffs pointed to any other evidence that suggests that the training was constitutionally deficient.  *Connick*, 563 U.S. at 68 ("[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.").

The Court concludes, therefore, that Plaintiffs have failed to identify a triable issue of causation based on the Group Probable Cause Policy.  However, as a jury may find a causal link between Kushneir's false arrest claim and the Dispersal Orders, §§ 240.20(5), and 240.20(6) Policies, Kushneir's claim may proceed against the City under those theories.

Accordingly, the Defendants' motion for summary judgment on Kushneir's false arrest claim against the City is DENIED.

### b.  Kushneir's Fair Trial Claim[9]

The Court concludes that no triable questions remain on municipal liability for Kushneir's fair trial claim.  Plaintiffs have not demonstrated a causal link between Kushneir's fair trial claim, on the one hand, and the Dispersal Order, §§ 240.20(5), and 240.20(6) Policies, on the other.  *See* Pl. Mem. at 34–37.  Nor does the Court discern one.  *Cf. Bd. of Cty. Comm'rs of Bryan Cty., Okl.*, 520 U.S. at 415 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability.").  Furthermore, because the Court has already concluded that Plaintiffs' Group Probable Cause Policy cannot stand, Plaintiffs cannot establish municipal liability under that theory.  As such, there are no triable issues of fact remaining with respect to Kushneir's fair trial claim against the City.

Accordingly, Defendants' motion for summary judgment on the fair trial claim against

---

[9]  Because the Court grants summary judgment to Defendants on Case and Klein's fair trial claims above, Case and Klein have no underlying constitutional violations for which the City can be held liable.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

the City is GRANTED.

                        c.   Case, Klein, and Kushneir's Time, Place, and Manner Claim

It is well-settled that "[q]ualified immunity is a defense available only to individuals sued in their individual capacity," and "municipalities have no immunity from damages for liability flowing from their constitutional violations." *Askins*, 727 F.3d at 254 (internal quotation marks and citation omitted). "Municipalities are held liable if they adopt customs or policies that violate federal law and result in tortious violation of a plaintiff's rights, regardless of whether it was clear at the time of the adoption of the policy or at the time of the tortious conduct that such conduct would violate the plaintiff's rights." *Id.* Therefore, the Court must examine separately the City's liability for Plaintiffs' First Amendment time, place, and manner claim even where Individual Defendants are entitled to qualified immunity.

As a threshold matter, the Court addresses the existence of the underlying constitutional violation. *Burgess v. DeJoseph*, 725 F. App'x 36, 40 (2d Cir. 2018) (affirming lack of municipal liability where no underlying constitutional claim survives). The government may regulate the time, place, and manner of expression so long as the regulations (1) are content-neutral, or "justified without reference to the content of the regulated speech," (2) "are narrowly tailored to serve a significant governmental interest," and (3) "leave open ample alternative channels for communication of the information." *Clark*, 468 U.S. at 293.

Plaintiffs challenge the time, place, and manner restrictions imposed by "police orders actually or allegedly given before each Plaintiff's arrest." Pl. Mem. at 22. The parties agree that these restrictions were content-neutral, *see also Case*, 233 F. Supp. 3d at 392, and that the government has a compelling interest in public safety and regulating the sidewalks and streets. They differ, however, on whether Defendants' restrictions (1) were narrowly tailored, and (2)

provided ample alternative channels of communicating their expression.  *See* Def. Mem. at 20–
23; Pl. Mem. at 22–26.

A regulation is narrowly tailored so long as it "promotes a substantial government
interest that would be achieved less effectively absent the regulation," and is "not substantially
broader than necessary to achieve the government's interest."  *Ward v. Rock Against Racism*,
491 U.S. 781, 799–800 (1989) (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).
And, as this Court observed in the February 2017 Order, particular considerations arise when a
police officer's oral order is issued in the field, such that heightened review may be required.
*Case*, 233 F. Supp. 3d at 393 (discussing *McTernan v. City of York*, 564 F.3d 636, 655–56 (3d
Cir. 2009)).  Without reaching the question of whether *McTernan*'s "more searching" review of
the narrow tailoring prong applied, this Court held in the February 2017 Order that the complaint
adequately alleged a lack of "narrow tailoring" and "ample alternative channels of
communication" sufficient to survive the motion to dismiss under a less demanding level of
review.  *Case*, 233 F. Supp. 3d at 394.

Considering the issue again with further factual development, the Court concludes that
Plaintiffs' time, place, and manner claim against the City cannot survive summary judgment.
The Court first resolves whether the disputes are material.  The parties dispute the cause of
Plaintiffs' complained-of inability to reach their intended destinations.  Defendants contend that
video footage of the locations where Plaintiffs were arrested "demonstrates that the turnout of
people on November 17th was so large that it was unavoidable that substantial numbers of
demonstrators would be unable to access the area surrounding the New York Stock Exchange."
Def. Mem. at 21.  Plaintiffs, however, argue that it was not the size of the crowd, but rather the
officers' restrictions on the time, place, and manner of protest, that limited their access to the

Wall Street vicinity. Pl. Mem. at 25. Plaintiffs claim that the government, "in sum and substance" "bann[ed] demonstrators from the Wall Street area," which was the "intended target of their protests." *Id.*

Even under Plaintiffs' asserted version of events, however, the restrictions were not as a matter of law substantially broader than necessary to achieve the government's interest. The record is undisputed as to the sizable crowds, and their presence on roadways and sidewalks during morning rush hour traffic in lower Manhattan. *See* Case Dep. 33:10–15; 34:7–8; Klein Dep. 20:2–4; 38:6–11; Kushneir Dep. 26:5–8; Def. Exs. M & N. Courts have recognized a compelling governmental need in "ensuring the public safety and order" and "promoting the free flow of traffic on public streets and sidewalks." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994). The challenged regulations—the officers' orders to disperse—furthered those ends. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800. In other words, "a regulation of the time, place, or manner of protected speech . . . need not be the *least* restrictive or *least* intrusive means of doing so." *Id.* at 798; *cf. Collins*, 295 F. Supp. 3d at 363–64 (noting that courts in this District have held that similar "spontaneous police orders to demonstrators to relocate . . . were constitutional restrictions on the time, place, or manner of the Occupy Wall Street demonstrations" (alterations omitted) (collecting cases)).

Moreover, no triable issue of material fact remains on the question of whether Plaintiffs were provided ample alternative channels of communication. Plaintiffs argue that they should have been afforded "another location within sight and sound," and point to the "close proximity"

27

language in *Marcavage v. City of New York* in support of their argument that the regulations lacked narrow tailoring and ample alternative channels. 689 F.3d 98, 108 (2d Cir. 2012). *Marcavage*, however, compels the contrary conclusion.

The Second Circuit in *Marcavage* affirmed a grant of summary judgment to the City and individual officers on, among other things, a First Amendment time, place, manner claim brought by protestors at the 2004 Republican National Convention. *Id.* at 109. Protestors in *Marcavage*, like Plaintiffs here, argued that the demonstration zone they were directed to by officers "was not within sight and sound of the Convention attendees." *Id.* at 102. The Second Circuit rejected that argument, holding that none of the cases cited "support a holding that sight and sound access is constitutionally compelled." *Id.* at 108. Instead, "[i]n this Circuit, an alternative channel is adequate and therefore ample if it is within 'close proximity' to the intended audience." *Id.* at 107.

Here, Plaintiffs were able to approach within a couple blocks of their intended audience, the New York Stock Exchange. Def. 56.1 ¶¶ 12, 40, 95.[10] The Court concludes, therefore, that Plaintiffs' alternative channels were adequate. "[T]he First Amendment does not guarantee protesters access to every or even the best channels or locations for their expression." *Marcavage*, 689 F.3d at 107 (internal quotation marks and citation omitted). The requirement also "does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs . . . indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed ample." *Costello v. City of Burlington*, 632 F.3d 41, 47 (2d Cir.

---

[10] Kushneir disputes that he intended to march to the Stock Exchange. Def. 56.1 ¶ 82. However, it is undisputed that Kushneir attended the protest in the vicinity of Wall Street, *id.*, and Kushneir testified that his intent was to "kind of bounce around the area," *id.* ¶ 85. As such, for the purposes of the time, place, and manner claim, the Court considers the Wall Street area Kushneir's intended audience, and concludes that Kushneir, like Case and Klein, was not denied adequate alternative channels of communication.

2011) (internal quotation marks and citation omitted). As the Court finds no underlying constitutional violation, it need not reach the question of causation for municipal liability. *Heller*, 475 U.S. at 799.

Accordingly, Defendants' motion for summary judgment on the First Amendment time, place, and manner claim against the City is GRANTED.

### 2. No-Summons Policy

Plaintiffs argue that the No-Summons Policy of not issuing DATs reflects municipal policy underlying the asserted Fourteenth Amendment equal protection and First Amendment violations. Pl. Mem. at 37, 40. The No-Summons Policy, however, is a road to nowhere. The Court dismissed the equal protection claim in the February 2017 Order, *see Case*, 233 F. Supp. 3d at 395, 408, and the Court has granted Defendants' motion for summary judgment on the time, place, and manner claim.[11] As such, Plaintiffs have no underlying constitutional violations for which the City can be held liable under the No-Summons Policy. *Heller*, 475 U.S. at 799.

Accordingly, the Defendants' motion for summary judgment on the No-Summons claim against the City is GRANTED.

## CONCLUSION

For the reasons stated above:

- Defendants' motion for summary judgment on Kushneir's Fourth Amendment false arrest claim against Esposito, Maldonado, and the City is DENIED.

- Defendants' motion for summary judgment on Kushneir's Sixth Amendment fair trial claim against Esposito and Maldonado is DENIED.

---

[11] To the extent Plaintiffs raise a No-Summons Policy municipal liability claim with respect to First Amendment retaliation, the Court reminds Plaintiffs that they have expressly withdrawn such a claim. Oliver Decl. ¶ 3 (withdrawing First Amendment retaliation claim); *see* Pl. Mem. at 37 (citing cases and advancing arguments concerning retaliation, not time, place, and manner).

- Defendants' motion for summary judgment on Case and Klein's Sixth Amendment fair trial claims against Papola, Almonte, Groht, Tverdokhleb, and the City is GRANTED.

- Defendants' motion for summary judgment on Plaintiffs' First Amendment time, place, and manner claims against all Defendants is GRANTED.

- Defendants' motion for summary judgment on Kushneir's Sixth Amendment fair trial claim against the City is GRANTED.

Trial will commence on **May 18, 2020**, at **9:00 a.m.** The Clerk of Court is directed to terminate the motion at ECF No. 122.

SO ORDERED.

Dated:  September 30, 2019
        New York, New York

_____
ANALISA TORRES
United States District Judge